# RECORD NO. 16-1567

In The

# United States Court Of Appeals

## For The Fourth Circuit

**N.O., a minor by Christine Orwig, her Mother and Next Friend; CHRISTINE ORWIG,**

*Plaintiffs – Appellants,*

v.

**MARC ALEMBIK, M.D.; ABOUT WOMEN, OB/GYN, P.C.,**

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

_____

## JOINT APPENDIX
### Volume I of II
### (Pages 1 to 317)

_____

Mikhael D. Charnoff
Scott M. Perry
PERRY CHARNOFF PLLC
2300 Wilson Boulevard
Suite 240
Arlington, VA 22201
(703) 291-6650

Catherine Bertram
Laurie Amell
BERTRAM & AMELL
1100 Vermont Avenue, NW
Suite 500
Washington, DC 20005
(888) 991-5245

J. Jonathan Schraub
Paige L. Smith
SANDS ANDERSON, PC
1497 Chain Bridge Road
Suite 202
McLean, VA 22101
(703) 893-3600

*Counsel for Appellants*        *Counsel for Appellants*        *Counsel for Appellees*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# TABLE OF CONTENTS
## Volume I of II

Page:

Docket Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Complaint**
    filed July 2, 2015.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Defendants' Expert Disclosures Pursuant to**
**Fed. R. Civ. Pro. 26(a)(2)**
    dated November 11, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Exhibits to
Defendants' Memorandum in Support of
Defendants' *Motion in Limine* to Preclude Use of
Medical Literature in Direct Examinations of Plaintiffs' Experts
    filed December 4, 2015:

    A.    Plaintiffs' Rule 26(a)(2) Expert Witness Disclosures
            dated October 12. 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    B.    Expert Report of Dr. Craig Cohen
            undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Exhibit to
Defendants' Memorandum in Support of
Defendants' *Motion in Limine* to Strike Plaintiff's Expert's
Craig Cohen, M.D.'s "Supplement to His Report"
    filed December 4, 2015:

    B.    Supplemental Expert Report of Dr. Craig Cohen
            undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Plaintiffs' *Motion in Limine* to
Exclude Improper Standard of Care Testimony**
    filed April 1, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

**Plaintiffs' Memorandum of Law in Support of
Plaintiffs' *Motion in Limine* to Exclude
Improper Standard of Care Testimony,
with Exhibits,**
    filed April 1, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**

    <u>Exhibits:</u>

    3.    **Letter/Expect Report from
        Dr. Donald Dudley to Paige Smith
        Re: Dr. Dudley's Opinion of Care of Christine Orwig**
            dated October 26, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . **52**

    4.    **Letter/Expect Report from
        Dr. Errol Norwitz to Paige Smith
        Re: Dr. Norwitz' Opinion of Care of Christine Orwig**
            dated October 26, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . **58**

**Defendants' Opposition to Plaintiffs' *Motion in Limine* to
Exclude Improper Standard of Care Testimony**
    filed April 6, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **63**

**Plaintiffs' Statement as to Standard of Care Testimony**
    filed April 7, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **76**

**Transcript of Motion Hearing Before
The Honorable T.S. Ellis, III**
    on April 8, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **78**

**Excerpts of**
**Transcript of Jury Trial Proceedings Before**
**The Honorable T.S. Ellis, III**
> on April 12, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

**Testimony of <u>Dr. Craig Cohen</u>:**

**Direct Examination by Ms. Amell**. . . . . . . . . . . . . . . . . . . . . . . . . . . 175
**Continued Direct Examination by Ms. Amell**. . . . . . . . . . . . . . . . . 213

**Excerpts of**
**Transcript of Jury Trial Proceedings Before**
**The Honorable T.S. Ellis, III (AM Session)**
> on April 13, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

**Testimony of <u>Dr. Khushbaskakhat Mittal</u>:**

**Direct Examination by Ms. Amell**. . . . . . . . . . . . . . . . . . . . . . . . . . . 249
**Continued Direct Examination by Ms. Amell**. . . . . . . . . . . . . . . . . 290
**Cross Examination by Ms. Smith**. . . . . . . . . . . . . . . . . . . . . . . . . . . 295
**Redirect Examination by Ms. Amell**. . . . . . . . . . . . . . . . . . . . . . . . 309

**Testimony of <u>Dr. Marcus Hermanson</u>:**

**Direct Examination by Ms. Amell**. . . . . . . . . . . . . . . . . . . . . . . . . . . 317

## <u>TABLE OF CONTENTS</u>
## Volume II of II

**Page:**

**Excerpts of**
**Transcript of Jury Trial Proceedings Before**
**The Honorable T.S. Ellis, III (PM Session)**
       **on April 13, 2016.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **318**

**Excerpts of**
**Transcript of Jury Trial Proceedings Before**
**The Honorable T.S. Ellis, III (AM Session)**
       **on April 14, 2016.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **327**

**Excerpts of**
**Transcript of Jury Trial Proceedings Before**
**The Honorable T.S. Ellis, III (PM Session)**
       **on April 14, 2016.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **339**

**Excerpts of**
**Transcript of Jury Trial Proceedings Before**
**The Honorable T.S. Ellis, III**
       **on April 15, 2016.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **345**

**Testimony of <u>Errol Norwitz</u>:**

**Direct Examination by Mr. Schraub.** . . . . . . . . . . . . . . . . . . . . . . . . **348**
**Cross Examination by Mr. Perry.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **394**
**Redirect Examination by Mr. Schraub.** . . . . . . . . . . . . . . . . . . . . . . **418**

Excerpts of
Transcript of Jury Trial Proceedings Before
The Honorable T.S. Ellis, III
        on April 15, 2016, Continued:

        Testimony of <u>Dr. Marc Alembik</u>:

        **Direct Examination by Mr. Schraub.** . . . . . . . . . . . . . . . . . . . . . . **427.1**
        **Cross Examination by Ms. Bertram.** . . . . . . . . . . . . . . . . . . . . . . **427.10**

Excerpts of
Transcript of Jury Trial Proceedings Before
The Honorable T.S. Ellis, III
        on April 18, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **432**

        Recalled Testimony of <u>Dr. Craig Cohen</u>:

        **Continued Direct Examination by Ms. Amell.** . . . . . . . . . . . . . . . **435**
        **Cross Examination by Mr. Schraub.** . . . . . . . . . . . . . . . . . . . . . . **487**
        **Redirect Examination by Ms. Amell.** . . . . . . . . . . . . . . . . . . . . . . **521**

Excerpts of
Transcript of Jury Trial Proceedings Before
The Honorable T.S. Ellis, III (AM Session)
        on April 19, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **524**

        Testimony of <u>Dr. Marc Alembik</u>:

        **Cross Examination by Ms. Bertram.** . . . . . . . . . . . . . . . . . . . . . . **526.1**

Excerpts of
Transcript of Jury Trial Proceedings Before
The Honorable T.S. Ellis, III (AM Session)
         on April 19, 2016, Continued:

         Testimony of <u>Dr. Donald Dudley</u>:

         Direct Examination by Mr. Schraub. . . . . . . . . . . . . . . . . . . . . . . . . . 527
         Cross Examination by Mr. Perry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 559
         Redirect Examination by Mr. Schraub. . . . . . . . . . . . . . . . . . . . . . . . 581

Excerpts of
Transcript of Jury Trial Proceedings Before
The Honorable T.S. Ellis, III (PM Session)
         on April 19, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 592

Excerpts of
Transcript of Jury Trial Proceedings Before
The Honorable T.S. Ellis, III
         on April 20, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 598

Jury Verdict
         filed April 20, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 665

Judgment
         filed April 20, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 667

Plaintiffs' Notice of Appeal
         filed May 16, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 668

APPEAL,BOC,CLOSED,JURY

**U.S. District Court**
**Eastern District of Virginia - (Alexandria)**
**CIVIL DOCKET FOR CASE #: 1:15-cv-00868-TSE-JFA**

N.O. a minor et al v. Alembik et al
Assigned to: District Judge T. S. Ellis, III
Referred to: Magistrate Judge John F. Anderson
Demand: $5,000,000
Case in other court: 4th Circuit, 16-01567
Cause: 28:1332 Diversity-Medical Malpractice

Date Filed: 07/02/2015
Date Terminated: 04/20/2016
Jury Demand: Plaintiff
Nature of Suit: 362 Personal Inj. Med.
Malpractice
Jurisdiction: Diversity

**Plaintiff**

**N.O. a minor**
*by Christine Orwig, her Mother and Next*
*Friend*

represented by **Scott Michael Perry**
Klores Perry Mitchell PC
1735 20th Street NW
Washington, DC 20009
(202) 628-8100
Fax: (202) 628-1240
Email: scott@perrycharnoff.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laurie Ann Amell**
Bertram & Amell PLLC
1100 Vermont Ave NW
Suite 500
Washington, DC 20005
202-803-5800
Fax: 202-803-6814
Email: lamell@bertramamell.com
*ATTORNEY TO BE NOTICED*

**Leslee Michael Soudrette**
Perry Charnoff PLLC
2300 Wilson Blvd.
Suite 240
Arlington, VA 22201
703-291-6650
Fax: 703-563-6692
Email: leslee@perrycharnoff.com
*ATTORNEY TO BE NOTICED*

**Mikhael David Charnoff**
Perry Charnoff PLLC
2300 Wilson Blvd.
Suite 240
Arlington, VA 22201
(703) 291-6650
Fax: 703-563-6692

Email: mike@perrycharnoff.com
*ATTORNEY TO BE NOTICED*

**Petitioner**

**Christine Orwig**                           represented by **Scott Michael Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laurie Ann Amell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leslee Michael Soudrette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mikhael David Charnoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Marc Alembik, M.D.**                        represented by **J. Jonathan Schraub**
Sands Anderson Marks & Miller
1497 Chain Bridge Rd
Suite 202
McLean, VA 22101
703-893-3600
Fax: 703-893-8484
Email: jjschraub@sandsanderson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paige Levy Smith**
Sands Anderson Marks & Miller
1497 Chain Bridge Rd
Suite 202
McLean, VA 22101
703-893-3600
Fax: 703-893-8484
Email: plevysmith@sandsanderson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**About Women, OB/GYN, P.C.**                 represented by **J. Jonathan Schraub**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paige Levy Smith**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/02/2015 | 1 | COMPLAINT against About Women, OB/GYN, P.C., Marc Alembik, MD (Filing fee $ 400, receipt number 14683052441) filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Civil Cover Sheet, # 2 Letter, # 3 Receipt)(jlan) (Entered: 07/07/2015) |
| 07/02/2015 | 2 | Summons Issued to be served by SPS as to About Women, OB/GYN, P.C., Marc Alembik, MD. (jlan) (Entered: 07/07/2015) |
| 07/27/2015 | 3 | ANSWER to 1 Complaint by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 07/27/2015) |
| 07/27/2015 | 4 | Financial Interest Disclosure Statement (Local Rule 7.1) by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 07/27/2015) |
| 07/31/2015 | 5 | SCHEDULING ORDER: Initial Pretrial Conference set for 8/26/2015 at 11:00 AM in Alexandria Courtroom 501 before Magistrate Judge John F. Anderson. Final Pretrial Conference set for 12/17/2015 at 01:00 PM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Discovery due by 12/11/2015. Signed by District Judge T. S. Ellis, III on 07/31/2015. (Attachments: # 1 Magistrate Consent Form, # 2 Pretrial Notice) (mpha) (Entered: 08/03/2015) |
| 08/06/2015 | 6 | Consent MOTION to Continue *Initial Pretrial Conference* by N.O. a minor. (Attachments: # 1 Proposed Order)(Perry, Scott) (Entered: 08/06/2015) |
| 08/07/2015 | 7 | *Proposed Joint* Discovery Plan by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 08/07/2015) |
| 08/10/2015 | 8 | Order Rule 16(b) Scheduling Order - Upon consideration of the representations made by the parties in their Proposed Joint Discovery Plan ( 7 ) and taking note of the Scheduling Order entered in this case ( 5 ), the court makes the following rulings: The Joint Discovery Plan filed by the parties is approved and shall control discovery to the extent of its application unless further modified by the court. See Order for further details. Signed by Magistrate Judge John F. Anderson on 08/10/2015. (wgar, ) (Entered: 08/10/2015) |
| 08/22/2015 | 9 | NOTICE of Appearance by Laurie Ann Amell on behalf of N.O. a minor, Christine Orwig (Amell, Laurie) (Entered: 08/22/2015) |
| 08/26/2015 | 10 | NOTICE of Appearance by Mikhael David Charnoff on behalf of N.O. a minor, Christine Orwig (Charnoff, Mikhael) (Entered: 08/26/2015) |
| 09/01/2015 | 11 | Consent Motion to appear Pro Hac Vice by Catherine D. Bertram and Certification of Local Counsel Laurie A. Amell Filing fee $ 75, receipt number 0422-4617578. by N.O. a minor, Christine Orwig. (Amell, Laurie) (Entered: 09/01/2015) |
| 09/01/2015 | 12 | NOTICE of Appearance by J. Jonathan Schraub on behalf of About Women, OB/GYN, P.C., Marc Alembik, MD (Schraub, J.) (Entered: 09/01/2015) |
| 09/03/2015 | 13 | ORDER granting 11 Motion for Pro hac vice. Signed by District Judge T. S. Ellis, III on 9/3/2015. (rban, ) (Entered: 09/04/2015) |
| 11/12/2015 | 14 | NOTICE by N.O. a minor, Christine Orwig *of change of address of Plaintiff counsel* (Amell, Laurie) (Entered: 11/12/2015) |

| 11/24/2015 | 15 | MOTION in Limine *to Preclude Testimony By Plaintiffs' Expert Craig Cohen, M.D. Whether Or Not Intrapartum Administration Of The Antibiotic Gentamicin Would Have Made A Difference In The Outcome For N.O.* by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 11/24/2015) |
|---|---|---|
| 11/24/2015 | 16 | Memorandum in Support re 15 MOTION in Limine *to Preclude Testimony By Plaintiffs' Expert Craig Cohen, M.D. Whether Or Not Intrapartum Administration Of The Antibiotic Gentamicin Would Have Made A Difference In The Outcome For N.O.* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Smith, Paige) (Entered: 11/24/2015) |
| 11/24/2015 | 17 | Notice of Hearing Date set for 12/4/15 re 15 MOTION in Limine *to Preclude Testimony By Plaintiffs' Expert Craig Cohen, M.D. Whether Or Not Intrapartum Administration Of The Antibiotic Gentamicin Would Have Made A Difference In The Outcome For N.O.* (Smith, Paige) (Entered: 11/24/2015) |
| 11/24/2015 | 18 | MOTION in Limine *To Preclude Plaintiffs' Expert Douglas Phillips, M.D. From Testifying Due To Inadequate Qualifications* by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 11/24/2015) |
| 11/24/2015 | 19 | Memorandum in Support re 18 MOTION in Limine *To Preclude Plaintiffs' Expert Douglas Phillips, M.D. From Testifying Due To Inadequate Qualifications* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Smith, Paige) (Entered: 11/24/2015) |
| 11/24/2015 | 20 | Notice of Hearing Date set for 12/4/15 re 18 MOTION in Limine *To Preclude Plaintiffs' Expert Douglas Phillips, M.D. From Testifying Due To Inadequate Qualifications* (Smith, Paige) (Entered: 11/24/2015) |
| 11/25/2015 | | Set Deadlines as to 15 MOTION in Limine *to Preclude Testimony By Plaintiffs' Expert Craig Cohen, M.D. Whether Or Not Intrapartum Administration Of The Antibiotic Gentamicin Would Have Made A Difference In The Outcome For N.O.*, 18 MOTION in Limine *To Preclude Plaintiffs' Expert Douglas Phillips, M.D. From Testifying Due To Inadequate Qualifications*. Motion Hearing set for 12/4/2015 at 10:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (clar, ) (Entered: 11/25/2015) |
| 12/02/2015 | 21 | Opposition to 16 Memorandum in Support, 15 MOTION in Limine *to Preclude Testimony By Plaintiffs' Expert Craig Cohen, M.D. Whether Or Not Intrapartum Administration Of The Antibiotic Gentamicin Would Have Made A Difference In The Outcome For N.O.* filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Perry, Scott) (Entered: 12/02/2015) |
| 12/02/2015 | 22 | Opposition to 18 MOTION in Limine *To Preclude Plaintiffs' Expert Douglas Phillips, M.D. From Testifying Due To Inadequate Qualifications*, 19 Memorandum in Support, filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Perry, Scott) (Entered: 12/02/2015) |
| 12/03/2015 | 23 | REPLY to Response to Motion re 15 MOTION in Limine *to Preclude Testimony By Plaintiffs' Expert Craig Cohen, M.D. Whether Or Not Intrapartum Administration Of The Antibiotic Gentamicin Would Have Made A Difference In The Outcome For N.O.* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 12/03/2015) |
| 12/03/2015 | 24 | REPLY to Response to Motion re 18 MOTION in Limine *To Preclude Plaintiffs' Expert Douglas Phillips, M.D. From Testifying Due To Inadequate Qualifications* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 12/03/2015) |

| 12/04/2015 | 25 | MOTION in Limine *to Preclude Use of Medical Literature in Direct Examinations of Plaintiffs' Experts* by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 12/04/2015) |
|---|---|---|
| 12/04/2015 | 26 | Memorandum in Support re 25 MOTION in Limine *to Preclude Use of Medical Literature in Direct Examinations of Plaintiffs' Experts* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O)(Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 27 | Notice of Hearing Date set for 1/8/2016 re 25 MOTION in Limine *to Preclude Use of Medical Literature in Direct Examinations of Plaintiffs' Experts* (Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 28 | MOTION in Limine *to Preclude Expert Testimony on Loss of Earning Capacity* by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 29 | Memorandum in Support re 28 MOTION in Limine *to Preclude Expert Testimony on Loss of Earning Capacity* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 30 | Notice of Hearing Date set for 1/8/2016 re 28 MOTION in Limine *to Preclude Expert Testimony on Loss of Earning Capacity* (Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 31 | MOTION in Limine *to Strike Plaintiff's Expert's Craig Cohen, M.D.'s "Supplement to His Report"* by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 32 | Memorandum in Support re 31 MOTION in Limine *to Strike Plaintiff's Expert's Craig Cohen, M.D.'s "Supplement to His Report"* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 33 | Notice of Hearing Date set for 1/8/2016 re 31 MOTION in Limine *to Strike Plaintiff's Expert's Craig Cohen, M.D.'s "Supplement to His Report"* (Smith, Paige) (Entered: 12/04/2015) |
| 12/04/2015 | 34 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Motion Hearing held on 12/4/2015 re: Defendant's Motion 15 in Limine to Preclude Testimony (Craig Cohen, M.D.) and 18 in Limine to Preclude Testimony (Douglas Philips, M.D.). Scott M. Perry, Laurie A. Amell, Mikhael D. Charnoff, and Catherine D. Bertram present on behalf of plaintiff. J. Jonathan Schraub present on behalf of defendant. Matters briefed, argued, and denied. FPTC currently scheduled for Thursday, December 17, 2015 @ 1:00PM, continued to Friday, January 8, 2016 @ 10:00AM. Order to follow. (Court Reporter Michael A. Rodriquez)(mpha) (Entered: 12/08/2015) |
| 12/04/2015 | | Set/Reset Scheduling Order Deadlines: Final Pretrial Conference reset for **1/8/2016 at 10:00 AM** in Alexandria Courtroom 900 before District Judge T. S. Ellis III. See Minute Entry 34 . (mpha) (Entered: 12/08/2015) |
| 12/04/2015 | 35 | ORDER for the reasons stated from the Bench, and for good cause, the motions 15 & 18 are DENIED. A Memorandum Opinion recording and further elucidating the reasons for this ruling will follow. It is further ORDERED that the final pretrial conference currently scheduled for 1:00 p.m. on Thursday, December 17, 2015, is CONTINUED to 10:00 a.m. on Friday, January 8, 2016. Signed by District Judge T. S. Ellis, III on 12/04/2015. |

| | | (mpha) (Entered: 12/08/2015) |
|---|---|---|
| 12/07/2015 | | Set Deadlines as to 25 MOTION in Limine *to Preclude Use of Medical Literature in Direct Examinations of Plaintiffs' Experts*, 31 MOTION in Limine *to Strike Plaintiff's Expert's Craig Cohen, M.D.'s "Supplement to His Report"*, 28 MOTION in Limine *to Preclude Expert Testimony on Loss of Earning Capacity*. Motion Hearing set for 1/8/2016 at 10:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (clar, ) (Entered: 12/07/2015) |
| 12/09/2015 | 36 | Opposition to 31 MOTION in Limine *to Strike Plaintiff's Expert's Craig Cohen, M.D.'s "Supplement to His Report"*, 32 Memorandum in Support, filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Perry, Scott) (Entered: 12/09/2015) |
| 12/09/2015 | 37 | Opposition to 26 Memorandum in Support,, 25 MOTION in Limine *to Preclude Use of Medical Literature in Direct Examinations of Plaintiffs' Experts* filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Perry, Scott) (Entered: 12/09/2015) |
| 12/09/2015 | 38 | Opposition to 29 Memorandum in Support, 28 MOTION in Limine *to Preclude Expert Testimony on Loss of Earning Capacity* filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Perry, Scott) (Entered: 12/09/2015) |
| 12/11/2015 | 39 | REPLY to Response to Motion re 31 MOTION in Limine *to Strike Plaintiff's Expert's Craig Cohen, M.D.'s "Supplement to His Report"* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 12/11/2015) |
| 12/11/2015 | 40 | REPLY to Response to Motion re 25 MOTION in Limine *to Preclude Use of Medical Literature in Direct Examinations of Plaintiffs' Experts* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 12/11/2015) |
| 12/11/2015 | 41 | REPLY to Response to Motion re 28 MOTION in Limine *to Preclude Expert Testimony on Loss of Earning Capacity* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A)(Smith, Paige) (Entered: 12/11/2015) |
| 01/04/2016 | 42 | MEMORANDUM OPINION. Signed by District Judge T. S. Ellis, III on 01/04/2016. (jlan) (Entered: 01/04/2016) |
| 01/07/2016 | 43 | *Rule 26 a 3 disclosures* Witness List by N.O. a minor, Christine Orwig. (Amell, Laurie) (Entered: 01/07/2016) |
| 01/07/2016 | 44 | Pretrial Statement (Exhibits and Witness Lists) by N.O. a minor, Christine Orwig. (Amell, Laurie) (Entered: 01/07/2016) |
| 01/08/2016 | 45 | Exhibit List by About Women, OB/GYN, P.C., Marc Alembik, MD.. (Smith, Paige) (Entered: 01/08/2016) |
| 01/08/2016 | 46 | Witness List by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 01/08/2016) |
| 01/08/2016 | 47 | Rule 26 Disclosure by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Smith, Paige) (Entered: 01/08/2016) |
| 01/08/2016 | 48 | *Amended Trial* Exhibit List by About Women, OB/GYN, P.C., Marc Alembik, MD.. (Smith, Paige) (Entered: 01/08/2016) |
| 01/08/2016 | 49 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Final Pretrial Conference & Motions Hearing held on 1/8/2016 re: Defendant's Motion 25 in Limine to Preclude Use of Medical Literature, Defendant's Motion 28 in Limine to Preclude Expert Testimony, and Defendant's Motion 31 in Limine to Strike Plaintiff's Expert's |

|  |  | Supplemental Report. Scott M. Perry, Laurie A. Amell, and Catherine D. Bertram present on behalf of plaintiffs. J. Jonathan Schraub and Paige L. Smith present on behalf of defendants. Motions briefed and argued. Motion 25 to Preclude Medical Literature, denied. Motions 28 and 31 , taken under advisement. Jury Trial set for 4/12/2016 at 10:00 AM (approx. 6 days - 3 days for each side) in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Oral request for use of electronic evidence, permitted. Order to follow. (Court Reporter Michael A. Rodriquez)(mpha) (Entered: 01/12/2016) |
|---|---|---|
| 01/08/2016 | 50 | ORDER for the reasons stated from the Bench, and for good cause, the motion to preclude the use of medical literature in direct examinations of plaintiffs' experts 25 is DENIED as moot in light of plaintiffs' representation that the contested literature will not be referenced on direct examination; the remaining motions in limine 28 and 31 are TAKEN UNDER ADVISEMENT. A further Order disposing of the motions will follow shortly; a jury trial in this matter will commence at 10:00 a.m. on Tuesday, April 12, 2016. At trial, the parties are permitted to use computer equipment, document cameras, audio devices, and TV/VCR/DVD combination equipment in the courtroom to publish exhibits, as permitted by the Court. Signed by District Judge T. S. Ellis, III on 01/08/2016. (mpha) (Entered: 01/12/2016) |
| 01/15/2016 | 51 | ORDER denying 28 Motion in Limine; denying 31 Motion in Limine (see order for details). Signed by District Judge T. S. Ellis, III on 01/15/2016. (jlan) (Entered: 01/15/2016) |
| 01/18/2016 | 52 | *Plaintiffs' Objection to Defendants'* Exhibit List by N.O. a minor, Christine Orwig.. (Perry, Scott) (Entered: 01/18/2016) |
| 01/18/2016 | 53 | *Defendants' Objections to Plaintiffs' Trial* Exhibit List by About Women, OB/GYN, P.C., Marc Alembik, MD.. (Smith, Paige) (Entered: 01/18/2016) |
| 01/29/2016 | 54 | *Plaintiff's Amended Rule 26(a)(3) Disclosures* Exhibit List by N.O. a minor, Christine Orwig.. (Amell, Laurie) (Entered: 01/29/2016) |
| 02/04/2016 | 55 | *Defendants' Objections to Plaintiffs' "Amended Rule 26(a)(3) Disclosures"* Exhibit List by About Women, OB/GYN, P.C., Marc Alembik, MD.. (Smith, Paige) (Entered: 02/04/2016) |
| 02/09/2016 | 56 | Motion for use of Courtroom Technology by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 02/09/2016) |
| 02/10/2016 |  | Notice of Correction: The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. re 56 Motion for use of Courtroom Technology. (jlan) (Entered: 02/10/2016) |
| 02/10/2016 | 57 | ORDER granting in part and denying in part 56 Motion for use of courtroom technology (see order for details). Signed by District Judge T. S. Ellis, III on 02/10/2016. (jlan) (Entered: 02/10/2016) |
| 02/10/2016 | 58 | MOTION Motion to Permit Additional Electronic Devices by N.O. a minor, Christine Orwig. (Amell, Laurie) (Entered: 02/10/2016) |
| 02/10/2016 | 59 | Waiver of re 58 MOTION Motion to Permit Additional Electronic Devices *Notice of Waiver of Oral Argument* by N.O. a minor, Christine Orwig (Amell, Laurie) (Entered: 02/10/2016) |
| 02/11/2016 | 60 | ORDER granting in part and denying in part 58 Motion Motion to Permit Additional Electronic Devices (See order for details). Signed by District Judge T. S. Ellis, III on 02/11/2016. (jlan) (Entered: 02/11/2016) |
| 03/31/2016 | 61 | Rule 26 Disclosure by N.O. a minor, Christine Orwig. (Charnoff, Mikhael) (Entered: |

| | | 03/31/2016) |
|---|---|---|
| 04/01/2016 | 62 | MOTION to Exclude *Post Occurrence Medical Literature* by N.O. a minor, Christine Orwig. (Charnoff, Mikhael) (Entered: 04/01/2016) |
| 04/01/2016 | 63 | Memorandum in Support re 62 MOTION to Exclude *Post Occurrence Medical Literature* filed by N.O. a minor, Christine Orwig. (Charnoff, Mikhael) (Entered: 04/01/2016) |
| 04/01/2016 | 64 | Notice of Hearing Date re 62 MOTION to Exclude *Post Occurrence Medical Literature*, 63 Memorandum in Support (Charnoff, Mikhael) (Entered: 04/01/2016) |
| 04/01/2016 | 65 | MOTION to Exclude *Improper Standard of Care Testimony* by N.O. a minor, Christine Orwig. (Charnoff, Mikhael) (Entered: 04/01/2016) |
| 04/01/2016 | 66 | Memorandum in Support re 65 MOTION to Exclude *Improper Standard of Care Testimony* filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Charnoff, Mikhael) (Entered: 04/01/2016) |
| 04/01/2016 | 67 | Notice of Hearing Date re 65 MOTION to Exclude *Improper Standard of Care Testimony* (Charnoff, Mikhael) (Entered: 04/01/2016) |
| 04/04/2016 | | Set Deadlines as to 62 MOTION to Exclude *Post Occurrence Medical Literature*, 65 MOTION to Exclude *Improper Standard of Care Testimony*. Motion Hearing set for 4/8/2016 at 10:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (clar, ) (Entered: 04/04/2016) |
| 04/05/2016 | 68 | Proposed Voir Dire by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 04/05/2016) |
| 04/05/2016 | 69 | Proposed Jury Instructions by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 04/05/2016) |
| 04/05/2016 | 70 | Objection to 61 Rule 26 Disclosure filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 04/05/2016) |
| 04/05/2016 | 71 | Proposed Voir Dire by N.O. a minor, Christine Orwig. (Soudrette, Leslee) (Entered: 04/05/2016) |
| 04/05/2016 | 72 | Proposed Jury Instructions by N.O. a minor, Christine Orwig. (Soudrette, Leslee) (Entered: 04/05/2016) |
| 04/06/2016 | 73 | Opposition to 65 MOTION to Exclude *Improper Standard of Care Testimony* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Smith, Paige) (Entered: 04/06/2016) |
| 04/06/2016 | 74 | Opposition to 62 MOTION to Exclude *Post Occurrence Medical Literature* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Smith, Paige) (Entered: 04/06/2016) |
| 04/06/2016 | | Set/Reset Hearings: In Chambers Telephone Conference set for 4/6/2016 at 04:00 PM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (mpha) (Entered: 04/08/2016) |
| 04/06/2016 | 76 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: In Chambers Telephone Conference held on 4/6/2016. Catherine D. Bertram, Laurie A. Amell, Scott M. Perry, and Mikhael D. Charnoff present on behalf of plaintiffs. J. Jonathan Schraub and Paige L. Smith present on behalf of defendants. Matter came on for status of trial proceedings / scheduling. (Court Reporter Michael A. Rodriquez)(mpha) (Entered: |

| | | 04/08/2016) |
|---|---|---|
| 04/07/2016 | 75 | STATUS REPORT *PLAINTIFFS STATEMENT AS TO STANDARD OF CARE TESTIMONY* by N.O. a minor, Christine Orwig. (Charnoff, Mikhael) (Entered: 04/07/2016) |
| 04/08/2016 | 77 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Motion Hearing held on 4/8/2016 re: Plaintiff's Motion 62 to Exclude Post Occurrence Medical Literature and Plaintiff's Motion 65 to Exclude Improper Standard of Care Testimony. Scott M. Perry, Laurie A. Amell, Mikhael D. Charnoff, and Catherine D. Bertram present on behalf of plaintiffs. J. Jonathan Schraub and Paige L. Smith present on behalf of defendants. Matters briefed and argued. Motion 62 to Exclude Post Occurrence Medical Literature, denied as moot. Motion 65 to Exclude Improper Standard of Care Testimony, denied. Order to follow. (Court Reporter Michael A. Rodriquez)(mpha) (Entered: 04/08/2016) |
| 04/08/2016 | 78 | ORDER For the foregoing reasons, for the reasons stated from the Bench, and for good cause, It is hereby ORDERED that the motion in limine to exclude post-occurrence medical literature on the standard of care is DENIED AS MOOT; the motion in limine to exclude improper standard of care testimony is DENIED. Signed by District Judge T. S. Ellis, III on 04/08/2016. (mpha) (Entered: 04/08/2016) |
| 04/10/2016 | 79 | NOTICE of Appearance by Leslee Michael Soudrette on behalf of N.O. a minor, Christine Orwig (Soudrette, Leslee) (Entered: 04/10/2016) |
| 04/11/2016 | 80 | Defendant's Trial Exhibits Received (3 Black Binders) (jlan) (Entered: 04/11/2016) |
| 04/11/2016 | | Set/Reset Hearings: Jury Trial reset for 4/12/2016 at **09:30 AM** to go over pretrial matters in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (mpha) (Entered: 04/11/2016) |
| 04/12/2016 | 81 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Voir Dire/Jury Trial (day 1) held on 4/12/2016. Appearances of parties and counsel. Court in session without jurors to address fair notice issue. The jury appeared as summoned and were sworn on voir dire. 8 jurors were sworn to try the issue. Jurors allowed to take notes. Rule on witnesses. Opening Statements. Pltf adduced evidence. Jury excused to return 4/13/16/at 9:00am. Jury trial (day 2)set for 4/13/2016 at 09:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Court adjourned. (Court Reporter M. Rodriquez.)(yguy) (Entered: 04/13/2016) |
| 04/12/2016 | 82 | ORDER: The jury trial commenced in this matter at 10:00 a.m. on Tuesday, April 12,2016. For good cause, It is hereby ORDERED that jurors in this matter shall be delivered a daily meal at the expense of the United States, with any bills or invoices to be submitted to the Clerk of the Court for payment. Signed by District Judge T. S. Ellis, III on 4/12/16. (yguy) (Entered: 04/13/2016) |
| 04/13/2016 | 83 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Jury Trial (day 2) held on 4/13/2016. Appearances of counsel & parties. Jury appeared as previous. Pltf continued to adduce evidence. Jury excused to return 4/14/16 at 9:00am. Jury trial (day 3) set for 4/14/2016 at 09:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Court adjourned. (Court Reporter M. Rodriquez.)(yguy) (Entered: 04/14/2016) |
| 04/14/2016 | 84 | Minute Entry for proceedings held before District Judge T. S. Ellis, III: Jury Trial(day 3) held on 4/14/2016. Appearances as previous. Jury appeared as previous. Plaintiff continued to adduce evidence. Pltf final witness to appear on Monday. Agreed stipulations are read into the record. Deft adduced evidence. Out of the presence of the jury, defts rule 50 motion deemed made and taken under advisement. Jury excused to |

| | | return 4/15/16 at 11:00am. Jury Trial (day 4)set for 4/15/2016 at 11:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Court adjourned. (Court Reporter M. Rodriquez.)(yguy) (Entered: 04/15/2016) |
|---|---|---|
| 04/14/2016 | 88 | STIPULATION. (yguy) (Entered: 04/19/2016) |
| 04/14/2016 | 89 | STIPULATION. (yguy) (Entered: 04/19/2016) |
| 04/15/2016 | 86 | Minute Entry for proceedings held before District Judge T. S. Ellis, III:Jury Trial(day 4) held on 4/15/2016. Appearances of counsel & parties. Jury appeared as previous. Deft continued to adduce evidence. Jury excused to return 4/18/16 at 1:00pm. Jury Trial (day 5)set for 4/18/2016 at 01:00 PM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. (Court Reporter M. Rodriquez.)(yguy) (Entered: 04/18/2016) |
| 04/17/2016 | 85 | TRIAL BRIEF *Exclude Cumulative Expert Testimony* by N.O. a minor, Christine Orwig. (Charnoff, Mikhael) (Entered: 04/17/2016) |
| 04/18/2016 | 87 | Minute Entry for proceedings held before District Judge T. S. Ellis, III:Jury(day 5) held on 4/18/2016. Appearances as previous. Out of the presence of the jury, pltf's #85 Motion to Strike is argued and Denied. Jury appeared as previous. Plaintiff continued to adduce evidence and rests. Deft continued to adduce evidence. Jury excused to return 4/19/16 at 9:00am. Jury Trial (day 6)set for 4/19/2016 at 09:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Out of the presence of the jury, deft Rule 50 motion (JMOL) is argued. Parties to provide the Court with briefs by noon tomorrow. Court adjourned. (Court Reporter M. Rodriquez.)(yguy) (Entered: 04/19/2016) |
| 04/19/2016 | 90 | MOTION for Judgment as a Matter of Law by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Smith, Paige) (Entered: 04/19/2016) |
| 04/19/2016 | 91 | Opposition to 90 MOTION for Judgment as a Matter of Law filed by N.O. a minor, Christine Orwig. (Soudrette, Leslee) (Entered: 04/19/2016) |
| 04/19/2016 | 92 | TRIAL BRIEF *Agreed Upon Verdict Form* by N.O. a minor, Christine Orwig. (Soudrette, Leslee) (Entered: 04/19/2016) |
| 04/19/2016 | 93 | Minute Entry for proceedings held before District Judge T. S. Ellis, III:Jury Trial(day 6)/Motion Hearing held on 4/19/2016. Appearances of counsel & parties. Jury appeared as previous. Deft continued to adduce evidence & rests. Jury excused to return 4/20/16 at 9:00am. Jury Trial (day 7)set for 4/20/2016 at 09:00 AM in Alexandria Courtroom 900 before District Judge T. S. Ellis III. Out of the presence of the jury, preliminary charging conference held and defts 90 MOTION for Judgment as a Matter of Law is argued and TAKEN UNDER ADVISEMENT. Court adjourned. (Court Reporter M. Rodriquez.) (yguy) (Entered: 04/20/2016) |
| 04/20/2016 | 94 | NOTICE by About Women, OB/GYN, P.C., Marc Alembik, MD *Defendants' Proposed Jury Verdict Form* (Smith, Paige) (Entered: 04/20/2016) |
| 04/20/2016 | 95 | Minute Entry for proceedings held before District Judge T. S. Ellis, III:Jury Trial (day 7) held on 4/20/2016. Appearances of counsel & parties. Jury appeared as previous. Closing arguments. Rebuttal argument. Jury charged and retired to deliberate at 12:17pm. Jury returned with a verdict at 5:48pm in favor of defendants. Jury polled. Jury verdict filed in open court and jurors excused at 5:55pm. (Court Reporter M. Rodriquez.)(yguy) (Additional attachment(s) added on 4/22/2016: # 1 Trial Exh Cert of Review) # 2 Pltf Witness List, # 3 Pltf Admitted Exh List, # 4 Deft Witness List, # 5 Deft Admitted Exh List) (yguy, ). (Entered: 04/20/2016) |
| 04/20/2016 | 96 | REDACTED JURY VERDICT FORM. (yguy) (Entered: 04/20/2016) |

| 04/20/2016 | 97 | Sealed Verdict Form (yguy) (yguy, ). (Entered: 04/20/2016) |
| 04/20/2016 | 98 | CLERK'S JUDGMENT: Signed by Deputy Clerk on 4/20/2016. (yguy) (Entered: 04/20/2016) |
| 04/20/2016 | 109 | Sealed Jury Note (yguy) (Entered: 04/22/2016) |
| 04/21/2016 | 99 | TRANSCRIPT of proceedings held on 4-12-2016, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.**(rodriquez, michael) (Entered: 04/21/2016) |
| 04/21/2016 | 100 | TRANSCRIPT of proceedings held on 4-13-2016-AM, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.**(rodriquez, michael) (Entered: 04/21/2016) |
| 04/21/2016 | 101 | TRANSCRIPT of proceedings held on 4-13-2016-PM, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.**(rodriquez, michael) (Entered: 04/21/2016) |
| 04/21/2016 | 102 | TRANSCRIPT of proceedings held on 4-14-2016-AM, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for** |

| | | |
|---|---|---|
| | | 6/21/2016. Release of Transcript Restriction set for 7/20/2016.(rodriquez, michael) (Entered: 04/21/2016) |
| 04/21/2016 | 103 | TRANSCRIPT of proceedings held on 4-14-2016-PM, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.(rodriquez, michael) (Entered: 04/21/2016)** |
| 04/21/2016 | 104 | TRANSCRIPT of proceedings held on 4-15-2016, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.(rodriquez, michael) (Entered: 04/21/2016)** |
| 04/21/2016 | 105 | TRANSCRIPT of proceedings held on 4-18-2016, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.(rodriquez, michael) (Entered: 04/21/2016)** |
| 04/21/2016 | 106 | TRANSCRIPT of proceedings held on 4-19-2016-AM, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.(rodriquez, michael) (Entered: 04/21/2016)** |

| 04/21/2016 | 107 | TRANSCRIPT of proceedings held on 4-19-2016-PM, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.(rodriquez, michael) (Entered: 04/21/2016)** |
|---|---|---|
| 04/21/2016 | 108 | TRANSCRIPT of proceedings held on 4-20-2016, before Judge Ellis, Court Reporter/Transcriber Michael Rodriquez, Telephone number 301-213-4913. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/23/2016. Redacted Transcript Deadline set for 6/21/2016. Release of Transcript Restriction set for 7/20/2016.(rodriquez, michael) (Entered: 04/21/2016)** |
| 05/02/2016 | 110 | BILL OF COSTS by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Invoices)(Smith, Paige) (Entered: 05/02/2016) |
| 05/13/2016 | 111 | Opposition to 110 Bill of Costs *of Defendants* filed by N.O. a minor, Christine Orwig. (Attachments: # 1 Affidavit Christine Orwig, # 2 Exhibit, # 3 Exhibit)(Perry, Scott) (Entered: 05/13/2016) |
| 05/16/2016 | 112 | NOTICE OF APPEAL by N.O. a minor, Christine Orwig. Filing fee $ 505, receipt number 0422-4989926. (Perry, Scott) (Entered: 05/16/2016) |
| 05/17/2016 | 113 | Transmission of Notice of Appeal to US Court of Appeals re 112 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (kgra, ) (Entered: 05/17/2016) |
| 05/18/2016 | 114 | Response to 111 Opposition *TO BILL OF COSTS* filed by About Women, OB/GYN, P.C., Marc Alembik, MD. (Attachments: # 1 Exhibit A)(Smith, Paige) (Entered: 05/18/2016) |
| 05/19/2016 | 115 | USCA Case Number 16-1567 4th Circuit, Case Manager R. Sewell for 112 Notice of Appeal filed by Christine Orwig, N.O. a minor. (kgra, ) (Entered: 05/19/2016) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/07/2016 13:17:50 | | |
| **PACER Login:** | sp202020:4028586:0 | **Client Code:** | |
| | | **Search** | 1:15-cv-00868- |

| Description: | Docket Report | Criteria: | TSE-JFA |
|---|---|---|---|
| Billable Pages: | 12 | Cost: | 1.20 |

FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## (ALEXANDRIA DIVISION)

2015 JUL -2  P 3: 42

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| N. O., a minor,<br>By CHRISTINE ORWIG,<br>her mother and Next Friend<br>62 Horseshoe Canyon<br>San Antonio, TX 72858 | )<br>)<br>)<br>) |
| and | ) |
| CHRISTINE ORWIG<br>62 Horseshoe Canyon<br>San Antonio, TX 72858 | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) |
| ABOUT WOMEN, OB/GYN, P.C.<br>2296 Opitz Boulevard<br>Woodbridge, VA 22191<br>SERVE:<br>WSG Services, PLLC<br>Registered Agent<br>10521 Judicial Drive, Suite 204<br>Fairfax, VA 22030 | )<br>)<br>)<br>)<br>)<br>) |
| and | ) |
| MARC ALEMBIK, M.D.<br>c/o About Women Ob/Gyn, P.C.<br>2296 Opitz Boulevard<br>Woodbridge, VA 22191 | )<br>)<br>) |
| Defendants. | ) |

Civil Action No. 1:15-CV-868
JURY TRIAL REQUESTED
(TSE/JFA)

## COMPLAINT
### (Negligence/Medical Malpractice)

-15-

COMES NOW, Christine Orwig and N. O., a minor, by Christine Orwig, her mother and Next Friend, by and through their attorneys who sue Defendants About Women Ob/Gyn, P.C. and Marc Alembik, M.D.  In support of their Complaint, Plaintiffs state as follows:

1.    Jurisdiction is proper under 28 U.S.C. § 1332 as there is complete diversity of citizenship.

2.    Venue is proper in this Court because the claims asserted occurred within this Court's district.

3.    Christine Orwig and N. O. are residents of Texas. At the time of the malpractice alleged herein, they were residents of Woodbridge, Virginia. Plaintiffs bring this action as a result of the medical care provided to them by the Defendants on or about September 28, 2011 and continuing.

4.    Defendant About Women Ob/Gyn, P.C. is a Virginia professional corporation operating in Virginia.  At all times mentioned herein, the medical care provided to N. O. and to Christine Orwig by About Women Ob/Gyn, P.C. was provided by agents, employees, servants and/or representatives of this Defendant, all acting within the scope of their employment or agency.

5.    Defendant Dr. Alembik is a health-care provider licensed in the Commonwealth of Virginia who provided care and treatment to N. O. and Christine Orwig in Virginia and as such, owed each of them a duty to conform his conduct to prevailing standards of care. A patient-physician relationship existed between Dr. Alembik and N. O. and between Dr. Alembik and Christine Orwig.

6.    On or about September 28, 2011, Christine Orwig was approximately 28 weeks pregnant.

2

**-16-**

7.       Defendants had provided pre-natal care to Christine Orwig.

8.       Up through that time, Christine Orwig had had a normal pregnancy.

9.       On or about September 28, 2011, Christine Orwig's membranes prematurely ruptured, causing her amniotic fluid to leak.

10.      Christine Orwig presented at About Women Ob/Gyn, P.C. for treatment.

11.      After seeing Christine Orwig's condition, an About Women Ob/Gyn physician referred her to Potomac Hospital.

12.      Christine Orwig immediately reported to Potomac Hospital where she was admitted.

13.      Christine Orwig did not go into labor after her membranes ruptured.

14.      The Defendants chose not to deliver at that time. Instead, they placed Christine Orwig on bed rest at Potomac Hospital.

15.      This decision placed Christine Orwig and her unborn child, N. O., at risk of infection and other dangerous consequences because Christine Orwig's membranes had prematurely ruptured and the Defendants were required to be aware of the infection risk.

16.      The Defendants ignored and or missed evidence of infection during Christine Orwig's hospitalization.

17.      During the morning of October 13, 2011, a non-stress test was equivocal and N. O. was noted to be less reactive than in prior tests.

18.      During the morning of October 13, 2011, Christine Orwig complained of increased pressure and bleeding.

19.      During the morning of October 13, 2011, N. O.'s fetal heart rate increased.

3

20.    On October 13, 2011, Christine Orwig's white blood cell count was high, indicating a likely infectious process.

21.    Defendants either ignored the signs of infection or they were aware of the signs of infection and chose not to perform an immediate delivery via Cesarean section at that time.

22.    By 2:30 p.m., the Defendants documented that Christine Orwig likely had chorioamnionitis.

23.    Defendants chose not perform an immediate delivery via Cesarean section.

24.    Defendants instead decided to induce labor and to vaginally deliver the unborn child.

25.    Defendants allowed Christine Orwig to remain in labor for another eleven hours after documenting likely infection, subjecting N. O. to worsening infection, which also resulted in significant decelerations.

26.    At approximately 11:35 p.m., N. O. was vaginally delivered.

27.    N. O. was taken to Potomac Hospital's neonatal intensive care unit ("NICU") where she was diagnosed with meningitis and sepsis.

28.    N. O. had to be transferred to the Inova Fairfax Hospital NICU where she developed a Grade III bleed and subsequently hydrocephalus.

29.    N. O. permanently suffers from hydrocephalus, a/k/a "water on the brain." The hydrocephalus has required N. O. to undergo scores of surgeries and the repeated placement of multiple shunts into her brain. These shunts have to be replaced and adjusted throughout N. O.'s lifetime.

30.    Throughout N. O.'s life, she has suffered and will continue to suffer from multiple infections at the sites of her shunts.

4

31.     N. O. is not in need of assistance in all activities of daily living.  N. O. does not live in Virginia.  Thus N. O. has not suffered a "birth-related neurological injury" as that term is defined by Code of Virginia § 38.2-5001, the Virginia Birth-Related Neurological Injury Compensation Act. As such, the Virginia Birth-Related Neurological Injury Compensation Act does not apply to this case.

### NEGLIGENCE/MEDICAL MALPRACTICE

32.     Plaintiffs incorporate all previous paragraphs.

33.     The Defendants, individually and through their respective agents, servants, employees and/or representatives provided medical and surgical care to N. O. and to Christine Orwig at Potomac Hospital on or about September 28, 2011, and continuing.

34.     At all times of which Plaintiffs complain, Defendants, by themselves and through their agents, servants, employees and/or representatives represented to N. O. and to Christine Orwig and to the general public that they possessed the degree of knowledge, ability and skill possessed by reasonably competent medical and surgical practitioners, practicing under the same or similar circumstances as those involving N. O. and Christine Orwig.

35.     Defendants, including their agents, servants, employees and/or representatives owed to N. O. and Christine Orwig a duty to exercise that degree of skill, judgment, and care expected of reasonably competent medical and surgical practitioners practicing under the same or similar circumstances as those involving N. O. and Christine Orwig, which duty included the taking of appropriate precautions, performing appropriate evaluations, performing appropriate diagnostic testing and timely delivering N. O. – all of which Defendants failed to do.

36.     The Defendants were further negligent in that they:

    a.     failed to properly monitor N. O.'s condition;

b.    failed to properly monitor Christine Orwig's condition;

b.    failed to properly medicate to avoid infection to N. O.;

d.    failed to properly medicate to avoid infection to Christine Orwig;

e.    improperly discontinued antibiotics;

f.    failed to properly monitor N. O. for signs of infection and fetal distress;

g.    failed to properly monitor Christine Orwig for signs of infection and fetal distress of N. O.;

h.    failed to properly react to signs of infection and fetal distress;

i.    failed to timely deliver N. O.;

j.    failed to timely perform a Cesarean section;

k.    failed to avoid injury to N. O.;

l.    failed to avoid injury to Christine Orwig by causing injury to her unborn child;

m.    failed to engage and consult appropriate medical care and specialties including maternal-fetal medicine; and

n.    were otherwise negligent.

37.    Injuries to Christine Orwig's unborn child constitute injuries to Christine Orwig.

38.    As a proximate result of the Defendants' negligence, Christine Orwig has experienced, and will continue to suffer, severe and permanent injuries, including lifelong mental suffering resulting from the birth of, and the extraordinary care needed for, a disabled child.

39.    As a proximate result of the Defendants' negligence, N. O. has suffered physical and mental damages and will continue suffer lifelong physical and mental damages.

WHEREFORE, Christine Orwig and N. O., a minor, by her Next Friend Christine Orwig, her mother, request judgment against the Defendants, jointly and severally, in the amount of five

6

-20-

million dollars ($5,000,000.00), and for pre- and post-judgment interest, and all other relief the

Court deems appropriate.

Dated: July 2, 2015                    Respectfully submitted,

                                      PERRY CHARNOFF PLLC

                                      Scott M. Perry (#67417)
                                      Mikhael D. Charnoff (#43929)
                                      Leslee M. Soudrette (#84478)
                                      2300 Wilson Boulevard, Suite 240
                                      Arlington, VA 22202
                                      P: (703) 291-6650
                                      F: (703) 563-6692
                                      scott@perrycharnoff.com
                                      mike@perrycharnoff.com
                                      leslee@perrycharnoff.com


          Plaintiff demands a jury trial pursuant to FRCP 38.

          Scott M. Perry

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| N.O., a minor, by Christine Orwig,<br>Her mother and Next Friend and<br>Christine Orwig, Individually,<br><br>    Plaintiffs,<br>v.<br><br>ABOUT WOMEN OB/GYN, P.C. and<br>MARC ALEMBIK, M.D.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:15-CV-868-TSE-JFA<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' EXPERT DISCLSOURES PURSUANT TO FED. R. CIV. PRO. 26(a)(2)

Defendants About Women OB/GYN, P.C. and Marc Alembik, M.D. ("Defendants"), by counsel, submit the following disclosures of experts whom Defendants designate and plan to call as expert witnesses at trial. This designation of expert witnesses also serves as a supplement to any discovery propounded by Plaintiffs inquiring as to the expert witnesses Defendants may call at trial of this matter. The following individuals may be called as expert witnesses:

1.    Donald J. Dudley, M.D., William T. Moore Professor and Director of the Division of Maternal-Fetal Medicine, Department of Obstetrics and Gynecology, University of Virginia, P.O. Box 800712  Charlottesville, VA  22908-0712.  Dr. Dudley's expert report is attached and incorporated by reference as Exhibit A.

2.    Errol Norwitz, M.D., Ph.D., Louis E. Phaneuf Professor of Obstetrics and Gynecology and Chairman, Department of Obstetrics & Gynecology at Tufts University School of Medicine, Boston, MA  02111.  Dr. Norwitz's expert report is attached and incorporated by reference as Exhibit B.

-22-

3.      David Bearden, M.D., Clinical Instructor of pediatric neurology at Children's Hospital of Philadelphia and Medical Director of the Neurology International Medicine Program, 503 N. 41st Street, Philadelphia, PA   19104   Dr. Bearden's expert report is attached and incorporated by reference as Exhibit C.

4.      Thierry A.G.M. Huisman, M.D., Professor of Radiology, Pediatrics, Neurology and Neurosurgery at The Johns Hopkins School of Medicine, Chairman of the Department of Imaging and Imaging Science at Johns Hopkins Bayview Medical Center and Director of the Division of Pediatric Radiology and Pediatric Neuroradiology at Johns Hopkins Hospital, Charlotte R. Bloomberg Children's Center, Sheikh Zayed Tower, Room 4174, 1800 Orleans Street, Baltimore, MD 21287.   Dr. Huisman's expert report is attached and incorporated by reference as Exhibit D.

The attached reports provide a general overview of the experts' opinions and shall not serve as a limitation of their trial testimony, which may be more detailed based upon questions during deposition or trial.  Their investigations are ongoing and additional materials may be reviewed.  They may also rely on medical literature to be reviewed prior to trial.  They reserve the right to elaborate upon or modify the opinions stated above pending review of further medical records, imaging studies, deposition transcript testimony of the parties and/or witnesses to the events in question and discovery responses filed by the parties, as well as their review of any opinions offered by experts designated by Plaintiffs.  To the extent necessary to explain and/or elaborate upon their opinions, they may demonstrate or comment upon the general principles of medicine and their individual fields which are applicable in this case.  They may also point to particular medical records to illustrate their opinions, and may use demonstrative exhibits for that same purpose.

Defendants reserve the right to (a) call at trial any expert or other witness designated by

2

-23-

Plaintiffs, whether or not such witnesses are called by Plaintiffs; (b) add to, amend or supplement this Expert Designation as may be warranted through the course of discovery and, more specifically, upon completion of the depositions of Plaintiffs' experts and upon receipt of any additional discovery; and (c) call any or all of Christine Orwig's and/or N.O.'s treating physicians and other health care providers who were involved in their medical care, to testify as to their findings, impressions, observations, diagnoses, evaluations and opinions.

DATED:    November 11, 2015        Respectfully submitted,

SANDS ANDERSON PC

J. Jonathan Schraub (VSB No. 17366)
jjschraub@sandsanderson.com
Paige Levy Smith (VSB No. 39093)
plevy@sandsanderson.com
1497 Chain Bridge Road, Suite 202
McLean, VA  22101
(703) 893-3600
(703) 893-8484 (fax)

**Counsel for Defendants**

3

**-24-**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th of November, 2015, I served the foregoing DEFENDANTS' EXPERT DISCLSOURES PURSUANT TO FED. R. CIV. PRO. 26(a)(2) by hand delivery on the following:

Scott M. Perry
Mikhael D. Charnoff
Leslee M. Soudrette
PERRY CHARNOFF, PLLC
2300 Wilson Boulevard
Suite 240
Arlington, VA  22201
(703) 291-6650
(703) 563-6692 (facsimile)
scott@perrycharnoff.com
mike@perrycharnoff.com
leslee@perrycharnoff.com

Laurie A. Amell
Catherine D. Bertram
BERTRAM & AMELL, PLCC
1100 Vermont Avenue, NW
Suite 500
Washington, DC  20005
(202) 803-5800
(202) 803-6814 (facsimile)
lamell@bertramamell.com

_____
Paige Levy Smith

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| N.O., a minor, by Christine Orwig, )<br>her Mother and Next Friend and )<br>CHRISTINE ORWIG, Individually, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>ABOUT WOMEN OB/GYN, P.C. and )<br>MARC ALEMBIK, M.D., )<br> )<br>Defendants. ) | Civil Action No. 1:15cv868-TSE-JFA |

#### PLAINTIFFS' RULE 26(a)(2) EXPERT WITNESS DISCLOSURES

Plaintiffs N.O., a minor, by Christine Orwig, her Mother and Next Friend and Christine Orwig, Individually, by counsel, and pursuant to Fed. R. Civ. P. 26(a)(2) and this Court's Scheduling Order hereby identify the expert witnesses and treating physicians who may be called at trial, and who may offer expert opinions in this matter. This is a preliminary designation because certain depositions have not yet been taken. Plaintiffs reserve the right to add to or amend this expert witness designation given that discovery is continuing. The words and phrases used are those of the attorneys who are summarizing the opinions and anticipated testimony of the witnesses.

1.  **Craig Cohen, M.D.**
    University of California, San Francisco
    50 Beale Street, 1200
    San Francisco, CA 94105

Dr. Cohen is Board-Certified in obstetrics and gynecology. His curriculum vitae, fee schedule and list of cases are attached to this statement. Dr. Cohen will testify based upon



**-26-**

his education, training, experience, and review of N.O.'s and Christine Orwig's medical records, radiology films and studies, the deposition testimony of all fact witnesses, and all other records and materials produced in discovery as well as the conclusions reached by Dr. Cohen. He is expected to testify in accordance with his signed, written report, which is attached hereto. He is further expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants. At trial, he will refer to Plaintiffs' medical records, Dr. Cohen's conclusions, and to applicable medical literature including any references in his report, as well as to demonstrative exhibits prepared in advance of trial. Dr. Cohen may refer to the reports of Plaintiff's other expert witnesses. Plaintiff also anticipates that this witness will use an ELMO and/or other computerized graphic presentation of the evidence during the course of his testimony.

Dr. Cohen reserves the right to amend and/or supplement his opinions in light of additional testimony, information and/or materials received in the matter.

**2.    Douglas Phillips, M.D.**
         2848 Merrick Road
         Bellmore, NY 11710

Dr. Phillips is Board-Certified in obstetrics and gynecology. His curriculum vitae, fee schedule and list of cases are attached to this statement. Dr. Phillips will testify based upon his education, training, experience, and review of N.O.'s and Christine Orwig's medical records, radiology films and studies, the deposition testimony of all fact witnesses, and all other records and materials produced in discovery as well as the conclusions reached by Dr. Phillips. He is expected to testify in accordance with his signed, written report, which is attached hereto. He is further expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants. At trial, he will refer to

2

**-27-**

Plaintiffs' medical records, Dr. Phillips' conclusions, and to applicable medical literature including any references in his report, as well as to demonstrative exhibits prepared in advance of trial. Dr. Phillips may refer to the reports of Plaintiffs' other expert witnesses. Plaintiffs also anticipate that this witness will use an ELMO and/ or other computerized graphic presentation of the evidence during the course of his testimony.

Dr. Phillips reserves the right to amend and/or supplement his opinions in light of additional testimony, information and/or materials received in the matter.

3.    **Marcus Hermansen, M.D.**
Southern New Hampshire Medical Center
8 Prospect Street
Nashua, NH 03060

Dr. Hermansen is Board Certified in pediatrics and sub-boarded in neonatology-perinatal medicine. His curriculum vitae, fee schedule and list of cases are attached to this statement. Dr. Hermansen will testify based upon his education, training, experience, and review of N.O.'s and Christine Orwig's medical records, radiology films and studies, the deposition testimony of all fact witnesses, and all other records and materials produced in discovery as well as the conclusions reached by Dr. Hermansen. He is expected to testify in accordance with his signed, written report, which is attached hereto. He is further expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants.    At trial, he will refer to Plaintiffs' medical records, Dr. Hermansen's conclusions, and to applicable medical literature including any references in his report, as well as to demonstrative exhibits prepared in advance of trial. Dr. Hermansen may refer to the reports of Plaintiffs' other expert witnesses. Plaintiffs also anticipate that this witness will use an ELMO and/ or other computerized graphic presentation of the evidence during the course of his testimony.

3

-28-

Dr. Hermansen reserves the right to amend and/or supplement his opinions in light of additional testimony, information and/or materials received in the matter.

**4.    William Malcolm, M.D.**
Duke University Medical Center #3127
Durham, N.C. 27710

Dr. Malcolm is Board-Certified in pediatrics and is a neonatologist at Duke University Medical Center. His curriculum vitae, fee schedule and list of cases are attached to this statement. Dr. Malcolm will testify based upon his education, training, experience, and review of N.O.'s and Christine Orwig's medical records, radiology films and studies, the deposition testimony of all fact witnesses, and all other records and materials produced in discovery as well as the conclusions reached by Dr. Malcolm. He is expected to testify in accordance with his signed, written report, which is attached hereto. He is further expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants. At trial, he will refer to Plaintiffs' medical records, Dr. Malcolm's conclusions, and to applicable medical literature including any references in his report, as well as to demonstrative exhibits prepared in advance of trial. Dr. Malcolm may refer to the reports of Plaintiffs' other expert witnesses. Plaintiffs also anticipate that this witness will use an ELMO and/or other computerized graphic presentation of the evidence during the course of his testimony.

Dr. Malcolm reserves the right to amend and/or supplement his opinions in light of additional testimony, information and/or materials received in the matter.

4

**-29-**

5.   **Carol Benson, M.D.**
     Brigham and Women's Hospital
     75 Francis Street
     Boston, MA 02115

Dr. Benson is Board-Certified in radiology.  She is an obstetrical ultrasound radiologist at Brigham and Women's Hospital and a professor of medicine at Harvard University. Dr. Benson's curriculum vitae, fee schedule and list of cases are attached to this statement.  Dr. Benson will testify based upon her education, training, experience, and review of N.O.'s and Christine Orwig's medical records, radiology films and studies, the deposition testimony of all fact witnesses, and all other records and materials produced in discovery as well as the conclusions reached by Dr. Benson.  She is expected to testify in accordance with her signed, written report, which is attached hereto.  She is further expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants.  At trial, she will refer to Plaintiffs' medical records, Dr. Benson's conclusions, and to applicable medical literature including any references in her report, as well as to demonstrative exhibits prepared in advance of trial.  Dr. Benson may refer to the reports of Plaintiffs' other expert witnesses. Plaintiffs also anticipate that this witness will use an ELMO and/or other computerized graphic presentation of the evidence during the course of his testimony.

Dr. Benson reserves the right to amend and/or supplement his opinions in light of additional testimony, information and/or materials received in the matter.

5

**-30-**

6.    **Khushbakhat Mittal, M.D.**
      New York University
      462 First Avenue
      New York, NY 10016

Dr. Mittal is Board-Certified in pathology. He is a placental pathologist and the Director of Obstetric and Gynecologic Pathology at New York University Medical Center. Dr. Mittal's curriculum vitae, fee schedule and list of cases are attached to this statement. Dr. Mittal will testify based upon his education, training, experience, and review of placental pathology slides, and reserves the right to rely on all other records and materials produced in discovery. He is expected to testify in accordance with his signed, written report, which is attached hereto. He is further expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants. At trial, he will refer to Plaintiffs' medical records, Dr. Mittal's conclusions, and to applicable medical literature including any references in his report, as well as to demonstrative exhibits prepared in advance of trial. Dr. Mittal may refer to the reports of Plaintiffs' other expert witnesses. Plaintiffs also anticipate that this witness will use an ELMO and/or other computerized graphic presentation of the evidence during the course of his testimony.

Dr. Mittal reserves the right to amend and/or supplement his opinions in light of additional testimony, information and/or materials received in the matter.

7.    **Craig Lichtblau, M.D.**
      550 Northlake Blvd.
      North Palm Beach, FL 33408

Dr. Lichtblau is Board-Certified in physical medicine and rehabilitation. His curriculum vitae, fee schedule and list of cases are attached to this statement. Dr. Lichtblau will testify based upon his education, training, experience, and review of N.O.'s and Christine Orwig's medical records, radiology films and studies, the deposition testimony

6

**-31-**

of all fact witnesses, and all other records and materials produced in discovery as well as

the conclusions reached by Dr. Lichtblau. He is expected to testify in accordance with his

signed, written report, which is attached hereto. He is further expected to address and/or

rebut opinions expressed by experts retained in this matter by Defendants. At trial, he

will refer to Plaintiffs' medical records, Dr. Lichtblau's conclusions, and to applicable

medical literature including any references in his report, as well as to demonstrative

exhibits prepared in advance of trial. Dr. Lichtblau may refer to the reports of

Plaintiffs' other expert witnesses. Plaintiffs also anticipate that this witness will use

an ELMO and/or other computerized graphic presentation of the evidence during the

course of his testimony.

Dr. Lichtblau reserves the right to amend and/or supplement his opinions in light

of additional testimony, information and/or materials received in the matter.

8.    **Thomas Borzilleri, Ph.D.**
      6701 Democracy Blvd., Ste. 300
      Bethesda, MD 20817

Thomas Borzilleri is an expert economist retained to calculate the present value of N.O's

future medical needs and loss of earning capacity. His curriculum vitae, fee schedule, and list of

cases are attached. Dr. Borzilleri is expected to testify regarding the pecuniary losses suffered

and likely to be suffered in the future on account of the injuries and damages sustained by N.O.

and by Christine Orwig. Dr. Borzilleri will testify based upon his education, training, experience

and upon his review of the report of Craig Lichtblau, M.D. He may also review other

documents, such as depositions taken in this matter, and reports and records from experts

designated by the Defendants, and other materials. Dr. Borzilleri's opinions, the basis for the

opinions, and the facts and data considered are included in the attached report. He may be further

7

**-32-**

expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants.

Dr. Borzilleri reserves the right to amend and/or supplement his opinions in light of additional testimony, information and/or materials received in the matter. Dr. Borzilleri reserves the right to update his economic evaluation to adjust the incurred and future economic losses based upon the date of trial, and in the event additional information becomes known about N.O.'s disabilities. Dr. Borzilleri may use charts, graphs, economic models, rate sheets, and learned treatises in his testimony.

### NON-RETAINED TREATING PHYSICIANS

The following physicians are treating physicians who provided N.O. with care and treatment following the negligence in this case. Plaintiffs reserve the right to elicit testimony from these physicians consistent with their observations and conclusions made at the time they provided care for the Plaintiffs.

9. **Robert Keating, M.D.**
   Children's National Medical Center
   111 Michigan Avenue, N.W.
   Washington, DC 20010

It is anticipated that Dr. Keating will testify regarding the surgical and medical care he provide to N.O. He is expected to testify as to why N.O. needed this medical and surgical treatment and her future needs. Plaintiffs also intend to elicit testimony as to why this medical and surgical treatment was appropriate and necessary.

8

10. **John Myseros, M.D.**
    Children's National Medical Center
    111 Michigan Avenue, N.W.
    Washington, DC 20010

It is anticipated that Dr. Mysersos will testify regarding the surgical and medical care he provide to N.O. He is expected to testify as to why N.O. needed this medical and surgical treatment. Plaintiffs also intend to elicit testimony as to why this medical and surgical treatment was appropriate and necessary.

11. **Patricia Mancuso, M.D.**
    Baylor College of Medicine – San Antonio
    Room BCLN-1350
    San Antonio, TX 78207

It is anticipated that Dr. Mancuso will testify regarding the surgical and medical care she is providing to N.O. She is expected to testify as to why N.O. needed this medical and surgical treatment. Plaintiffs also intend to elicit testimony as to why this medical and surgical treatment was appropriate and necessary.

12. **John M. North, M.D.**
    Fairfax Neonatal Associates
    Inova Children's Hospital
    3300 Gallows Road
    Falls Church, VA 22042

It is anticipated that Dr. North will testify regarding the surgical and medical care he provided to N.O. He is expected to testify as to why N.O. needed this medical and surgical treatment. Plaintiffs also intend to elicit testimony as to why this medical and surgical treatment was appropriate and necessary.

13.    Plaintiffs reserve the right to supplement this designation upon completion of the depositions of the parties or other fact witnesses and completion of discovery.

9

**-34-**

14.    Plaintiffs reserve the right to elicit expert testimony from any experts who may be identified by Defendants, and from the Defendants, its agents and/or employees.

Dated: October 12, 2015                           Respectfully submitted,

                                                  PERRY CHARNOFF PLLC

                                                  Scott M. Perry (#67417)
                                                  Mikhael D. Charnoff (#43929)
                                                  2300 Wilson Boulevard, Suite 240
                                                  Arlington, VA 22202
                                                  P:  (703) 291-6650
                                                  F:  (703) 563-6692
                                                  scott@perrycharnoff.com
                                                  mike@perrycharnoff.com

                                                  Laurie A. Amell (#33854)
                                                  Catherine Bertram (admitted *pro hac vice*)
                                                  BERTRAM & AMELL
                                                  1666 Connecticut Avenue, N.W., Suite 250
                                                  Washington, DC 20009
                                                  P: (202) 803-5800
                                                  F: (202) 803-6814
                                                  lamell@betramamell.com

                                                  *Counsel for Plaintiffs*

10

**-35-**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on the 12th day of October, 2015, a copy of the foregoing

was mailed to:

J. Jonathan Schraub, Esq.
Paige Levy Smith, Esq.
Sands Anderson, P.C.
1497 Chain Bridge Road, Suite 202
McLean, VA 22101-5728
*Counsel for Defendants About Women, OB/GYN, P.C. & Marc Alembik, M.D.*

Scott M. Perry

11

**-36-**

My name is Craig Cohen, MD, MPH. I am a Professor in the UCSF Department of Obstetrics, Gynecology and Reproductive Sciences. My medical specialty is reproductive infectious disease. I am also an attending physician at San Francisco General Hospital and Co-Director of the University of California Global Health Institute Center of Expertise in Women's Health & Empowerment. I have published numerous articles in peer-reviewed journals regarding reproductive infectious disease. I have extensive experience diagnosing and treating obstetric infections including chorioamnionitis. As such, I am familiar with the clinical presentation, differential diagnosis, frequency, standard treatment and known complications for the fetus of this condition as of the time of the treatment rendered in this case. The risks for the fetus included meningitis, sepsis, intracranial hemorrhage and prematurity.

I received my undergraduate degree from the University of California Berkeley, followed by my medical degree at the University of Louisville School of Medicine. I then completed a residency in obstetrics & gynecology at Northwestern University. Following residency I completed a post-doctoral fellowship in infectious diseases at the University of Washington that included a Masters in Public Health. I attach my curriculum vitae, which is incorporated herein by reference, along with a fee schedule and list of cases.

I have reviewed the medical records in this case, which include the prenatal records of Christine Orwig from About Women OB/GYN, the hospital records for Christine Orwig and N.O. at Sentara Potomac Hospital and the hospital records for N.O. at Inova Fairfax Hospital. I have formulated opinions to a reasonable degree of medical certainty regarding the breaches in the standard of care involving the treatment provided by Dr. Marc Alembik, a private attending physician who was employed by About Women OB/GYN PC. I have also formulated opinions to a reasonable degree of medical certainty as how the breaches in the standard of care by Dr. Alembik, individually and as an employee of About Women OB/GYN PC were a proximate cause of N.O.'s injuries.

The medical records confirm that Christine Orwig had a normal pregnancy and received standard prenatal care through 27 weeks. Christine Orwig presented to About Women OB/GYN with premature rupture of membranes ("PROM") at 28 weeks and she was admitted to Sentara Potomac Hospital. She tested negative for group B strep ("GBS-") on September 28, 2011. Daily non stress tests (NST) were performed which demonstrated appropriate fetal response prior to October 13, 2011. The baseline fetal heart rate on October 5, 2011 was in the 130s. Baseline fetal heart rate remained at or below 150 until October 13, 2011. As of the morning of October 13, 2011, the fetus was 30 3/7 weeks with an estimated fetal weight of 1580 grams based on ultrasound. The fetus generally appeared to be without complications or concerns prior to October 13, 2011.

The medical records indicate that the clinical circumstances changed on October 13, 2011. The nursing notes indicate more than one episode of foul smelling fluid was experienced by the patient and verified by the nurse on October 13th. The record also verifies that this information was communicated to Dr. Alembik. In addition, the baseline fetal heart rate on October 13 was recorded as 160 bpm with variables at 12:34 p.m., in 160's at 13:09 p.m., and in the 170's with variable decelerations at 14:30. The fetal heart rate remained tachycardic on October 13th. A repeat NST was performed. The nurse called Dr. Alembik to evaluate. Dr. Alembik performed a



**-37-**

vaginal exam; he noted a large amount of fluid. By 13:00, the lab tests showed that Ms. Orwig had an elevated white blood cell count of 15.6. and a left shift with segs of 92%. An ultrasound with biophysical profile was ordered. Fetal breathing movements were scored as zero. Overall, the fetus was scored a 6 out of 8, which is equivocal for this fetus. Dr. Alembik wrote an order for clindamycin 900 mg IVPB x 1, then 60 mg IVPB every 6 hours. The clindamycin appears to have been administered at or around 15:00. Specifically, no antibiotic with adequate coverage for Gram negative bacteria was ordered or administered on October 13, 2011.

By 14:30, the fetal heart rate was documented to be in the 170's and there were occasional variable decelerations. By 17:00, the fetus's baseline heart rate was 185 bpm. Supplemental oxygen was applied. A second dose of clindamycin was given per the records at 21:15. By 21:30 the nursing staff was having Mrs. Orwig turn on her side due to variable decelerations. At 21:46, with Dr. Alembik present it was noted that the patient was feeling "pressure." Dr. Alembik conducted a vaginal exam and had an intrauterine pressure catheter inserted.

At 23:27, it is noted that the fetus experienced two large decelerations to 60 bpm lasting 90 seconds. The nursing staff called Dr. Alembik to the room for delivery. N.O. was vaginally delivered at 23:35. N.O.'s APGAR scores were 4 at one minute and 8 at five minutes. Foul smelling fluid was again noted at delivery. The blood gas from the umbilical at artery at delivery was pH of 7.284, PCO2 57.0, PO2 10.6, HCO3 26.4 with a base excess of 1.4. The placental pathology confirmed chorioamnionitis, and a three-vessel cord. N.O. required brief resuscitation and was transferred to the NICU. Cultures taken from the placenta at delivery grew Gram negative rods, presumptive for *E. Coli*. The infant was given gentamicin.

N.O. subsequently developed seizures, which were noted on October 15, 2011. The decision was made to transfer her to Inova Fairfax Hospital's NICU. N.O.'s discharge diagnosis noted sepsis, *E. Coli*, and suspected meningitis. N.O. was admitted to the Fairfax NICU's for treatment of meningitis, sepsis. A lumbar puncture on October 16, 2011 confirmed Gram negative rods. A head ultrasound on October 16, 2011 found a grade II bleed in the right ventricle and a possible grade I bleed in the left ventricle. Subsequent ultrasounds showed progressive development of hydrocephalus.

It is my opinion to a reasonable degree of medical certainty that Dr. Alembik breached the applicable standard of care under the circumstances by his failure to order a second antibiotic for Mrs. Orwig at the time he diagnosed the chorioamnionitis and admitted her to labor and delivery for induction of labor. The standard of care required Dr. Alembik to order a second antibiotic to cover Gram negative organisms, such as *E. coli*, given the clear signs and symptoms of clinical chorioamnionitis that the patient was exhibiting by 14:30 on October 13, 2011. I base my opinion on the available medical records, the deposition testimony of Ms. Orwig, as well as my training, education and experience, the medical literature and specifically ACOG Clinical Management Guidelines for Obstetrician-Gynecologists, Number 80, April 2007, which was in effect at the time the care was provided in this case. The ACOG management guideline has been validated by appropriately conducted outcome-based research.

It is my opinion, that Dr. Alembik made the diagnosis of clinical choriomnionitis, which is noted in the medical records. Ms. Orwig due to her history of preterm premature rupture of membranes had a significant risk of developing choriomniontis. Both the nurse and patient had recognized development of a foul smelling vaginal discharge (reported to Dr. Alembik), and the

fetus developed tachycardia, both signs of clinical chorioamnionitis. Furthermore, the final placental pathological diagnosis was acute chorioamnionitis. Thus, it is my professional opinion that Dr. Alembik made the correct diagnosis of clinical chorioamnionitis, but mistakenly did not treat the patient with the standard antibiotic regimen for this condition

The premature rupture of membranes "PROM" is a complication in approximately one third of preterm births. PROM is typically associated with increased risk of perinatal infection. Intraamniotic infection has been shown to commonly be associated with preterm PROM, especially if preterm PROM occurs at earlier gestational age. Of women with preterm PROM, clinically evident intraamniotic infection occurs in 13-60% of cases.

It is standard of care to order antibiotics to cover both Gram positive and Gram negative bacteria in this clinical circumstance and it is very important to ensure that loading doses and subsequent doses are administered in order to protect the fetus. The accepted standard was not met in this case. Dr. Alembik only ordered a loading dose of clindamycin and no other antibiotic such as gentamycin which is what was required for this patient given her known penicillin allergy. The failure to timely order and have gentamycin administered on October 13, 2011 is a proximate cause of N.O.'s subsequent infection and sequelae including intraventricular hemorrhage. Had the standard of care been followed, the infant would have had broad spectrum antibiotic coverage that included Gram negative bacteria such as *E. coli* prior to delivery and, more likely than not this would have prevented the intracranial hemorrhage and other complications.

It is my opinion to reasonable degree of medical certainty that a proximate cause of N.O.'s hydrocephalus and her brain bleed was the progression of chorioamnionitis, which led to meningitis and sepsis. N.O. was born at 30 3/7 weeks. At 30 3/7 weeks, fetuses are generally well developed as was the case for N.O. who weighed 1570 grams. In addition, N.O.'s APGARs were 4 at one minute and 8 at five minutes. Although she needed resuscitation, it was brief and N.O. did well on CPAP. N.O. had no dysmorphia, her initial arterial chord gas of 7.346 is within the normal range. At birth, N.O.'s temperature was elevated, her heart rate was elevated and white blood cell count was low. These factors indicate that the cause of N.O.'s hydrocephalus and brain bleed occurred at or close to the time of birth, i.e. on October 13, 2011. If a factor other than the progression of chorioamnionitis on October 13, 2011 was an actual cause of N.O.'s condition, then the infant's overall clinical condition at birth would have been much worse.

As to the brain bleed, it is well known that if meningitis is allowed to progress it can get into the cerebral spinal fluid and cross the blood-brain barrier, which occurred here and likely resulted in the intraventricular hemorrhage. It is extremely unlikely for a Grade III brain bleed to develop post-delivery in a 30 week old baby without an infection. In this case, to a reasonable degree of medical certainty the brain bleed and hydrocephalus developed as a result of the progression of chorioamnionitis and infection of the fetus that caused meningitis and sepsis as a result of Dr. Alembik's failure to order gentamycin on October 13, 2011 at approximately 14:30.

As additional information becomes available, I reserve the right to supplement my opinions.

*Craig R Cohen*
-----------------------------------------
Craig R. Cohen, MD, MPH

My name is Craig Cohen, M.D., MPH. I was recently deposed in the case of *Orwig v. About Women Ob/Gyn, PC.* During the deposition, I was asked about the following sentence from page two of my report (second full paragraph): "Cultures taken from the placenta at delivery grew Gram negative rods, presumptive for *E. Coli.*" That sentence should read: "Blood cultures taken from N.O. on 10/14/11 grew Gram negative rods presumptive for *E. Coli.*" In addition, my report references ACOG Clinical Management Guidelines for Obstetrician-Gynecologists, Number 80, April 2007. To be clear, as to the need to use antibiotics with Gram negative coverage for chorioamnionitis, such as gentamicin, that is supported by *Diagnosis and Management of Clinical Chorioamnionitis,* 2010 Clin. Perin.; 37(2):339-354. This article was attached as Exhibit 3 to my deposition.

Craig R.
Cohen

Digitally signed by Craig R.
Cohen
DN: cn=Craig R. Cohen, o, ou,
email=craig.cohen.ucsf.edu
c=US
Date: 2015.11.23 11:42:25
-04'00'

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### (Alexandria Division)

| | |
|---|---|
| N.O., a minor, by Christine Orwig,<br>her Mother and Next Friend and<br>CHRISTINE ORWIG, Individually,<br><br>      Plaintiffs,<br><br>v.<br><br>ABOUT WOMEN OB/GYN, P.C. and<br>MARC ALEMBIK, M.D.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:15cv868-TSE-JFA<br>)<br>)<br>)<br>) |

### PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE
### IMPROPER STANDARD OF CARE TESTIMONY

Plaintiffs N.O. and Christine Orwig, by counsel, file this Motion in Limine to exclude improper standard of care testimony from experts identified by Defendants on a standard of care issue not alleged by Plaintiffs. In support of this Motion, Plaintiffs file this same day an accompanying Memorandum in Support.

WHEREFORE, Plaintiffs respectfully request the Court grant their Motion in Limine to exclude improper standard of care testimony, and for all other relief the Court deems fair and just.

### STATEMENT PURSUANT TO PARAGRAPH 9(a) OF THE
### COURT'S RULE 16(B) SCHEDULING ORDER

Plaintiffs have communicated in writing to Defendants in good faith seeking consent. After consideration, Defendants advised that they cannot agree.

Dated: April 1, 2016                    Respectfully submitted,

                                        PERRY CHARNOFF PLLC

                                        ___s/  Scott M. Perry_____
                                        Scott M. Perry (#67417)
                                        Mikhael D. Charnoff (#43929)
                                        2300 Wilson Boulevard, Suite 240
                                        Arlington, VA 22202
                                        P:  (703) 291-6650
                                        F:  (703) 563-6692
                                        scott@perrycharnoff.com
                                        mike@perrycharnoff.com

                                        Laurie A. Amell (#33854)
                                        Catherine Bertram (admitted *pro hac vice*)
                                        BERTRAM & AMELL
                                        1666 Connecticut Avenue, N.W., Suite 250
                                        Washington, DC 20009
                                        P: (202) 803-5800
                                        F: (202) 803-6814
                                        lamell@betramamell.com
                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of April, 2016 a copy of the foregoing was sent

by facsimile and electronic filing to:

J. Jonathan Schraub, Esq.
Paige Levy Smith, Esq.
Sands Anderson, P.C.
1497 Chain Bridge Road, Suite 202
McLean, VA 22101-5728
*Counsel for Defendants About Women, OB/GYN, P.C. & Marc Alembik, M.D.*

And a copy was hand delivered via the Clerk's Office to:

The Honorable T.S. Ellis, III
United States District Court
   for the Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 223124

s/  Mikhael D. Charnoff
Mikhael D. Charnoff

**3**

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### (Alexandria Division)

| | | |
|---|---|---|
| N.O., a minor, by Christine Orwig,<br>her Mother and Next Friend and<br>CHRISTINE ORWIG, Individually,<br><br>    Plaintiffs,<br><br>v.<br><br>ABOUT WOMEN OB/GYN, P.C. and<br>MARC ALEMBIK, M.D.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:15cv868-TSE-JFA |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE IMPROPER STANDARD OF CARE TESTIMONY

Plaintiffs N.O. and Christine Orwig, by counsel, file this Motion in Limine to exclude improper standard of care testimony from experts identified by Defendants on a standard of care issue not alleged by Plaintiffs. In support of this Motion, Plaintiffs respectfully state as follows.

### FACTUAL BACKGROUND

This is a medical malpractice case that the Court is familiar with, having authored a January 4, 2016 Memorandum Opinion denying motions in limine brought by Defendants. In brief, on October 13, 2011, Defendant Mark Alembik, M.D., an obstetrician, ordered that 30-week pregnant Christine Orwig be transferred to the labor and delivery unit of a local hospital. Dr. Alembik's admitting diagnosis to labor and delivery was chorioamnionitis.[1]

This is Dr. Alembik's handwritten diagnosis:



---

[1]    Chorioamnionitis is an inflammation of the fetal membranes (amnion and chorion) caused by an infection. Untreated chorioamnionitis can cause catastrophic injuries to the baby including sepsis, meningitis, and intracranial bleeding. N.O. suffered all of these.

Plaintiffs allege a single breach of the standard of care: that when Dr. Alembik diagnosed chorioamnionitis, he was required to prescribe two drugs, one to protect against gram-positive pathogens and one to protect against gram-negative pathogens. It is undisputed that Dr. Alembik only prescribed one drug, which protects against gram-positive pathogens. It is likewise undisputed that at birth N.O. was diagnosed with chorioamnionitis caused by a gram-negative pathogen.

Despite his diagnosis of chorioamnionitis documented in Dr. Alembik's own handwriting in the medical record, Dr. Alembik has taken the position in this litigation that he did not diagnose Ms. Orwig with chorioamnionitis.[2] For this defense, Dr. Alembik relies on a different entry in the record in which he wrote that Ms. Orwig had "probable impending chorioamnionitis."[3] This creates a fact issue for the jury. Did Dr. Alembik diagnose Ms. Orwig with chorioamnionitis?

The problem is that Dr. Alembik seeks to impermissibly use expert witness testimony to resolve this purely factual jury issue. Specifically, he seeks to present expert witnesses who will testify that Dr. Alembik's claimed failure to diagnose chorioamnionitis was within the standard of care. But Plaintiffs do not allege that Dr. Alembik breached the standard of care by failing to diagnose chorioamnionitis because the record establishes that he did diagnose it. As such, the proposed expert witness testimony regarding a breach not alleged would both improperly invade

---

[2]    Dr. Alembik was forced to take this incredible position because he also conceded under oath that his standard practice when treating chorioamnionitis is to prescribe drugs that fight both gram-positive and gram-negative pathogens, which he failed to do here. This is the very regimen that Plaintiffs' experts will testify was required by the standard of care.

[3]    Plaintiffs and their experts are at a loss to understand how this entry supports Dr. Alembik's litigation-invented defense that he did not diagnose chorioamnionitis. However, this is his position.

the province of the jury as to a purely factual dispute, and unfairly prejudice Plaintiffs by turning

a fact question into an expert witness question.

## ARGUMENT

### I.  THE STANDARD OF CARE DISPUTE INVOLVES TREATMENT, NOT DIAGNOSIS

#### A.  Plaintiffs' Experts Allege That Dr. Alembik Breached the Standard of Care by Prescribing the Wrong Treatment

Plaintiffs identified Craig Cohen, M.D., M.P.H. as an expert witness on standard of care

and causation.  Exhibit 1, Cohen report at 1.  Dr. Cohen alleges one violation of the standard of

care.  Specifically, on page two, his report states:

> **It is my opinion to a reasonable degree of medical certainty that Dr. Alembik breached the applicable standard of care under the circumstances by his failure to order a second antibiotic for Mrs. Orwig at the time he diagnosed the chorioamnionitis and admitted her to labor and delivery for induction of labor.**  The standard of care required Dr. Alembik to order a second antibiotic to cover Gram negative organisms, such as *E. coli*, given the clear signs and symptoms of clinical chorioamnionitis that the patient was exhibiting by 12:30 on October 13, 2011.

(Emphasis added).[4]

Similarly, Plaintiffs identified Douglas R. Phillips, M.D., F.A.C.O.G., F.A.C.S., F.I.C.S.

as an expert witness on standard of care.  See Exhibit 2.  His sole standard of care opinion, too, is

the failure to prescribe the correct medication regimen:  "It is my opinion to a reasonable degree

of medical certainty that Dr. Alembik deviated from the standard of care by failing to administer

a second antibiotic to Ms. Orwig on 10/13/11 at 2:30 p.m. when he diagnosed her with

chorioamnionitis and initiated her induction of labor."  *Id.* at 8.

---

[4]     Dr. Cohen goes on to specifically state at the top of page three of his report that "it is my professional opinion that Dr. Alembik made the correct diagnosis of clinical chorioamnionitis, but mistakenly did not treat the patient with the standard antibiotic regimen for this condition."

3

In other words, the alleged deviation from the standard of care only concerns treatment, not diagnosis. Neither standard of care expert identified by Plaintiffs have been designated to testify that Dr. Alembik misdiagnosed or failed to diagnose Plaintiffs. This is because he diagnosed the very condition at issue as demonstrated in the record.

### B.   Defendants' Experts Improperly Opine About Whether the Diagnosis Was Required, and Such Testimony Should be Excluded

Defendants filed an Expert Witness Designation in which individuals are designated to testify that Dr. Alembik's failure to diagnose chorioamnionitis did not breach the standard of care. *See, e.g.,* Exhibit 3, at 3:

> I will explain that in real time an obstetrician is able to make a diagnosis of chorioamnionitis based only on presenting clinical information and does not have the benefit of placental pathology, through which, at some later time, a pathological diagnosis of chorioamnionitis may be made.
>
> According to accepted obstetric medical literature, the standard of care allows for consideration of a variety of different criteria to diagnose clinical chorioamnionitis. In one accepted method (which I use), in order to make a clinical diagnosis of chorioamnionitis, the patient must demonstrate three of the following five criteria ….

*See also* Exhibit 4, at 2 (Dr. Norwitz is allegedly going to "explain the clinical diagnosis of chorioamnionitis (intraamniotic infection) and the distinction between a clinical and histological or pathological diagnosis of chorioamnionitis.") Neither of these opinions respond to the standard of care breach being alleged by Plaintiffs: improper treatment once the diagnosis was made. Instead, these opinions seek to turn a purely factual question into an expert witness issue.[5]

---

[5]    Plaintiffs do not move to exclude these experts' opinions in their entirety as they also opine that the standard of care once chorioamnionitis was diagnosed by Dr. Alembik did not require the prescribing of two drugs. This addresses the standard of care issue in dispute and thus is proper.

Pursuant to Federal Rule of Evidence 702 expert witness testimony may be admissible if it will help the fact finder determine an issue in dispute that is beyond the ken of the average juror. "The district court may also exclude expert testimony if it does not aide the finder of fact." *Stradtman v. Republic Servs.*, 2015 U.S. Dist. LEXIS 55266, *4 (E.D. Va. Apr. 28, 2015) (citations omitted). Expert testimony is not admissible to resolve purely factual questions that are within the province of the jury. *See e.g. Carter v. U.S.*, 2014 U.S. Dist. LEXIS 109930, *14 (E.D. Va. Aug. 8, 2014) (excluding expert opinion that goes to an issue that should be left to the trier of fact). Expert testimony used in this way is improper because it usurps the jury's role. And whether to admit expert witness testimony is at the discretion of the trial court. *See* F.R.E. 702.

Dr. Alembik either did or did not diagnose Ms. Orwig with chorioamnionitis when he ordered her admitted to labor and delivery. That will be determined via the jury's review of the medical records introduced at trial, the trial testimony of Dr. Alembik, and any other fact witness with knowledge of the circumstances surrounding the admission. Defense expert testimony as to whether the standard of care *required* Dr. Alembik to diagnose chorioamnionitis is irrelevant. The question is simply whether he *did* diagnose it.

This testimony is not only impermissible pursuant to Fed. R. Civ. P. 702, but it should also be excluded pursuant to Rule 403 of the Federal Rules of Evidence as it is far more prejudicial and unfair to Plaintiffs than probative. Defendants' experts seek to testify that the standard of care did not require diagnosis of chorioamnionitis because Ms. Orwig did not meet all of the criteria for diagnosing clinical chorioamnionitis. They specifically focus on the fact that Ms. Orwig's temperature "only" reached 99.9 degrees when, according to them, it needed to reach 100.4 degrees (a ½ degree more) before the standard of care required a diagnosis of

5

clinical chorioamnionitis. But again, what the standard of care may or may not require as to diagnosis sheds no light on whether Dr. Alembik actually diagnosed chorioamnionitis.

Rule 403 of the Federal Rules of Evidence expressly states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In the Fourth Circuit, "District courts are granted "broad discretion" to decide 'whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, misleading the jury, or confusion of the issues.'" *Cisson v. C.R. Bard, Inc. (In re C.R. Bard, Inc.)*, 810 F.3d 913, 920, 2016 U.S. App. LEXIS 589, *9 (4th Cir. W. Va. 2016) (quoting *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 349 (4th Cir. 2014)). The District Court in *Cisson* refused to create a mini-trial over a collateral issue that would create "very substantial dangers of misleading the jury and confusing the issues." *Id.* at 922.

Here, allowing defense experts to opine about the standard of care for diagnosis (as opposed to treatment) would be beyond the scope of Plaintiffs' case and very confusing for the jury. They would be misled and left to wonder why Defendants are attempting to rebut a proposition not argued by Plaintiffs. It would be unfairly prejudicial to overlay the purely factual question of whether Dr. Alembik diagnosed chorioamnionitis with the testimony of two defense-hired doctors who claim he was not required to do so. If the jury heard this expert testimony and accepted it, it would improperly allow them to conclude that because the standard of care did not require the diagnosis of chorioamnionitis, Dr. Alembik must not have diagnosed it.

Moreover, because Plaintiffs have the burden of proof they have the right to have the case decided based on the standard of care violation alleged by them: improper treatment for

chorioamnionitis.  Defendants, who bear no burden, are not entitled to muddy the waters by

injecting standard of care questions not being challenged.  The real purpose of such testimony

would be to unnecessarily complicate the case and distract jury from the questions at hand:  did

Dr. Alembik diagnose chorioamnionitis; did Dr. Alembik breach the standard of care by

prescribing only one drug; and if so, did Dr. Alembik's breach proximately cause Plaintiffs'

injuries and damages?

    WHEREFORE, Plaintiffs respectfully request the Court grant their Motion in Limine to

exclude improper standard of care testimony, and for all other relief the Court deems fair and

just.


Dated: April 1, 2016                    Respectfully submitted,

                                        PERRY CHARNOFF PLLC

                                            s/  Scott M. Perry
                                        Scott M. Perry (#67417)
                                        Mikhael D. Charnoff (#43929)
                                        2300 Wilson Boulevard, Suite 240
                                        Arlington, VA 22202
                                        P:  (703) 291-6650
                                        F:  (703) 563-6692
                                        scott@perrycharnoff.com
                                        mike@perrycharnoff.com

                                        Laurie A. Amell (#33854)
                                        Catherine Bertram (admitted *pro hac vice*)
                                        BERTRAM & AMELL
                                        1666 Connecticut Avenue, N.W., Suite 250
                                        Washington, DC 20009
                                        P: (202) 803-5800
                                        F: (202) 803-6814
                                        lamell@betramamell.com

                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of April, 2016 a copy of the foregoing was sent

by facsimile and electronic filing to:

J. Jonathan Schraub, Esq.
Paige Levy Smith, Esq.
Sands Anderson, P.C.
1497 Chain Bridge Road, Suite 202
McLean, VA 22101-5728
*Counsel for Defendants About Women, OB/GYN, P.C. & Marc Alembik, M.D.*


And a copy was hand delivered via the Clerk's Office to:

The Honorable T.S. Ellis, III
United States District Court
   for the Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 223124


                                         s/  Mikhael D. Charnoff
                                        Mikhael D. Charnoff

8

**-51-**



UNIVERSITY *of* VIRGINIA HEALTH SYSTEM          *The* DEPARTMENT *of* OBSTETRICS *and* GYNECOLOGY

James E. (Jef) Ferguson II, MD, MBA
*Professor and Chair*

Christian A. Chisholm, MD
*Vice Chair Education*

Diane Rozycki, MD
*Patient Quality and Safety Officer*

Irene Tostanoski, MHA
*Administrator*

*FEMALE PELVIC MEDICINE AND
RECONSTRUCTIVE SURGERY*
Elisa R. Trowbridge, MD
Kathie L. Hullfish, MD
Carolyn Eddins, FNP

*GYNECOLOGIC ONCOLOGY*
Susan C. Modesitt, MD
Linda Duska, MD
Leigh Cantrell, MD, MSPH
Charles N. Landen, Jr., MD, MS
Willie A. Andersen, MD (Professor Emeritus)
Peyton T. Taylor, MD (Professor Emeritus)

*MATERNAL-FETAL MEDICINE.*
Donald J. Dudley, MD
Christian A. Chisholm, MD
James E. (Jef) Ferguson II, MD, MBA
Annelee Boyle, MD
Kate Pettit, MD
William H.P. Herbert, MD (Professor Emeritus)
Logan B. Karns, MS
Karen A. Ventura, MS

*REPRODUCTIVE MEDICINE AND SURGERY*
Bruce G. Bateman, MD
Laura P. Smith, MD
Christopher Williams, MD
Wallace C. Nunley, Jr., MD

*MIDLIFE HEALTH*
JoAnn V. Pinkerton, MD
Carolyn Wilson, MD
Michelle Rindos, MD

*GENERAL OBSTETRICS AND GYNECOLOGY*
Vanessa H. Gregg, MD
Dana L. Redick, MD
Katherine Kent, MD
Megan J. Bray, MD
Carrie Sopata, MD
Diane Rozycki, MD
Megan Barrett, MD
Dana Porter, MD
Sarah Mercer, PA

*AMBULATORY OBSTETRICS AND
GYNECOLOGY*
Yvonne Newberry, MSN, FNP
Denise S. Young, MD
Kate Becker, NP, CNM

*RESEARCH*
Euseblo Pires, PhD

*TEEN HEALTH CENTER*
Dyan Arelakis, MSN, WHNP
Heather Payne, MSN, FNP

*STUDENT HEALTH GYNECOLOGY*
Christine M. Peterson, MD
Lisa Christianson, MD, MPH

*JOINT APPOINTMENTS*
Anita H. Clayton, MD
Department of Psychiatric Medicine

William S. Evans, MD
Susan E. Kirk, MD
Department of Medicine, Division of Endocrinology

Mark H. Stoler, MD
Department of Pathology

October 26, 2015

Paige Levy Smith
Attorney
Sands Anderson PC
1497 Chain Bridge Road, Suite 202
McLean, VA 22101

**RE: Orwig v. About Women OB/Gyn PC and Marc Alembik, M.D
Civil action #1:15cv868-TSE-JFA**

Dear Ms. Smith;

This letter represents my opinion regarding the care of Christine Orwig provided by Dr. Mark Alembik.

**BACKGROUND AND QUALIFICATIONS**

I am Professor and Director of the Division of Maternal-Fetal Medicine, Department of Obstetrics and Gynecology, University of Virginia. I am currently licensed to practice medicine in the Commonwealth of Virginia and the state of Texas. I received my M.D. degree in 1984 at the University of Texas Health Science Center at San Antonio, and then completed my residency in obstetrics and gynecology at the University of Iowa Hospitals and Clinics in 1988. After this, I completed my fellowship in maternal-fetal medicine at the University of Utah Hospitals and Clinics in 1991 and joined the faculty at Utah until 1999. I then became professor of obstetrics and gynecology at the University of Texas Health Science Center at San Antonio with the ultimate position of vice chair for research. In 2014, I was recruited to the University of Virginia to assume my current position. Given my academic background, I believe I can render a learned opinion regarding the clinical care rendered by Dr. Alembik on behalf of Ms. Orwig and her unborn child.

I have (and at all relevant times had) an active clinical practice in obstetrics and maternal-fetal medicine since completing fellowship. I have substantial experience providing care and treatment for patients like Ms. Orwig, including management and treatment of preterm premature rupture of membranes (PPROM). I also have extensive experience assessing patients for the development of intraamniotic infection. I am board certified in General Obstetrics and Gynecology and Maternal-Fetal medicine. A copy of my *Curriculum Vitae* is attached for reference. I will offer opinions relevant to this case and outside the knowledge of the average juror and relevant to issues of standard of care, causation and damages. My opinions will be based on my education, training, experience and review of pleadings, depositions, medical records (including fetal heart tracings) and medical literature. I have prepared this report to state my opinions and the bases therefore and I hold the opinions set forth below to a reasonable degree of medical probability. I will testify that Dr. Alembik adhered to the applicable standard of care for a safe and prudent obstetrician and did not act or fail to act in a manner which proximately caused injury to N.O. or Christine Orwig.

**MATERIALS REVIEWED**

I have reviewed the following items:

1.    a copy of the Complaint setting forth Plaintiffs' allegations;

2.    a copy of Plaintiffs' Answers to Interrogatories;

3.    a copy of Christine Orwig's medical records from About Women OB/GYN, P.C. and Potomac Hospital plus a summary of certain clinical findings;

4.    a copy of N.O's medical records from Potomac Hospital; and

5.    transcripts from the depositions of Dr. Alembik and Christine Orwig.

**OPINIONS AND BASES FOR OPINIONS**

As part of the testimony relating to my opinions, I may, if called upon to do so, explain to the jury basic/general principles of obstetrics and maternal-fetal medicine. I will explain a typical gestational period (37-42 weeks), the complication of preterm premature rupture of membranes (PPROM), as occurred in Ms. Orwig's case, and the management and treatment of that condition. As necessary, I will explain the clinical diagnosis of chorioamnionitis (intraamniotic infection) and the distinction between a sub-clinical, clinical, and pathological diagnosis of chorioamnionitis.

I will testify that Ms. Orwig's prenatal care once she became a patient of About Women OB/GYN was completely appropriate and within the standard of care. Once her membranes ruptured, on September 28, 2011, around 28 weeks of gestation, she was appropriately, and within the standard of care, admitted to Potomac Hospital for expectant management. I will explain that at that point the standard of care required a seven (7) day course of antibiotics, usually ampicillin and erythromycin. I will state that, within the field of obstetrics, there is not one particular antibiotic that is considered to be "best" for this initial period following PPROM and prior to labor, known as the latency period. I will explain that administration of antibiotics is the standard of care, but the standard of care does not require a specific antibiotic or combination of antibiotics. The choice of Ancef in Ms. Orwig's case was appropriate and within the standard of care given her allergy to penicillin and its derivatives. In addition, administration of antenatal steroid therapy to enhance fetal lung development (betamethasone) was appropriate and within the standard of care. The order for daily non-stress tests was also appropriate. I have reviewed the reports of Plaintiffs' experts, including those of Drs. Cohen and Phillips, and it is my understanding that Plaintiffs' experts do not take issue with, and are not critical of, the management of this patient prior to October 13, 2011.

Further, during the period of time up until October 13, 2011, About Women's treatment and management of Ms. Orwig was appropriate and within the standard of care. One of the obstetricians from the group rounded on Ms. Orwig at least daily. Several of the progress notes, including those by Dr. Alembik, specifically indicate that the group assessed Ms. Orwig for the potential development of the clinical signs and symptoms of chorioamnionitis.

I will state that the standard of care for women with PPROM, particularly when that occurs at or around 28 weeks gestation, the primary goal is to continue the pregnancy for as long as possible, preferably until 34 to 35 weeks gestation. I will explain that delivery prior to 34 weeks puts the baby at high risk for numerous complications associated with prematurity. In general, as one would expect, the earlier the delivery the higher risk of complications associated with prematurity.[1]

---

[1]    I rely on the following medical literature, which I consider to an excellent resource for maternal-fetal medicine, to support my opinion in this regard:

    1. Creasy and Resnik's Maternal-Fetal Medicine: Principles and Practice (6th ed. 2009) ("Infant morbidity and mortality increase with decreasing gestational age at birth. The risk of poor outcome, defined as death or lifelong handicap, increases dramatically as gestational age decreases.") ("Besides increased mortality risk, prematurity is associated with an increased risk for morbidity in almost every major organ system. BPD, retinopathy of prematurity, necrotizing enterocolitis, and IVH are particularly linked to preterm births.") ("IVH (i.e., germinal matrix hemorrhage) occurs most commonly in preterm infants and is a major cause of mortality and long-term disability. . . . Lower gestational age is associated with an increased risk of severe IVH.")

P.O. Box 800712 • Charlottesville, VA 22908-0712        2 | P a g e
Tel: 434-982-3700 • Fax: 434-924-9180

On the morning of October 13, 2011, Dr. Alembik rounded on Ms. Orwig at approximately 7 a.m. He noted that Ms. Orwig made no complaints to him, was not leaking fluid, had stable vital signs, no fever, and did not have the signs or symptoms necessary to meet the clinical criteria for the diagnosis of intraamniotic infection, or chorioamnionitis.    The plan at that point was to continue expectant management. This plan was well within the standard of care.[2]

According to the medical records, in the early afternoon on October 13, the hospital's nursing staff contacted Dr. Alembik to inform him that Ms. Orwig was complaining of pressure and increased bleeding. Her non-stress test from that morning had changed relative to her previous monitoring strips and that Ms. Orwig was having occasional contractions. According to the chart, Dr. Alembik promptly returned to the patient's bedside and evaluated her.   He ordered a CBC at that time, which showed a slightly elevated WBC.   He also ordered that a fetal biophysical profile (BPP) be performed on Ms. Orwig, to evaluate fetal well-being. These steps were all well within the standard of care.

The fetal BPP was performed immediately and showed no fetal breathing movement (BPP score was 6/8, considered equivocal, or uncertain). Fetal heart rate was also sporadically elevated (to the 170s) and there were occasional variable decelerations on the fetal strips.  Dr. Alembik's 2:30 p.m. progress note indicated that, in his clinical judgment, there had been a non-reassuring change in fetal status. These determinations were also within the standard of care.

I will explain that in real time an obstetrician is able to make a diagnosis of chorioamnionitis based only on presenting clinical information and does not have the benefit of placental pathology, through which, at some later time, a pathological diagnosis of chorioamnionitis may be made.

According to accepted obstetric medical literature, the standard of care allows for consideration of a variety of different criteria to diagnose clinical chorioamnionitis.  In one accepted method (which I use), in order to make a clinical diagnosis of chorioamnionitis, the patient must demonstrate three of the following five criteria: maternal tachycardia (pulse > 100 bpm), fetal tachycardia (fetal heart rate > 160 bpm), fever (> 100.4), uterine tenderness and foul smelling discharge. Using these criteria, Ms. Orwig did not meet the clinical criteria necessary to make a clinical diagnosis of chorioamnionitis.  Specifically, there was no maternal tachycardia, no maternal fever and no uterine tenderness.  The medical record does reflect a nurse's perception of foul smelling fluid, but this was not be confirmed by Dr. Alembik. The fetal heart rate was variable and, although was at certain times over 160 bpm, this level was not sustained either at a single time or at different times for a sufficient period to constitute a clinical marker for chorioamnionitis.

I understand that Dr. Alembik uses another accepted method for diagnosing clinical chorioamnionitis, which is maternal temperature (> 100.4) (a requirement), **plus** one other criterion (maternal tachycardia, fetal tachycardia, maternal leukocytosis (elevated WBC), uterine tenderness and purulent amniotic fluid).  This approach is also reflected in the medical literature and is within the standard of care.[3]  By this diagnostic method as well, prior to and during labor, Ms. Orwig did not meet

---

[2]    I rely on the following medical literature, which I consider to be an excellent resource for field of obstetrics, to support my opinion in this regard:

    1.    Gabbe:  Obstetrics Normal and Problem Pregnancies (Fifth Ed. 2007) (". . . [T]he stable gravida with PROM between 23 and 31 weeks is generally offered inpatient conservative management in an attempt to obtain extended pregnancy prolongation unless intrauterine infection, significant vaginal bleeding, placental abruption, advanced labor, or fetal compromise") are evident.")

[3]    I rely on the following medical literature, which I consider to be reliable authority within my field, to support my opinion in this regard:

    1.    Gabbe:  Obstetrics Normal and Problem Pregnancies (Fifth Ed. 2007) ("The clinical diagnosis is made when maternal fever (temperature = $38.0^{\circ}C$ or $100.4^{\circ}F$ with uterine tenderness and maternal or fetal tachycardia are identified in the absence of another evident source of infection.")d

    2.    Tita, A, "Diagnosis and Management of Clinical Chorioamnionitis," Clin. Perinatol. 2010 June; 37(2): 339-354 (stating that "the presence of maternal fever > 100.4 is required in addition to two other signs (uterine tenderness, maternal or fetal tachycardia and foul/purulent amniotic fluid)" as requirements for diagnosis of clinical chorioamnionitis).

    3.    Soper DE, et al.  Risk factors for intraamniotic infection: A prospective epidemiologic study.  Am J Obstet Gynecol.  1989;161(3):562-8 (clinical diagnosis of chorioamnionitis is made when the following are met:  ruptured membranes and a temperature > 100°F on two occasions at least 1 hour apart or a single temperature > 101°F plus the patient has one of the following clinical findings: (1) maternal tachycardia > 100 bpm, (2) fetal tachycardia > 160 bpm, (3) maternal leukocytosis > 11000/mm3, or (4) foul-smelling amniotic fluid).

    4.    Edwards RK.  Chorioamnionitis and labor.  Obstet Gynecol Clin North Am.  2005;32(2):287-96 (the clinical criteria used to make the diagnosis of clinical chorioamnionitis include maternal fever (at least 38°C) plus one of the following: maternal tachycardia, fetal tachycardia, uterine tenderness, and foul-

criteria for the clinical diagnosis of chorioamnionitis, as the prerequisite of a maternal fever, which can be considered a hallmark for the clinical diagnosis of chorioamnionitis, was never present. Although Drs. Cohen and Phillips, in their expert reports, contend that Dr. Alembik "diagnosed the chorioamnionitis" on October 13, that conclusion is contrary to Dr. Alembik's deposition testimony (see, e.g., Dr. Alembik's deposition at pp. 26-27, 29, 33-34) and his 2:30 p.m. progress note which, taken together, indicate his impression that the patient exhibited only "probable impending chorioamnionitis." In any event, in my opinion, to a reasonable degree of medical probability, regardless of the wording of the notes, the patient did not in fact meet the clinical criteria necessary for the diagnosis of chorioamnionitis and hence prescribing gentamcin was not required or indicated.

I will also explain to the jury that the ACOG Clinical Management Guidelines for Obstetricians-Gynecologists, Number 80, April 2007, which both Drs. Cohen and Phillips cite in their reports as support for their opinions that the standard of care required intrapartum administration of Gentamycin or another antibiotic with Gram-negative coverage, is inapposite to the single claim of a breach of the standard of care in this case. That ACOG Guideline relates to expectant management following premature rupture of membranes, and does not specifically address either (1) the criteria for a clinical diagnosis of chorioamnionitis or (2) the intrapartum management of a patient who meets the clinical diagnosis of chorioamnionitis. Regardless, ACOG Guidelines very clearly state that the information contained in them "is designed to aid practitioners in making decisions about appropriate obstetric and gynecologic care" and "should not be construed as dictating an exclusive course of treatment or procedure."

Given the overall clinical picture, and based on Dr. Alembik's judgment that there had been a shift in the fetal status, Dr. Alembik's decision to induce labor was reasonable and within the standard of care. Since Ms. Orwig did not meet a clinical diagnosis of chorioamnionitis, the standard of care did not require that Dr. Alembik follow any protocol for treatment of chorioamnionitis, including administration of gentamycin. Dr. Alembik's decision to recommend induction of labor and order prophylaxis with Clindamycin (Cleocin) for Group B streptococcus, the most common organism to cause sepsis in a newborn, was reasonable and within the standard of care. I am aware that the patient had a negative Group B streptococcus culture taken on September 28; nevertheless, prophylaxis for that organism over two weeks later in the setting of PPROM is not unreasonable or outside the standard of care.

I will explain to the jury that antibiotic use during pregnancy is not always benign, and the standard of care requires discretion and judgment when ordering antibiotics. In this case, known side effects of ototoxicity and nephrotoxicity were important considerations when considering administration of gentamicin, a commonly used aminoglycoside in pregnancy for the treatment of Gram-negative bacteria. Absent a clinical diagnosis of chorioamnionitis, the standard of care did not require use of gentamycin and in my opinion Dr. Alembik's decision to order prophylaxis with Clindamycin was reasonable and within the standard of care[4].

I believe that Ms. Orwig's labor and delivery proceeded appropriately and without complication. Ms. Orwig was only in labor for approximately eight hours, which is not an unduly lengthy period of time.

---

smelling amniotic fluid) (also discussing that Gibbs, et al. defined intra-amniotic infection on the basis of a temperature of at least 37.8°C (100° F) and two or more of the following additional criteria: maternal tachycardia, fetal tachycardia, uterine tenderness, foul odor of the amniotic fluid, and maternal leukocytosis).

5.   Gibbs, RS, et al.  Quantitative Bacteriology of Amniotic Fluid from Women with Clinical Intramaniotic Infection at Term.  J Infect Dis 1982;145:1-8.

[4]   I rely on the following medical literature, which I consider to be reliable authority within my field, to support my opinion in this regard:

1.   Hopkins L, Smaill F.  Antibiotic Regimens for management of intraamniotic infection.  Cochrane Database Syst Rev 2002:CD003254, which concludes that, while antibiotic treatment for chorioamnionitis is accepted as standard of care, there is insufficient evidence regarding the effectiveness of different antibiotic regimens for chorioamnionitis and whether to administer antibiotics intrapartum or postpartum. According to that literature, "no recommendations can be made on the most appropriate antimicrobial regimen to choose to treat intraamniotic infection," as there is no evidence supporting the use of one regimen over another.

2.   Greenberg, M., "A First Look at Chorioamnionitis Management Practice Variation Among US Obstetricians," Volume 2012, Infectious Diseases in Obstetrics and Gynecology (2012). This article reviewed management of chorioamnionitis among obstetricians in the United States and concludes that there is wide variation in clinical practice with respect to choice of intrapartum antibiotics in the setting of diagnosed chorioamnionitis. Although ampicillin + gentamicin is most common for intrapartum treatment, according to this study, 30% of obstetricians use a single-agent regimen and of that group, 14.5% use a regimen without Gram negative coverage.

The fetal tracings indicated that the fetus was tolerating labor and that there was no fetal indication for operative intervention (including cesarean delivery) for an abnormal heart rate tracing.

I will also state that the decision to proceed to a vaginal delivery was appropriate and within the standard of care, and at no time was there an indication for cesarean delivery. There are no data to support the contention that a cesarean delivery was indicated, either with or without a clinical diagnosis of chorioamnionitis.[5] In all likelihood, cesarean delivery of Ms. Orwig likely would not have changed the clinical outcome in this case.

## SUMMARY OF OPINIONS

Three key issues are evident in the management of Ms. Orwig. The first has to do with the diagnosis of chorioamnionitis. At no time did Ms. Orwig develop sufficient signs and symptoms to make the diagnosis of clinically evident intraamniotic infection, or chorioamnionitis. While she did have some "soft" signs and symptoms suggestive of infection, she never mounted sufficient enough temperature elevation to meet these criteria (100.4F, or 38C). This is key, as fever is evident in 95-100% of cases of clinical infection. Further, there was never a sustained fetal or maternal tachycardia, nor was there documentation of uterine tenderness. Her WBC was mildly elevated at 15,600, but there are several cut-offs for this in the medical literature, indicating a lack of agreement of a reliable finding. Further, there are many potential causes for an elevated WBC, the most common being labor itself, along with antenatal steroid therapy. While nursing notes state that she had a foul-smelling discharge, Dr. Alembik did not note this finding. This is not unexpected, as this is a very subjective symptom and is one of many reasons why there are diagnostic criteria for which several criteria must be met before the diagnosis can be made. In summary, Ms. Orwig likely had intraamniotic infection as evidenced by the infection manifest in her daughter, but at no time did she clearly meet criteria for the diagnosis of clinically-evident chorioamnionitis.

This leads to the second issue, and that being choice of antibiotics. Because of the absence of this diagnosis, Dr. Alembik opted to not treat with gentamicin, a commonly used medication if the clinical diagnosis of intraamniotic infection is made. He opted instead to treat with clindamycin for GBS prophylaxis and to deliver the baby, a completely reasonable course of action given the diagnoses he had made. He clearly states that, because she did not meet criteria for clinical infection, then gentamicin was not indicated. This reflects his clinical judgement at the time and is reasonable given the facts. Further, there are no clear standards of care for the choice of antibiotics in the management of PPROM or clinically-evident intraamniotic infection. While gentamicin is commonly used, there are no compelling data that this is the best or only treatment should intraamniotic infection be diagnosed. Similarly, latency antibiotics commonly initiated when PPROM is diagnosed usually consists of ampicillin and erythromycin based on previously published studies. Again, there are no comparative studies to prove that this is the best treatment regimen. In summary, while antibiotics are commonly prescribed for this complication, there is no clear standard for the best antibiotic treatment, and so the choice of clindamycin only in this circumstance is reasonable given the clinical presentation of Ms. Orwig.

Thirdly, there simply is no proof that gentamicin would have tangibly changed or improved the clinical outcome for Ms. Orwig's daughter. Infection in this setting is quite commonly sub-clinical, meaning that the patient does not have clinical evidence of infection (as is noted in Ms. Orwig's care). At this gestational age, sub-clinical infection complicates approximately 30-50% of pregnancies. The incidence of sub-clinical infection progressively increases with earlier gestational ages and declines across gestation, such that about 70-80% of pregnancies with PPROM at 24 weeks would be infected, and only 10-20% of pregnancies at 34 weeks would be infected (percentages approximate). This is why standard of care is to prescribe latency antibiotics (commonly ampicillin/erythromycin). By the time that Ms. Orwig was induced, her baby likely was already infected and the use of gentamicin would have been too little too late to make a difference in her outcome. Unfortunately, this reflects an all too common complication of pregnancies with PPROM. Even though her physicians completely followed the standard of care for her management, her daughter unfortunately suffered this unpreventable complication. Further, at no time in her care was cesarean delivery indicated. Again, this likely would not have tangibly improved her outcome. In summary, there is no compelling evidence that gentamicin, even if prescribed at the time of induction, would have prevented the outcome noted in her daughter.

---

[5]     I rely on the following medical literature to support my opinion in this regard:

    1.      Tita, A, "Diagnosis and Management of Clinical Chorioamnionitis," Clin. Perinatol. 2010 June; 37(2): 339-354.

These opinions are mine alone and are based on my interpretation of the medical records provided by the Sands Anderson legal firm. I reserve the right to change my opinion should further details come to light which leads me to change my medical interpretation of the course of events outlined above

**PUBLICATIONS AUTHORED WITHIN THE LAST TEN YEARS**

A complete listing of my publications is listed in my *Curriculum Vitae*.

**OTHER CASES IN WHICH I HAVE TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITHIN THE PRECEDING FOUR YEARS.**

Shashani vs.Gandhi, Houston, TX (September 9, 2015)

**COMPENSATION TO BE PAID**

I am being compensated at the rate of $500 per hour for document review. I charge $750 per hour plus expenses for deposition; and $1,000 per hour plus expenses for trial testimony

Date:  October 26, 2015

Donald J. Dudley, M.D.
Professor and Director
Division of Maternal-Fetal Medicine
Department of Obstetrics and Gynecology
University of Virginia
Charlottesville, VA



*The principal teaching hospital for Tufts University School of Medicine*

**Tufts** Medical Center

800 Washington Street, #324
Boston, Massachusetts 02111
T 617 636-2282
F 617 636-8315
tuftsmedicalcenter.org

Errol R. Norwitz, MD, PhD
*Obstetrician/Gynecologist-in-Chief*
**Department of Obstetrics and Gynecology**
*Professor and Chair of Obstetrics and Gynecology*
**Tufts University School of Medicine**

October 26, 2015

Paige Levy Smith, Esq.
Sands Anderson PC
1497 Chain Bridge Road, Suite 202
McLean, VA 22101

**Re:   Noelle Orwig, et al. vs About Women OB/GYN, PC, et al.**

To Whom It May Concern

I am the Louis E. Phaneuf Professor of Obstetrics and Gynecology and Chairman, Department of Obstetrics & Gynecology at Tufts University School of Medicine in Boston. I am currently licensed to practice medicine in the Commonwealth of Massachusetts. I have an active clinical practice in Obstetrics & Gynecology and Maternal-Fetal Medicine. I have substantial experience providing care and treatment for patients like Ms. Orwig, including management and treatment of preterm premature rupture of membranes. I also have extensive experience assessing patients for the development of intraamniotic infection. I am board certified in General Obstetrics & Gynecology and Maternal-Fetal Medicine. A copy of my *Curriculum Vitae* is attached hereto and incorporated herein by reference.

I intend to offer obstetric opinions relevant to this case and outside the knowledge of the average juror and relevant to issues of standard of care, causation and damages. My opinions will be based on my education, training, experience and review of pleadings, depositions, medical records (including fetal heart tracings) and medical literature. I hold the opinions set forth below to a reasonable degree of medical probability. I have prepared this report to state the opinions which I intend to give at trial and the bases of those opinions. I will testify that Dr. Alembik adhered to the applicable standard of care for an obstetrician and did not act or fail to act in a manner which proximately caused injury to N.O. or Christine Orwig.

I have reviewed the following items:

1. A copy of the Complaint setting forth Plaintiffs' allegations;

2. A copy of Plaintiffs' Answers to Interrogatories;

3. OB ultrasound studies from Potomac Hospital;

4. A copy of Christine Orwig's medical records from About Women OB/GYN, P.C. and Potomac Hospital;

5. A copy of N.O's medical records from Potomac Hospital; and

6. Transcripts from the depositions of Dr. Alembik and Christine Orwig.

As part of the testimony relating to my opinions, I will discuss principles of obstetrics and general medicine. I will explain a typical gestational period (37-42 weeks), the complication of preterm premature rupture of membranes (PPROM), as occurred in Ms. Orwig's case, and the management and treatment of that condition. As necessary, I will explain the clinical diagnosis of chorioamnionitis (intraamniotic infection) and the distinction between a clinical and histological or pathological diagnosis of chorioamnionitis.

I will testify that Ms. Orwig's prenatal care once she became a patient of About Women OB/GYN was all appropriate and within the standard of care. Once her membranes ruptured, on September 28, 2011, around 28 weeks of gestation, she was appropriately, and within the standard of care, admitted to Potomac Hospital for treatment and observation. At that point, the standard of care required a seven (7) day course of antibiotics. It is my opinion that, within the field of obstetrics, there is not one particular antibiotic that is considered to be "best" for this initial period following PPROM and prior to labor, known as the latency period. Administration of antibiotics is the standard of care, but the standard of care does not require a particular antibiotic or combination of antibiotics.[1] The choice of Ancef in Ms. Orwig's case was appropriate. In addition, it was appropriate and within the standard of care to administer betamethasone, a steroid, to enhance fetal lung development. The order for daily non-stress tests was also appropriate. I have reviewed Plaintiffs' expert designations and reports and it is my understanding that Plaintiffs' experts do not take issue with, and are not critical of, the management of this patient prior to October 13, 2011.

Further, during the period of time up until October 13, 2011, About Women's treatment and management of Ms. Orwig was appropriate and within the standard of care. One of the obstetricians from the group rounded on Ms. Orwig at least daily, and kept a close watch on her condition. Several of the progress notes, including those by Dr. Alembik, specifically indicate that the group was mindful of the potential to develop clinical signs and symptoms of chorioamnionitis.

In the case of PPROM, particularly when that occurs at or around 28 weeks' gestation, it is well understood and accepted that the primary goal of the health care provider is to facilitate the continuation of the pregnancy for as long as possible, preferably until 34 weeks' gestation. Delivery prior to 34 weeks puts the baby at high risk for numerous complications associated with prematurity. Generally speaking, the earlier the delivery, the higher risk of complications associated with prematurity.[2]

On the morning of October 13, 2011, Dr. Alembik rounded on Ms. Orwig at approximately 7 a.m. He noted that Ms. Orwig made no complaints to him, was not leaking fluid, had stable vital signs, no fever, and did not have the signs or symptoms necessary to meet the clinical criteria for the diagnosis of chorioamnionitis. The plan at that point was to continue expectant management, i.e., to keep Ms. Orwig hospitalized and on modified bed rest, and to closely monitor her condition. This plan was well within the standard of care.[3]

---

[1] See ACOG Clinical Management Guidelines for Obstetricians-Gynecologists, Number 139, October 2013 ("The optimal antibiotic regimen is unclear because multiple regimens have demonstrated benefit.").

[2] I rely on, amongst others, the following medical literature, which I consider to be a reliable source within my field, to support my opinion in this regard: Creasy and Resnik's Maternal-Fetal Medicine: Principles and Practice (6th ed. 2009) at pp. 1199, 1211 ("Infant morbidity and mortality increase with decreasing gestational age at birth. The risk of poor outcome, defined as death or lifelong handicap, increases dramatically as gestational age decreases.") ("Besides increased mortality risk, prematurity is associated with an increased risk for morbidity in almost every major organ system. BPD, retinopathy of prematurity, necrotizing enterocolitis, and IVH are particularly linked to preterm births.") ("IVH (i.e., germinal matrix hemorrhage) occurs most commonly in preterm infants and is a major cause of mortality and long-term disability. ... Lower gestational age is associated with an increased risk of severe IVH.").

[3] I rely on, amongst others, the following medical literature, which I consider to be a reliable source within my field, to support my opinion in this regard: Gabbe: Obstetrics Normal and Problem Pregnancies (Fifth Ed. 2007) (". . . [T]he stable gravida with PROM between 23 and 31 weeks is generally offered inpatient conservative management in an attempt to obtain extended pregnancy prolongation unless intrauterine infection, significant vaginal bleeding, placental abruption, advanced labor, or fetal compromise are evident.").

According to the medical records, in the early afternoon on October 13, the hospital's nursing staff contacted Dr. Alembik to inform him that Ms. Orwig was complaining of pressure and increased bleeding. Her non-stress test from that morning was not concerning, but Ms. Orwig was having occasional contractions. It appears from the chart that Dr. Alembik promptly returned to the patient's bedside and evaluated her. He ordered a CBC at that time, which showed a slightly elevated WBC. He also ordered that a fetal biophysical profile (BPP) be performed on Ms. Orwig, to evaluate fetal well-being. These steps were all well within the standard of care.

The fetal BPP was performed. The BPP score was 6 out of 8 (2 points off for absent fetal breathing movements), which did not require emergent delivery. Fetal heart rate was also sporadically elevated (to the 170s) and there were occasional variable decelerations on the fetal strips. Dr. Alembik's 2:30 p.m. progress note indicated that, in his clinical judgment, there had been a non-reassuring change in fetal status. Further, although the clinical features required for a diagnosis of chorioamnionitis were not present, Dr. Alembik appropriately assessed that there was evidence of "probable impending chorioamnionitis." These determinations were also within the standard of care.

In real time, an obstetrician is able to make a diagnosis of chorioamnionitis based only on presenting clinical information; he or she does not have the benefit of placental pathology, through which, at some later time, a pathological diagnosis of chorioamnionitis may be made. I will explain to the jury that a patient can have a pathological diagnosis of chorioamnionitis, but not have the requisite clinical signs or symptoms to support a clinical diagnosis of chorioamnionitis.

According to accepted medical literature within the field of obstetrics, the clinical diagnosis of chorioamnionitis may be made consistent with the standard of care utilizing a variety of different criteria and combinations of criteria.[4] One accepted method (which I use) allows for the diagnosis of clinical chorioamnionitis if the patient meets two or more of the following four clinical criteria in the absence of an alternative explanation: Fetal tachycardia (sustained elevation of the fetal heart rate at >160 bpm for longer than 10 minutes); uterine fundal tenderness between contractions; maternal tachycardia (sustained elevation of maternal heart rate >100 bpm); and maternal fever of 100.4°F or higher. Under this approach, prior to and during labor, Ms. Orwig did not demonstrate the clinical criteria necessary to make a clinical diagnosis of chorioamnionitis. Although Drs. Cohen and Phillips, in their expert reports, contend that Dr. Alembik "diagnosed the chorioamnionitis" on October 13, that conclusion is contrary to Dr. Alembik's deposition testimony (see, e.g., Dr. Alembik's deposition at pp. 26-27, 29, 33-34) and his 2:30 p.m. progress note, which, taken

---

[4] I rely on, amongst others, the following medical literature, which I consider to be reliable sources within my field, to support my opinion in this regard:

- Gabbe:  Obstetrics Normal and Problem Pregnancies  (Fifth Ed. 2007) ("The clinical diagnosis is made when maternal fever (temperature = 38.0°C or 100.4°F with uterine tenderness and maternal or fetal tachycardia are identified in the absence of another evident source of infection.")
- Tita, A, "Diagnosis and Management of Clinical Chorioamnionitis," Clin. Perinatol. 2010 June; 37(2): 339-354 (stating that "the presence of maternal fever > 100.4 is required in addition to two other signs (uterine tenderness, maternal or fetal tachycardia and foul/purulent amniotic fluid)" as requirements for diagnosis of clinical chorioamnionitis).
- Soper DE, et al.  Risk factors for intraamniotic infection: A prospective epidemiologic study.  Am J Obstet Gynecol. 1989;161(3):562-8 (clinical diagnosis of chorioamnionitis is made when the following are met:  ruptured membranes and a temperature > 100°F on two occasions at least 1 hour apart or a single temperature > 101°F plus the patient has one of the following clinical findings: (1) maternal tachycardia > 100 bpm, (2) fetal tachycardia > 160 bpm, (3) maternal leukocytosis > 11000/mm3, or (4) foul-smelling amniotic fluid).
- Edwards RK.  Chorioamnionitis and labor.  Obstet Gynecol Clin North Am.  2005;32(2):287-96 (the clinical criteria used to make the diagnosis of clinical chorioamnionitis include maternal fever (at least 38°C) plus one of the following: maternal tachycardia, fetal tachycardia, uterine tenderness, and foul-smelling amniotic fluid) (also discussing that Gibbs, et al. defined intra-amniotic infection on the basis of a temperature of at least 37.8°C (100° F) and two or more of the following additional criteria:  maternal tachycardia, fetal tachycardia, uterine tenderness, foul odor of the amniotic fluid, and maternal leukocytosis).
- Gibbs, RS, et al.  Quantitative Bacteriology of Amniotic Fluid from Women with Clinical Intraamniotic Infection at Term.  J Infect Dis  1982:145:1-8.

together, sets forth his impression that the patient exhibited "probable impending chorioamnionitis." In other words, he suspected that Ms. Orwig may be in the process of developing chorioamnionitis, but did not have sufficient clinical criteria to confirm that diagnosis. In any event, regardless of any notations in the chart, in my opinion, to a reasonable degree of medical probability, the patient did not meet the clinical criteria necessary for the diagnosis of chorioamnionitis.

The ACOG Clinical Management Guidelines for Obstetricians-Gynecologists, Number 80, April 2007, which both Drs. Cohen and Phillips cite in their reports as support for their opinions that the standard of care required intrapartum administration of Gentamycin or another antibiotic with Gram-negative coverage, does not speak directly to their single claim of a breach of the standard of care in this case. This ACOG Guideline relates to expectant management following premature rupture of membranes, and does not specifically resolve issues related to either (1) the criteria for a clinical diagnosis of chorioamnionitis or (2) the intrapartum management of a patient who meets the clinical diagnosis of chorioamnionitis. Regardless, ACOG Guidelines very clearly state that the information contained in them "is designed to aid practitioners in making decisions about appropriate obstetric and gynecologic care" and "should not be construed as dictating an exclusive course of treatment or procedure."

Given Dr. Alembik's judgment that there had been a shift in the fetal status, it was reasonable and within the standard of care for Dr. Alembik to recommend induction of labor. Inasmuch as Ms. Orwig did not meet a clinical diagnosis of chorioamnionitis, the standard of care did not require that Dr. Alembik follow any protocol for treatment of chorioamnionitis. Dr. Alembik's decision to order prophylaxis for Group B streptococcus was reasonable and within the standard of care. This was a reasonable, albeit conservative recommendation, given that the Group B streptococcus perineal culture from September 28 was negative. Further, Dr. Alembik's order for intrapartum Clindamycin (Cleocin), was appropriate and within the standard of care for Group B streptococcus prophylaxis, given the patient's allergy to Penicillin. I am aware that the patient had a negative Group B streptococcus culture taken on September 28; nevertheless, prophylaxis for that organism over 2 weeks later in the setting of PPROM is not unreasonable.

It is my opinion that Ms. Orwig's labor and delivery proceeded appropriately and without complication. Ms. Orwig was only in labor for approximately eight hours, which is not an unduly lengthy period of time. The fetal tracings indicated that the fetus was tolerating the labor.

It is also my opinion that the decision to proceed to a vaginal delivery was appropriate and within the standard of care, and at no time was there any indication that a cesarean delivery was warranted. There is no data to support the theory that a cesarean delivery was indicated, either with or without a clinical diagnosis of chorioamnionitis. In my opinion, a cesarean delivery likely would not have changed the outcome in this case.

A complete listing of my publications is listed in my *Curriculum Vitae*.

Other cases in which I have testified as an expert at trial or by deposition within the preceding 4 years are the following:

1. Laura Pedro and John Daggett, Co-Administrators of the Estate of Brandon Pedro Daggett v. Miriam Goldfarb, M.D., et al., No. 2008-4471, Commonwealth of Massachusetts Superior Court, Middlesex [October 2012 - deposition; trial testimony]

2. Carlethia Armstrong et al. v. Gynecology & Obstetrics of Dekalb et al., Dekalb County, Georgia state court [2012 - deposition]

3. <u>Ashley Burton and Arthur Bass, Individually and on behalf of Brenna Kincaid, a minor v.</u>
   <u>Adventist Health System/Sunbelt, Inc. d/b/a Florida Hospital Celebration et al.</u>, Circuit
   Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 2011-CA-
   14421-O [August 2015 - deposition]

I am being compensated at the rate of $700 per hour.

Sincerely,

**Errol R. Norwitz, M.D., Ph.D.**

Louis E. Phaneuf Professor of Obstetrics & Gynecology
Tufts University School of Medicine

Chairman
Department of Obstetrics & Gynecology
Tufts Medical Center
800 Washington Street
Boston, MA 02111
Tel: (617) 636-2382
enorwitz@tuftsmedicalcenter.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

N.O., a minor, by Christine Orwig,           )
Her mother and Next Friend and               )
Christine Orwig, Individually,               )
                                             )
      Plaintiffs,                            )
                                             )
v.                                           )    Case No. 1:15-CV-868-TSE-JFA
                                             )
ABOUT WOMEN OB/GYN, P.C. and                 )
MARC ALEMBIK, M.D.,                          )
                                             )
      Defendants.                            )
_____)

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE "IMPROPER STANDARD OF CARE TESTMIONY"

#### Introduction and Relevant Background

This eleventh hour request is an improper effort to short-circuit the jury trial process in

determining a key issue in the case.[1]  In this case Plaintiffs allege the following:

1.      Plaintiff Christine Orwig developed an infection known as "clinical

chorioamnionitis" on the day she delivered her baby.

_____

[1]      Plaintiffs' Motions, filed on Friday, April 1, 2016, are exceedingly untimely. The
Court's Rule 16(B) Scheduling Order, entered by Magistrate Judge Anderson on August 10,
2015, at p. 2, states clearly: "All motions, except for summary judgment and consent motions,
shall be noticed for a hearing on the earliest possible Friday before the final pretrial conference
consistent with the briefing schedules discussed below."  The final pretrial conference in this
case was initially set for December 17, 2015.  Judge Ellis held the final pretrial conference on
January 8, 2016.  Plaintiffs filed no motions in limine, at any time.
    The subject of Plaintiffs' two belated motions in limine, filed nearly three months **after**
the final pretrial conference, relate to information and statements disclosed to Plaintiffs by way
of the defense expert designations -- which were provided to Plaintiffs on November 11, 2015.
Plaintiffs never objected to any portion of any of the defense experts' reports (and, in fact, did not
even depose a single defense expert).  To come before the Court two business days before trial is
improper and prejudicial.

**-63-**

2.     Dr. Alembik made the diagnosis of clinical chorioamnionitis when he visited her bedside at or around 2:30 p.m. that day.

3.     Despite having made the diagnosis, Dr. Alembik did not administer the appropriate antibiotic (Gentamicin) for the diagnosed condition.

4.     As a result of not properly treating clinical chorioamnionitis, Mrs. Orwig gave birth to a child who was septic (i.e., had an infection in her blood stream).[2]

5.     The infection in the child's bloodstream travelled through her blood-brain barrier and resulted in an infection in her brain (meningitis).

6.     As a result of the meningitis, the child developed a brain bleed.

7.     As a result of the brain bleed, the child developed a hydrocephalus (a collection of fluid in the brain).

8.     As a result of the hydrocephalus, the child suffered a brain injury resulting in a mild (Level 1) case of cerebral palsy (CP).

**Defendants dispute every step of this analysis.** Defendants contend:

1.     Mrs. Orwig did not at any time prior to the baby's delivery meet the criteria for the diagnosis of clinical chorioamnionitis.[3]

---

[2]     Plaintiffs' Memorandum suggests confusion or misunderstanding regarding the child's diagnosis. On p. 2 they write that, "at birth, N.O. was diagnosed with chorioamnionitis caused by a gram negative pathogen." See also Plaintiffs' Memorandum of Law in Support of Motion in Limine to Exclude Post Occurrence Medical Literature at p. 1 ("At birth N.O. was diagnosed with chorioamnionitis caused by a gram-negative pathogen."). This is untrue. The only diagnosis of chorioamnionitis made in this case was made histologically by a pathologist after Mrs. Orwig delivered N.O., and it was a diagnosis of Mrs. Orwig, not N.O.

[3]     Chorioamnionitis is an infection that can be diagnosed in one or both of two manners, at different times. Prior to delivery, there is no laboratory test for the condition. Rather, the only way to diagnose the condition prenatally is through the appearance of certain well-defined clinical symptoms. As a result, the infection in the mother, if diagnosed before birth, is called "**clinical** chorioamnionitis." After the baby's birth, a pathologic study of the mother's placental tissue is possible and at that time the condition can be definitively diagnosed.

2

**-64-**

2.      Dr. Alembik did not make a diagnosis of clinical chorioamnionitis because the necessary clinical signs were never present.

3.      After visiting Mrs. Orwig's bedside, Dr. Alembik formed the impression of "probable impeding chorioamnionitis" and stated that in his contemporaneous written progress note.[4]

4.      Dr. Alembik properly treated Mrs. Orwig for "probable impending chorioamnionitis" by moving expeditiously to deliver the baby and thus remove it from the potentially hostile environment.

5.      Dr. Alembik did not treat for clinical chorioamnionitis because the necessary clinical signs and symptoms were not present.[5]

6.      After birth, Mrs. Orwig was diagnosed by pathology with histologic chorioamnionitis.

---

If diagnosed after the baby's birth, the condition is known as **histologic or pathologic** chorioamnionitis. Many women will be shown after birth to have histologic or pathologic chorioamnionitis, but never have displayed the necessary clinical symptoms prior to birth to have the diagnosis of clinical chorioamnionitis made before birth. That was the situation in this case with Mrs. Orwig.

[4]     Plaintiffs rely heavily on an entry in the medical records that Dr. Alembik made on the heading of an order sheet at the same time he formed the impression of "probable impending chorioamnionitis" in his actual, written progress note. In the heading he used the shorthand term "chorioamnionitis." As Plaintiffs are aware from Dr. Alembik's deposition, Dr. Alembik will testify that both sheets were filled out at the same time (around 2:30 p.m. on October 13) and that immediately after forming his impression of "probable impending chorioamnionitis" and documenting that impression in his written progress note, he simply did not repeat all of the words "("probable impending") when he filled out the header on the medical order form. It is unfair and misleading to read and present to this Court only one entry out of context with the impression actually formed at the bedside and recorded in the written progress note. And, it is misleading and improper to represent to the Court that "the record establishes that [Dr. Alembik] did diagnose" chorioamnionitis. See Memorandum at p. 2.

[5]     Defendants will also contend that even if clinical chorioamnionitis was present, there is no single standard of care for the administration of antibiotics and Dr. Alembik met the standard of care.

3

7.      The baby was born at 30 weeks gestation, or approximately two months prematurely.

8.      The baby was born with an E. Coli infection in her blood stream, i.e., she was septic.

9.      The sepsis did **not** cross the blood-brain barrier and there is **no** evidence that this child had a brain infection (meningitis).[6]

10.     The baby developed a brain bleed (known as a germinal matrix hemorrhage) as a result of a common phenomenon in premature babies.

11.     The germinal matrix hemorrhage was the result of significant prematurity and not infection.

12.     The germinal matrix hemorrhage caused a hydrocephalus to develop.

13.     The hydrocephalus, although ultimately drained, caused the baby to develop CP, which is a physical – not a cognitive – disability.

14.     Plaintiff N.O. has the mildest form of CP (Level 1).

Each and every one of Defendants' contentions is supported by qualified and properly and timely disclosed expert testimony.[7]

---

[6]      Plaintiff N.O. was treated in the neonatal intensive care unit (NICU) for **presumptive** meningitis. This is a typical procedure in a NICU. No doctor made a definitive diagnosis of meningitis. Defense experts will testify that there is no clinical or radiographic evidence of this child having had meningitis.

[7]      Defendants' experts include: (a) Dr. David Dudley, Chairman of the Department of Maternal and Fetal Medicine at the University of Virginia Hospitals (standard of care, causation and damages); (b) Dr. Errol Norwitz, Chairman of the Department of OB/GYN at the Tufts University hospitals in Boston (standard of care, causation and damages); (c) Dr. Thierry Huisman, Professor of Radiology, Pediatrics, Neurology and Neurosurgery at The Johns Hopkins University School of Medicine and Director of Pediatric Neuroradiology, at Johns Hopkins Hospital (causation and damages); and (d) Dr. David Bearden, pediatric neurologist at Children's Hospital of Philadelphia (causation and damages).

4

## Argument

By this motion Plaintiffs are seeking to limit artificially the scope of the case (because of

a belated recognition of a serious deficiency in her own expert designations)[8] and to prevent

Defendants' standard of care experts from discussing the conclusions they draw from the medical

record on the disputed issues of whether any diagnosis of clinical chorioamnionitis was made or

would have been appropriate.  The review of the medical record and the conclusions that the

expert physicians draw from it are the foundation and basis for their opinions in this case and

may be discussed and explained to the jury.[9]  Plaintiffs may not peremptorily bar the defense

experts from discussing their review of the medical record, what they believe that record shows

with regard to clinical conditions and a diagnosis and the conclusions they draw from that.

These experts are, of course, subject to cross-examination on their interpretation of the medical

record and the jury is free to draw their own, ultimate conclusions on all these issues.  But just

because Plaintiffs failed to designate any expert to opine that if a diagnosis of clinical

chorioamnionitis was **not** made (as Defendants maintain), that would have been a breach of the

standard of care (a position inherent in their case but lacking expert support), does not justify

preventing the defense experts from introducing evidence that (1) not making such a diagnosis

---

[8]       In a prior filing with the Court (Defendants' Reply Brief in Support of Motion in Limine to Preclude Plaintiffs' Expert Douglas Philips, M.D. from Testifying Due to Inadequate Qualifications, filed December 3, 2015, at p. 1 n.1), we pointed out to the Court this serious deficiency in Plaintiffs' case.

[9]       Defendants' experts will also support their opinions that the medical record does not reflect a diagnosis of clinical chorioamnionitis by explaining that the required clinical indicia were not present for such a diagnosis.  That position is, in turn, supported by a wealth of medical literature. **The experts will opine that in the final analysis whether the word "chorioamnionitis" appears in the record as an intended diagnosis or whether the diagnosis was "probable impending chorioamnionitis" is not the important or dispositive question.  The critical fact is that Mrs. Orwig did not in medical fact have the condition of clinical chorioamnionitis and so not treating for it was appropriate and within the standard of care.**  Nothing prevents our experts from opining on these issues and discussing the medical record in support of their position.

5

**was consistent** with the standard of care; and (2) thus, Dr. Alembik's clinical decision to not order the antibiotic Gentamicin was also consistent with the standard of care.[10]

    \*    **There is Nothing "Improper" About Defendants' Experts' Opinions Relating to the Diagnosis (or Not) of Clinical Chorioamnionitis; Those Opinions Are An Essential Foundation for the Experts' Opinions as to Why the Standard of Care Did Not Require Dr. Alembik to Order the Antibiotic Gentamicin.**

As Plaintiffs point out, the issue they have advanced in this case is whether or not Dr. Alembik breached a standard of care by not ordering the antibiotic Gentamicin during Plaintiff Christine Orwig's intrapartum period. That allegation is premised on the absolute assumption that Dr. Alembik did in fact make a clinical diagnosis of chorioamnionitis. The problem for Plaintiffs -- and why they are so desperate to steer the testimony clear of any evidence regarding whether or not the clinical signs and symptoms of clinical chorioamnionitis were present -- is that Dr. Alembik testified at his deposition that he did not make the clinical diagnosis of chorioamnionitis and that is the reason he did not order the antibiotic Gentamicin. For whatever reason Plaintiffs' experts overlooked this alternative set of facts and failed to account for that factual conclusion in their reports.

Plaintiffs are correct that the defense experts will opine, as they have disclosed in their reports, that the standard of care did not require that Dr. Alembik order and administer the antibiotic Gentamicin. **Part and parcel of that opinion, and an essential basis for it, is that**

---

[10]    Plaintiffs take issue with the opinions of the defense experts that **not** diagnosing clinical chorioamnionitis was consistent with the standard of care. According to Plaintiffs, they did not raise this issue because they **assume** for purposes of their case and based on their reading of the medical records that the diagnosis was made by Dr. Alembik. **Defendants are not required to accept this assumption** and in fact contest it. Defendants are entitled to provide the jury with their version of the record and their conduct, including the fact that Dr. Alembik made no diagnosis of clinical chorioamnionitis and had no clinical basis to make such a diagnosis and then have the defense experts support that position with their expert reading of the medical record and advise the jury that pursuant to Dr. Alembik's testimony and the medical record, there was no breach of any standard of care.

**Christine Orwig did not meet the clinical criteria for a diagnosis of chorioamnionitis.** There is nothing "collateral" about this issue, as Plaintiffs suggest. See Memorandum at p. 6. Thus, our experts will first explain to the jury the obstetric medical condition of clinical chorioamnionitis and how it is or is not diagnosed in a patient. They will testify that the standard of care did not require the diagnosis of clinical chorioamnionitis and that, in medical fact, Christine Orwig never prior to N.O's delivery met the criteria for that clinical diagnosis. In turn, they will opine that, because Christine Orwig's clinical condition did not meet the criteria for a diagnosis of clinical chorioamnionitis, there was no requirement under the standard of care for Dr. Alembik to order and administer the antibiotic Gentamicin.[11]

It is simply not the case -- and, of course, Plaintiffs cite no authority to the contrary -- that, "because Plaintiffs have the burden of proof they have the right to have the case decided based on the standard of care violation alleged by them . . . ." See Motion at p. 6. What Plaintiffs are attempting to argue is that they have the right to decide how Defendants will defend their conduct -- which of course is not true. And the defense is not "muddy[ing] the waters" in any way. Id. at p. 7. Rather, we are introducing expert testimony on the full breadth of the clinical care and treatment that Plaintiffs have placed in issue in this medical malpractice case.

---

[11]     Defendants' experts will also testify that even if Mrs. Orwig had the required clinical symptoms to support a diagnosis of clinical chorioamnionitis, a single dose of the antibiotic – which is all that could have been administered before birth – would not have prevented the neurologic issues that ensured – assuming those issues were caused to begin with by an infection. But they were not. The entire issue of the administration of an antibiotic is a "red herring" in this case because, as the defense experts will testify, the baby's neurologic problem **did not result from anything having to do with an infection** but rather were directly and proximately caused by being born significantly prematurely resulting in a specific type of brain bleed known as a germinal matrix hemorrhage. That condition is not at all uncommon in premature babies and is not anyone's "fault."

7

> \*      **Admission of the Defense Experts' Opinions and Testimony Regarding the Diagnosis (As Opposed to Treatment) of Chorioamnionitis Would Not Violate Federal Rule of Evidence 702.**[12]

Further, although Plaintiffs posit the issue of diagnosis, vel non, as purely a factual issue

that goes to an ultimate question for the jury, Fed. R. Evid. 704 specifically permits experts to

opine on issues that are considered "ultimate issues."  Salas v. Wang, 846 F.2d 897, 905, n.4 (3d

Cir. 1988) ("Rule 704 was intended to abolish the common law rule against testimony regarding

the ultimate issue.").  Indeed the fact that the issue has a disputed factual component does not

prevent expert testimony drawn from the expert's review of the record and evidence.  As stated in

the Advisory Committee Notes to Rule 702:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 Advisory Committee Note.

As the Court stated in Maggard v. Essar Global Ltd., 2015 U.S. Dist. LEXIS 42387 \*6

(W.D. Va. 2015):

> **The reality is that 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'** Id. (quoting United States v. 14.38 Acres, 80 F.3d 1074, 1078 (5th Cir. 1996)).  As noted in Daubert, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' 509 U.S. at 596.  Stated differently, **the jury must decide the disputed facts in this case, and if it disagrees with [the expert's] interpretation of the facts, that is an issue of the weight and impeachability of his testimony, and not its admissibility**.

---

[12]      Although Plaintiffs argue that expert testimony "to resolve purely factual questions that are within the province of the jury" is improper, see Plaintiffs' Memorandum at p. 5, their own experts, as they have been designated in this case, violate that Rule.  See Plaintiffs' Memorandum at p. 3 (citing excerpts from Dr. Craig Cohen's and Dr. Douglas Phillips' Reports, where they conclude that Dr. Alembik diagnosed chorioamnionitis).

(Emphasis added).

The Fourth Circuit in Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993), has opined in a similar fashion:

> Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror.  Persinger v. Norfolk & Western Railway Co., 920 F.2d 1185, 1188 (4th Cir. 1990) (testimony about how difficult it is to lift heavy things is not "helpful" and is thus excludable) . . . .  'Trouble is encountered only when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense.' Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986).

Here, the opinions of the defense experts as to:  the requirements for diagnosis; the nature of the diagnosis in the medical records; the actual clinical condition of the patient (irrespective of the diagnosis); and the appropriateness of the actions taken by the defendant given the actual clinical presentation, are all issues outside the "everyday knowledge and experience of a lay juror" and their consideration of the case will be assisted by the opinions which they can consider, assess and make such use of as they deem appropriate.    Kopf, supra at 377 ("There is no gap between the 'specialized knowledge' that is admissible under the rule and the 'common knowledge' that is not.  The boundary between the two is defined by helpfulness.").

### *    Authorities Relied on by Plaintiffs Do Not Support Their Position.

The cases cited by Plaintiffs do not support their position in this case.  This Court in Stradtman v. Republic Servs., 2015 U.S. Dist. LEXIS 55266 (E.D. Va. April 28, 2015), see Plaintiffs' Memorandum at p. 5, considered the propriety of permitting an expert in a tortious interference suit to opine as to corporate fiduciary duties.  The Court stated that, "[t]he touchstone of the rule is whether the testimony will assist the jury." Id. at *4 (quoting United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011)).  In Stradtman, the Court determined this type

9

**-71-**

of testimony would aid the trier of fact in assessing if there was a tortious interference and the Court **permitted** the expert testimony.

In this case the proposed testimony of the experts does not involve opinions on "legal" issues at all, but will aid and inform the jury as to how complex medical records are viewed, read and interpreted within the medical field. This will assist the jury in determining, ultimately, whether Dr. Alembik breached any standard of care in how he diagnosed and treated Plaintiff's condition. In no way does the experts' proposed testimony in this case "merely tell[ ] the jury what result to reach." Id. The defense experts will provide expert opinions on medical records which form a basis for their opinions that the medical impression Dr. Alembik maintains he formed and documented --- "probable impending chorioamnionitis" -- was accurate and the treatment of Plaintiff Christine Orwig was consistent and correct. This is an intertwined issue of fact and expert medical opinion, where the experts are permitted to state their understanding of the medical record as it forms the foundation of their opinions as to treatment. There is no basis to disallow Defendants' experts from offering their complete opinions on these issues.

In Carter v. U.S., 2014 U.S. Dist. LEXIS 109930 (E.D. Va. August 8, 2014), see Plaintiffs' Memorandum at p. 5, the Court disallowed expert testimony from a "grief and loss counseling" expert. The Court disallowed the testimony because "[d]amages in a death case . . . for loss of society can be left to turn mainly upon the good sense and deliberate judgment of the trier . . . and the judge or jury must be allowed to make a reasonable approximation, guided by judgment and practical experience." Id. at *10. This bears no resemblance to the proposed medical expert testimony in this case with regard to the interpretation, meaning and import of medical records (which are disputed by the parties) and whether clinical chorioamnionitis was or should have been diagnosed by Dr. Alembik.

10

**-72-**

Reading and interpreting the various components of a medical record and determining where and in what context entries are made and what their significance is in medical treatment is quintessentially an area where the jury needs and deserves the assistance of experts. That ultimately there is a factual judgment that the jury must reach does not prevent the experts from discussing their review of the medical record and how that record is properly interpreted in the specialized field of medicine. See Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). The fact that the expert uses his professional judgment in reviewing the medical record to reach an opinion as to the nature of the diagnosis does not disqualify the opinion, as judgment is inherent in a wide range of expert opinions. United States v. Aman, 748 F. Supp. 2d 531, 541 (E.D. Va. 2010) ("an expert's methodology may be admissible even though it 'requires the exercise of judgment . . . that might be explored on cross-examination." [Citation omitted] . . . A contrary rule would effectively exclude vast amounts of expert scientific testimony. Judgment is, and must be, ubiquitous in science. Indeed, experts across various fields routinely must rely on the exercise of judgment in their work, and this fact alone does not prevent them from offering reliable, admissible opinions in court.").

**\*    There is Nothing Whatsoever "Prejudicial" About the Proposed Defense Experts' Opinions.**

As a final, desperate argument to preclude expert opinions which Plaintiffs did not account for when they designated experts (and as to which Plaintiffs did not even bother to rebut with any expert testimony), Plaintiffs contend that introduction of legitimate and relevant expert testimony would be "prejudicial" to their case. See Plaintiffs' Memorandum at pp. 6-7. We are by no means attempting "to unnecessarily complicate the case" or any issue the jury will

11

**-73-**

consider. Id. Instead, we intend to educate the jury with preeminent experts' testimony and opinions and enhance their understanding of the critical medical issue of "chorioamnionitis." See United States v. Decinces, 808 F.3d 785, 791 (9th Cir. 2015) ("Although the admission of the evidence may harm the defendants' case, that is not reason to exclude it under Rule 403, which refers only to *unfair* prejudice.") (italics in original); United States v. Balde, 616 Fed. Appx. 578, 581-82 (4th Cir. 2015) ("Evidence should be excluded under Rule 403 only in rare cases because the policy of the Federal Rules is that all relevant evidence should be admitted. See United States v. Cooper, 482 F.3d 658, 663 (4th Cir. 2007). The fact that the challenged evidence will damage the defendant's case is insufficient to render it inadmissible; rather, to be excluded under Rule 403, the evidence must cause "'unfair' prejudice," and the "unfair prejudice must 'substantially' outweigh the probative value of the evidence." United States v. Grimmond, 137 F.3d 823, 833 (4th Cir. 1998) (quoting Fed. R. Evid. 403).").

DATED:  April 6, 2016                    Respectfully submitted,

                                         SANDS ANDERSON PC


                                              /s/ Paige Levy Smith
                                         J. Jonathan Schraub  (VSB #17366)
                                         jjschraub@sandsanderson.com
                                         Paige Levy Smith (VSB #39093)
                                         PLevySmith@sandsanderson.com
                                         1497 Chain Bridge Road
                                         Suite 202
                                         McLean, VA  22101
                                         (703) 893-3600
                                         (703) 893-8484 (facsimile)

                                         **Counsel for Defendants**

12

-74-

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th of April, 2016, I served the foregoing DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE "IMPROPER STANDARD OF CARE TESTMIONY" by electronic mail, through the Court's ECF system, on the following:

> Scott M. Perry
> Mikhael D. Charnoff
> Leslee M. Soudrette
> PERRY CHARNOFF, PLLC
> 2300 Wilson Boulevard
> Suite 240
> Arlington, VA  22201
> (703) 291-6650
> (703) 563-6692 (facsimile)
> scott@perrycharnoff.com
> mike@perrycharnoff.com
> leslee@perrycharnoff.com
>
> Laurie A. Amell
> Catherine D. Bertram
> BERTRAM & AMELL, PLLC
> 1100 Vermont Avenue,  NW
> Suite 500
> Washington, DC  20005
> (202) 803-5800
> (202) 803-6814 (facsimile)
> lamell@bertramamell.com
> cbertram@betramamell.com

and a copy was delivered by hand to the Chambers of

> The Honorable T.S. Ellis, III
> United States District Court
>   for the Eastern District of Virginia
> United States Courthouse
> 401 Courthouse Square
> Alexandria, VA  22314

> /s/ Paige Levy Smith
> Paige Levy Smith (VSB No. 39093)

13

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### (Alexandria Division)

| | | |
|---|---|---|
| N.O., a minor, by Christine Orwig, | ) | |
| her Mother and Next Friend and | ) | |
| CHRISTINE ORWIG, Individually, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15cv868-TSE-JFA |
| | ) | |
| ABOUT WOMEN OB/GYN, P.C. and | ) | |
| MARC ALEMBIK, M.D., | ) | |
| | ) | |
|     Defendants. | | |

### PLAINTIFFS' STATEMENT AS TO STANDARD OF CARE TESTIMONY

Plaintiffs N.O. and Christine Orwig, by counsel, in response to a request from the Court, hereby state and clarify as follows:  Although both of Plaintiffs' standard of care experts reference the fact in their reports that Dr. Alembik made the diagnosis of chorioamnionitis, neither standard of care expert has been explicitly designated to testify that Dr. Alembik misdiagnosed or failed to diagnose Plaintiffs.  That is because Dr. Alembik plainly diagnosed the very condition at issue as demonstrated in the record.  Whether Dr. Alembik made the diagnosis on October 13, 2011 is a factual issue, not an expert issue.

Dated: April 7, 2016

Respectfully submitted,

PERRY CHARNOFF PLLC

   s/  Scott M. Perry
Scott M. Perry (#67417)
Mikhael D. Charnoff (#43929)
2300 Wilson Boulevard, Suite 240
Arlington, VA 22202
P:  (703) 291-6650
F:  (703) 563-6692

scott@perrycharnoff.com
mike@perrycharnoff.com

Laurie A. Amell (#33854)
Catherine Bertram (admitted *pro hac vice*)
BERTRAM & AMELL
1666 Connecticut Avenue, N.W., Suite 250
Washington, DC 20009
P: (202) 803-5800
F: (202) 803-6814
lamell@betramamell.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of April, 2016 a copy of the foregoing was sent

by facsimile and electronic filing to:

J. Jonathan Schraub, Esq.
Paige Levy Smith, Esq.
Sands Anderson, P.C.
1497 Chain Bridge Road, Suite 202
McLean, VA 22101-5728
*Counsel for Defendants About Women, OB/GYN, P.C. & Marc Alembik, M.D.*


And a copy was hand delivered via the Clerk's Office to:

The Honorable T.S. Ellis, III
United States District Court
   for the Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 223124

                                    s/  Mikhael D. Charnoff
                                    Mikhael D. Charnoff

2

1

1        IN THE UNITED STATES DISTRICT COURT FOR THE
                 EASTERN DISTRICT OF VIRGINIA
2                     Alexandria Division

3    N.O. a MINOR, ET AL.,                    )
                                              )
4                            Plaintiff,       )
                                              )
5    v.                                       ) CIVIL ACTION
                                              )
6    MARC ALEMBIK, M.D., ET AL                ) 1:15-cv-868
                                              )
7                            Defendant.       )
     _____)
8
                      REPORTER'S TRANSCRIPT
9
                        MOTION HEARING
10                   Friday, April 8, 2016

11    _                    ---

12   BEFORE:       THE HONORABLE T.S. ELLIS, III
                   Presiding
13
     APPEARANCES:  SCOTT MICHAEL PERRY, ESQ.
14                 MIKHAEL CHARNOFF, ESQ.
                   Klores Perry Mitchell PC
15                 1735 20th Street NW
                   Washington, DC 20009
16
                   LAURIE ANN AMELL, ESQ.
17                 CATHERINE D. BERTRAM, ESQ.
                   Bertram & Amell PLLC
18                 1100 Vermont Ave NW, Suite 500
                   Washington, DC 20005
19

20
                      For the Plaintiff
21                         ---

22          MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                  Official Court Reporter
23         USDC, Eastern District of Virginia
                   Alexandria Division
24

25

2

```
 1              (APPEARANCES CONTINUED)

 2

 3         J. JONATHAN SCHRAUB, ESQ.
           PAIGE LEVY SMITH, ESQ.
 4         Sands Anderson Marks & Miller
           1497 Chain Bridge Rd
 5         Suite 202
           McLean, VA 22101
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

-79-

3

1                   THE CLERK:  N.O. Minor, et al., versus Marc
2   Alembik, MD, et al.

3                   Civil case number 1:15-cv-868.

4                   THE COURT:  All right.

5                   Who is here for the plaintiff in the N.O.
6   case?

7                   ATTORNEY PERRY:  Good morning, your Honor.
8   This is Scott Berry, along with Mikhael Charnoff, Laurie
9   Amell and Catherine Bertram for the plaintiffs.

10                  THE COURT:  Well, large number here.

11                 And for the defendants?

12                 ATTORNEY SCHRAUB:  Good afternoon, your
13   Honor.  Jonathan Schraub along with Paige Levy Smith.

14                THE COURT:  All right.  There are really
15   only two motions yet for the Court to decide.  I told
16   you in our telephone conference, or I gave you a pretty
17   significant indication with respect to these.  Let me
18   tell you more now, and let me see if we can save some
19   time.

20                With respect to the post-occurrence
21   literature, some of it isn't post-occurrence, but the
22   Greenberg first looked at chorioamnionitis practice.
23   The article reported a survey from 500 obstetricians
24   inquiring about their patterns for diagnosis and
25   treatment of chorioamnionitis and the date it was

**4**

1    collected between January and July 2011.

2           That seems to me to be within the time

3    period when it would have probative value as to the

4    standard of care because this occurred in 2013.  So

5    starting with that the one, let me hear from the

6    plaintiffs, why shouldn't that be admissible?  It covers

7    the period.

8           ATTORNEY PERRY:  Yes, your Honor.  And I

9    agree with your Honor.  We will withdrawal our objection

10   to that one.

11          THE COURT:  All right.

12          The second one is Chapman.  The defendants

13   say they don't intend to use this article but will use a

14   2007 article that was also disclosed and to which there

15   is no objection.  So the motion will be denied as moot

16   with respect to Chapman because it's not being offered.

17          The third one is the "Pediatric Cerebral

18   Palsy in Africa, a Systematic Review" and the defendants

19   say we are not going to use that except we may use it

20   for damage purposes.

21          Well, the timing of it isn't that relevant

22   in my view.  It could be used for damages.  The jury

23   would have to be carefully instructed that they could

24   not consider anything in that article having to do with

25   the standard of care or the breach of the standard of

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

-81-

5

1    care.  They could only consider the article for damages.

2             And the reason for that is if there is a

3    violation of a standard of care, and there is harm that

4    is -- that results as a proximate cause and that

5    happened ten years ago, but that there is more recent

6    authority indicating that -- that the -- let's say the

7    damage was -- that you are not going to move your arm as

8    well, that there is more recent evidence to show that,

9    yes, you can move your arm as well, that would be

10   admissible.

11            So I think the motion is denied on the basis

12   of the defendants' representation, is denied as moot,

13   that they won't use it if -- it won't be used on the

14   standard of care; and if it's used at all, if at all, it

15   will only be for damages.  And what I will do there is

16   before the defendants can use that particular

17   publication for damages, come to the bench, and I will

18   review it in the context of what's happened.

19            The final article is the "American College

20   of Obstetricians and Gynecologists' Practice Bulletin on

21   the Premature Rupture of Membranes" from October 2013.

22   Now, here the defendant says it can lay a proper

23   foundation for the contents of the article by

24   introducing their expert, that the bulletin reflects a

25   standard of care in existence before the date of the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

-82-

**6**

1    alleged negligence.

2            Well -- and the argument would being that

3    under the federal rules of evidence if there is a proper

4    foundation they say they would provide that proper

5    foundation.  My view of that, and I'll let you address

6    it briefly -- very briefly, I have thought about it.

7    That is a kind of boot strapping.  In other words, there

8    is nothing in the article itself that says that was the

9    standard of care in 2000 -- what was the date of this

10   event?

11           ATTORNEY PERRY:  October 2011, your Honor.

12           THE COURT:  October 2011.  There is nothing

13   in the article that says that that was the standard of

14   care in October 2011, but an expert is going to say that

15   that was the standard.  And so using that article

16   doesn't really buttress that that was the standard then.

17   It's his testimony that says that that was the standard

18   then.  So it's kind of boot strapping, and I am not

19   inclined to permit it.  I'll give you an opportunity

20   very briefly to address it.

21           ATTORNEY SCHRAUB:  Your Honor, we don't

22   intend to use the article.

23           THE COURT:  Well, I am going to -- all

24   right.  I will include that.

25           Now we come to the motion to exclude the

7

1   standard of care testimony.  And here, let me tell you

2   why I think the plaintiff looses.  The plaintiff is

3   correct that this is an issue of fact.  Did he or did he

4   not diagnose chorioamnionitis at the crucial time?  We

5   now know, and the plaintiff knew that he's going to say,

6   No, it was just a possibility, a potential.

7           All right.  So it's an issue of fact whether

8   he did or he didn't.  If he did, then the plaintiffs are

9   able to -- if the jury finds that he did, then by his

10  own testimony he should have done other things.

11          If he didn't, if the jury were to conclude

12  that he didn't diagnose it then, I am not quite sure

13  what follows, but it is clear that the defendant is

14  entitled, because proper notice was given, to introduce

15  evidence that it was within the standard of care not to

16  conclude that it was chorioamnionitis.  That is my

17  current view.

18          Anything to the contrary?

19          ATTORNEY PERRY:  If I may, your Honor, I

20  will give it a shot.

21          THE COURT:  All right.

22          ATTORNEY PERRY:  Scott Perry on behalf of

23  the plaintiff.  And I recognize your Honor's position.

24  This is an attempt by the defense to use expert

25  testimony to prove that a diagnosis handwritten in the

8

```
 1    medical record numerous times by the defendant is not a
 2    diagnosis handwritten numerous times by the defendant in
 3    the medical record.  That's what this is.
 4                   THE COURT:  Well, it's an attempt to do
 5    that.  And the attempt would succeed only if the jury
 6    agrees with the defendants' testimony, because he's
 7    going to testify, I didn't diagnose that.
 8                   ATTORNEY PERRY:  Agreed.  We have no problem
 9    with that.
10                   THE COURT:  I can't rule here that he is
11    precluded from saying that.
12                   ATTORNEY PERRY:  We're not asking that, your
13    Honor.  We agree a hundred percent.  Here is what the
14    problem is:  They also are going to go hear from the
15    doctor's experts who are going to say the standard of
16    care didn't require diagnosis in this scenario, and what
17    is the jury to do with that?  They are being --
18                   THE COURT:  I asked that question on the
19    telephone and at the last hearing.
20                   ATTORNEY PERRY:  And the answer is it's an
21    improper purpose because the sole purpose is --
22                   THE COURT:  It's --
23                   ATTORNEY PERRY:  The plaintiffs say they are
24    asking the jury to do something improper, which is
25    consider things other than what actually happened in the
```

9

1    record when you decide this factual issue.  An expert

2    cannot do that.  And here is the way they are going to

3    do it:  They've talked throughout their motions about

4    they have these preeminent experts who are going to get

5    up there and essentially say -- we know they are not

6    allowed to use the word "I," but what they are really

7    saying is I wouldn't have diagnosed chorioamnionitis

8    here because that is not what the standard of care is.

9            THE COURT:  Well, they are not going to say

10   that.

11           ATTORNEY PERRY:  Well, they are because they

12   are going to say the standard of care did not require

13   that diagnosis.

14           THE COURT:  It's different from I wouldn't

15   or I didn't.

16           ATTORNEY PERRY:  I agree.  But the jury

17   knows that the standard of care is what the personal

18   practice of what the doctor is.  They know that.

19           THE COURT:  Well, you cross-examined these

20   doctors in a deposition.

21           ATTORNEY PERRY:  Correct -- well, we didn't

22   depose them in this case.

23           THE COURT:  You didn't.

24           ATTORNEY PERRY:  Right.

25           THE COURT:  But you would have asked them,

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    "Well, don't you think it would have been prudent if you

2    have all these signs and you don't have one of them,

3    what do you lose by giving both drugs instead of just

4    one drug?"

5            ATTORNEY PERRY:  Understood.  But here's my

6    issue, your Honor.  If an improper --

7            THE COURT:  What do you suppose you would

8    have gotten for an answer then.

9            ATTORNEY PERRY:  Well, we know that because

10    the answer would have been either I agree with you

11    plaintiff's counsel, and then they wouldn't be appearing

12    at trial or no I disagree with you.  So we would be in

13    the same situation.

14            But what I am trying to point out here, your

15    Honor, is it's an attempt to bolster the doctor's

16    credibility, which is what's improper here.  That's what

17    they cannot do with expert testimony.  So let met give

18    the Court an example.

19            If a lawyer signs a retainer agreement with

20    a client, okay, and then he gets sued later on for legal

21    malpractice, he can't put expert testimony on to say I

22    didn't have to sign that retainer, and, therefore, I

23    didn't commit malpractice.

24            Same thing, an architect designs a building

25    that collapses, and he gets sued for the collapse.  He

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   can't put expert testimony on to say, I wasn't required

2   to design that building.  That's ridiculous.  But that's

3   exactly what they are doing here.  We are questioning

4   the treatment, not the diagnosis.  The dispute in this

5   case is once you've made the diagnosis --

6           THE COURT:  But isn't there a dispute about

7   whether he made the diagnosis?

8           ATTORNEY PERRY:  Factually dispute.

9           THE COURT:  All right.  What's the jury to

10  do if they don't think he made the diagnosis?

11          ATTORNEY PERRY:  I think they win.  I think

12  they win.  But it's not something that an expert can

13  opine on, and that's my point, and that's why it's so

14  dangerous.  Because the breach of the standard of care

15  are the medications used here, okay, and so if you have

16  an expert get up there and say, "These are all the other

17  reasons that it didn't need to be diagnosed" --

18          THE COURT:  Did you ask the defendant,

19  "Look, you had all of these signs, even if not all of

20  them said chorio, why didn't you give her both drugs

21  anyway?"

22          ATTORNEY PERRY:  Absolutely.

23          THE COURT:  And what did he say?

24          ATTORNEY PERRY:  Personal preference.

25  Personal practice.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**12**

1    THE COURT:  All right.  Then the jury

2    decides life is making choices and living with the

3    consequences.

4    ATTORNEY PERRY:  I agree a hundred percent,

5    your Honor.  My issue is not with anything Dr. Alembik,

6    the defendant wants to say or testify about.  I have no

7    problem with that.  He can say anything he wants.  What

8    he can't do is use, in the defense's word, preeminent

9    experts to say that what I wrote in the record doesn't

10   mean that.  That is not expert testimony.  That is just

11   bolstering what he is saying.

12   And, remember, he said this in a deposition

13   five years, almost five years after the accident

14   happened.  He's had plenty of time --

15   THE COURT:  How many times has

16   chorioamnionitis as a diagnosis reflected in the medical

17   records that he wrote?

18   ATTORNEY PERRY:  That he wrote, at least

19   four in his own writing.  But this is exactly my

20   concern.  To me -- and I recognize I am biased, I am the

21   plaintiff's lawyer -- but that's crystal clear.  It

22   always has been.  But now you get up these two experts

23   that say, look -- I think the defense's opposition

24   actually explains the 403 issue better than I did in my

25   motion.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

13

1          They say they want to talk about how complex

2     medical records are reviewed.  How complex medical

3     records are interpreted, the nature of the diagnosis in

4     medical records.  First of all, none of that was

5     identified as the opinion to be offered by their

6     experts.

7          THE COURT:  Well, that's not what's being

8     argued, though.

9          ATTORNEY PERRY:  But that's exactly what

10    they put in their opposition, and this is where our

11    403 --

12         THE COURT:  What was the notice for these

13    experts, that they would give an opinion that what?

14         ATTORNEY PERRY:  That Dr. Alembik did not

15    breach the standard of care by failing to diagnose

16    chorioamnionitis.

17         THE COURT:  All right.  Why can't they give

18    that opinion?  You have got notice of it.

19         ATTORNEY PERRY:  It's not a question of

20    notice.  We are not claiming we didn't have notice.

21         THE COURT:  All right.

22         ATTORNEY PERRY:  It's not being questioned

23    in this case.

24         THE COURT:  But you just complained about

25    notice if they were going to say something about the

**14**

1    medical records.

2            ATTORNEY PERRY:  Correct.  Let me postulate

3    this.  If they wanted to put on an expert -- I dont know

4    if such an expert exist, but here is how to interpret

5    medical records.

6            THE COURT:  They don't intend to do that,

7    I'm sure.

8            ATTORNEY PERRY:  But that is what they put

9    in their opposition --

10            THE COURT:  Do you intend to do that?

11            ATTORNEY SCHRAUB:  Your Honor, one of the

12    things we intend the expert to assist -- to assist the

13    jury with is how you read a whole series of interrelated

14    medical records.

15            THE COURT:  Did give notice as to that?

16            ATTORNEY SCHRAUB:  Yes, yes, yes.  Yes, it's

17    part -- it's part of the designation.

18            THE COURT:  So you are going to put him on

19    to say that when he wrote chorioamnionitis he didn't

20    mean that was his diagnosis.  He meant that it was a

21    possibility.

22            ATTORNEY SCHRAUB:  It's really not very

23    complicated.

24            THE COURT:  Is that right?

25            ATTORNEY SCHRAUB:  It's right, but it's

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**-91-**

1    right for a specific reason.  It's right because he

2    wrote these notes at the same time, right, and the place

3    in a medical record where a diagnosis or an impression

4    is made is in a progress note.  Juries don't know that.

5    Experts can tell them that.  All right?

6            Dr. Alembik will say, I wrote these all

7    these at about 2:30.  My diagnosis was probable chorio.

8    I put that in my progress note.  At the same time I am

9    filling out the caption form on a medical order form, or

10   I'm filling out a billing form, I just wrote down

11   chorio.  I didn't write down the entire thing that I had

12   just written as my two contemporaneous diagnoses --

13           THE COURT:  Why did he write down chorio?

14           ATTORNEY SCHRAUB:  Because he just didn't

15   put in all the words.  He wasn't thinking about

16   litigation.  He just didn't put in the entire word --

17           THE COURT:  What would he have put in?

18           ATTORNEY SCHRAUB:  What would he put in?  He

19   would have put -- had he put down his diagnosis, he

20   would have put down probable impending chorio.

21           THE COURT:  All right.  Why wouldn't you

22   then -- why wouldn't if follow prudently to give both

23   drugs?

24           ATTORNEY SCHRAUB:  Because, in fact, that is

25   exactly what the experts will explain carefully to the

1    jury, that there is, in fact a protocol for giving

2    antibiotics to women.

3              THE COURT:  Never mind a protocol.  Why

4    isn't it prudent for six people or eight people sitting

5    there, look, you got this condition, they are going to

6    be thinking about it, what are these people trying to

7    tell us.  They are covering for the defendant.

8              ATTORNEY SCHRAUB:  Then we will lose.

9              THE COURT:  Yes, you will.  You will in that

10   event.

11             ATTORNEY SCHRAUB:  I don't think that is the

12   case.

13             THE COURT:  But the point I am making is

14   what were they asked what did they say, why didn't he

15   give it to them as a matter of prudence since it was a

16   pretty likely thing?

17             ATTORNEY SCHRAUB:  Because it was not a

18   pretty likely thing and because --

19             THE COURT:  Why?  Did he write down other

20   things?  He only wrote down one thing, so it must have

21   been the most likely thing.

22             ATTORNEY SCHRAUB:  No, no.  Judge, the issue

23   was the baby's condition at the time that this occurred

24   was the baby had a physical profile done, and

25   Dr. Alembik concluded that the baby was in distress and

1     he should move to delivery.  He had been following all

2     along the protocol for and watching for the signs of

3     chorio.  Those are in his notes.  She did not have --

4                 THE COURT:  I just don't understand why if

5     that happened, if chorio was the one thing that occurred

6     to him that was really possible, why you wouldn't give

7     both drugs.

8                 ATTORNEY SCHRAUB:  Because you do not give

9     both drugs unless the patient meets the clinical

10    diagnosis.

11                THE COURT:  But why?

12                ATTORNEY SCHRAUB:  Because it is -- in fact,

13    it is not prudent to do that.

14                THE COURT:  Why?

15                ATTORNEY SCHRAUB:  Because these drugs are

16    not harmless.

17                THE COURT:  They're antibiotics, aren't

18    they?

19                ATTORNEY SCHRAUB:  They are.  If we had

20    given gent to this baby -- excuse me, to this mother --

21    and by the way, gent treats -- gentamicin threats the

22    mother, not the fetus.  If we had given gentamicin to

23    the mother, right, and the baby is born with kidney

24    disease and with hearing loss, which are the two side

25    effects of gentamicin, we're going to be sitting right

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

-94-

18

1    here in this seat, they are going to be saying this

2    mother did not have the clinical requirements in

3    multiple pieces of medical literature, not just one, and

4    yet you went ahead and administered this drug.

5            THE COURT:  All right.  Well, you have

6    answered my question.

7            ATTORNEY SCHRAUB:  Okay.

8            THE COURT:  But, that, too, is going to be a

9    jury issue.

10           ATTORNEY SCHRAUB:  Believe me, I'll move --

11           THE COURT:  Why you all can't find a

12   reasonable means of settling this case is astonishing to

13   me because it isn't going to be a matter of a figure

14   here.  It's going to be a matter of a figure down here,

15   zero, or a figure up here.  And so the notion that you

16   should settle for something here doesn't make sense.

17   That's what your client and your client should

18   understand.

19           In other words, the issue is whether it's

20   going to be zero or whether it's going to be X.  It

21   isn't going to be where people are perhaps now at X

22   minus significant delta X.  It just isn't.  And all

23   that's going to mean is money spent litigating, which is

24   not going to be recovered by the plaintiff, and it isn't

25   going to be recovered by the defendant.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

19

```
 1            But in any event, you all know that, and I
 2      merely mention it in the unlikely event that it has
 3      escaped your attention during these.
 4            ATTORNEY PERRY:  Your Honor, may I just
 5      complete, if I may?
 6            THE COURT:  Yes.
 7            ATTORNEY PERRY:  But the issue here, and we
 8      have discussed this, is they cannot put on legally that
 9      the doctor complied with a standard of care that we
10      haven't alleged he breached.  And, see, that's the issue
11      here.  We are not going to have experts that say he
12      breached the standard of care.
13            THE COURT:  That's because you made a
14      judgment that he was stuck with his diagnosis of chorio.
15            ATTORNEY PERRY:  Correct.
16            THE COURT:  As facts have developed, that
17      judgment was not entirely sound because he says that
18      wasn't my...
19            ATTORNEY PERRY:  It's not a judgment.  You
20      cannot find --
21            THE COURT:  It is a matter of fact.
22            ATTORNEY PERRY:  Correct.
23            THE COURT:  And if he says he didn't do it,
24      that creates an issue of fact, so you could persuade the
25      jury that he did do it.
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1            ATTORNEY PERRY:  Right, but what --

2            THE COURT:  If you don't, they get to show

3  that it's within the standard of care that he didn't do

4  it.

5            ATTORNEY PERRY:  But that would allow the

6  jury to conclude that he didn't diagnose chorio because

7  the standard of care didn't require it.  That would be

8  an improper way to reach their conclusion.  That's what

9  I am trying to say to you, your Honor.  That's the

10  issue.  Thank you.

11            THE COURT:  All right.  I understand that.

12            ATTORNEY PERRY:  Okay.

13            THE COURT:  But anything further?  I am

14  going to take a brief recess.

15            ATTORNEY SCHRAUB:  Only, your Honor, that

16  the experts are permitted to say, to give expert

17  testimony to assist the jury in concluding that it makes

18  sense what Dr. Alembik is saying about not diagnosing

19  it.

20            THE COURT:  If you give notice, proper

21  notice.  Did you give proper notice --

22            ATTORNEY SCHRAUB:  Yes.

23            THE COURT:  -- of everything that you expect

24  this witness to say about whether -- if he didn't

25  diagnose chorio as he claims now that he didn't, whether

1    that was a reasonable thing for him to do?

2            ATTORNEY SCHRAUB:  We did, and it's never

3    been challenged.  I mean, they have never filed --

4    they've known about this for months.  They've never

5    challenged the notices.  They never challenged the --

6            THE COURT:  He says it just improperly

7    boosts their opinion.  I understand that.  I am going to

8    think about it.

9            Court stands in recess.  It will be

10    no more -- 15 minutes.

11            (Court recessed at 12:30 p.m.)

12            (Court called to order at 1:02 p.m.)

13            THE COURT:  All right.

14            The matter is before the Court, remaining --

15    I have already ruled on some matters, which I will

16    record in an order -- but remaining for disposition is

17    the defendant's -- I beg your pardon, the plaintiff's

18    motion in limine to preclude the defendant from offering

19    expert testimony on the standard of care concerning the

20    criteria for diagnosing chorioamnionitis.

21            The defendant wishes to offer evidence that

22    in this case the standard of care did not require the

23    conclusion chorioamnionitis, that a diagnosis of that

24    was required.  I think that's correct isn't it?

25            ATTORNEY SCHRAUB:  That is correct, your

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   Honor.

2             THE COURT:  All right.  I will deny the

3   motion in limine.  I think that there is no question

4   about notice.  The question is only about whether that

5   is relevant.  The plaintiff argues it's not relevant.

6   The only issue is whether -- is the factual issue,

7   whether that was the diagnosis.

8             The plaintiff argues that that's a factual

9   issue, and the plaintiff is correct in that regard.

10  That will be a factual issue for the jury.  But it is

11  also permissible for the defendant to testify, if that's

12  his testimony, that I didn't diagnose that, and experts

13  can say that he was justified in not diagnosing that

14  because that is the standard of care, not to diagnose it

15  in those specific circumstances.

16            I raised the question of whether -- why it

17  wouldn't have been prudent to do it anyway, and the

18  defendant says there will be testimony, if it comes up,

19  that there are possible side effects to these drugs.  I

20  don't even know why the first one was prescribed.  Maybe

21  there are side effects to that one, too.  But anyway, I

22  don't need to know more about it now.

23            Well, if he's -- go ahead.  You can tell me

24  what you were going to tell me.

25            ATTORNEY SCHRAUB:  The first -- the first

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    drug, your Honor, was not prescribed for chorio.  There

2    was no drugs prescribed for chorio.  The first drug was

3    prescribed for Group B strep, which is a prophylactic

4    for the most common pathogen that can occur in the

5    delivery process.  That is a common and routine

6    practice.

7            So the fact that also would have been a drug

8    in the chorio setting is not really the issue.  He did

9    not prescribe it for that reason.

10            THE COURT:  I don't agree with the

11    plaintiff's argument that admitting the testimony has

12    the impermissible effect of bolstering either the

13    defendant or the defendant's experts.  I think it is a

14    natural consequence of the fact that he claims he didn't

15    diagnose it.  This is why he didn't diagnose it, in his

16    view, and there is support for that, and there was

17    notice.

18            Now, I don't think we are going to get into

19    an argument, but perhaps we will, about whether expert

20    testimony can be offered as to what it means to fill in

21    a particular space.  But if we do, I'll deal with that

22    at the time.

23            I take it that there was notice about that

24    as well.

25            ATTORNEY SCHRAUB:  We believe that's

1    included in our -- in our designation notice with

2    respect to what the medical records show with regard to

3    Dr. Alembik's diagnosis, and an expert will assist the

4    jury in understanding where in a medical record a

5    diagnosis appears.  That's something a jury -- I mean,

6    that's the keystone of expert testimony.  Everything is

7    a fact.  It isn't a law question, so the fact that it's

8    a fact doesn't answer the question.  The issue is will

9    it assist the jury.

10         THE COURT:  Well, I think what I will do,

11    too, is consider, if the plaintiffs request it, putting

12    a special interrogatory to the jury at the end of the

13    case:  Do you find that the plaintiffs have proved by a

14    preponderance of the evidence that Dr. -- what's his

15    name, Alembik?

16         ATTORNEY SCHRAUB:  Alembik.

17         THE COURT:  -- Alembik diagnosed the mother

18    with chorioamnionitis?  Yes, no.  They have a burden of

19    proving that by a preponderance of the evidence.  If

20    they say yes, seems to me like the ball game is over.

21    If they say no, it seems to me like the ball game is

22    over.

23         ATTORNEY SCHRAUB:  It's not -- it wouldn't

24    be over at all, Judge.  Again, I don't know if the Court

25    had a chance to really look at the opposition we filed,

1    but we laid out every step of what we contest in

2    numbered sentences so the Court could understand every

3    step of what is at issue in this case.  But not only is

4    the standard of care hotly contested with regard to

5    whether he made or didn't make the diagnosis of clinical

6    chorio, the question is did she have that condition.

7              Supposing he made a diagnosis of bubonic

8    plague, and he didn't treat for it, but the experts get

9    on and say she never had bubonic plague to begin with.

10   Our experts will say this woman didn't have clinical

11   chorio.  It wouldn't make any difference what

12   Dr. Alembik wrote.

13             THE COURT:  Did she have chorio?

14             ATTORNEY SCHRAUB:  She had histologic

15   chorio, which is determined after birth.  And nobody

16   says that the obstetrician is required to predict --

17   there are many -- the experts will say, Judge --

18             THE COURT:  Six people here might say so.

19             ATTORNEY SCHRAUB:  Well, they may.  All I am

20   saying is the experts will say many women have

21   histologic chorio, which is proven by microscopic

22   analysis of tissue after birth but never had the

23   required clinical signs before birth to make the

24   diagnosis.  That was the case here.

25             And we have an enormous proximate cause

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    defense, which is equally -- equally as big as the

2    standard of care.  The whole issue of infection is a red

3    herring.  It's irrelevant.  This little girl's injuries

4    did not result from an infection.  It resulted from

5    prematurity.

6              THE COURT:  Well, I am sure you have

7    convinced yourself of that.

8              ATTORNEY SCHRAUB:  I hope so.

9              THE COURT:  Now you have eight people to

10   convince.

11             ATTORNEY SCHRAUB:  I will try.

12             THE COURT:  But I'm sure you have tried a

13   number of medical malpractice cases, and I dare say

14   you've not won every one of them.

15             ATTORNEY SCHRAUB:  Oh, I dare say.

16             THE COURT:  Enough said about that, then.

17             Anything further from the plaintiff?

18             ATTORNEY PERRY:  No.  Thank you, your Honor.

19             THE COURT:  Court stands in recess.

20             I have spoken to jurors in medical

21   malpractice cases.  It won't surprise you to learn here

22   that one of the firmest impressions I have in those

23   discussions are impressions about how they try to mask

24   in technical parlance and other things what common sense

25   should have said to them.  And, I mean, this is a jury

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

-103-

1     issue.

2            Now, the plaintiffs chose not to put on

3     testimony or to make a medical issue about whether he

4     should have diagnosed chorio.  Perhaps, in fact, because

5     it would be hard to find an expert who would say that.

6     I understand that.  I know about doctors.

7            Now, I am not sure you couldn't find one.

8     You know, there are some outliers out there who will say

9     anything, say anything for a fee, on both sides.  And a

10    lot of it is judgment.

11            I remember when I first went into practice

12    one of the things I did was to defend a Virginia Transit

13    Company in Richmond, the firm I was with, but I had to

14    go into court.  And all the cases were silly -- well,

15    they weren't silly.  People were bringing claims, but

16    they were silly because -- the bus came to a sudden

17    stop.  The person fell or did something and claimed all

18    sort of damages.

19            Well, we had a neurologist and a back doctor

20    who would always say Nonsense, always.  And the

21    plaintiffs' attorneys, whom I knew well, had doctors

22    that would say that the injury was cataclysmic, life

23    changing, permanent.  It was also that way.  And I think

24    juries discarded a lot of that information, and that's

25    what juries do.  They see through a lot of stuff.  There

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

28

1    is a certain cultural background.

2            None of this needs to be on the record.

3            (Off record).

4            THE COURT:  All right.  I will see you on

5    Tuesday morning.  Be alert because I may not start at

6    10:00.  I may start at 1:00.  I don't know yet.  I will

7    let you know.

8            ATTORNEY PERRY:  Thank you.

9            ATTORNEY SCHRAUB:  Thank you.

10            (Court adjourned at 1:07 p.m.)

11                ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

29

```
 1                        CERTIFICATE

 2

 3            I, MICHAEL A. RODRIQUEZ, an Official Court

 4   Reporter for the United States District Court, in the

 5   Eastern District of Virginia, Alexandria Division, do

 6   hereby certify that I reported by machine shorthand, in

 7   my official capacity, the proceedings had upon the

 8   MOTION HEARING in the case of N.O. a MINOR, ET AL v.

 9   MARC ALEMBIK, M.D., ET AL.

10

11            I further certify that I was authorized and

12   did report by stenotype the proceedings in said MOTION

13   HEARING, and that the foregoing pages, numbered 1 to 29,

14   inclusive, constitute the official transcript of said

15   proceedings as taken from my machine shorthand notes.

16

17            IN WITNESS WHEREOF, I have hereto subscribed

18   my name this   14th    day of    June        , 2016.

19

20

21                               /s/
                     Michael A. Rodriquez, RPR/CM/RMR
22                        Official Court Reporter

23

24

25
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                      EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3    N.O. a MINOR, ET AL.,              )
                                         )
 4                        Plaintiff,     )
                                         )
 5    v.                                 ) CIVIL ACTION
                                         )
 6    MARC ALEMBIK, M.D., ET AL          ) 1:15-cv-868
                                         )
 7                        Defendant.     )
      _____)
 8
                        REPORTER'S TRANSCRIPT
 9
                            JURY TRIAL
10
                     Tuesday, April 12, 2016
11
                             ---
12
      BEFORE:        THE HONORABLE T.S. ELLIS, III
13                   Presiding

14    APPEARANCES:   SCOTT MICHAEL PERRY, ESQ.
                     Klores Perry Mitchell PC
15                   1735 20th Street NW
                     Washington, DC 20009
16
                     LAURIE ANN AMELL, ESQ.
17                   CATHERINE D. BERTRAM, ESQ.
                     Bertram & Amell PLLC
18                   1100 Vermont Ave NW, Suite 500
                     Washington, DC 20005
19

20
                          For the Plaintiff
21                           ---

22             MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                     Official Court Reporter
23             USDC, Eastern District of Virginia
                      Alexandria Division
24

25
```

2

```
 1              (APPEARANCES CONTINUED)

 2

 3         J. JONATHAN SCHRAUB, ESQ.
           PAIGE LEVY SMITH, ESQ.
 4         Sands Anderson Marks & Miller
           1497 Chain Bridge Rd
 5         Suite 202
           McLean, VA 22101
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

INDEX

PRELIMINARY MATTERS:                               5

JURY VOIR DIRE/JURY SELECTION                     33

PRELIMINARY INSTRUCTIONS                          117

OPENING STATEMENT BY THE PLAINTIFFS               143

OPENING STATEMENT BY THE DEFENDANTS               163

WITNESSES:          DIRECT CROSS REDIRECT

Dr. Craig Cohen      182

4

```
1                      PROCEEDINGS

2

3              (Court called to order at 9:31 a.m.)

4              THE COURT:  All right.

5              Good morning.

6              You may call the case.

7              THE CLERK:  Civil Action 15-868, N.O. a

8    Minor, et al., versus Marc Alembik, M.D., et al.

9              Counsel please note your appearances for the

10   record.

11             THE COURT:  All right.

12             Who is here on behalf of the plaintiff

13   today?

14             ATTORNEY PERRY:  Good morning, your Honor.

15   On behalf of the plaintiff are Scott Perry, Catherine

16   Bertram, Laurie Amell; and the plaintiff is to our left.

17   That's Ms. Christine Orwig.

18             THE COURT:  All right.

19             Good morning to all of you this morning.

20             And for the defendant?

21             ATTORNEY SCHRAUB:  Good morning, your Honor.

22   Jonathan Schraub, Paige Levy Smith and the defendant,

23   Dr. Marc Alembik.

24             THE COURT:  All right.

25             Good morning to all of you this morning.
```

```
 1                   PRELIMINARY MATTERS
 2              THE COURT:  The reason for this hearing is
 3     that, on reflection, I am not certain that my ruling on
 4     the evidentiary matters was sufficiently precise, and I
 5     want to be clear about it.  I may have misunderstood to
 6     some extent the parties' submissions and positions.
 7              I think I was clear that it is permissible
 8     for the defendant to elicit from the defense experts
 9     that the constellation of signs and symptoms that were
10     exhibited by Ms. Orwig were not sufficient to warrant a
11     diagnosis of chorioamnionitis.  That's the opinion I
12     thought you wanted to elicit.  Is that right, Mr.
13     Schraub?
14              ATTORNEY SCHRAUB:  That's correct, your
15     Honor.
16              THE COURT:  All right.  That opinion, there
17     is adequate notice of that and it's certainly relevant
18     and appropriate.
19              My concern is that there maybe opinions that
20     may go beyond that, that I'm not sure were specifically
21     identified for me that I could rule on.  And I would
22     rather rule on them now than -- than in the course of
23     the trial.
24              Do you intend, Mr. Schraub, to elicit any
25     opinion from any expert as to what Dr. Alembik had in
```

6

1   his mind at the time that he may have written anything

2   in a medical record?

3                ATTORNEY SCHRAUB:  Your Honor, not what

4   Dr. Alembik had in his mind, no.  But we do intend to

5   elicit, from the experts, testimony regarding where

6   diagnoses are written in a medical record.

7                THE COURT:  All right.  Now where is notice

8   of that?

9                I have scoured now your reports and I am

10  concerned about that.  I have read the -- the reports

11  and I don't see adequate notice that you have given to

12  the plaintiffs that you are going to present an --

13  evidence on what certain medical records mean or what

14  captions mean.

15               ATTORNEY SCHRAUB:  Your Honor, our -- you

16  know, our --

17               THE COURT:  By the way, your two reports

18  from your two medical experts were written by the same

19  person.  They are pretty close to identical.

20               ATTORNEY SCHRAUB:  Well, their opinions are

21  pretty close.  Their opinions are pretty close --

22               THE COURT:  Yes.  Their phraseology is

23  pretty close.

24               ATTORNEY SCHRAUB:  -- to identical.  But

25  certainly the lawyers have a hand in drafting these and

7

1    then they are reviewed by the experts.

2              THE COURT:  Yes, I have been there.

3              ATTORNEY SCHRAUB:  Right.

4              Your Honor, in Dr. Dudley's, on page four,

5    although Dr. Cohen and Phillips in their expert reports

6    contend Dr. Alembik diagnosed the chorioamnionitis, the

7    conclusion is contrary to his deposition and to --

8              THE COURT:  You see, that's something he

9    can't -- you know, for him to say it's contrary to his

10   deposition testimony is not appropriate testimony here.

11   You understand that.  That cannot be elicited.

12             ATTORNEY SCHRAUB:  All right.  Except,

13   perhaps, as the basis for Dr. Dudley's conclusions.  He

14   relies on various parts of the record --

15             THE COURT:  Well --

16             ATTORNEY SCHRAUB:  -- including the

17   deposition.

18             THE COURT:  -- all he relies on is that

19   the -- the constellation on signs and symptoms, isn't

20   it?  He can't rely on Dr. Alembik's judgment.

21             ATTORNEY SCHRAUB:  No, he is not relying on

22   Dr. -- he is not relying on Dr. Alembik's judgment, and

23   he doesn't need to elicit about the deposition.

24             The important thing is he says:  And the

25   progress note which indicate his impression that the

8

1    patient exhibited only probable chorio.

2              Once he talks about the progress note, it

3    is -- it's proper to ask him where does a doctor --

4    where do you look in a medical record to see where a

5    progress note is?

6              THE COURT:  Well, it might be appropriate,

7    but where did you give them notice of that here?

8              ATTORNEY SCHRAUB:  It isn't stated

9    explicitly.

10             THE COURT:  No, it isn't.

11             ATTORNEY SCHRAUB:  It isn't.  But I don't

12   believe it has to be stated explicitly.

13             THE COURT:  Why not?  Where do you get the

14   notion that you don't have to state explicitly what

15   opinions you intend to elicit?

16             ATTORNEY SCHRAUB:  You only have -- you have

17   to give fair notice that he is going to talk about the

18   progress note.

19             THE COURT:  All right.  Now, tell me again,

20   exactly -- because fair notice, I have to decide.

21             ATTORNEY SCHRAUB:  Of course.

22             THE COURT:  You have the first opportunity

23   by being careful about it.  But ultimately, I have to

24   decide whether there is fair notice.

25             Now, I am not going to have you testifying

9

1    about what might have been in Dr. Alembik's head or what

2    he really meant when he said X.  He can't testify to

3    that.

4            ATTORNEY SCHRAUB:  No, he can't testify to

5    what's in Dr. Alembik's head.

6            THE COURT:  And he can't testify to what

7    Dr. Alembik meant.

8            Now, what is it beyond that, that you would

9    have him testify about medical records?

10            ATTORNEY SCHRAUB:  Where in medical records,

11    you know -- a jury is -- a lay jury can be assisted by

12    an expert in determining where --

13            THE COURT:  I don't question that.  I

14    question notice.

15            ATTORNEY SCHRAUB:  I know that.  I

16    understand that, your Honor --

17            THE COURT:  Well, you know that but you are

18    not addressing it.

19            ATTORNEY SCHRAUB:  I am addressing it as

20    best I can.

21            THE COURT:  All right.

22            ATTORNEY SCHRAUB:  The progress note, his

23    statement that --

24            THE COURT:  Tell me what question you intend

25    to ask and what answer you intend to elicit.

1          ATTORNEY SCHRAUB:  The question I would like

2     to ask is:  Where do you look in a medical record to see

3     where a diagnosis or an impression is made by a doctor?

4     Where are they normally written?

5          They are normally --

6          THE COURT:  What answer do you expect to get

7     from that?

8          ATTORNEY SCHRAUB:  They are -- diagnoses and

9     impressions are normally written in progress notes made

10    at the bedside when the doctor gives his impression of

11    what he is seeing and determining with respect to the

12    patient.  And he says here that -- that part of why he

13    believes that Dr. Alembik did not diagnose chorio was

14    because it wasn't in his progress note.

15         I can follow up on that --

16         THE COURT:  Well, but you see, that's what I

17    don't think you can elicit.  I don't think you can

18    elicit what he diagnosed, because you're talking about

19    what was in his mind, what he intended.

20         I think you can elicit -- well, I don't know

21    whether I'm going to allow this yet.  It depends on

22    notice.  But you may be able to elicit where the

23    diagnosis would appear, typically, and if he says

24    progress notes, that's the end of it.  Then we look at

25    the progress notes.

1          ATTORNEY SCHRAUB:  That's fine, your Honor.

2     That's really all I intend -- that's really all I

3     intend -- all I intend to do.

4          THE COURT:  All right.

5          Any objection to that?

6          ATTORNEY PERRY:  Yes, your Honor.  Your

7     Honor, I won't revisit your ruling.  I respect it, but

8     not that the plaintiff objects to the original ruling.

9          But the objection is notice.  There is

10    absolutely nothing in either of these reports that says

11    exactly what Mr. Schraub just said, that their experts

12    are going to say, "This is where you would find a

13    diagnosis in a medical record."

14         That is not in the designation.  So on the

15    basis of fair notice or any notice, there is none.

16         THE COURT:  Had you had that notice, what,

17    if anything, differently would have you done?

18         ATTORNEY PERRY:  We would have a rebuttal

19    expert witness who would have discussed:  These are how

20    medical records are filled out.  This is where diagnoses

21    appear in medical records.

22         THE COURT:  All right.

23         ATTORNEY PERRY:  But that's never been in

24    question.

25         THE COURT:  Look on page four --

```
 1              ATTORNEY PERRY:  Yes, your Honor.
 2              THE COURT:  -- of the notice that you got,
 3    since you are focused on notice, as I was.  Although
 4    Drs. Cohen and Phillips in their expert reports contend
 5    that Dr. Alembik diagnosed the chorioamnionitis on
 6    October 13th, that conclusion is contrary to
 7    Dr. Alembik's deposition testimony.  Now they can't
 8    testify as to what was in a deposition.
 9              Then he goes on to say Dr. Alembik's -- and
10    his 2:30 p.m. progress note which, taken together,
11    indicate his impression that the patient exhibited only
12    probable impending chorioamnionitis.
13              Now, by the way, does the word "probable
14    impending chorioamnionitis" appear in the progress
15    notes?
16              ATTORNEY PERRY:  It does, your Honor.
17              THE COURT:  All right.  So it's perfectly
18    appropriate for the defendant to rely on that language
19    as to what Dr. Alembik saw, and that was his judgment at
20    the time.
21              ATTORNEY PERRY:  I with that, your Honor.
22    My only dispute is with the -- what I think is the
23    follow-up question, is:  Okay.  Based on the totality of
24    the circumstances, including what Dr. Alembik said in
25    his deposition, have you concluded that he did not
```

```
 1    diagnose chorioamnionitis?
 2                THE COURT:  Well, that, I don't think he
 3    intends to elicit.
 4                ATTORNEY PERRY:  Okay.
 5                THE COURT:  Do you intend to elicit that?
 6                ATTORNEY SCHRAUB:  I want to be careful,
 7    your Honor, because I don't want to say something that
 8    isn't going to come out the right way.
 9                THE COURT:  That's all right.  Take your
10    time.
11                ATTORNEY SCHRAUB:  What we intend to elicit
12    is that there was no -- there would not have been a
13    proper basis in medical fact to diagnose chorio.
14                THE COURT:  Why isn't that simply elicited
15    by asking the experts, "Based on the constellation of
16    signs and symptoms exhibited by Ms." --
17                ATTORNEY SCHRAUB:  Orwig.
18                THE COURT:  -- "Orwig, is a diagnosis of
19    chorioamnionitis warranted?"
20                And the answer would "No."
21                And then, "Why not?"
22                And they explain why not.  But what -- I
23    still am unclear about what else.  I think you can
24    certainly elicit that.  That is clear.
25                ATTORNEY SCHRAUB:  And if you can elicit
```

1    that, can't you also elicit that the -- I think -- I'm

2    not sure if your Honor -- I think your Honor just ruled

3    on this a minute ago, but now I'm getting myself a

4    little confused -- that the expert can say that, "I

5    would -- the signs and symptoms don't warrant the

6    diagnosis.  It was not -- there was no standard of care

7    which required that the diagnosis be made given these

8    signs and symptoms and that the progress note indicates

9    that Dr. Alembik did not make the diagnosis, because you

10   look to the progress to see where a doctor's diagnosis

11   is"?

12           THE COURT:  That's the point you -- that's

13   the point we're focusing on, is whether there is notice

14   that that's where you look to see in a medical record.

15           ATTORNEY SCHRAUB:  And my point, your Honor,

16   is that certainly you have to give fair notice, and

17   ultimately, of course, that's for the Court to decide.

18   The issue is you don't give notice at every single step

19   of your line of questioning.

20           THE COURT:  No, but you do give notice of

21   every opinion you intend to elicit.

22           ATTORNEY SCHRAUB:  Right, but we -- and --

23           THE COURT:  And you're now wanting to elicit

24   an opinion that that's where a doctor puts his

25   diagnosis, not in other places.

1          ATTORNEY SCHRAUB:  Right, which I think

2     fairly flows from the notes.

3          THE COURT:  Of course, lots of things fairly

4     flow, but whether that's fair notice or not is another

5     matter.  Because, as he said -- and I asked him -- "What

6     would you have done if you had been told that that was

7     what they were going to do?"

8          He said he would get an expert who would

9     say, "No, there are other places in the medical record

10    where you would look to see what the diagnosis was."

11         And I take it there are other places in the

12    medical record where chorio is the only thing noted and

13    it doesn't say "possible" or "impending."

14         ATTORNEY SCHRAUB:  Right.  Correct.

15    Correct.  All I can -- my understanding of fair notice,

16    which may not be the Court's, obviously, is that if we

17    had put the medical record, the progress note, in issue

18    as the basis for an opinion that chorio was not

19    diagnosed together with the clinical signs and symptoms,

20    then there is fair notice --

21         THE COURT:  But whether he diagnosed chorio

22    is a jury issue.

23         ATTORNEY SCHRAUB:  Well, yes, it's a jury

24    issue aided by expert testimony on -- on medicine.

25    Everything's a jury issue.

1          THE COURT:  Yes.

2          Let me ask the defendant.  All right.  Let

3  me ask you further.  You -- the only thing I'm focused

4  on now, Mr. Schraub, is whether or not you should be

5  able to elicit from your expert that the place to find

6  it is in the progress notes, and you want to get him to

7  say, "And Dr. Alembik did not reach that conclusion."

8          ATTORNEY SCHRAUB:  The place -- the place to

9  find it is in the progress note.  The progress note does

10  not have that diagnosis, and the medical facts and

11  symptoms would not support --

12          THE COURT:  Well, that latter I'm going to

13  allow you to elicit.

14          ATTORNEY SCHRAUB:  No, I understand.  And

15  it's --

16          THE COURT:  Well, sure, it all goes

17  together, but you didn't give notice of it.

18          What page now?

19          ATTORNEY SCHRAUB:  We were looking at Page 4

20  on Dr. -- right, Dr. -- if you look at Dr. Norwitz,

21  Your Honor --

22          THE COURT:  All right.  I have that in front

23  of me.

24          ATTORNEY SCHRAUB:  Pages -- are these pages

25  numbered?  No, these pages aren't numbered.  Okay.

1          THE COURT:  That's all right.  The right
2     page is the one that has a footnote at the bottom that
3     said, "I rely on."
4               Is that it?
5               ATTORNEY SCHRAUB:  Actually, it's the
6     next --
7               THE COURT:  Next page.  All right.
8               ATTORNEY SCHRAUB:  Top of the next page.
9     And, you know, his wording is actually different than
10    Dr. Dudley's wording.  He made changes.  He says that,
11    "In any event, regardless of any notation in the chart."
12              "Regardless of any notation in the chart, in
13    my opinion to a reasonable degree of medical certainty,
14    the patient didn't met the clinical criteria."
15              So he gives notice that we are going to
16    discuss the significance of entries in the chart.  You
17    know, it could have been worded better, obviously.
18              THE COURT:  Should have been worded better,
19    is a better way to put it.
20              ATTORNEY SCHRAUB:  It should have been
21    worded better.
22              THE COURT:  You know, the way I always did
23    it and the way that I would require it done, if there's
24    ever any future case, is you enumerate each and every
25    expert opinion that you expect to elicit.  It's only

1    when that is done, rather than mixed up in a mix of

2    medical and legal narrative, that you give the kind of

3    notice.  But in any event, you've pointed -- and I've

4    read this material.  You've pointed out to me precisely

5    what you rely on as fair notice.

6               ATTORNEY SCHRAUB:  May I make one other

7    point, your Honor --

8               THE COURT:  Yes.

9               ATTORNEY SCHRAUB:  -- just as an aside?

10              The plaintiff's experts are going to get up

11   and do exactly, I think, what the Court said you can't

12   do.  They're going to point to all sorts of entries in

13   the record and say, "Look at this entry in the record.

14   Dr. Alembik made the diagnosis," you know?  You know --

15   and I'm not sure if that troubles the Court or not, but

16   I'm not sure what the difference is between --

17              THE COURT:  Well, I think there's plenty of

18   notice of that.

19              ATTORNEY SCHRAUB:  Right, but the issue is

20   can they say, "Look at this.  This supports the

21   diagnosis," but the defense expert can't get up and

22   counter that and say, "Look at the progress note.  The

23   progress note doesn't support the diagnosis because the

24   progress note is where the diagnosis should be made"?

25              THE COURT:  All right.  Let me --

1          ATTORNEY SCHRAUB:  It seems very one-sided

2     in that regard.

3          ATTORNEY PERRY:  Thank you, your Honor.

4          THE COURT:  Don't you already have your

5     expert about whether or not the diagnosis was made?

6          ATTORNEY PERRY:  Yes, your Honor.  And

7     that's in our notice.  It specifically says that Dr.

8     Alembik made the diagnosis.

9          THE COURT:  Right.

10          ATTORNEY PERRY:  So there's no question of

11     notice on the plaintiff's side.  All I would say, your

12     Honor, is that in Dr. Norowitz's, which is -- it's the

13     same sentence with a few different words, but the

14     conclusion he drew is exactly what the Court has already

15     said it's going to allow.  The conclusion at the end of

16     that sentence is simply that the patient did not meet

17     the clinical criteria.

18          THE COURT:  Which, of course, he can give

19     that testimony.

20          ATTORNEY PERRY:  Correct.  Correct.  That

21     doesn't change the issue of the medical record.

22          Thank you, your Honor.

23          THE COURT:  But let me go back to you.  Your

24     expert is going to testify that he did make that

25     diagnosis based on his reading of the record, and

1    Mr. Schraub said why can't his expert say his reading of

2    the record doesn't establish that?

3                ATTORNEY PERRY:  Well, now we are getting to

4    an area of -- and I'm trying to heed closely to the

5    Court's original ruling.

6                THE COURT:  Which was, as you understand it,

7    what?

8                ATTORNEY PERRY:  That they're going to be

9    allowed to testify that the standard of care did not

10   require diagnosis of chorio.

11               THE COURT:  Well, they clearly gave notice

12   of that.

13               ATTORNEY PERRY:  I agree.  I agree.  But we

14   think on the law, they're not allowed to say that, but I

15   respect the Court's ruling.  But here's why we go back

16   to that:  All our experts are going to say is "Let me

17   show you Page 33 where he made the diagnosis of

18   chorioamnionitis, and now let me tell what the standard

19   of care is as to how to treat chorioamnionitis."  That's

20   what they're going to say, and that's all our position

21   has ever been.

22               The problem is that -- and this is -- I'm

23   not trying to rehash, but the defense is going to get up

24   and say "Ignore that record, and let me tell you why the

25   standard of care didn't require that."

21

1    So the issue of what our experts are going

2    to say, our experts are just going to point to the

3    record and say, "Here it is.  Now let me tell you what

4    you do in that circumstance."

5    Their expert, which we didn't have notice

6    of --

7    THE COURT:  Are your experts on video or

8    live?

9    ATTORNEY PERRY:  Live, sir.

10    THE COURT:  Well, why wouldn't your experts

11    be able -- because they'll have to answer it on

12    cross-examination.  "Why do you conclude he reached the

13    diagnosis of chorio?

14    ATTORNEY PERRY:  He certainly will have to

15    answer on cross.

16    THE COURT:  And isn't that the debate that

17    Mr. Schraub wants to join in on?

18    ATTORNEY PERRY:  It could be.  The issue is

19    that their answer would be because it's in the medical

20    record.  So that's not a -- I mean, he can --

21    THE COURT:  Well, I'm sure Mr. Schraub will

22    inquire further.

23    ATTORNEY PERRY:  I agree, but I don't think

24    that by crossing an expert on an opinion you open up

25    what you didn't designate in your notice.  That's not --

1          THE COURT:  No, I think that's correct,

2     but --

3          ATTORNEY SCHRAUB:  Your Honor?

4          THE COURT:  Just a moment.

5          (Pause in proceedings.)

6          THE COURT:  What concerns me, Mr. Schraub,

7     is a statement, for example, in the second doctor's

8     statement.  He says, "In other words, he," meaning

9     Dr. Alembik, "suspected that Ms. Orwig may be in the

10    process of developing chorioamnionitis, but he didn't

11    have sufficient clinical criteria to confirm that

12    diagnosis."

13         ATTORNEY SCHRAUB:  Your Honor, that's the

14    import of -- the medical import of the diagnosis of

15    probable impending.

16         THE COURT:  But elsewhere it doesn't say

17    probable impending.

18         ATTORNEY SCHRAUB:  I know that, your Honor.

19    And that's fine.  That can be an issue -- that can be an

20    issue in the case.  But I have to say, your Honor, if

21    the Court is focused on the question of notice and how

22    things are written in the expert report, and I have

23    already accepted responsibility for ours, nowhere in the

24    plaintiff's expert report, nowhere does any plaintiff's

25    expert say that Dr. Alembik made a notation on page 33

1    of the record, on page 38 of the record, on page 39 of

2    the record, and that constitutes chorio.  They don't say

3    that.

4            They just simply say Dr. Alembik made a

5    diagnosis of chorio.  We don't have notice under that

6    theory that they are going to rely on it.

7            THE COURT:  I don't think it's the same at

8    all.  Your argument doesn't impress me at all.  But I do

9    take your point -- your other point that the debate over

10   what a particular statement in the medical record

11   means -- let me consider that further.

12           Do I have a list of your witnesses that's up

13   to date?

14           ATTORNEY PERRY:  Not up top date, your

15   Honor.  We can actually prepare one right now if we have

16   a moment.  We have culled it since we sent that to you.

17           THE COURT:  All right.  Here is a defendant

18   and plaintiff's list of witnesses.  And when I take the

19   recess you can bring it up to date.

20           ATTORNEY PERRY:  Thank you, your Honor.

21           THE COURT:  Before we go to opening

22   statements after selection of the jury I will consider

23   this matter further and clarify the ruling, but -- no,

24   put it on here, if you would.

25           ATTORNEY SCHRAUB:  We have a list of all of

1    Dr. Alembik's medical partners.  Will we read that to

2    the jury --

3              THE COURT:  No, I will.

4              ATTORNEY SCHRAUB:  I will hand this up.

5              THE COURT:  All right.  Thank you.  You can

6    give that when I recess.  Thank you.

7              I am concerned that in the end we may not

8    have enough jurors here, but we will have to wait and

9    see.  But I'll resolve this issue with greater precision

10   before opening statements.

11             But, Mr. Schraub, you are clearly entitled

12   to elicit from your experts that the signs and symptoms

13   that were exhibit by Ms. Orwig at the time she was

14   signed by Dr. Alembik did not warrant under the standard

15   of care a conclusion of chorioamnionitis.

16             But what I am focusing on are questions

17   beyond that, that is to say, the question of where would

18   a physician put a diagnosis.  And the reason that gets

19   difficult is because there is a little box, and there is

20   a thing that says diagnosis, and there is

21   chorioamnionitis.

22             So, what you're really doing is offering an

23   opinion that that is not to be taken into account or not

24   to be considered as final because doctors don't do that.

25   Doctors don't put their final diagnosis in a little box

1    that says -- that says that.  They put it elsewhere or

2    they say other.  That's what I am not sure there is real

3    notice about.

4                    ATTORNEY SCHRAUB:  I understand.

5                    THE COURT:  Do you have anything else you

6    want to tell me?

7                    ATTORNEY SCHRAUB:  No, your Honor.  The

8    issue is -- is not so much that they don't put it there.

9    It's that they don't necessarily write everything

10   repeatedly and repetitively.

11                   If you want to see the true place of

12   diagnose is you look in the progress note.  Other

13   places, other hospital forms may have short hand.  They

14   may have abbreviations, but when a doctor looks --

15                   THE COURT:  That's what I am not sure there

16   is notice about.

17                   ATTORNEY SCHRAUB:  Right.  And I am not

18   going to repeat the argument.  But we believe that

19   everybody has put the issue of the notes into issue in

20   this case and has said that our experts have said that

21   they rely on the note, forget about the deposition, they

22   rely on the note.  Say, well, why do you rely on it.

23                   THE COURT:  No, but they don't rely on it.

24   What they rely on are the constellation of signs and

25   symptoms.

1              ATTORNEY SCHRAUB:  Which support -- which

2    support the note.  It's all part and parcel --

3              THE COURT:  Does it support the note where

4    it says chorioamnionitis right below where it says

5    diagnosis?

6              ATTORNEY SCHRAUB:  That is what they have to

7    explain.

8              THE COURT:  But that explanation, I think,

9    is not what there is explicit notice of.

10             ATTORNEY SCHRAUB:  There is not explicit

11   notice, and we would maintain that explicit notice of

12   every step in a line of questioning is not -- is not

13   required.

14             THE COURT:  No, but that is a pretty major

15   first step.

16             ATTORNEY SCHRAUB:  Well --

17             THE COURT:  In other words, you didn't have

18   in here where he wrote chorioamnionitis in the block

19   that says diagnosis does not mean that he reached a

20   final diagnosis of that.

21             ATTORNEY SCHRAUB:  That statement is not in

22   there, no, sir.

23             THE COURT:  Right.

24             ATTORNEY SCHRAUB:  No, sir.

25             THE COURT:  Because -- and the reason that

1    opinion would be given is because it's the expert's

2    opinion that that's not what that form means or calls

3    for in that block.

4         ATTORNEY SCHRAUB:  Actually, the expert that

5    we have, our experts aren't even going to talk about

6    those blocks.  They simply are going to focus on the

7    blocks that they focused on in their expert designation.

8    They are going to focus on the progress note which has

9    been put into notice in their designation, and they are

10   going to say why, when they say the progress note

11   doesn't --

12        THE COURT:  So they won't have any opinion

13   about what is meant by chorioamnionitis in the other

14   blocks.

15        ATTORNEY SCHRAUB:  I am not going to ask

16   them.  I assume it's going to come out on cross.  I am

17   not going to ask them.  They are going to say --

18        THE COURT:  Oh, this is really a -- and

19   people wonder why the public is upset about lawyers.  It

20   is sophistry.  It all is.  But I'll think about what

21   you've said, and I will give you a more precise ruling.

22        ATTORNEY SCHRAUB:  May I make a final point

23   to clarify?

24        THE COURT:  Yes.

25        ATTORNEY SCHRAUB:  If the Court cares to be

1    completely accurate about the question of terminology.

2    All right.  What the signs and symptoms did not support

3    is what's called clinical chorioamnionitis, and it's a

4    very --

5              THE COURT:  Yes.  I recall your distinction

6    between clinical and histological.

7              ATTORNEY SCHRAUB:  So it's very important

8    because at the end of the day she did have chorio.

9    Nobody is disputing that.  The question is whether or

10   not an entity --

11             THE COURT:  I am understood that.

12             ATTORNEY SCHRAUB:  Okay.  Fine.  Thank you.

13             THE COURT:  Do you have anything else you

14   wanted to say?

15             ATTORNEY PERRY:  No, your Honor.  Thank you.

16             THE COURT:  Now, how long -- let me see,

17   there was one other -- the only thing I intend to tell

18   the panel about the case is that the plaintiffs, who

19   they are, minor and her mother, suing a physician and

20   his professional company -- I will mention those -- is

21   that the plaintiffs contend that the physician was

22   negligent in his care and treatment of the plaintiffs

23   and that as a result the plaintiffs each suffered harm,

24   that the plaintiffs contend was proximately caused by

25   the negligence of the defendants, and the defendant

```
 1    denies -- defendants deny that they were negligent in
 2    any way, and also deny that the plaintiffs were damaged
 3    or injured in the amount or to the extent claimed.
 4    That's all I intend to tell them.
 5              Yes?
 6              ATTORNEY SCHRAUB:  Your Honor, just two more
 7    quick points.  My understanding is we have been
 8    referring throughout the case in written material to the
 9    minor as N.O. because the rule requires that in written
10    submission she be referred to that way.  But it doesn't
11    cover what happens in court.
12              I just would like to know whether the
13    intention is to call this minor Noelle during the course
14    of the trial or how everybody intends to deal with it.
15    Because the rule doesn't require that we continue to use
16    N.O., but we'll do whatever --
17              THE COURT:  What is your view?
18              ATTORNEY SCHRAUB:  I think we should call
19    the child Noelle.
20              THE COURT:  Any objection to that?
21              ATTORNEY PERRY:  No, I was going to ask.  I
22    agree with that.  Thank you.
23              THE COURT:  All right.  I think that is
24    sensible.
25              ATTORNEY SCHRAUB:  Your Honor, the only -- I
```

1           ATTORNEY BERTRAM:  Ladies and gentlemen of

2     the jury, we were introduced to you.  I am Catherine

3     Bertram, and I, along with Ms. Amell and Mr. Perry,

4     represent the Orwigs.

5           I want to tell you what happened, the story

6     of what happened in this case, and give you a preview of

7     the evidence we anticipate you will hear in this case.

8           It starts in the late 1980's, when

9     Dr. Alembik was at Georgetown Medical School.  At

10    Georgetown Medical School and when he did his residency

11    at Chicago, he chose to specialize in obstetrics and

12    gynecology.  The treatment of pregnant is the

13    obstetrics.  That is what we are here to talk about

14    today.

15          During those four years of residency, he was

16    specializing in that type of medicine and he learned

17    about the risks to pregnant women.  He learned about

18    risks when pregnant women's water breaks early.  That is

19    called preterm premature rupture of membranes.

20          Now, what we call it and likely what the

21    experts will call it in this case is P-PROM.  So it's

22    P-P-R-O-M.  And what it means is if a woman is pregnant

23    and her water breaks earlier than 37 weeks -- because

24    40 weeks is full-term -- if your water breaks early,

25    medical experts and doctors will tell you that it puts

1    the baby at risk.

2              Well, what Dr. Alembik learned in medical

3    school and what you'll learn in this trial through the

4    experts is that the risk to the baby is from bacteria.

5    Now that the sack that the baby is in has been ruptured,

6    bacteria can actually travel up the birth canal,

7    backwards, right, up the birth canal and can infect the

8    membrane and can infect the fluid that the baby is

9    living in.  When this happens, that can be dangerous to

10   the mom and dangerous to the baby.

11             That condition is called chorioamnionitis.

12   Most of the time in this case we are just going to call

13   it chorio.  And before I go too far, I jus want to spell

14   that for you, because I know you want to take notes.

15             THE COURT:  No, we will get it for you.

16             ATTORNEY BERTRAM:  Thank you.

17             THE COURT:  It's a government easel.

18             (Laughter.)

19             ATTORNEY BERTRAM:  It's actually my easel,

20   which is even worse.

21             THE COURT:  Oh, my heavens.  I would have

22   concealed that.

23             ATTORNEY BERTRAM:  Okay.

24             So what we are going to call it, because

25   it's shorter and easier to pronounce, is chorio, which

1    is the beginning of the word, right?  It's actually

2    chorioamnionitis, meaning that the membranes and the

3    sack -- and the membranes around the sack are infected.

4    Okay?

5            Now, what you will learn from the experts is

6    that chorioamnionitis can be present and not necessarily

7    cause a terrible infection.  Sometimes it's present and

8    it doesn't.  There are different kinds of bacteria or

9    germs that can travel up the birth canal and cause

10    chorio.  Okay?

11            In general, it's more dangerous when the

12    mom's water breaks early.  What the experts will tell

13    you, if the mom's water breaks and the baby is

14    full-term, they jus deliver the baby.  But if the mom's

15    water breaks early, what you will learn is they want to

16    try to keep the baby in a little longer, to let the baby

17    develop a little more, if it's safe.

18            So what they do, and what Dr. Alembik

19    learned, is you look for signs and symptoms of whether

20    or not the chorio is impacting the baby.  While the baby

21    is in the uterus, you can't really test that.

22            So these are the kinds of things that you'll

23    hear that the doctors look for:  High white blood count.

24    Okay?  They can take blood from the mom and they check

25    it to see if she shows high white blood cells.  If she

1    shows that, it means her body is trying to fight an

2    infection.

3           There is another thing in the blood count

4    that you'll hear, that's called left shift or segs.

5    Okay?  When you get a left shift or segs, the experts

6    will tell you, that means that her blood cells are

7    actually little, she has too many little blood cells

8    move to the left.  What that tells you is her body is

9    trying to fight a bacterial infection.  Okay?  So that's

10   one sign, one clue.

11          A second thing that can happen is what we

12   call foul-smelling discharge.  So once the mom's mucous

13   plug breaks, she can continue to leak amniotic fluid.

14   In the records in this case you will hear them say that

15   for many days the fluid was clear.  For many days it did

16   not smell.

17          If a mom has foul-smelling, purulent

18   discharge, that's a sign of bacterial infection, a sign

19   of chorio.  And you need to remember that that premature

20   baby is living in that pus.

21          Another thing you can look for is how is the

22   baby doing?  They can hook the baby up to monitors.  And

23   the expert will tell you that before contractions start,

24   if the baby's heart rate starts accelerating in these

25   little periods of runs, they call them, that can be a

1     sign that the baby is infected.

2               There are other signs.  You'll hear, not all

3     moms and not all babies react the same way.  Some moms

4     get a temperature.  A lot of moms start to have a rising

5     temperature.  Sometimes the mom gets tachycardia.

6               In addition, the mom may feel her uterus

7     being tender, just like if you got an infection or a cut

8     in your hand, where it's is a little sore to feel around

9     it, she might touch and feel a little tender.

10              But that sign, you have to be careful with,

11    because what the doctors will tell you is sometimes,

12    once you get an epidural, that sign goes away, because

13    you have given the mom pain medication so that she can

14    get through the childbirth and, therefore, she doesn't

15    feel that any more.  That's what happens with an

16    epidural.

17              What Dr. Alembik learned in medical school,

18    and what you will hear from the experts, is chorio can

19    cause devastating injuries to babies if it's left

20    untreated.  So if the baby is left in this womb with the

21    pus and the infection, without any antibiotics, it

22    causes and can cause damage to the baby.

23              Some of the things you will hear it can

24    cause are brain damage, brain bleeds, neurological

25    problems, and cerebral palsy.  They are some of the

1    things you will hear about in the case.

2            You will also learn from the experts that

3    chorio can be treated.  The way that they treat chorio

4    is giving two different medications.  All right?  There

5    are two kinds of bacteria in general that can cause

6    chorio.  And since you don't know, you treat both.

7            One kind of chorio is what we call strep-B.

8    And it's a lot like the sore throat I currently have.

9    So strep, just like strep throat.  Okay?

10            Twenty-five percent of women walking around

11    are actually carriers for strep-B.  It's not because

12    they did anything wrong.  They just have that bacteria

13    in their body.  They have no signs or symptoms, but they

14    carry it around.  So strep-B can cause chorio, and there

15    is medication to fight strep-B.

16            The other kind that can cause it is a little

17    less common, but you have probably heard of it, too, is

18    E. coli.  And E. coli can travel up the birth canal and

19    cause a chorio infection.

20            So, since you don't know whether it's

21    strep-B or chorio, you give two kinds of antibiotics.

22    These antibiotics are safe, they are available, they are

23    in the hospital, and you can put them together and give

24    them safely into the mom's veins.

25            The experts will tell you, and Dr. Alembik

1    knows, that within 30 minutes or so of giving it to the

2    mom, it reaches the baby to treat the baby.

3            You'll also hear all drugs have some side

4    effects.  There is nothing without side effects.  These

5    are common antibiotics that you may have even been given

6    yourself.  Ancef and Cleomycin are two of the ones that

7    can be used for strep-B, and the one that you use for

8    E. coli is actually call Gentamicin.  Gentamicin.  These

9    are common, readily available antibiotics.

10            Now, there is a slight risk with Gentamicin,

11    of approximately one to two percent -- that you will

12    hear from the experts and the medical literature -- of

13    hearing loss.  The hearing loss could be temporary, but

14    it could be permanent.  But what you will also hear is

15    not treating chorio can be devastating to the baby.

16            Now, I am going to skip forward from 1990 to

17    20 years later.  It's now September 28th, 2011.

18    Christine Orwig is helping her kids get ready for

19    school -- it's a regular day -- when suddenly she fees a

20    gush of fluid.

21            Now she knows what that is because she has

22    been pregnant before.  She's had three normal

23    pregnancies before she gets pregnant with Noelle.  All

24    of them were fine.  All of them went to normal term.

25    She is a healthy woman.  She works out.  She doesn't

1    smoke and she wasn't taking any medication.

2           The evidence will show that she called her

3    husband, Tyler, to tell him something is wrong.

4           She goes directly to the obstetrician's

5    office, which is called about About Women OB/GYN.  And

6    it's right next to Potomac Hospital, if you know where

7    that is.

8           Now, she has been seeing the various

9    doctors -- there are about eight of them -- at About

10   Women OB/GYN, and each time she goes she sees a

11   different doctor.  She has made all of her visits, and

12   the record will show everything was fine.

13          When she gets to the doctor's office, she

14   tells the staff member, "I think I've broken my water."

15          Nothing happens.

16          She says, "I think I have broken my water,"

17   and expects to be put into a room and see a doctor.

18          She is told to stand in the lobby.  So

19   Christine Orwig stands in the busy lobby of this medical

20   practice while the fluid leaks down her legs and wets

21   her pants, with no help, until her husband arrives and

22   he sees her standing and he goes to the desk.  And you

23   will hear him say he demanded that she be seen.

24          The doctor sees her, confirms what Christine

25   already knows:  her water has broken.  And they take her

1    to the hospital.

2         Now, the good news is that she does not go

3    into labor.  So the contractions do not start.

4    Christine waits.  She is worried.  She knows this isn't

5    good.  She knows it's a little early.  She is worried

6    about her baby.

7         The doctors come in each day.  They check

8    her to make sure no foul-smelling fluid, no signs that

9    the baby is not doing well.

10         Two weeks go by.  So her water breaks on

11   September 28th, 2011.  And things changed.  On

12   October 13th, 2011, when she wakes up on that day, her

13   routine at this point -- her husband sees her every day

14   and her routine is to wait for a cup of coffee, her cup

15   of coffee on that hospital tray.

16         And she waits, and then she drinks her

17   coffee every day.  And every day between the 28th and

18   the 12th, the minute she had some coffee, Noelle started

19   kicking.  She could feel Noelle, and it made her smile.

20   She would sip her coffee and sort of have her time with

21   her daughter in that hotel (sic) room.

22         But on the 13th, Noelle didn't kick.

23   Ms. Orwig became concerned.  She told the nurse that she

24   was concerned.

25         She started to have some vaginal bleeding.

1    And the records reflect that she said that she could

2    feel some pressure in her uterus.  These were all new

3    signs.

4            She got worried about Noelle's heart rate.

5    The heart rate was up higher than it had been.

6            So the doctor was called.  Blood was taken

7    from Christine so they could figure out what was going

8    on.  Now, she wasn't having contractions and she wasn't

9    in labor, but the baby was exhibiting signs of stress.

10            When Noelle (sic) had first arrived at the

11    hospital, they tested her for strep-B.  And that's

12    standard.  They can give her a test by swab in her

13    vaginal canal to check and see if she has strep-B.

14            The records show her test was negative.

15    Noelle -- I'm sorry -- Christine did not have strep-B on

16    the 28th (sic).

17            The doctor on duty that day give her

18    antibiotics anyway.  He gave her seven days of Ancef as

19    a precaution.  That's all in the medical record.

20            Each day the doctor checks, but today there

21    is foul-smelling fluid.  You will hear testimony from

22    Christine and from her husband, there is an entry from

23    the nurse taking care of Christine, that she now is

24    leaking foul-smelling fluid.

25            At this point, Christine is what they would

1    say, 30 weeks and three days.  I like to do it in months

2    because it's easier for me.  So that is seven and a half

3    months.  The baby is still premature at this point, at

4    seven and a half months.

5              Dr. Alembik is on duty that day.  And now,

6    what does he know?  When he comes to see Christine, he

7    knows the following:  He know that she has been in the

8    hospital for two weeks with the water broken.  He knows

9    that she is strep-B negative.  And on top of that, she

10   was treated anyway for seven days.

11             He knows the baby is not breathing

12   correctly, because they did a biophysical profile.  On

13   the 13th, Noelle is not breathing correctly.

14             He knows she is not moving very much,

15   because they checked that, and Christine said that.  And

16   he knows that Noelle's heart rate is going high

17   (indicating).

18             He knows Christine has some vaginal bleeding

19   that's new, and he knows she felt an uncomfortable

20   pressure.  He also knows that Christine, Tyler and the

21   nurse all noticed the foul-smelling fluid.

22             He checks Christine's white blood count.

23   It's high, it's abnormally high, showing infection.  And

24   now there is the left shift.  There is the left shift,

25   meaning it's likely a bacterial infection.

1          Throughout the day, Christine's temperature

2     elevates.  It elevates to 99.9 at one point.

3          He also knows Christine's concern.

4          Christine and Noelle are showing the

5     clinical signs of chorio.

6          Now, what happens?  We have the medical

7     records to show you exactly what was done at the time.

8     I will refer you first to Exhibit 5, page 1-28.  And

9     you'll see these in more detail as we go through it, but

10    I just want to point this out.

11         This is Dr. Alembik's signature.  And right

12    here you'll see this is on the 13th at 2:30.  He is the

13    OB attending, meaning he is the doctor that's taking

14    care of Christine.

15         CTSP is called to see patient, with fetal

16    heart rate in the 170's.  That means Noelle's heart rate

17    is 170 beats per minute.  And -- I forget what this

18    says -- oh, some variable deceleration, meaning the

19    heart rate is kind of going like this, of the baby.  She

20    is not having contractions, but the baby's heart rate is

21    changing.

22         Dr. Alembik notes right here the white blood

23    count that I discussed earlier is high, 15.6, and the

24    segs, the left shift is 92.

25         What does he say it is?  Probable impending

1    chorio.  This says "consistent with," CW, "probable

2    impending chorioamnionitis."

3              And what's his plan?  Plan:  IOL.  That's

4    induce labor, induction of labor, meaning he is going to

5    jump-start the labor to get the baby out.

6              "NICU aware."  NICU is where premature

7    babies go to get care after they are born.  So he is

8    alerting the NICU that this baby is going to be born, so

9    they can be ready to take care of Noelle.  He times that

10   at 2:30.

11             What else do we know?  Well, in order to

12   jump-start the labor -- thank you.  In order to

13   jump-start the labor, orders are written.  This is

14   Plaintiff's Exhibit 28, page 118 -- 1-18, physician

15   order sheet for vaginal delivery, signed by Dr. Alembik,

16   admit to labor and delivery.

17             Before, Christine was on a regular floor

18   being observed, because she wasn't ready to have the

19   baby.  At this point, we've got to move her into the

20   room with all the equipment so she can deliver the baby.

21   You will see that is checked.

22             You will see it says "Admission

23   certification."  And then it has the word, "Diagnosis."

24   Again, this is on the 13th around 2:30.  What this says

25   is, 30 and 3/7.  That means she is 30 weeks and 3 out of

1    7 days.  So she is about 30 and a half weeks.  Here it

2    is, chorioamnionitis.  Chorio.  That's the diagnosis,

3    and the certification for admission, IOL, induction of

4    labor.

5            And this says "antibiotics."  And ladies and

6    gentlemen, it says antibiotics," plural, with an "s".

7            The rest of these checkmarks tell the nurses

8    for the team what needs to be done.  Get consent.  Take

9    vital signs.  Give some fluids, ice chips, epidural if

10   the patient wants one.  And give medicine, get set for

11   labor.

12           In his own handwriting, Dr. Alembik writes

13   the diagnosis, chorioamnionitis.  It appears five

14   places.

15           Here is a note from Dr. Alembik's own chart

16   back at About Women OB/GYN, which is essentially right

17   next to the hospital, where he writes the diagnosis of

18   chorioamnionitis again.  This is About Women, page 225.

19           He writes it again on the discharge summary,

20   in his own handwriting again, signs it again, admitting

21   diagnosis:  30 weeks, 3/7 days, PPROM, which is that

22   term we discussed before, premature preterm rupture of

23   membranes, meaning her water broke too early,

24   chorioamnionitis.

25           This form is signed when he knows what

1    happened, December 2011.  His own handwriting.

2           And finally, on the face sheet of the

3    hospital record, you see it again, 28 weeks gestation --

4    meaning that's when she came to the hospital -- preterm

5    premature rupture of membrane, that's that PPROM.  I

6    don't believe that these are in his writing.  I don't

7    know who did that.  I am not 100 percent sure that this

8    is his writing, but there it is again:

9    chorioamnionitis.

10          Now, at the same time he diagnosed it, he

11   wrote an order for medications.  The order for

12   medications includes Cleocin, which covers strep-B,

13   which she doesn't have.  There is no order for

14   Gentamicin.  For nine and a half hours, Noelle was in

15   the pus with no Gentamicin.

16          You will hear a different story from the

17   defendants, that he actually was not diagnosing chorio.

18   GBS or group B strep diagnosis doesn't appear in the

19   chart.  Ms. Orwig was not told that that was the

20   diagnosis.

21          THE COURT:  You will have to speak up.  I

22   can't hear you.

23          ATTORNEY BERTRAM:  I'm sorry.

24          Ms. Orwig was not told that group B strep

25   was the diagnosis.  The one word she heard was "chorio."

1          Now, after he writes these orders he leaves,

2     and he is gone for four hours according to the records.

3     He comes back, stops in.  What's happening for

4     Christine?  The heart rate is still, period of

5     tachycardia.  Foul-smelling fluid is still present.

6          At 11:30 at night it took one push and

7     Noelle was out.  The doctors were there to care for

8     Noelle.  They were standing there.  Noelle's temperature

9     was 101.7 and she needed help to breathe.  They took her

10    immediately to the neonatal ICU.

11         Those doctors that take care of babies are

12    called neonatologists or pediatricians.  We will bring

13    you both.  You will hear from both from our side.  These

14    are doctors that are boots on the ground.  They take

15    care of these little babies every day.  And you will

16    hear them explain why this happened to Noelle.

17         They immediately give Noelle -- the baby

18    doctors do -- Gentamicin.  Within an hour of her birth,

19    before they know for sure what she has, they give her

20    the medication.  After she has been given the medication

21    and she is stabilized, they draw a little blood to test

22    it.  E. coli.  She has E. coli.  She has sepsis, which

23    is a terrible infection in her blood caused by the

24    E. coli.

25         When she finally gets stable, they try to

1    test the spinal fluid -- you will see that's after she

2    has had a fair amount of Gentamicin -- and it does test

3    positive for one gram.

4         Now, sepsis and meningitis, you will hear,

5    are quite serious in a baby, in a fragile baby like

6    this.  And three days later Noelle suffers a brain

7    bleed.  She is a 30-week baby when she is born.

8         You will hear from Dr. Malcolm tomorrow that

9    30-week babies don't have grade 3 brain bleeds unless

10   there is another inciting factor.  Two factors can cause

11   that.  Number one is trauma, which no one said Noelle

12   had.  And number two is infection.

13        The infection that Noelle had caused her

14   brain bleed.  She had to fight off the infection.  Her

15   platelets went super, super low, that caused her blood

16   to be very thin, and her brain bleed occurred.

17        Because she had serious brain bleed, she got

18   a condition called hydrocephalus.  What that is, is the

19   ventricles in her brain can no longer drain the fluid,

20   and so the fluid build-up in her head is called

21   hydrocephalus.

22        Noelle at that point had her first of 16

23   surgeries for shunts.  In her four, precious four little

24   years, she has had 16 surgeries on her brain.

25        She also ha had a recent surgery for what

1    they call cranial expansion.  Mrs. Orwig will tell you a

2    little bit more about it on Thursday, but essentially

3    they had to cut Noelle's skull and expand it for her

4    fluid in her brain, and put cadaver bone to make her

5    skull larger.

6              Noelle is permanently neurologically

7    impaired.  She is an awesome little girl and you are

8    going to get to meet her.  But at four she can't do some

9    of the things that other little girls her age can do.

10   She still has to drink out of a sippy cup.  She has

11   left-sided weakness, so she can't walk up and down

12   stairs by herself.  Her mom has to help her in the

13   bathroom.  It's not easy.  But she is a fighter.

14             Why are we here?  We are here because About

15   Women OB/GYN and Dr. Alembik aren't taking

16   responsibility for their actions.  We are suing them

17   because he diagnosed chorio and didn't give Gentamicin.

18   He didn't give the medication to protect Noelle from

19   E. coli.

20             And rather than accept that responsibility,

21   the defense is going to tell you that these medical

22   records, they don't really mean what they mean.  They

23   are going to say he never really diagnosed it.  That's

24   not what that means.  Five times in the record, ignore

25   all that.  That's not what they mean.

1           And then if that doesn't work, they have

2    other experts to tell you it's the prematurity.  Even if

3    we would have diagnosed the chorio, it's the

4    prematurity.  They don't have doctors to take care of

5    these babies every day.

6    We ask, as the judge said in the beginning, that you use

7    your common sense to apply it to the facts in the case.

8    If you use your common sense, we believe we will show

9    you through the evidence and through the medical

10   literature that while she was premature and while that

11   put her at more risk, the infection was the inciting

12   factor that caused her sepsis and her meningitis.

13          Now, we had to find that out.  We had to ask

14   experts.  We're going to bring those experts to tell you

15   babies that are 30 weeks only have third-degree brain

16   bleeds 1 to 2 percent of the time without infection.

17          You can -- also, you don't have to believe

18   our experts.  These are the records from Fairfax and

19   Children's Hospital where she had about 15 of her

20   surgeries.  Ask where in there does it say it was

21   prematurity as opposed to sepsis and meningitis.

22          THE COURT:  You're shading into argument

23   now.

24          ATTORNEY BERTRAM:  I'm sorry.

25          Finally, I'll leave you with one thing.  We

1    all have a job to do here.  The judge's job is to keep

2    me in line and to rule on the law and to instruct you on

3    the law.  Our job is to present you with the facts and

4    the evidence, and your job is to decide the facts and

5    reach a just and fair verdict.

6          Please understand that we're going to

7    present some very sad testimony and some hard things to

8    look at.  Noelle been through a lot.  This is what she

9    looks like.  She's four and a half.  And she'll be here

10   on Thursday.  But we're presenting this to you not

11   because we want your sympathy.  Christine and Noelle

12   don't need your sympathy.  What they need is something

13   to balance the harms that have occurred.  And under the

14   law in Virginia, there are two separate claims.  And at

15   the end, you'll be asked about these claims.

16          Christine Orwig has a claim for the medical

17   expenses that she has incurred on behalf of Noelle.  In

18   four short years, 16 surgeries, countless

19   hospitalizations.  It's already over a million dollars.

20   She has a claim for that million dollars plus all the

21   medicals until Noelle reaches 18.  As a mom, she also

22   has a recognized claim in Virginia for the stress of

23   taking care of a little girl that has these kinds of

24   disabilities; 16 surgeries, countless doctors'

25   appointments, Noelle couldn't walk until she was two,

1  things like that.  You'll hear a little bit more about

2  that.

3          And then Noelle.  Noelle has a claim for the

4  harms and losses, for the 16 surgeries she's had, and

5  the countless number she looks at for the rest of her

6  life, as well as for medical expenses and other losses

7  once she reaches 18.

8          At the end of the case, we'll come back.

9  And we're going to ask you, based on the evidence here,

10  for a very significant number to try to balance the

11  harms and the losses that Christine and Noelle suffered.

12          Thank you very much.

13          THE COURT:  All right.  Mr. Schraub, are you

14  ready to make your opening statement?

15          ATTORNEY SCHRAUB:  I am, your Honor.

16          THE COURT:  You may proceed.

17      OPEN STATEMENT BY THE DEFENDANT

18          ATTORNEY SCHRAUB:  May it please the Court,

19  Ms. Bertram.  Good afternoon, ladies and gentlemen.  My

20  name is Jonathan Schraub, and together with Ms. Levy

21  Smith we represent Dr. Alembik.

22          Ladies and gentlemen, there are two sides

23  to every case.  If, in fact, if, in fact, what happened

24  in this case is what the plaintiff says happened, if a

25  board certified, trained, 20-year experienced

```
 1    obstetrician who knows how to treat chorio, has treated

 2    chorio, was looking for chorio, if, in fact, that

 3    doctor saw the clinical signs and symptoms that he

 4    knows he was looking for and diagnosed chorio -- we're

 5    going to talk about what that means in a second -- but

 6    for some reason, for some reason chose not to treat it,

 7    all right, and if the result -- if that happened, if

 8    the result of that was that a little girl was born with

 9    neurologic injury, if all that was the case, we

10    wouldn't be here.  We wouldn't be defending of the

11    case.

12              The fact of the matter is it's medically

13    incorrect.  It's medically incorrect.  It is not what

14    happened.

15              THE COURT:  Now you're -- you need to be

16    cautioned against switching into argument.  You need to

17    be forecasting what evidence the jury will hear.

18              ATTORNEY SCHRAUB:  I'm sorry, your Honor.

19              You have to answer two questions.  You're

20    going to have to answer two questions in the case.

21              One of them is did Dr. Alembik at 2:30 p.m.

22    on October 13th, 2011, which is what the allegation is

23    in this lawsuit, that at or about 2:30 p.m., Mrs. Orwig

24    displayed the necessary signs and symptoms of chorio,

25    all right?  You're going to have to decide whether that
```

1   is true or not true.

2          The second thing you have to decide is

3   regardless of whether she did or she didn't, is there

4   any relationship between the fact that the mother had an

5   infection, may have had an infection, all right, and the

6   subsequent damage or injury that happened to the baby

7   after she was born?  Are those two related in any way,

8   all right?  Because if they're not related -- and the

9   evidence will show you they're not related, all

10  right? -- and whether it was diagnosed or treated is not

11  really that relevant in the case.  They have to prove

12  both parts of that case.

13         Let's start with the diagnosis.  Let's start

14  with chorio, because that's where they start.

15         A woman -- a pregnant woman can get an

16  infection.  That's correct.  A certain kind of infection

17  is called chorio, chorioamnionitis.  Chorio.  There's no

18  indication and there's no dispute in this case that

19  everything related to Mrs. Orwig's pregnancy up until

20  the very last day, October 13th, there's no dispute in

21  this case that her care was correct.  There's no claim

22  of negligence.  There's no claim about anything having

23  to do with waiting in a waiting room or anything like

24  that, none of that is in this case.  The claim in the

25  case is that on October 13th at or about 2:30 p.m.,

1    Dr. Alembik saw or should have seen the signs of

2    clinical chorio and made a diagnosis.

3              Chorio is diagnosed in one of two ways at

4    two different times, all right?  The gold standard

5    way --

6              THE COURT:  You're testifying now rather

7    than predicting.

8              ATTORNEY SCHRAUB:  No, I'm telling them what

9    the evidence will be.

10             THE COURT:  Well, then say so.

11             ATTORNEY SCHRAUB:  I'm sorry.  I

12   should preface everything -- the sentences, I'm telling

13   you what the evidence is going to be in this case, all

14   right?  The evidence from expert witnesses and from

15   medical literature will be that a definitive diagnosis

16   of chorio is made after the baby is born.  It's made by

17   a pathologist.  A pathologist after the baby is out

18   takes a piece of the placental tissue, puts it under a

19   microscope and makes a microscopic or called histologic,

20   a microscopic diagnosis.  And when he does that, that is

21   called pathologic chorio.  That's the definitive

22   diagnosis.

23             While the baby is still in the mother, which

24   is when Dr. Alembik is involved, you can't do that.  You

25   can't take a piece of the placental tissue, all right?

1    So the only thing a doctor can do who's an obstetrician

2    is take a look at signs and symptoms.  Not just any sign

3    or symptoms, but sign or symptoms, the evidence will

4    show you, are very well established in medicine.  And he

5    looks for those signs and symptoms.  And if he can find

6    them, then he can make a diagnosis of what is called

7    clinical chorio, chorio that's shown by clinical

8    evidence.  It's not a definitive diagnosis, but it's the

9    best diagnosis you can make while the woman is still

10   pregnant.

11           So the question is did Mrs. Orwig have signs

12   or symptoms of clinical chorio at 2:30 p.m. on

13   October 13th, at or about?  What you will hear from the

14   evidence is that there is one necessary precondition to

15   a diagnosis of clinical chorio.  There is one symptom,

16   if you will, that is present in 95 to 100 percent of the

17   cases of clinical chorio.  It is very specific for an

18   infection.

19           That one criterion is the mother must

20   display a temperature of greater than 100.4 degrees, all

21   right?  If you have a temperature of greater than

22   100.4 degrees, that's going to be there in 95 to

23   100 percent of the cases of chorio.  If you have that

24   single sentinel requirement, then if you are a doctor

25   dealing with this, you look for one or two corroborating

168

1    signs that go with that high specificity sign.  And

2    there are four --

3                    THE COURT:  Again, all of this is --

4                    ATTORNEY SCHRAUB:  Everything is --

5                    THE COURT:  But you need to say that.

6    Otherwise, you're testifying.  And by saying that they

7    will hear evidence of it, it gives it more weight than

8    if you're sitting there saying it.

9                    ATTORNEY SCHRAUB:  Yes, your Honor.

10                    You will hear evidence that there are four

11    possible corroborating signs of clinical chorio.  You

12    would look for one or two of these in connection with

13    the temperature.  One of them is does the mother display

14    fundal tenderness?  That's tenderness in and around the

15    belly, all right?  That's one sign, a corroborating

16    sign.

17                    A second corroborating sign is does the

18    mother have an unusually elevated heart late, maternal

19    tachycardia.  That's a second possible corroborating

20    sign.

21                    The evidence will show you a third

22    corroborating sign is does the fetus have tachycardia,

23    which is an unusually elevated heart rate that is

24    sustained for a period of time.  If the fetus -- if the

25    fetus's heart rate is elevated because there is a raging

1    infection that isn't being treated, then the evidence
2    will show you that there is no reason for that heart
3    rate to come down again.
4           What you're going to find out from the
5    evidence is that this baby's heart rate certainly at
6    2:30 p.m. when they say the standard of care was
7    violated, right, was normal, was not tachycardic.
8    Tachycardic is either over 160 or some doctors say 170
9    beats per minute.  This baby sustained -- this baby's
10   heart rate at 2:30 was about 150 to 160, bouncing around
11   in that range.  Baby's heart rates are variable, all
12   right?
13          The final sign that you can look for is
14   foul-smelling amniotic fluid.  I told you that the
15   evidence will show you that that maternal temperature is
16   present in 95 to 100 percent of the cases.  It's very,
17   very specific.  As you go down the list of corroborating
18   factors, foul-smelling amniotic fluid is present in as
19   few as 4 percent and only as many as 20 percent.  One
20   out of five cases of chorio.  It is very nonspecific.
21   Fluid can smell in pregnancy for all kinds of different
22   reasons.  And it's very subjective, you'll hear.  What
23   one person thinks is foul-smelling another person
24   doesn't.
25          You were told in the plaintiff's statement

1    that Dr. Alembik was aware of this.  The question in

2    this case is what did Dr. Alembik know and do at or

3    about 2:30 p.m. when he was supposedly breaching the

4    standard of care?  There's no evidence in this case that

5    Dr. Alembik had any knowledge of foul-smelling amniotic

6    fluid until a nurse's note at or about 7:00 p.m.  And

7    then he himself at the bedside did not smell the same

8    thing.  He could not corroborate that himself.  But

9    certainly there was no evidence of it that was

10   communicated to Dr. Alembik at or about 2:30.

11          So what you have is at best subclinical,

12   below clinical diagnosis level chorio.  You don't have

13   the gold standard --

14          THE COURT:  Again, you're arguing.

15          ATTORNEY SCHRAUB:  This is what the evidence

16   will show.

17          THE COURT:  Then please make it clear.  It

18   should begin almost every other sentence with "The

19   evidence will show."  You can even tell them from which

20   witness they can look for that.  Otherwise, you're

21   simply arguing.

22          ATTORNEY SCHRAUB:  I'll try to do that, your

23   Honor.

24          What the evidence will show you, all right,

25   is that she did not have the signal requirement and, in

fact, she really didn't have any of the corroborating

requirements even if you had the signal requirement.

So what did Dr. Alembik do, all right?

Mrs. Orwig at this point is 30 weeks' pregnant.  She's

still two months before her pregnancy should end if it

were going to be full term.  And the effort had been

made to continue her pregnancy as long as possible.

But Dr. Alembik will tell you that he sensed

that something was moving in the wrong direction here,

right?  There wasn't enough evidence to make a clinical

diagnosis of chorio.  It simply wasn't there.

Dr. Alembik and our experts will tell you

that if you don't make a diagnosis, you do not load a

pregnant woman up with antibiotics.  You have to make a

diagnosis first before you start administering

antibiotics to a woman who's about to go into labor and

delivery.

The experts will tell you that gentamicin is

not a benign drug.  It is not a sugar pill.  Gentamicin

causes and is connected to kidney failure and hearing

loss, all right?  When you have to use it, when you've

got a clinical diagnosis, you use it.  But if you don't

make the clinical diagnosis, the evidence will show you,

you do not order an antibiotic for a condition you

cannot clinically support.

1    So what do you do?  The evidence is that

2    what you do is you take all the factors into

3    consideration.  There is a slight elevation in the white

4    blood cells of Ms. Orwig.  There is a slight left shift

5    with respect to that.  That's true.  Dr. Alembik says to

6    himself, "I'm going to look at these somewhat subtle

7    signs," right, "and I'm going to order a biophysical

8    profile," which is a profile how a fetus is doing, to

9    whether it's going to be safe to continue the pregnancy.

10    He does that.  The biophysical profile comes

11    back non-reassuring.  Something's wrong with the baby's

12    breathing, or at least the baby isn't breathing at the

13    level that it should be on this biophysical profile.  So

14    Dr. Alembik puts all the pieces together, puts the whole

15    picture together and said, "The thing to do is get the

16    baby out.  Something is developing.  It is not

17    clinically diagnosable at this point, but I'm not going

18    to wait for that.  We're going to get the baby out."

19    Nobody disputes in this case that delivery

20    of that baby on October 13th was the right thing to do.

21    Nobody disputes that.  And that's what he -- and that's

22    what he did, all right?

23    When you ask what is the standard of care in

24    Virginia, we will present to you Dr. David Dudley.  Dr.

25    Dudley is the chairman of the Department of Maternal

1    Fetal Medicine at the University of Virginia.  Dr.

2    Dudley will tell you that he's reviewed this case

3    closely and that Dr. Alembik met the standard of care in

4    all respects; that you do not deliver chorio drugs in a

5    situation where you cannot meet the clinical

6    requirements of the diagnosis.  What you do is you move

7    expeditiously to get the baby out of harm's way or out

8    of the developing harm's way.

9         We will introduce to you Dr. Errol Norwitz.

10    Dr. Norwitz is the chairman of the Department of

11    Obstetrics and Gynecology at the Tufts University

12    hospitals in Boston.  He also is the lead researcher at

13    the Norwitz Lab in the Infant and Mothers -- Infant and

14    Mothers Research Institute, MIRI, in Boston.

15         Dr. Norwitz specializes in preterm

16    pregnancy, in preterm labor.  He specializes in handling

17    of antibiotics in pregnant women.  Dr. Norwitz will tell

18    you Dr. Alembik met the standard of care by delivering

19    this baby, that there were not the adequate signs and

20    symptoms to make a clinical diagnosis of chorio, and

21    that therefore you do not deliver drugs for a condition

22    you cannot clinically diagnose.

23         So what's with this, all right (indicating)?

24    Dr. Alembik made a progress note at 2:30 when he is

25    accused of committing malpractice.  He was at the

1    bedside, he examined Ms. Orwig, and he made a progress

2    note.  He will tell you that in his progress note is

3    where he makes his diagnosis.  He doesn't make it

4    anywhere else.  He makes it in a progress note at the

5    bedside.

6             He does his assessment, he does his physical

7    examination, he does his plan, and he does his

8    diagnosis.  And his diagnosis was probable impending

9    chorio, because he thought things were moving in a

10   not-so-good direction here, all right?  And that's what

11   the diagnosis was.

12            There are, in fact, a half a dozen other

13   medical records where he simply didn't bother to repeat

14   the entire diagnosis.  He didn't put down all the words.

15   He just wrote "chorio."  But he will tell you those are

16   not forms on which he makes his official diagnosis, all

17   right?  He's not being sued for bad recordkeeping here

18   or confusing recordkeeping here, all right?  His

19   diagnosis is in his progress note made at the bedside

20   which says one thing and one thing --

21            THE COURT:  You're arguing again.

22            ATTORNEY SCHRAUB:  The evidence will be --

23            THE COURT:  And I'm not going to interrupt

24   again.  It'll just cease.

25            ATTORNEY SCHRAUB:  The evidence --

1              Yes, your Honor.

2              THE COURT:  All right.  Acknowledge what I

3    say.

4              ATTORNEY SCHRAUB:  Yes, your Honor.

5              THE COURT:  All right.  Proceed.

6              ATTORNEY SCHRAUB:  The evidence will be that

7    his progress note is where his diagnosis is.  And it was

8    exactly what he thought it was, probable impending

9    chorio, and he moved to get the baby out.  That's the

10   standard of care question.  There was no breach of the

11   standard of care here.

12             Subsequently, the mother -- the evidence

13   will be the mother delivered the baby, there was a --

14   there was a sample of the tissue, and histologic chorio

15   was definitively diagnosed.  And the mother recovered

16   and moved on and had no complications herself from

17   histologic chorio.

18             Noelle was born with an infection.  Noelle

19   had an E.Coli infection.  And the plaintiffs say their

20   chain of causation to hold Dr. Alembik responsible is

21   that it went from the mother to the baby.  The baby had

22   an infection in her bloodstream.  That infection then

23   crossed the blood-brain barrier which separates the

24   blood system from the brain, went into the brain, caused

25   a brain infection, the evidence -- the plaintiffs say,

1    caused a brain infection, which is called meningitis,

2    right, and that the meningitis is what caused the brain

3    to bleed and then caused this hydrocephalus, this

4    collection of fluid to happen, which pressed on areas of

5    the brain and caused the ultimate neurologic problem.

6              Our evidence will be that is not at all what

7    happened here, all right?  We will present to you, and

8    we will be the only people -- side in this case to

9    present to you, a pediatric neurologist, a doctor who

10   studies the brains and treats the brains of babies and

11   children.  And we will present to you a pediatric

12   neuroradiologist, a radiologist who specializes in brain

13   studies and specifically in brain studies of children.

14             The pediatric neuroradiologist, Dr. Thierry

15   Huisman, is the chairman of that department at Johns

16   Hopkins University.

17             The pediatric neurologist, Dr. David

18   Bearden, is a neurologist at Children's Hospital of

19   Philadelphia, CHOP.

20             They will tell you they have looked at all

21   of the images, the CT scans, the sonograms, the MRIs,

22   all the images of Noelle's brain.  There is no evidence

23   of a brain infection.  There is no evidence that

24   Noelle's sepsis, her blood infection which was treated

25   after birth with an antibiotic and went away, there's no

1    evidence that that infection crossed over into the brain

2    and caused meningitis.

3              They will tell you that if a baby has

4    meningitis, that disease, that problem leaves a mark.

5    It leaves a scar.  It leaves a trail.  You can see it if

6    you're trained to see it.  They will tell you there is

7    no evidence in Noelle's brain that she had meningitis.

8    And they will tell you, to more than a reasonable degree

9    of medical probability, that she did not have

10   meningitis.  She was treated in the NICU, the evidence

11   will be, for presumed meningitis, because that's what

12   they do in the NICU.  But when you actually look and

13   make the diagnosis, our experts, the only neurologist

14   and neuroradiologist, will tell you the evidence is not

15   there.

16             So if, in fact, an infection had nothing to

17   do with why Noelle had a brain injury, what did?  What

18   caused the problem?

19             The evidence will be that Noelle was

20   30 weeks and three days when she was delivered, all

21   right?  That's about eight to ten weeks premature.  That

22   isn't anybody's fault.  The evidence will be it's not

23   Mrs. Orwig's fault.  It's not, God knows, Noelle's

24   fault.  It isn't Dr. Alembik's fault.  It's just the way

25   her pregnancy went.

1          The evidence will be that babies who are

2     born severely prematurely have a host or are susceptible

3     to a host of problems because their major organ systems

4     simply aren't developed sufficiently to live outside the

5     womb.  And when it comes to the brain, there is a

6     specific problem that develops.

7          Dr. Huisman from Hopkins and Dr. Bearden

8     from CHOP will tell you and explain to you there is a

9     special area of the brain, all right?  It's called the

10    germinal matrix, g-e-r-m-i-n-a-l.  The germinal matrix.

11    It's an area of the brain that only exists, the evidence

12    will be, in fetuses and in early neonates because it has

13    a special function in developing the brain, brain cells.

14    And when its function is done, it disappears.  So you

15    don't have it, I don't have it anymore, all right?

16         But while you do have it, the germinal

17    matrix is a highly concentrated series of very thin,

18    very fragile blood vessels.  And in a very premature

19    baby, those blood vessels very often rupture.  They

20    break, all right?  Nobody's fault, the evidence will be.

21    It happens because the baby is that premature.

22         When the germinal matrix blood vessels

23    break, you get what's called a germinal matrix

24    hemorrhage.  You get a big collection of fluid in the

25    brain, which is what happened to Noelle.  That

179

1  collection of fluid, a hydrocephalus, is eventually

2  drained, maybe repeatedly drained, right?  But while

3  it's there, it presses on other developing areas of the

4  brain and it can cause damage, which it did in Noelle.

5  It caused a mild case of CP.  A mild case, the

6  lowest-level case of CP.

7          CP has five levels, 1 to 5, the evidence

8  will show you.  Noelle has a Level 1.  Level 5 are

9  people who are wheelchair-bound or totally incapable of

10  directed -- undirected movement.  The evidence will show

11  you, by the way, CP is a physical disability.  It's not

12  a cognitive disability.  Noelle is cognitively intact.

13  She is a beautiful little girl.  She is cognitively

14  intact.  She has a slight left-sided weakness, a

15  physical weakness.  CP is not a progressive disease, the

16  evidence will show you.  It doesn't get worse over time.

17  Her slight left-sided disability, although it might get

18  better with some physical therapy, essentially stays

19  stable.

20          So what happened to Noelle was the result of

21  prematurity and a germinal matrix hemorrhage.

22  Dr. Bearden and Dr. Huisman will tell you that a

23  germinal matrix hemorrhage in premature babies is the

24  most common cause of hemorrhage.  It may not happen in

25  that high a percentage, but it is the most common cause

1    of hemorrhage.  And with no evidence that infection had

2    anything to do with anything here with regard to Noelle

3    and clear evidence that there was a germinal matrix

4    hemorrhage, then the cause of her Level 1 cerebral palsy

5    is nobody's fault.  It's just that she was born severely

6    prematurely and has the problems that children like that

7    can sometimes develop.

8              So in the end what the evidence will be in

9    total is that if, in fact, you determine it makes any

10   different how an infection in the mother was or wasn't

11   diagnosed, that, in fact, Dr. Alembik did it correctly

12   for Mrs. Orwig.  He didn't have the clinical signs and

13   symptoms, the evidence will show you.  He didn't have

14   them in front of him.  He couldn't make the clinical

15   diagnosis, all right?  His diagnosis was probable

16   impending, which means things are not going the right

17   way.  He couldn't give the antibiotic without a

18   diagnosis, so he delivered the baby to get it out of

19   harm's way.

20             The baby's infection in her bloodstream was

21   then treated, her E.Coli, and it went away.  Nothing

22   crossed over into her brain.  There is no radiologic

23   evidence or neurologic evidence of that.  Her brain

24   bleed was caused by this germinal matrix hemorrhage,

25   which is nobody's fault in this case.

1           At the end of it all, we hope and believe

2    that you will see the evidence that way and what you

3    will return the verdict for Dr. Alembik.

4           THE COURT:  All right.  Ms. Bertram, who's

5    your first witness?

6           ATTORNEY BERTRAM:  Your Honor, our first

7    witness is Dr. Craig Cohen.

8           THE COURT:  All right.  How long do you

9    anticipate he will take?

10          ATTORNEY AMELL:  Your Honor, I will be

11   putting on Dr. Cohen, and I'll estimate an hour and a

12   half.

13          THE COURT:  All right.  Well, we'll have to

14   recess in the midst of it, but let's get started with

15   him.

16          ATTORNEY AMELL:  May I summon the witness?

17          THE COURT:  Yes.

18          Well, the court security officer will.  Just

19   tell him who it is.

20          Come forward, take the oath, please, sir.

21          (Witness sworn.)

22          THE COURT:  You may proceed.

23          ATTORNEY AMELL:  Thank you, your Honor.

24

25               DIRECT EXAMINATION

## C. COHEN - DIRECT

```
1    BY ATTORNEY AMELL:

2    Q.    Good afternoon, Doctor.

3    A.    Good afternoon.

4    Q.    Could you state your name for the record, please.

5    A.    Craig Cohen.

6    Q.    If you could keep your voice up for the jury.

7    A.    Okay.

8    Q.    What's your business address?

9              THE COURT:  I'm sorry, sir.  My hearing is

10   not what it once was.  Nothing is.  So I'd ask you to

11   speak up, please.

12             THE WITNESS:  Okay.

13             THE COURT:  What's your name again, please.

14             THE WITNESS:  My name is Craig Cohen.

15   BY MS. AMELL:

16   Q.    What's your business address, sir?

17   A.    550 16th Avenue, Third Floor in San Francisco,

18   California.

19   Q.    What's your occupation?

20   A.    Physician.

21   Q.    And what's your specialty?

22   A.    Obstetrics and gynecology.

23   Q.    Do you have any subspecialities?

24   A.    Yes.  Reproductive infectious diseases.

25   Q.    What is your current position?
```

# C. COHEN - DIRECT

1  A.    Professor in the Department of Obstetrics,

2  Gynecology, and Reproductive Sciences at the University

3  of California San Francisco.

4  Q.    Can you give the jury a thumbnail sketch of your

5  medical education and training.

6  A.    Yes.  So I was -- I went to medical school at the

7  University of Louisville in Kentucky from 1986 to 1990.

8  I then did my internship year in obstetrics/gynecology

9  at the University of Washington in Seattle and completed

10  residency in 1994 at Northwestern University in Chicago.

11  I then went on and did a three-year reproductive

12  infectious disease fellowship at University of

13  Washington.

14  Q.    If you could tell the jury, what does the

15  specialty of a reproductive infectious disease involve?

16  A.    It involves the infections that are related to

17  obstetric conditions and also gynecologic.  So the

18  female genital tract includes those infections that are

19  related to what could be -- what could become abnormal

20  outcomes in obstetric cases or when women are pregnant

21  and also importantly infections as they relate to

22  women's --

23         THE WITNESS:  I'm sorry, it's a little --

24  can I put this up here maybe?

25         THE COURT:  Yes, you can.  Or you can hold

## C. COHEN - DIRECT

1    it if you wish.

2         THE WITNESS:  Or hold it.  Maybe that's

3    easier, because I feel a little funny bending over.

4         THE COURT:  Whatever you'd prefer.

5         THE WITNESS:  I think holding it is better.

6    Thank you very much.

7         So also infections related to the female

8    reproductive tract for women when they're not pregnant,

9    such as HIV and sex-transmitted infections.

10

11   Q.   How many physicians across the country practice in

12   your specialty?

13   A.   I don't know the exact number, but there is a

14   group called the Infectious Disease Society of

15   Obstetrics and Gynecology.  The membership of that

16   society is approximately 100 members.

17   Q.   You told the jury that you are a professor at UCSF

18   in the department of OB/GYN.  What does that position

19   entail?

20   A.   So my daily work.  Yeah.  So my work is twofold.

21   I spend about 25 percent, about a quarter of my time

22   taking care of patience at San Francisco General

23   Hospital, which is the public medical center in San

24   Francisco serving the entire population.  And within

25   that work I take care of patients primarily in the

# C. COHEN - DIRECT

1    women's health clinic, obstetrics and gynecologic

2    patients, as well as work in labor delivery, and I still

3    do night call, meaning I work weekends and nights during

4    the month.

5             That -- in that position in addition to

6    taking caring of patients I am teaching residence and

7    working with -- there is a midwifery service as well.

8    And also I am teaching medical students.

9             The other 75 percent of my position is

10   mixed, but predominantly it has to do with conducting

11   research on productive infectious diseases, and so a lot

12   of my work is actually based in Kenya, where I work on

13   the intersection of HIV, sexually transmitted infections

14   and reproductive health.  I lead a large program there.

15            And the other part of my work and somebody

16   in my position has to do with administration, attended

17   meetings and conferences and things of that sort.

18   Q.   Doctor, how many days a week do you spend treating

19   patients in labor and delivery?

20   A.   So it depends on the week, but on average, I'm

21   spending about four to five days a month doing clinical

22   work.

23   Q.   How often do you manage labor and deliveries?

24   A.   So whenever I am on call, which is one full

25   weekend day and two weekend nights -- one to two weekend

## C. COHEN - DIRECT

1  nights per month, then I am in labor and delivery.  We

2  occasionally do get patients with gynecological symptoms

3  who then come to the emergency department that I also

4  provide care for.

5         And then I am spending about one day a month

6  in labor and delivery.  And of course there is the

7  pre-natal clinic as well, where I am in the clinic about

8  three to four days a week -- sorry, per month.

9  Q.    Where are you licensed to practice medicine?

10 A.    In the state of California.

11 Q.    Are you board certified?

12 A.    Yes.

13 Q.    In what specialty?

14 A.    In obstetrics and gynecology.

15 Q.    What does it mean to be board certified?

16 A.    It means that I have gone through the prescribed

17 required training.  That was my residency in obstetrics

18 and gynecology.  And then there is a written examination

19 and also an oral examination given by the board of

20 obstetrics and gynecology.  It also means that I have

21 been -- in addition, you didn't ask the question, but I

22 have been recertified, and then every year I main -- in

23 order to maintain my board certification, I need to

24 conduct certain tasks in order to -- and complete those

25 successfully in order to keep my board eligibility.

## C. COHEN - DIRECT

1   **Q.**   Doctor, what is PROM?

2   **A.**   Premature rupture of membranes is a condition when

3   are the bag of waters, as is commonly known as, ruptures

4   prior to the onset of labor.  So normally, labor starts

5   first, and then as the uterus contracts it causes the

6   bag of water to rupture.

7   **Q.**   How often do you manage patients who are -- have

8   premature rupture of membranes?

9   **A.**   It's quit common, and so on a monthly basis I am

10  taking care of patience with PROM.

11  **Q.**   What is preterm premature rupture of membranes?

12  **A.**   Right, otherwise known as PPROM, is when PROM, or

13  the premature rupture of membranes, happens prior to

14  37 weeks ever gestational age, so during -- what we call

15  during prematurity.

16  **Q.**   And how often do you see PPROM patients?

17  **A.**   We see it quite often.  I would say every month I

18  am taking care of a patient who presents with PPROM at

19  San Francisco General Hospital.  Oftentimes these

20  patients will spend a considerable -- depending on what

21  gestational age they come in with PPROM, will come in to

22  the hospital and stay for a number of either days or

23  sometimes weeks until either they require to be induced

24  into labor or until they go into labor spontaneously on

25  their own.

## C. COHEN - DIRECT

1   Q.     Doctor, what is chorioamnionitis?

2   A.     Chorioamnionitis is a condition.  It's

3   intra-amniotic infection, infection again in the bag of

4   waters.  It can include a variety of tissues which

5   become infected.  I don't know -- I mean, I could go

6   into the ideology and so forth and the pathogenesis, but

7   you just asked, I guess, for the definition.

8   Q.     I'll go into that a bit more later.

9   A.     Okay.

10  Q.     How many times over your career you have treated

11  laboring mothers who had chorioamnionitis?

12  A.     Very often.  This is a condition that -- again, I

13  am seeing it every month in my practice.

14  Q.     And how frequently do you make a diagnosis of

15  clinical chorioamnionitis?

16  A.     Again, the diagnosis within the labor and delivery

17  where I work, it's a clinical diagnosis.

18  Q.     And just briefly, how do you go about making a

19  clinical diagnosis of chorioamnionitis?

20  A.     Right.  So it includes a variety of factors.  One

21  is the level of suspicion.  So in a woman who is at term

22  and is in labor and delivery and her bag ever waters is

23  intact, her risk of developing chorioamnionitis is very

24  low.

25          In a woman who is presenting with PPROM, for

C. COHEN - DIRECT

189

example, in early gestation, her risk of developing

chorioamnionitis could be one in three, so it's very,

very high.  So that -- it's very important to keep the

baseline risk in mind when I see my patients.

In addition, I -- of course, we're assessing

for fever or a fever.  Also looking for uterine

tenderness.  Looking for an increased heart rate in the

mother and also in the fetus or the infant as well as

the discharge, which can sometimes become fowl.

In making this diagnosis we want to rule out

other causes of fever, and so we commonly will get a

urinalysis, and then if warranted, if there's a need to,

we can get a chest x-ray as well, but that is usually

not needed.

Q.   Are white blood cell counts ever obtained?

A.   And then we obtain a lab specimen for white blood

cell count with differential, which gives us a sense of

the acuteness of the infection.

Q.   How many times have you made a diagnosis of

chorioamnionitis with a mother who did not have a fever?

A.   It's not -- yes.  I have made that diagnosis

before.  Again, one has to take the entire picture into

account.  If it's the woman who -- I would say not

common.  I can't recall per se with the woman who is

term gestation, so around 40 weeks and has an intact bag

C. COHEN - DIRECT

1    of membranes, for example.

2          However, in a woman who has a very high risk

3    of developing chorioamnionitis I have made that

4    diagnosis, such as a woman who has a premature labor and

5    especially with ruptured membranes.

6    Q.    Over your careers have you taken care of mothers

7    who have given birth to children who were diagnosed with

8    hydrocephalus or brain bleeds?

9    A.    Unfortunately, yes.  It does happen, yes.

10   Q.    Have you been called upon to work with a

11   multidisciplinary team to figure out what the cause of

12   those conditions are?

13   A.    Yes.  At the hospital where I work -- it tends to

14   be at a hospital -- it's an academic medical center, and

15   every week there is a conference that brings together

16   the obstetrician, the pediatrician, neonatologists who

17   are the doctors who specialize in taking care of

18   premature infants.  And then, depending on the case, the

19   radiologists or ultrasonographers will come in and

20   sometimes a pathologist, so -- and also of course

21   nursing very critically are part of that discussion.

22          If it's a patient whose been taken care of

23   by a midwife, then of course the midwifes are also

24   present too.  We use it for learning purposes and also

25   to assess our practice and to see where we can if needed

## C. COHEN - DIRECT

1   strengthen our practices to take better care of our

2   patients.

3   Q.    What is prematurity?

4   A.    Prematurity now is defined as 38 weeks

5   gestation -- or less than 38 weeks gestation at the time

6   this case took part.  The American College of Obstetrics

7   and Gynecology defined it as less than 37 weeks.

8   Q.    Do you have experience in fetal heart tracing?

9   A.    Yes.  That is what I do.  That's what physicians

10  will do obstetricians will do when we're on the labor

11  and delivery ward, is we will follow the fetal heart

12  rate tracing very carefully.

13  Q.    Dr. Cohen, how often do you review cases for

14  attorneys?

15  A.    I have had the opportunity to review a case for an

16  attorney once before.  It was about three years ago.

17  Q.    Have you ever testified at the trial before today?

18  A.    No, this is my first time.

19  Q.    Can you give us a breakdown as to those two cases,

20  whether you looked at cases for the plaintiffs or the

21  defense?

22  A.    So the other time besides this time was for the

23  plaintiff.

24  Q.    How would you say how much income you derive from

25  reviewing cases or what percentage of your time is spent

## C. COHEN - DIRECT

1    looking at these types of cases?

2    **A.**    I don't know, 1 to 2, 3 percent.  It would depend

3    on -- like last year would be pretty much -- or very

4    low, maybe 1, 2 percent, so very low.

5    **Q.**    What do you do charge for these services?  So like

6    reviewing cases, giving depositions and coming to trial

7    like today?

8    **A.**    For reviewing cases I receive $400 per hour, and

9    for coming to trial and for depositions $500 per hour.

10    **Q.**    Do you list your name with any expert referral

11    services?

12                THE COURT:  I can't hear you.  You have to

13    speak up a bit.

14                ATTORNEY AMELL:  Yes, your Honor.

15    ATTORNEY AMELL:

16    **Q.**    Do you list your name with any expert referral

17    services?

18    **A.**    No, I don't.

19    **Q.**    Dr. Cohen, what is the standard of care?

20    **A.**    Standard of care is the way that we practice

21    medicine.  It is based on literature and on -- so it's

22    based on literatures, and it's what is considered to be

23    good practice of care that we should offer our patients

24    these services or therapies or medications as warranted

25    in order to take the best care of our patients.

## C. COHEN - DIRECT

1  Q.    Are you familiar with the Virginia standard of

2  care?

3  A.    Yes, I am.

4  Q.    And how so?

5  A.    So in regards to -- I have not practiced medicine

6  in the Commonwealth of Virginia.  However, I have worked

7  with colleagues here in Virginia on a variety of various

8  projects including creating guidelines that are used

9  across the country for different sort of treatment

10  trials looking at a variety rubric of health outcomes.

11         And in doing that -- one of the leaders in

12  the field -- it's called microbicides or essentially

13  products that can reduce the risk of a women acquiring a

14  sexually transmitted infection and/or HIV -- one of the

15  leaders in that field is at the Eastern Virginia Medical

16  School.  And so I have worked with several colleagues.

17  Within that department there is an organization called

18  CONRAD, and I have worked with that organization quite a

19  bit over the, probably about the past 15 years.

20  Q.    Have you had an opportunity to discuss cases with

21  other Virginia practitioners at seminars or forums?

22  A.    I have.  In fact, even when creating those

23  guidelines, and I think that was 2006 or '7, in order to

24  come up with these guidelines -- I don't want to go into

25  the specifics right now, but we had to come up with what

## C. COHEN - DIRECT

1    would be -- I'm going to use the word adverse event or

2    you can think of it as a potential side effect -- we had

3    to come up with a grading system for mild, moderate and

4    severe.

5            And in doing that we had to discuss many of

6    the issues, kind of related to this case, both obstetric

7    cases and also women who were not pregnant, and we had

8    to come up with guidelines that would work across the

9    country as well.  And so I have had the opportunity.

10    And in doing that we of course are talking about our

11    various cases and our experience and expertise in order

12    to come to a common understanding.

13    Q.    Have you had any interaction with practitioners

14    from other Virginia hospitals and medical schools?

15    A.    I am sure I have.  Yes, I have at various

16    conferences.  I can't think specifically with names per

17    se, but I have at various conferences I have attended.

18    Q.    And have you attended any forums in the Virginia

19    area, health forums?

20    A.    Yes.  So there was the -- again, the National

21    Institutes of Health meeting that I mentioned earlier

22    about looking at adverse events, and that was held near

23    the Dulles Airport, so in Virginia.  I attend many

24    meetings within the District of Columbia, which I know

25    is not technically in the commonwealth but adjacent to,

## C. COHEN - DIRECT

1    and within that -- again, there are physicians and

2    physician-researcher within the Commonwealth of Virginia

3    that are taking part in those conferences.

4    Q.    Dr. Cohen, are you aware if you are eligible for

5    licensure in Virginia?

6    A.    The answer I think is yes, I am eligible for

7    licensure.  In fact, you were able to get a letter from

8    the board, I imagine, right, that I am eligible for

9    licensure in this state.

10             ATTORNEY AMELL:  Your Honor, we have marked

11   for identification Plaintiffs' Exhibit 50, which I would

12   ask the Court if the Court wants to take this.

13             THE COURT:  You're offering it for

14   admission?

15             ATTORNEY AMELL:  Not to go back to the jury,

16   your Honor, but sometimes the Court would like me to

17   hand it up just to show that the expert witness is

18   eligible for licensure.  Whatever the Court wants to do.

19             THE COURT:  Next question.  Not necessary.

20             ATTORNEY AMELL:  Thank you, your Honor.

21   ATTORNEY AMELL:

22   Q.    Doctor, I would like to refer you to Plaintiffs'

23   Exhibit 48, your curriculum vitae.

24   A.    Okay.

25   Q.    If you could look at your CV and let us know if

**C. COHEN - DIRECT**

1   that is reasonably accurate and complete.

2   **A.**   (Complied).  Yes, it is.  There could be some

3   updates with some additional publications and

4   individuals that I have mentored and talks I have given

5   since the time I submitted this to you.

6   **Q.**   Okay.

7           ATTORNEY AMELL:  At this time I would move

8   into evidence Plaintiffs' Exhibit 48, Doctor Cohen's CV.

9           ATTORNEY SCHRAUB:  No objection.

10          THE COURT:  Admitted.  Next question.

11          ATTORNEY AMELL:  And I would proffer Doctor

12  Cohen as an expert in obstetrics and gynecology and

13  infectious disease to talk to the standard of care,

14  causation and damages, the interpretation of fetal heart

15  tracings biophysical profiles and non-stress tests and

16  the obstetrical management of PPROM and PROM patients,

17  intra-amniotic infections including chorioamnionitis,

18  and the diagnosis, treatment and sequelae of chorio.

19          ATTORNEY SCHRAUB:  No objection.

20          THE COURT:  All right.

21          Ladies and gentlemen, ordinarily, witnesses

22  are not permitted to offer their opinions about things,

23  but there are exemptions to that.  One exception is

24  persons we call expert witnesses.  These are persons who

25  have special training and experience in a certain area

## C. COHEN - DIRECT

1    whose testimony can help you understand issues, and they

2    are permitted to offer their opinions.

3            However, the extent to which you accept this

4    witness, Doctor Cohen, as an expert in the areas that

5    were just outlined, and the extent to which you accept

6    his opinions as expert opinions in those areas are

7    matters left entirely to you.  And I will give you

8    further instruction on these as well as other matters at

9    the end of the case.

10           Proceed.  You may ask this witness questions

11   as an expert in the areas you outlined.

12           ATTORNEY AMELL:  Thank you, your Honor.

13   ATTORNEY AMELL:

14   Q.    Dr. Cohen, have you formulated opinions regarding

15   Dr. Alembik's management of Mrs. Orwig as it relates to

16   standard of care, causation and damages?

17   A.    I have to the first two, not to damages, per se.

18   Q.    What did you review in formulating your opinions?

19   A.    So, I have reviewed the medical records primarily,

20   as well as I have had the opportunity to review the

21   literature and also the depositions of the -- the

22   deposition of the other expert witnesses as well as

23   Dr. Alembik.

24   Q.    Okay.  Are these medical records and

25   depositions -- did it include the fetal heart tracings?

# C. COHEN - DIRECT

1    A.    That would include -- that would be part of the

2    medical records, yes.

3    Q.    Are these medical records and depositions and

4    fetal heart tracings, are these of the type that you

5    normally rely on in your field as an expert witness when

6    forming your opinion on standard of care and causation?

7    A.    Yes, it is.

8    Q.    Have you formed an opinion to a reasonable degree

9    of medical certainty as to whether or not Dr. Alembik

10    breached the standard of care in the management of

11    Mrs. Christine Orwig on October 13, 2013?

12    A.    Yes, I have.

13    Q.    What is your opinion?

14    A.    My opinion is that Dr. Alembik made the diagnosis

15    of chorioamnionitis with Mrs. Orwig and treated with a

16    single drug, and in this case of chorioamnionitis it

17    calls for -- the diagnosis calls for the treatment with

18    two drugs.

19    Q.    And what were the antibiotics that should have

20    been prescribed in your opinion?

21    A.    So Dr. Alembik had prescribed clindamycin, which

22    treats one type -- or two different types of bacteria,

23    gram-positive bacteria as well as anaerobic bacteria,

24    bacteria that grow without oxygen.  However, he failed

25    to treat with gentamycin, which would be the second drug

C. COHEN - DIRECT

1    that is required in order to treat what's called

2    gram-negative bacteria.  And one of those organisms that

3    is gram negative E. Coli, which ended up causing the

4    sepsis and meningitis within Mrs. Orwig's infant.

5    **Q.**    What is the basis of your opinion, that gentamycin

6    was required to be given?

7    **A.**    So the standard of care is -- so we understand

8    that chorioamnionitis, the condition Mrs. Orwig was

9    diagnosed with, is caused by many difference sorts of

10   bacteria, often what's called polymicrobial.  And that

11   includes gram-negative bacteria as well as gram-positive

12   bacteria.

13            And so when we're treating a patient we make

14   the diagnosis clinically, we don't have laboratory

15   confirmation or pathological confirmation, so we're

16   treating what is called broad-spectrum antibiotics.  We

17   want to be able to cover all of the major known causes

18   of that condition, and so in the case of

19   chorioamnionitis that would include, since Mrs. Orwig

20   has an allergy to penicillins, it would include the use

21   of clindamycin instead of ampicillin, and then also in

22   addition gentamycin.

23   **Q.**    And if Mrs. Orwig had been treated with the

24   Cleocin or the clindamycin and the gentamycin do you

25   have an opinion as to whether the outcome would have

# C. COHEN - DIRECT

1    been changed?

2         THE COURT:  I can't hear you.  You're going

3    to have to speak up a bit more.

4         ATTORNEY AMELL:  I will, your Honor.

5         THE COURT:  It's a big courtroom.

6         ATTORNEY AMELL:  I apologize, and I will.

7    ATTORNEY AMELL:

8    **Q.**    Dr. Cohen, do you have an opinion to a reasonable

9    degree of medical certainty if Dr. Alembik had

10   prescribed both clindamycin and gentamycin whether the

11   outcome would have been changed?

12   **A.**    I do.  I think that if Mrs. Orwig would have

13   receives the gentamycin at the time she received the

14   clindamycin, around 2:30 in the afternoon on the 13th of

15   October, that this would have led to a different outcome

16   for the infant.

17        I base this on the literature and my

18   experience, but the literature briefly shows that there

19   is a very significant reduced risk of developing --

20   stops the infant developing sepsis if the mother is

21   treated properly with antibiotics, with broad-spectrum

22   antibiotics during labor course, rather than just

23   waiting to give the infant antibiotics once the infant's

24   been born.  And so that's how I base my opinions, based

25   on that evidence.

1    **Q.**    You testified that the standard of care required

2    both antibiotics at 2:30 p.m.  Did that -- does that

3    opinion continue on over time?

4    **A.**    Can you ask that question again.

5    **Q.**    Yes.  Over what period of time should Dr. Alembik

6    have prescribed both antibiotics?

7    **A.**    They should have been given at the same time.

8    Yes.

9    **Q.**    And then if an hour later had gone on in this case

10   did the standard of care still require that those two

11   antibiotics be given?

12              ATTORNEY SCHRAUB:  Objection, your Honor.

13   It's not in the designation.

14              THE COURT:  I'm sorry.  I did not hear you.

15              ATTORNEY SCHRAUB:  I beg your pardon.

16              It's not in the designation, your Honor.

17              ATTORNEY AMELL:  Your Honor, Dr. Cohen has

18   testified never to just a distinct time period of 2:30.

19   He's testified that standard of care requires the second

20   antibiotic, gentamycin, to be given, and I just want the

21   jury to understand that it's not at one-time opinion.

22              THE COURT:  All right.

23              Ladies and gentlemen, it's an afternoon

24   recess time.  I omitted to mention to you that if at any

25   time during the course of the case you need a recess for

## C. COHEN - DIRECT

1    some truly exigent reason I give you the privilege of

2    raising your hand or giving me the sports time signal.

3    I will call a recess, and I will not inquire of you of

4    the reason for the recess.  So I ask that you not avail

5    yourselves of that special privilege unless it's truly

6    an exigent reason.

7              Now we will take a recess at this time.  I

8    don't know if there are soft drinks in the area back

9    here?

10             THE MARSHAL:  Water.

11             THE COURT:  Water.  All right.  But I think

12   tomorrow and the days after we will have it stocked with

13   soft drinks.

14             We will take a recess.  Remember --

15   Dr. Cohen, you may step down, sir.

16             During this recess you may not discuss your

17   testimony with anyone.

18             You may step down, sir.

19             (Witness excused).

20             THE COURT:  During the recess you must

21   refrain from discussing the matter among yourselves or

22   with anyone or undertaking any investigation on your

23   own.  We will recess until ten minutes to 4:00.  Now, I

24   typically go -- I typically go as late as 5:30 or 6:00,

25   sometimes later, but I always accommodate any of you who

1    need to be released sharply at 5:00 because you may have

2    child care responsibilities or something of that sort.

3              Tell the court security officer, Mr.

4    Williams, what's your -- whether you are unable to go

5    beyond 5:00, and I will accommodate that.  If you can go

6    beyond 5:00, we will push it until about 6:00.  We have

7    a lot of -- many witnesses to hear, and the more we can

8    get in the better.

9              All right.  Thank you.  You may follow the

10   court security officer into the jury room.

11              (Jury excused at 3:27 p.m.)

12              THE COURT:  All right.  You may be seated.

13   Now, Mr. Schraub has initiated the sauce for the goose

14   is sauce for the gander, but it will eventually bite

15   both sides I think.  Now, what is it you say she has not

16   given notice of in her witness expert report?

17              ATTORNEY SCHRAUB:  Your Honor, her witness

18   expert -- Dr. Cohen's witness expert report says that --

19              THE COURT:  No, I didn't ask what it said.

20   What is it she says is not in there?  I may have to go

21   read it.  I don't want to hear it from you.

22              What is it that she has asked that you say

23   you have not had notice of?

24              ATTORNEY SCHRAUB:  She did not give notice

25   that it was a breach of the standard of care to follow

204

1    Mrs. Orwig after 2:30 and to give the gentamycin at some

2    other time when the clinical circumstances might have

3    been different or changed.

4              THE COURT:  All right.

5              ATTORNEY SCHRAUB:  The claim of malpractice

6    in this case is at or about 2:30 when they say he made

7    the diagnosis --

8              THE COURT:  All right.  But isn't -- can't

9    she ask what's the general length of time that you give

10   an antibiotic for?

11             ATTORNEY SCHRAUB:  I'm sorry.  I thought

12   Dr. Cohen was still in here.

13             THE COURT:  Yes.

14             ATTORNEY SCHRAUB:  I am not sure what the

15   Court means by that question.  The general time that you

16   give it for, I mean, how long it works for?

17             THE COURT:  No.  How long do you give an

18   antibiotic for, typically.

19             ATTORNEY SCHRAUB:  The question in this case

20   is when the antibiotic should have started.  The breach

21   of the standard of care is that he didn't give it at

22   2:30.  They can't come into court all of a sudden in

23   trial and say, well, the breach of standard of care is

24   he didn't give it at 7:30.  That's not in this case.

25             What is in this case is he didn't give the

 1    gentamycin when he made the diagnosis and admitted her

 2    into labor and delivery.  That is what he says in his

 3    opinion.

 4              THE COURT:  All right.

 5              And what's your view?

 6              ATTORNEY AMELL:  Your Honor, depending on

 7    the dose and frequency that would have been ordered, and

 8    Dr. Cohen will explain that as an infectious disease

 9    expert, it could have been given in a 12-hour dose, so

10    one would be given before the delivery, or it could have

11    been given on Q6- or Q8-hour schedule.  So depending on

12    how it was ordered for the mother, the child would have

13    received one or two doses before delivery, and that

14    would have eradicated the E. Coli.

15              THE COURT:  I will overrule the objection.

16    You may inquire as to that.

17              ATTORNEY AMELL:  Thank you, your Honor.

18              THE COURT:  Court stands in recess.

19              (Court recessed at 3:30 p.m.)

20              (Court called to order at 3:50 p.m.)

21              (Jury not present.)

22              THE COURT:  May I ask you, Dr. Cohen, to

23    step out for just a moment, please.

24              (Witness stood aside.)

25              THE COURT:  All right.  I want to confirm

206

1    that what you have alleged is that the defendants

2    breached the standard of care on October, what is it?

3                   ATTORNEY AMELL:  13.

4                   THE COURT:  -- 13th by not prescribing the

5    Gentamicin because of the diagnosis, in your view, of

6    chorio, right?

7                   ATTORNEY AMELL:  Yes.

8                   THE COURT:  You are not alleging multiple

9    breaches over time, are you?

10                   ATTORNEY AMELL:  No.  We are alleging it

11   should have been prescribed at that time, and whether

12   one dose or two doses were given before delivery --

13                   THE COURT:  Well, all you asked this witness

14   was what dose of Gentamicin over what period of time

15   should have been -- should have been prescribed.  Is

16   that right?

17                   ATTORNEY AMELL:  Yes, your Honor.  And I'm

18   going to start with that very question, maybe clean it

19   up a little bit.

20                   THE COURT:  That's what I understood you

21   were asking.

22                   ATTORNEY AMELL:  That's what I meant to ask.

23                   THE COURT:  You are not alleging multiple

24   breaches of the standard of care.  It's just that one

25   breach.  And the fact is that the remedy for that

1    breach, or the description, is a dose that may carry out

2    over time, it may be two days, it may be two weeks.

3    Everyone here has had an antibiotic that you take over

4    time.  Almost never is it one.

5            ATTORNEY AMELL:  Yes, your Honor.

6            THE COURT:  Now, given that, they don't

7    allege multiple breaches, Mr. Schraub.  Did I

8    misunderstand your objection?

9            ATTORNEY SCHRAUB:  No.  It's possible that I

10   misunderstood the question, but I didn't think I did.  I

11   thought the question that elicited my objection was:

12   Well, what about -- I don't remember the exact wording

13   of it, but what about at a later time?  Or, you know --

14           THE COURT:  I see.

15           ATTORNEY SCHRAUB:  We are not talking 2:30.

16   What about --

17           THE COURT:  But your concern --

18           ATTORNEY SCHRAUB:  -- did the obligation

19   continue until some later hour?

20           I thought the question was not how long does

21   the antibiotic last, and if you started it at 2:30,

22   which is the standard of care breach, you would then

23   take it again at 10:00 and you would take it again at

24   1:00 or whatever it is.

25           THE COURT:  That's what she is asking.

```
 1              Is that right?
 2              ATTORNEY AMELL:  Yes, your Honor.
 3              THE COURT:  But you are only alleging the
 4     breach of the standard of care that one time.  Because,
 5     obviously, you don't want to allege any further
 6     breaches.
 7              ATTORNEY AMELL:  That's correct, your Honor.
 8     The further ramification is going to causation.
 9              THE COURT:  You don't want later breaches.
10              ATTORNEY AMELL:  No.  I was speaking more of
11     causation, the ramifications of administering it.
12              THE COURT:  Yes.
13              ATTORNEY SCHRAUB:  I just think it needs to
14     be made clear to the jury that we are talking about a
15     single breach at 2:30, so that -- at or about 2:30,
16     2:31, 2:29, but right around 2:30, so that this doesn't
17     get confused with some notion that -- because the reason
18     it's important, Judge, is because the mother's condition
19     evolved.  It was changing over a period of time, right?
20              And at 7:00 o'clock, somebody writes a note
21     saying Dr. Alembik is aware of foul-smelling fluid,
22     right?  But the breach here is what he did or should
23     have done at 2:30.  So I don't want this to get confused
24     and muddled up.  If that's what the breach is, the jury
25     should understand that's what the breach is.
```

 1          THE COURT:  Well, what they are going to

 2    understand is what they hear in the testimony.  I am not

 3    going to tell them what the issue is.  You all will do

 4    that through the testimony.

 5          Now, ultimately I may in the instructions.

 6    But the point is that an objection was made to a

 7    question that has never been answered, so it's moot in a

 8    sense.  But you may ask:  What dose of Gentamicin should

 9    have been prescribed over -- and I am sure it's a dose

10    over a period of time.  Is that what you intended to

11    elicit?

12          ATTORNEY AMELL:  Yes, your Honor.

13          THE COURT:  All right.  And just so that I

14    confirm it -- and you can ask this witness, if you wish.

15    You can confirm that he is -- his testimony is a breach

16    at that time, the time that Mr. Schraub has indicated,

17    Mr. Schraub has indicated.  It's October the --

18          ATTORNEY SCHRAUB:  October the 13th, 2011,

19    at 2:30 p.m.

20          THE COURT:  At 2:30, that that's when

21    treatment should have started, about that time.

22          ATTORNEY AMELL:  About that time.

23          THE COURT:  At about that time.

24          All right.  Are you ready to proceed?

25          ATTORNEY AMELL:  One matter has come to my

1    attention.  I have been trying to truncate my direct

2    exam maximally, so we can get this gentleman on his

3    plane and back to California.  I spoke with Mr. Schraub

4    to find out whether or not we could work together and

5    try and get this witness off the stand, and he just

6    informed me that there is no way, even if I go lightning

7    speed, that he is going to be able to finish with his

8    cross today.

9            I don't know how late your Honor was

10   planning on going today, but I wanted to bring this to

11   your Honor's attention.

12           THE COURT:  Well, I am afraid there is

13   another factor, and that is the jury needs to be

14   released at 5:00.

15           So, this is a witness on breach of the

16   standard of care and causation; is that right?

17           ATTORNEY AMELL:  Yes, your Honor.

18           THE COURT:  Well, you have elicited that he

19   has an opinion that there was a breach of the standard

20   of care, and you have, you are now going to elicit that

21   there is causation?

22           ATTORNEY AMELL:  I believe I have already

23   elicited that, but I can do it again.

24           THE COURT:  Well, how long do you think your

25   cross-examination would take?

 1              ATTORNEY SCHRAUB:  Your Honor, I intend

 2       to -- to go over literature with him, and so I would

 3       estimate it would take about two hours.

 4              THE COURT:  All right.

 5              ATTORNEY SCHRAUB:  I don't know until my

 6       colleague is finished, obviously, but -- but he is the

 7       standard of care witness that they are presenting and

 8       I've got a lot of questions for him.

 9              THE COURT:  All right.  So we are not going

10       to finish with him today, and you don't need to truncate

11       your testimony, and he will have to return tomorrow

12       morning.

13              ATTORNEY AMELL:  May I inquire with

14       Dr. Cohen whether it's possible for him to stay over?

15              Or is it a possibility with your Honor that

16       he could perhaps appear by video?

17              THE COURT:  Appear by video?

18              ATTORNEY AMELL:  Yes.  If he has to get back

19       for obligations.

20              THE COURT:  Well, I think that would be

21       certainly permissible if the parties can agree to that.

22       You mean you would do it tonight?

23              ATTORNEY AMELL:  Either --

24              ATTORNEY PERRY:  May I be excused to ask his

25       schedule while you are talking?

 1                    THE COURT:  Yes.

 2                    Have you discussed that with Mr. Schraub?

 3                    (Counsel conferring.)

 4                    THE COURT:  Is he under subpoena?

 5                    ATTORNEY AMELL:  No.

 6                    ATTORNEY SCHRAUB:  The problem I have,

 7      Judge -- and I apologize, it is not my intention to be

 8      unreasonable here, and I don't think I am, I hope.  It

 9      would be prejudicial --

10                    THE COURT:  I am not requiring that you

11      finish his cross-examination in any specific time.

12                    ATTORNEY SCHRAUB:  Oh, no, no, no, I know

13      that.  But I'm saying it would be prejudicial -- I have

14      to put on the record it would be prejudicial to have him

15      here live for the plaintiff's direct, or for a portion,

16      and then I have to cross him on video.

17                    THE COURT:  In other words, you won't agree

18      to it.  That's fine.  You don't have to agree to it.

19                    ATTORNEY SCHRAUB:  I understand the problem

20      this presents, and I'm sympathetic to it --

21                    THE COURT:  No, you don't understand it

22      until you have it, believe me.

23                    ATTORNEY SCHRAUB:  I expect I'm going to

24      have it at some point.

25                    THE COURT:  Well, you might have it and then

1    you will fully understand it.  But it doesn't matter

2    whether you understand it or not.  You are not required

3    to agree to cross-examine him in a short period of time.

4          I won't allow you to be cumulative and I

5    won't allow you to browbeat him, but you have a full

6    opportunity to cross-examine him.  And I am not going to

7    require that it be done by videotape, if you think that

8    would prejudice you, unless we stopped it now.  But even

9    that, I am not sure would work.

10          One of the jurors has childcare

11    responsibilities.

12          ATTORNEY PERRY:  Your Honor, the doctors has

13    informed me that he has to leave tonight.  And he is

14    willing to do whatever the Court needs, to appear in

15    video tomorrow -- if he did it first thing in the

16    morning, it would be 6:00 a.m. his time to do that.  He

17    says there is no way.

18          THE COURT:  Well, he could return on Monday.

19          ATTORNEY PERRY:  May I inquire?

20          THE COURT:  All right.

21          He can either return on Monday -- because he

22    is not under subpoena; otherwise he wouldn't go home.

23    He could return on Monday or, alternatively, if you all

24    want to want review with Mr. Schraub his appearing on --

25    because you haven't even finished your direct yet.

 1                ATTORNEY AMELL:  Right.

 2                THE COURT:  But you might want to think

 3     about that a bit more.  Videotape is fairly effective.

 4                But you are not going to be required to

 5     agree to it, Mr. Schraub.

 6                ATTORNEY SCHRAUB:  Part of the problem, your

 7     Honor, is if he is in California and I am here, how do

 8     I --

 9                THE COURT:  Yes, I agree, that's a problem.

10                ATTORNEY SCHRAUB:  Manipulate documents and

11     show him exhibits?

12                THE COURT:  I quite agree.  I think it's

13     impractical.  I am certainly not going to require it.

14                ATTORNEY BERTRAM:  Your Honor, just so you

15     know, we do have the ability through video files to

16     present documents.  We are able to get them on board.

17                THE COURT:  Well, I am only going to do it

18     if the parties agree to it.  It's that simple.  I'm not

19     going to require it.

20                ATTORNEY PERRY:  The doctor doesn't have his

21     schedule on Monday.  He may have to review that.

22                THE COURT:  Well, the problem is I'll have

23     to strike his testimony.

24                ATTORNEY AMELL:  Your Honor, if that's the

25     alternative, we will have him here Monday.

1          THE COURT:  I am afraid there is nothing

2     else I can I do.  And if you put that to him, he might

3     want to stay here tomorrow.

4          Any objection to my putting it to him, that

5     he has that choice?

6          ATTORNEY SCHRAUB:  No objection.

7          ATTORNEY PERRY:  Not at all.

8          ATTORNEY AMELL:  No objection.

9          THE COURT:  All right.  Bring him back in.

10          You may resume the stand, Mr. -- or

11     Dr. Cohen.

12          (Witness resumed stand.)

13          THE COURT:  Dr. Cohen, we have a situation

14     that's arisen, as you know.

15          THE WITNESS:  Right.

16          THE COURT:  You are not under subpoena, so

17     you are not required to be here, nor would I allow you

18     to be served a subpoena this late.

19          But -- and I understand you have to be back

20     in San Francisco and -- but, we won't finish your

21     testimony.  It will take some time, perhaps as much as

22     two hours, in cross-examination --

23          THE WITNESS:  Right.

24          THE COURT:  -- and I am not going to

25     truncate that.  It wouldn't be fair to the defendants if

1    I did that.

2              On the other hand, it isn't fair to the

3    plaintiffs if you don't get to have your full say.

4              So our choice is this:  We either ask you

5    and have you return on Monday, presumably Monday or

6    Tuesday, at the worst, but Monday would be the better,

7    or you make alternative arrangements to whatever caused

8    you to leave here tonight, that you could stay and we

9    would finish with you tomorrow.

10             And really, I suppose, the plaintiffs are

11   asking you to make that choice.  But I need -- if you

12   don't complete your testimony here, I will be required

13   to strike your testimony and the plaintiff will not be

14   able to rely on anything you've testified to.  You have

15   to complete your testimony with cross-examination for it

16   to be admissible.

17             THE WITNESS:  Understood.

18             THE COURT:  So it's really up to you.  If a

19   subpoena had been served on you, it would not be up to

20   you.

21             THE WITNESS:  Understood.

22             So my problem is, is that my phone, which

23   holds my calendar, is at the hotel.  And if I would have

24   known I could have run across the street and found out.

25   So I know what's happening tomorrow, and I have a lot of

1    obligations tomorrow.

2              THE COURT:  Is there any --

3              THE WITNESS:  I can sort of picture part of

4    next Monday, but not, not easily.  So I can picture --

5    like if I am in clinic, if I have calls and meetings I

6    can reschedule those.  If I have clinic, it's really

7    difficult to -- to reschedule.  I don't think I have

8    clinic on Monday, but I -- I would need to check my

9    calendar.

10             THE COURT:  Well, think of it this way.

11   Suppose we go ahead tonight and I tell you I want you

12   here tomorrow morning, and you call up your folks in San

13   Francisco and say, "The judge says I have to be here

14   tomorrow morning.  Deal with it."

15             THE WITNESS:  It's more -- it's more

16   complicated than that.  It's not a clinic.  I do have

17   clinic the next, following day, or -- Tuesday or

18   Wednesday -- I have clinic on Thursday.  But I do have

19   obligations tomorrow.  I know during the day that, I

20   mean, if I didn't show up it wouldn't be the end of the

21   world, but they are important to me and my work.

22             THE COURT:  I know that you wouldn't raise

23   this issue if it weren't important.  I am sensitive to

24   that.  But, we really do need to finish your testimony.

25             And it seems to me, to me, the best solution

1    would be for us to finish as much as we can today and

2    tomorrow, and you would be done tomorrow for sure, and

3    you could leave tomorrow by noon without doubt, and you

4    would be done with it, and people would have to

5    accommodate your absence.

6              A college roommate of mine is a physician at

7    UCSF, and he wouldn't be reliable to appear at any time

8    for anything.  But he is not in your area.

9              ATTORNEY AMELL:  Your Honor?  One other

10   thorny issue is that tomorrow we have three expert

11   witnesses coming, all out-of-town witnesses.

12             THE COURT:  That's your problem.  That's

13   your problem.

14             ATTORNEY AMELL:  I only raise that, we would

15   rather do this Monday.

16             THE WITNESS:  If I can do it Monday, I know

17   that my Sunday, I mean --

18             THE COURT:  Your Sunday would then be

19   traveling.

20             THE WITNESS:  My Sunday would be traveling,

21   so it's less time with my family.  That's the down side.

22             THE COURT:  And that's a significant down

23   side.

24             THE WITNESS:  It is.  I mean, usually I take

25   a flight that leaves San Francisco at 1:25 that gets in

1    at 9:30 in the evening.  So I would at least have the

2    morning with my family, and I have Saturday with my

3    family.

4            I would have to -- but Monday, I would have

5    to look at my calendar to confirm, but I think Monday

6    would be preferable to Tuesday, for that reason.  I know

7    next week, I think on Tuesday I am on call at the

8    hospital, as well.

9            THE COURT:  Well that, of course,

10   emergencies happen.

11           THE WITNESS:  Right.

12           THE COURT:  That could be rescheduled,

13   especially if you just tell them the judge says you need

14   to be here.

15           THE WITNESS:  Right.

16           THE COURT:  And you do.  Because the

17   evidence that you give is important to the plaintiff,

18   and the cross-examination you'll be subjected to is

19   important for the defendant.

20           All right.  Let's do this:  We only have an

21   hour, less than an hour to go.  Let's do what you can.

22   You are not required to truncate the direct.

23           And you are not required to truncate the

24   cross-examination.

25           Let's proceed.  And Doctor, you can either

# C. COHEN - DIRECT

1    go home or appear tomorrow morning.  But if you go home,

2    I would like to see you sometime Monday so we can finish

3    you.  All right?

4         THE WITNESS:  Understood.

5         THE COURT:  All right.  Let's proceed.

6    Let's not waste any more time.

7         Bring the jury in, please.

8         (Jury impaneled at 4:07 p.m.)

9         THE COURT:  All right.  You may all be

10   seated.

11        We will cease sharply at 5:00 to accommodate

12   one or more of you who have childcare responsibilities.

13        Proceed.

14        ATTORNEY AMELL:  Thank you, your Honor.

15   BY ATTORNEY AMELL:

16   Q.   Dr. Cohen, what dose and frequency of Gentamicin

17   should Dr. Alembik have prescribed Mrs. Orwig on October

18   13th, 2011?

19   A.   So he had two options.  He either could go with

20   the dosing for, which you give once every 24 hours, or

21   you could give dosing every eight hours.

22   Q.   So, if Dr. Alembik had ordered the dose of

23   Gentamicin that was given every eight hours, how many

24   doses would have been given to Mrs. Orwig between

25   2:30 p.m. and then 11:30 when she delivered?

## C. COHEN - DIRECT

1    A.    I believe two doses, but they are really equal.

2    It's not -- you give the two doses.  It's a lower dose

3    for the eight-hour dosing versus the once every 12

4    hours.  They are really equivocal.  So either way,

5    either she would have received one larger dose at around

6    2:30 when she received Clindamycin, or she would have

7    received two smaller doses at every -- at around 2:30,

8    then eight hours later.

9            THE COURT:  I'm sorry.  I think you said

10   "equivocal."  Did you mean "equivalent"?

11           THE WITNESS:  Equivalent, yes.

12           THE COURT:  I may have --

13           THE WITNESS:  No, you are right.

14   Equivalent.  Thank you.

15   BY ATTORNEY AMELL:

16   Q.    And is Gentamicin effective against gram negative

17   bacteria like E. coli?

18   A.    Yes, it is.

19   Q.    Do you have an opinion whether Gentamicin is an

20   antibiotic that will cross the placenta and reach the

21   baby?

22   A.    Yes.  And that's the reason for giving it in this

23   case.  Both the Clindamycin and the Gentamicin cross the

24   placenta and therefore treat any potential infection, in

25   this case, infection in the baby.

## C. COHEN - DIRECT

1    Q.    In your opinion, to a reasonable degree of medical

2    certainty, how long would if take the Gentamicin to

3    reach the baby if administered initially at 2:30 p.m. on

4    October 13, 2011?

5    A.    Since it's an intravenous dose, the Gentamicin

6    would cross the placenta probably, I would -- around in

7    minutes, would start crossing the placenta.

8              THE COURT:  Let me ask both of you again to

9    speak up, please.

10             ATTORNEY AMELL:  Yes, your Honor.

11   BY ATTORNEY AMELL:

12   Q.    Do you have an opinion, Dr. Cohen, to a reasonable

13   degree of medical certainty that if Gentamicin had been

14   prescribed at the same time as the Cleocin, would

15   Noelle's sepsis, meningitis and brain bleed have been

16   avoided?  In your opinion.

17   A.    In my opinion, they would have been avoided.

18   Again, looking at the literature, I think we are looking

19   at an 80, 90 percent reduction in risk when giving

20   antibiotics while the mother is pregnant, than waiting

21   until after the baby is born.

22   Q.    Dr. Cohen, when Mrs. Orwig was admitted to Sentara

23   Potomac on September 28th, was she tested for any other

24   infections upon admission?

25   A.    When she presented with the premature --

**C. COHEN - DIRECT**

1    premature -- premature rupture of membranes, initially

2    she was also tested for group B beta strep, which is a

3    bacteria that colonizes around 25 to 30 percent of women

4    in pregnancy.  And she was then treated -- well, the

5    culture actually came back negative, but she was treated

6    prophylactically.

7    Q.    If I could refer you to the Sentara 1-56 record.

8               ATTORNEY AMELL:  Your Honor, may we publish

9    this to the jury?

10              THE COURT:  Is it already admitted?

11              ATTORNEY AMELL:  I would move its admission

12    at this time.

13              THE COURT:  All right.  Any objection to it?

14              ATTORNEY SCHRAUB:  No objection.

15              THE COURT:  All right.  If it's -- if an

16    exhibit is admitted, you may always publish.  If it's

17    not admitted, you must ask for its admission first.

18              You may publish.

19              ATTORNEY AMELL:  Thank you, your Honor.

20              THE COURT:  There should be a screen, yes,

21    to your left, Dr. Cohen.

22              ATTORNEY AMELL:  If you could just zoom in

23    on that a little bit.

24    BY ATTORNEY AMELL:

25    Q.    Dr. Cohen, what is this medical document?

## C. COHEN - DIRECT

1    **A.**    It's a lab result, documentation of laboratory

2    results from the hospital.

3    **Q.**    And what test was done on Mrs. Orwig?

4    **A.**    The group B beta strep.  But here it says, "No

5    streptococcus agalactiae group B isolated culture."

6    **Q.**    You testified a moment ago that Mrs. Orwig was

7    tested negative, as this document shows, but she was

8    treated.  Why was she treated?

9    **A.**    So, other studies have shown that when women come

10   in with a condition of PPROM, similar to Mrs. Orwig,

11   that when we treat prophylactically with antibiotics,

12   even when a woman doesn't have group B beta strep, that

13   we end up delaying the onset of labor and reducing the

14   risk of infection.

15          And so in this case it's very appropriate

16   for her to be treated, since she was treated for one

17   week with prophylactic antibiotics.

18          ATTORNEY AMELL:  Your Honor, I would next

19   move into evidence Plaintiff's Exhibit 1-30.

20          THE COURT:  All right.  Is this part of the

21   medical record?

22          ATTORNEY AMELL:  Yes, it is, your Honor.

23          THE COURT:  All right.

24          Any objection?

25          ATTORNEY SCHRAUB:  No objection, your Honor.

 1              THE COURT:  All right.  It's admitted.  You

 2    may publish.

 3              ATTORNEY AMELL:  Thank you, your Honor.

 4    BY ATTORNEY AMELL:

 5    **Q.**   I would like to refer you to this physician order

 6    sheet, and direct you to prescription for antibiotics.

 7    Do you see where I am looking, Dr. Cohen?

 8    **A.**   I see Ancef, I believe it says two grams.

 9    **Q.**   Was this the antibiotic that was prescribed by

10    Dr. Alembik?

11    **A.**   Apparently, yes.

12    **Q.**   For the strep B?

13    **A.**   Well, for the prophylaxis, PPROM.

14    **Q.**   What does "prophylaxis" mean?

15    **A.**   So prophylaxis is a -- physicians commonly

16    prescribe prophylaxis in different conditions.  So we

17    are not demonstrative an infection at the time, but we

18    want to prevent an infection from happening.

19              So commonly, for example, if one travels to

20    a country where there is malaria, it's appropriate for a

21    person who is traveling in such a place to take an

22    antimalarial as a prophylaxis to reduce the risk of him

23    or her becoming infected with the malaria parasite.

24              In this case, the ideal prophylaxis is we

25    are trying to prevent infection and we are trying to

## C. COHEN - DIRECT

1    delay the onset of labor, in this case with PPROM, to

2    usually around 34 to 35 weeks of gestational age.

3          So she was treated prophylactically for one

4    week.  And the studies have shown that when treated with

5    prophylactic antibiotics, that the delay -- that there

6    is a greater delay of labor and a reduced risk of

7    infection.

8    Q.   If I could direct you back to the physicians order

9    we were just looking at, and direct your attention a

10   little bit below the Ancef, to "daily NSTs."  What is

11   that?

12   A.   I am trying to see that.  It says -- oh, "daily

13   NSTs."

14         So, the way that we evaluate -- we have

15   several different ways to evaluate how a fetus is doing.

16   And in this case, with PPROM we want to be able to

17   evaluate fetal well-being or the infant's well-being.

18   And so these are the monitors, external monitors that,

19   if you have been in labor and delivery before, you will

20   see that there is one to monitor contractions and one to

21   monitor the fetal heart rate.  And we use that as an

22   assessment of fetal well-being.

23   Q.   And have you had a chance to look at the medical

24   records and the results of the daily nonstress tests for

25   Noelle?

**C. COHEN - DIRECT**

1    A.    Yes, I have.

2    Q.    And what did those nonstress tests show, up until

3    October 13th, 2011?

4    A.    They showed a fetal heart rate -- I don't remember

5    the exact baseline, but they showed a fetal heart rate

6    that was in the normal range, between 120 and 150 beats

7    per minute.  So the pulse of a fetus is quite a bit

8    higher than an adult.

9         And it also showed some acceleration, so we

10   want to see that the heart rate is not just flat.  We

11   want to see accelerations.  That demonstrates to us that

12   the fetus, the cardiovascular system and the central

13   nervous system are intact, and so forth.

14        So that, that's what we use the nonstress

15   test for.  We use it -- if we see any problems, then

16   that's an indication for us doing additional procedures

17   to evaluate the well-being of the fetus, and if it's

18   worse, then we move towards delivery.

19   Q.    Dr. Cohen, was the medication named betamethasone

20   administered?

21   A.    Yes, it was.

22   Q.    What is that for?

23   A.    So, one of the main risk factors for an infant at

24   gestational age, as in this case, is for pulmonary --

25   the lungs are not mature, to be able to breathe air like

1    we are all in this room.  And there is something called

2    surfactant which allows the lungs to fully expand, to be

3    able to absorb the oxygen.

4             And so the betamethasone research was done a

5    number of decades ago now, that demonstrated that

6    when --

7             ATTORNEY SCHRAUB:  I am going to object.

8    There has been no --

9             THE COURT:  I'm sorry.  I can't hear you.

10             ATTORNEY SCHRAUB:  I am going to object,

11    your Honor.  There has been no designation of literature

12    by this witness to -- and he continually references and

13    talks about the literature shows.  But they have

14    designated no literature, and this Court's pretrial

15    ruling was that they could no literature on their direct

16    examinations.

17             ATTORNEY AMELL:  I certainly didn't intend

18    to elicit any literature citations, and Dr. Cohen has

19    not given any citations.  He is just generally referring

20    to the literature in his response, which is certainly

21    what I didn't even intend to elicit.

22             THE COURT:  What pretrial ruling -- well, we

23    will have to do this at the bench.  Come to the bench,

24    quickly.

25             (Sidebar conference held as follows:)

**C. COHEN - DIRECT**

1    THE COURT:  The only pretrial ruling I made

2   was a pretrial ruling that precluded the defendant

3   from -- was it the defendant or the plaintiff? -- from

4   using evidence from literature about the standard of

5   care when it was after the events that occurred.  That's

6   the ruling I recall.

7    ATTORNEY AMELL:  I agree.

8    ATTORNEY SCHRAUB:  Oh, no, no, no.  The

9   Court made a ruling on our original set of in limine

10  motions, where we said the plaintiff had not designated

11  any literature, they had designated no literature.

12   Now Dr. Cohen subsequently did a

13  supplemental report where he did designate one article,

14  by TITA.

15   But apart -- which is fine, if he wants to

16  talk about TITA.

17   But apart from that, they designated no

18  literature, and this Court ruled that the plaintiff

19  would not be --

20    THE COURT:  Did I put that in an order?

21    ATTORNEY SMITH:  January 8th, the final

22  pretrial conference, you heard three motions, actually.

23    THE COURT:  All right.  And I entered an

24  order.

25    ATTORNEY SMITH:  You did.

**C. COHEN - DIRECT**

1          ATTORNEY SCHRAUB:  Yes, your Honor.

2          ATTORNEY SMITH:  Actually, they conceded

3    that they wouldn't use it.

4          ATTORNEY SCHRAUB:  So actually, our motion

5    was moot because they conceded the point they wouldn't

6    use it.

7          THE COURT:  So I didn't rule on it.

8          ATTORNEY SMITH:  You did.

9          ATTORNEY SCHRAUB:  Well, you said that it

10   was moot because the plaintiff conceded --

11         THE COURT:  Yes, but that just means I

12   didn't rule on the merits.

13         ATTORNEY SCHRAUB:  That's correct, sir.

14         THE COURT:  All right.

15         Do you recall that?

16         ATTORNEY AMELL:  Vaguely; to be honest,

17   vaguely.

18         THE COURT:  Well, what is it you are trying

19   to elicit?

20         ATTORNEY AMELL:  All I'm trying, so the jury

21   understands, is there was no evidence of infection.

22   This is talking about the betamethasone, the baby was

23   fine.

24         The very next question I am going to ask:

25   Was there any sign of infection in the baby on

## C. COHEN - DIRECT

1    September 28th?

2           He is going to say, "No."

3           I am going to say, "Was there any evidence

4    of infection in the mom on this date?"

5           He is going to say, "No."

6           That's my very next question.

7           THE COURT:  Almost any opinion that any

8    doctor is going to give is going to be based in,

9    somewhere, something he or she read.  I mean, that's the

10    way it works.

11           ATTORNEY SCHRAUB:  Yes.  But it is unfair

12    and prejudicial, and I have to --

13           THE COURT:  But I didn't rule on that.  It

14    was withdrawn and it was moot.

15           ATTORNEY SCHRAUB:  I understand that, your

16    Honor, but --

17           THE COURT:  All right.

18           ATTORNEY SCHRAUB:  -- they conceded they

19    would not use literature.  It is unfair then for --

20           THE COURT:  Did you ask for a transcript of

21    that hearing?

22           ATTORNEY SMITH:  I don't believe we did.

23           ATTORNEY SCHRAUB:  I don't know if we did.

24           ATTORNEY SMITH:  There is an order on it.

25           THE COURT:  Yes.  But I am sure the order

# C. COHEN - DIRECT

1  simply says it's denied as moot, because it was

2  withdrawn.

3          ATTORNEY SMITH:  Because I think -- I think

4  I can go grab it.  It says the plaintiff has represented

5  that they will not use literature --

6          THE COURT:  Yes.

7          ATTORNEY SMITH:  -- in the direct of their

8  experts.

9          THE COURT:  Yes.

10         ATTORNEY SCHRAUB:  Right.  Right.

11         It's unfair, then, for this witness then to

12  refer to literature, give the impression to the jury

13  that his opinion is bolstered by literature, when they

14  have no literature and they are not allowed to use it.

15  So they are sort of back-dooring something that is

16  unfair to the defense.

17         THE COURT:  All right.

18         And what's your view?

19         ATTORNEY AMELL:  The plaintiffs are not

20  intending to read any portions of literature into the

21  record, which is what we would normally do on direct

22  examination.  This is a vague reference to literature.

23  He didn't give a citation.  He is just saying this is

24  just to let the jury know that, you know, it's evidence

25  based.

# C. COHEN - DIRECT

1        ATTORNEY SCHRAUB:  That is precisely what I

2   don't think he can --

3        THE COURT:  No -- no statement a doctor can

4   make can be made without a basis in literature.  That's

5   how doctors learn things.

6        ATTORNEY SCHRAUB:  I agree, your Honor.  And

7   I intend --

8        THE COURT:  All right.  So --

9        ATTORNEY SCHRAUB:  -- to argue to the jury

10  that --

11       THE COURT:  Just a moment.

12       ATTORNEY SCHRAUB:  Yes, sir.

13       THE COURT:  I think what you have to do

14  is -- I am going to sustain that.  You may not elicit in

15  your direct testimony anything about literature.  If the

16  witness, however, says in response to a question

17  something about literature, then it seems to me that's a

18  matter for cross-examination.

19       ATTORNEY SCHRAUB:  Your Honor --

20       ATTORNEY AMELL:  Your Honor, I think that is

21  precisely what happened.

22       ATTORNEY SCHRAUB:  -- I am going to incur

23  the wrath of the Court here, but -- or at least run that

24  risk, but I think it is unfair and it should be handled

25  by the witness being told quietly by counsel that,

**C. COHEN - DIRECT**

1    please do not refer to literature in your answers.

2           THE COURT:  All right.  I can say that to

3    him, or you can say that.  Let's say it out loud.  Don't

4    refer to literature.  We won't ask about it.

5           ATTORNEY AMELL:  Would you like to re-ask

6    the question, then, to --

7           THE COURT:  Yes.  Re-ask the question.

8           ATTORNEY AMELL:  Thank you, your Honor.

9           (End of sidebar conference, open court as

10    follows:)

11           THE COURT:  You may proceed.

12           ATTORNEY AMELL:  Thank you, your Honor.

13    BY ATTORNEY AMELL:

14    Q.    Dr. Cohen, without referencing the literature, why

15    was the betamethasone administered by Dr. Alembik?

16    A.    So as I was mentioning earlier, we -- infants that

17    are born prematurely can have lungs that are not able to

18    breathe the room air that we're breathing.  So by giving

19    betamethasone, in this case to separate doses every

20    24 hours to complete that, increases the chance that the

21    infant's lungs will be mature and be able to breathe.

22    That's why they were given.

23    Q.    Do you have an opinion, to a reasonable degree of

24    medical certainty, whether there was any evidence of

25    infection in the baby on September 28th, 2011 when

**C. COHEN - DIRECT**

1    Mrs. Orwig was admitted to the hospital?

2    **A.**   Right.  So there was no evidence of infection at

3    that time.  Otherwise, it would have been appropriate to

4    move towards delivery at that time.

5    **Q.**   Do you have an opinion, to a reasonable degree of

6    medical certainty, whether there was any evidence of

7    infection in Mrs. Orwig on September 28th, 2011?

8    **A.**   Based on the -- based on the medical records, I

9    did not see any evidence of infection at that time.

10   **Q.**   On September 28th, was Mrs. Orwig in labor at that

11   time?

12   **A.**   No, she was not.

13   **Q.**   All right.  And from your review of the medical

14   records, what was the plan for Mrs. Orwig after her

15   admission and before October 13, 2011?

16   **A.**   Right.  So in this case, she had received one week

17   of prophylactic antibiotics and the -- was continuing to

18   be evaluated for fetal well-being as well as her own

19   well-being.  And then the plan is what's called

20   expectant management, meaning we wait -- we try -- as

21   the fetus is growing and growing normally and not in any

22   distress and the mother is doing well, we try to keep

23   the mother pregnant, which is what was happening.  So it

24   was expectant management with follow-up of ultrasounds

25   to follow growth and the nonstress test to follow fetal

## C. COHEN - DIRECT

1    well-being, as I explained before.  So that was, from my

2    perspective and the medical records, very appropriate.

3            ATTORNEY AMELL:  Your Honor, at this time,

4    I'd like to move into evidence Plaintiff's Exhibit 1-53.

5    And this is are globally from Plaintiff's Exhibit 28.

6    And I understand there's no objection.

7            THE COURT:  All right.  It's admitted.  You

8    may display it without objection.

9    BY ATTORNEY AMELL:

10   Q.    Dr. Cohen, if I could refer you to this document

11   and first ask you, what is this?

12   A.    These are the -- so this is, again, laboratory

13   results based on -- from blood -- which has white blood

14   cells and red blood cells and hematocrit and hemoglobin.

15   Q.    If I can refer you to the lab results from

16   September 28th, 2011, the day Mrs. Orwig was admitted.

17            Do you see where I'm referring you?

18   A.    I do.

19   Q.    And we're highlighting that now at -- what time is

20   that?

21   A.    1:00 p.m.

22   Q.    What is the first number in that column?

23   A.    That's the white blood cell counts.  So it's

24   9.5000.

25   Q.    What are white blood cells?

## C. COHEN - DIRECT

1    A.    So white blood cells are the cells in our body

2    that in general monitor any sort of infection.  And then

3    if we have an infection, they fight infection.

4    Q.    And is that indicative of any infection, a level

5    of 9.5 for white blood cell count?

6    A.    That's within the normal range.

7    Q.    If I could then refer you to the next CBC result

8    on September 30th, 2011, which is right next to it.

9    A.    Right, I see that.

10   Q.    What was Mrs. Orwig's white blood cell count on

11   September 30th, 2011?

12   A.    So it's 16.9000.  And again, that's -- the normal

13   range goes up to 11.  The reason for that being

14   elevated, at least my understanding, is that when you

15   use betamethasone, when you use a corticosteroid, it

16   increases, essentially -- it causes white blood cells on

17   the sides of blood vessels to go into the bloodstream,

18   if you will.  And therefore, it elevates the white blood

19   cell count, but it's not indicative of infection.

20   Q.    If I can next refer you to October 4, 2011 CBC

21   result.

22         What were the white blood cells on October

23   4th for Mrs. Orwig?

24   A.    They were 12,000.  And again, as the betamethasone

25   effect on the white blood cells is wearing off usually

**C. COHEN - DIRECT**

1    after about five to seven days, then we see the white

2    blood cell count decreasing back to within the -- it's

3    not quite normal, but within the normal range.

4    **Q.**    Did there come a time when the clinical

5    circumstances changed from Mrs. Orwig?

6    **A.**    Yes.  On the 13th is when Mrs. Orwig's condition

7    changed, in the early afternoon.

8    **Q.**    From your review on that day -- of the records on

9    that day, what happened?

10    **A.**    So Mrs. Orwig, I know at that time, was

11    complaining of abnormal -- a smelly vaginal discharge.

12    So up until that time, her vaginal discharge had been

13    low and normal, not with abnormal smell.  She also was

14    complaining of some bleeding which was evaluated at the

15    time by the doctor.  And the bleeding could be the signs

16    of early labor.  It could also be the signs of other

17    conditions as well at that time.

18            ATTORNEY AMELL:  Your Honor, at this time, I

19    would move into evidence without objection Plaintiff's

20    Exhibit 1-77.

21            THE COURT:  All right.  Without objection?

22            ATTORNEY SCHRAUB:  No objection.

23            THE COURT:  It's admitted.

24            ATTORNEY AMELL:  If I may publish this to

25    the jury?

**C. COHEN - DIRECT**

1          THE COURT:  You may do so.

2    BY ATTORNEY AMELL:

3    Q.    Did there come a time when Dr. Alembik saw

4    Mrs. Orwig on September 13, 2011?

5    A.    Yes, there was.  I can't see the time.

6          ATTORNEY AMELL:  Actually, if we can move it

7    up a little bit.  Maybe zoom in on the 12:30.

8    BY ATTORNEY AMELL:

9    Q.    Referring you to the 12- --

10          THE COURT:  Show Dr. Cohen the actual

11    exhibit so he can see the whole page.

12          Do we have it here?

13          ATTORNEY AMELL:  I believe it's up on your

14    screen right now.

15          THE COURT:  Yes, I know.

16          THE WITNESS:  But it's difficult for me to

17    see and to read.

18          ATTORNEY AMELL:  I have a copy here.

19          THE COURT:  All right.  Next question.

20    BY ATTORNEY AMELL:

21    Q.    Referring you to the 12:34 time frame, does that

22    indicate that Dr. Alembik saw the patient?

23    A.    Yes.  [Reading]  So "VE" stands for vaginal exam.

24    So vaginal exam per Dr. Alembik.  Long and closed.  So

25    that refers to her cervix was long and closed.  Large

1    amount of serosanguinous discharge.  So that's mucus

2    mixed with blood.  Fetal heart rate, a hundred and --

3    160s, 160 beats per minute, with variables.

4    Q.    When Dr. Alembik noted that the cervix was long

5    and closed, does that suggest that Mrs. Orwig is moving

6    to active labor?

7    A.    No, it's not.  So the cervix needs to thin and it

8    also needs to open in order for labor to occur, for

9    natural labor to occur.

10   Q.    Is there any significance to you of the notation

11   of the serosanguinous drainage?

12   A.    So the serosanguinous discharge can result -- it

13   happens.  It could be a sign again of early labor if

14   Mrs. Orwig was having contractions.  Commonly, we see a

15   serosanguinous discharge that can happen just prior to

16   labor.  But it also -- sometimes we have -- women have

17   discharge at different times.  It may not be associated

18   with labor or with anything abnormal at that time.

19   Q.    If I could then direct you back to Plaintiff's

20   Exhibit 53, which was previously published to the jury.

21            And now, Dr. Cohen, directing your attention

22   to the CBC result for October 13, 2011.  If you can put

23   that just up a little bit.

24   A.    Yeah.  So now it's 15.6000.  So it was elevated

25   from approx- -- from the October 4th result of 12,000.

**C. COHEN - DIRECT**

1  Q.    And if I can direct your attention down a little

2  bit lower to where the value says "segs," s-e-g-s.

3  A.    Right.  So this refers to seg- -- it's -- white

4  blood cells are comprised of many different types of

5  white blood cells, and one of them is segmented or

6  polymorph- -- PMNs.  And so at 9- -- this is essentially

7  saying that 92 percent of the white blood cells are

8  segmented PMNs.  So that is high.

9  Q.    Do you have an opinion, to a reasonable degree of

10 medical certainty, whether those findings are consistent

11 with an intraamniotic bacterial infection?

12 A.    They're consistent with infection, but not

13 sufficient for making a diagnosis of infection.

14 Q.    Okay.  If I could next, what is a biophysical

15 profile?

16 A.    So that is another -- as I mentioned earlier about

17 the nonstress test where we watch the fetal heart rates

18 and we're looking for variability.  We don't want to see

19 a straight line.  We want to see decelerations.  So

20 sometimes it's difficult to evaluate the fetal heart

21 rates or we might see something concerning and we're

22 worried about how concerning it might be.

23        In this case, Dr. Alembik must have seen

24 something in the fetal heart rate that caused him to

25 order the biophysical profile.  This is a test that's

1    conducted by using an ultrasound, and we're looking

2    for -- we score different elements of the fetus,

3    including fluid and movement and breathing movements and

4    tone.  And each of those can get 0 to 2 points, and then

5    plus the nonstress test gets an additional 2 points.  So

6    the range can be from 0 to 10.  10 is excellent.

7              ATTORNEY AMELL:  Your Honor, at this time, I

8    would move into evidence without objection Plaintiff's

9    Exhibit 1-64 and 65.

10             THE COURT:  All right.  Without objection,

11   they're admitted.  You may display them.

12             ATTORNEY AMELL:  Thank you, your Honor.

13   BY ATTORNEY AMELL:

14   Q.    If I can direct your attention, Dr. Cohen, to the

15   impression on this record near the bottom of the page.

16   We'll blow that up so it's easier to see.

17             What document are you looking at now?

18   A.    This is the result of the biophysical profile.

19             I'd like to see the date and time above.

20             This is on the 13th.  And time -- where's

21   the time?

22             THE COURT:  Show Dr. Cohen the whole

23   document.

24             THE WITNESS:  Can you see the time?

25             ATTORNEY AMELL:  I've got the whole document

## C. COHEN - DIRECT

1    here, your Honor.

2              THE COURT:  Hand it to the court security

3    officer so he can have the entire document.

4              ATTORNEY AMELL:  Okay.

5              THE COURT:  Does that help you, Dr. Cohen?

6              THE WITNESS:  Yes.  I'm still looking for

7    the time, but I know that one was ordered I believe

8    after the 12:30 visit by the doctor to Mrs. Orwig.

9              So the impression says [reading] biophysical

10   profile scored 6 of 8 with no fetal breathing movement

11   noted.  And now the fluid index is 4.7 centimeters,

12   which is less than 2.5 percentile indicative of

13   oligohydramnios.  It is slightly increased since

14   October 7, 2011 when the amniotic fluid index was 4.4.

15             Of course, the amniotic fluid is low because

16   the -- Mrs. Orwig had had the premature rupture --

17   preterm premature rupture of membranes.

18   BY ATTORNEY AMELL:

19   Q.   Can you explain to the jury in layman's term, what

20   did those findings mean as a physician?  What was

21   significant, if anything?

22   A.   So it's just another piece of a puzzle.  When

23   we're taking care of patients, we look at all different

24   elements about the patient.  In this case, two patients.

25   And the biophysical profile is essentially indicative

## C. COHEN - DIRECT

1    that -- I mean, here it says, you know, again for 6 out

2    of 8, is equivocal -- which is equivocal.

3            So 6 -- it doesn't really -- it wouldn't

4    really help me.  If it would have been 8 -- I mean, in

5    this case, I don't think -- it doesn't really have a --

6    it wouldn't sway me in my -- in the clinical practice.

7    And if it's abnormal, of course, that would -- if it was

8    less than 6, in this case 4, then that would be

9    abnormal.

10   Q.   Now directing your attention to 2:30 p.m. on

11   October 13, 2011, were there any significant clinical

12   changes in Mrs. Orwig at that time, at 2:30 p.m.?

13   A.   Yeah, I'm waiting -- am I waiting for something on

14   the screen?

15   Q.   No.

16   A.   So 2:30 -- sorry.  So at 2:30 p.m. is when

17   Mrs. Orwig's clinical condition deteriorated and she was

18   complaining of smelly vaginal discharge, which the nurse

19   was made aware.  And I believe the nurse's notes said

20   that Dr. Alembik was also aware of this discharge as

21   well.

22           And the fetal heart rate was again in the

23   160s, which isn't abnormal at that time.  So the main

24   change was smelly -- the acknowledgement and smelly

25   vaginal discharge, and then Mr. -- sorry -- Dr. Alembik

**C. COHEN - DIRECT**

1    made the diagnosis of chorioamnionitis and started

2    clindamycin.

3                ATTORNEY AMELL:  I would like to at this

4    time move into evidence, your Honor, Plaintiff's 1-28

5    without objection.

6                THE COURT:  Without objection, it's

7    admitted.  You may display it.

8                ATTORNEY AMELL:  Thank you, your Honor.

9    BY ATTORNEY AMELL:

10   **Q.**   If I can refer your attention to the October 13,

11   2011, 2:30 p.m. progress note at the top of the page.

12               Have you seen this document before?

13   **A.**    Yes, I have.

14   **Q.**    And who wrote this note?

15   **A.**    Well, it's hard to read the signature.

16               Can you confirm the signature?  It says OB

17   attending.  So it's either Dr. Alembik or his associate,

18   but the signature would have to be confirmed.

19   **Q.**    Okay.  Let's go through that note for just a

20   minute.

21               [Reading] CTSP is called to see patient with

22   fetal heart rate 170s and occasional variable

23   decelerations.  WBC increased to 15" --

24               THE COURT:  Why don't we have him read it to

25   us.

C. COHEN - DIRECT

1              ATTORNEY AMELL:  Okay.

2              THE WITNESS:  If I can.

3              [Reading] WB- -- white blood cell counts

4    increased to 15.6000.  92 percent segmented neutrophils,

5    as I had explained earlier, and probable impending

6    chorioamnionitis.  What's the next word?  Something

7    temp.  Normal --

8    BY ATTORNEY AMELL:

9    Q.    Maternal temp?

10   A.    I can't read that word.  Something temp, and then

11   I can't read the next parts.

12            That sentence is very difficult for me.

13   Something about temp, then something, and then it's hard

14   to read the rest of that.

15   Q.    Do you see on the very last line towards the

16   bottom right-hand side where it says IOL?  IOL?

17   A.    "Plan IOL."

18   Q.    And then "NICU aware."

19   A.    "NICU aware," right.

20   Q.    What does "IOL" mean?

21   A.    I'm not sure.  We don't use that nomenclature in

22   San Francisco.  So "IOL."

23   Q.    Are you familiar with induction of labor?

24   A.    Induction of labor, yes.

25            So induction of labor, NICU, because the

# C. COHEN - DIRECT

1    infant's premature, would be aware.

2    Q.    And what is induction of labor?

3    A.    So there's -- labor can be caused naturally where

4    a woman comes in and -- or goes into labor on her own.

5    And there are indications when physicians, obstetricians

6    will induce labor such as in this case the -- what's

7    probable impending chorioamnionitis.  Other causes are

8    when a woman goes over 41 weeks, in our hospital

9    practice that also calls for induction.  There are many

10   other reasons why we induce labor with various means.

11   Q.    What significance, if any, does this progress note

12   have for your opinions in this case?

13   A.    This is Dr. Alembik correctly making the diagnosis

14   of chorioamnionitis, looking at the entire patient, at

15   the issue that she's at very high risk of her

16   chorioamnionitis, that she has -- well, we know that she

17   has a foul-smelling discharge that he's aware of, the

18   white blood cell count.  So that's essentially what this

19   progress note says.

20   Q.    The notation that Dr. Alembik made in the progress

21   note we just looked at that says fetal heart rate in the

22   170s, does that have any significance to you?

23   A.    It does, in the 170s if it's sustained, meaning if

24   it lasts for more than 15 minutes and sustained.

25   Sometimes fetal heart rates will adjust to baseline.

## C. COHEN - DIRECT

1    The fetal heart rate will change.  And if it's

2    sustained, then it is of concern.  And again, it's -- it

3    can be indicative of chorioamnionitis, so one of the

4    signs of chorioamnionitis.

5    **Q.**   And if a fetal heart rate above 160s is sustained,

6    as you just testified, what is that called?

7    **A.**   Tachysystole.

8    **Q.**   Have you reviewed the fetal heart tracings in this

9    case?

10   **A.**   I did, yes.

11   **Q.**   Did you see any evidence of fetal heart tracing

12   abnormalities at either 2:30 p.m. or later?

13   **A.**   So at 2:30 p.m., I do not see fetal heart rate

14   abnormalities other than the variable decelerations that

15   Dr. Alembik had mentioned here.  At around 4:30 p.m. is

16   when the fetal heart rate becomes significantly elevated

17   into the 180s, actually 180 beats per minute, and stays

18   sustained for quite a while after that time, again with

19   be variable decelerations, which we can see with

20   contractions.

21            ATTORNEY AMELL:  Your Honor, I would like to

22   show just Dr. Cohen -- I don't need to publish this for

23   the jury -- Plaintiff's Exhibit 18, the fetal heart

24   tracings.  I would like to ask him a few questions about

25   October 13th.

## C. COHEN - DIRECT

1          THE COURT:  All right.  You may do so.

2          And you're admitting it into evidence?

3          ATTORNEY AMELL:  Yes, I would admit

4    Plaintiff's --

5          THE COURT:  What exhibit number is it?

6          ATTORNEY AMELL:  It's 18.

7          THE COURT:  All right.  It's admitted

8    without objection.

9          Next question.

10          ATTORNEY AMELL:  Thank you, your Honor.

11    BY ATTORNEY AMELL:

12    Q.    Dr. Cohen, you said you've reviewed the fetal

13    heart tracings in this case.

14          If you can tell the jury, what evidence of

15    tachycardia or tachysystole did you see on October 13th,

16    2010?  Either give us the time frames or the numbers.

17    A.    So I'd have to look -- let me find it again.

18          It looks that the baseline change from the

19    160 beats per minute to 180 beats per minute at

20    approximately, let's see, 4:10 in the afternoon that

21    day.

22          ATTORNEY SCHRAUB:  Your Honor, I would note

23    an objection to this testimony regarding the fetal heart

24    rate at 4:10 when the allegation of breach is that the

25    decision by the doctor should have been made --

# C. COHEN - DIRECT

1        THE COURT:  So your objection is one as to

2    relevance.

3        ATTORNEY SCHRAUB:  It's an objection as to

4    relevance, yes, your Honor.

5        ATTORNEY AMELL:  Your Honor, this testimony

6    goes to causation and the development of a progressive

7    infection, progressive chorioamnionitis in Mrs. Orwig

8    that progressed also in the baby.  This is evidencing

9    the baby's reaction.

10       THE COURT:  All right.

11       ATTORNEY SCHRAUB:  If they're offering it

12   for a limited purpose that does not involve standard of

13   care, then -- and the Court so informs the jury, then I

14   would not have an issue.

15       THE COURT:  All right.  Do you want -- we're

16   going to cease here fairly quickly.  Do you want to ask

17   a summary question about where you are at this point so

18   the jury is not lost?

19       And I think Mr. Schraub's observation is

20   correct.  You're offering it for not standard of care,

21   but for causation.  So it's admitted for that limited

22   purpose.  But I'm suggesting to you now that you go back

23   and make it clear what is the standard of care, what is

24   the time at which you say there was a breach of the

25   standard of care.  You may elicit it from this witness

**C. COHEN - DIRECT**

 1    even though it may be cumulative.

 2    BY ATTORNEY AMELL:

 3    Q.    Dr. Cohen, what is your opinion with respect to

 4    when the standard of care was breached by Dr. Alembik in

 5    this case on October 13, 2011?

 6    A.    So he correctly made the diagnosis of

 7    chorioamnionitis at 2:30 p.m. --

 8            ATTORNEY SCHRAUB:  Your Honor, that doesn't

 9    answer the question.

10            THE COURT:  Overruled.  It does.

11            THE WITNESS:  -- at 2:30 p.m. and then moved

12    towards induction of labor very appropriately.  He then

13    treated her with clindamycin and omitted the gentamicin,

14    which is the breach of the standard of care.

15    BY ATTORNEY AMELL:

16    Q.    The findings of -- at least one of the findings of

17    tachysystole that you just identified for the jury, what

18    does that suggest as far as the fetus's reaction to the

19    infection?

20    A.    Again, just like if -- so tachysystole is related

21    to infection and also having an elevated temperature.

22    In this case, the mother didn't have a temperature.  But

23    remember, there's two individuals here.  And so it's

24    also the infant's response to infection as well.

25            THE COURT:  All right.  We'll cease here

 1    today.  Dr. Cohen, you may step down.  And you may not

 2    discuss your testimony with anyone *but the lawyers in

 3    this case until you return to testify.

 4                THE WITNESS:  Thank you.

 5                THE COURT:  Thank you.  You may step down.

 6                (Witness excused.)

 7                THE COURT:  All right.  Ladies and

 8    gentlemen, pass your books to the right.  The court

 9    security officer, Mr. Williams, will collect them,

10    maintain their security until tomorrow morning.

11                Now, during this evening, you'll be accosted

12    by your family, your friends, your children, your

13    spouses.  They'll be intensely interested in what you've

14    been doing.  They'll ask you questions.  You'll be

15    tempted to answer the questions.

16                Resist the temptation.  Do not answer the

17    questions.  Simply tell them the judge has instructed

18    you that you may not discuss the matter with anyone

19    until after the case is over.  And you may not discuss

20    it with anyone.  Don't undertake any investigation by

21    any electronic or other means at all.  Put it out of

22    your mind until tomorrow morning.

23                Now, I give you some leeway on when you wish

24    to report.  The traffic is intense in the morning.  I

25    will be happy to begin at 9:00 or 9:30 or even 8:30 or

1

1    IN THE UNITED STATES DISTRICT COURT FOR THE
            EASTERN DISTRICT OF VIRGINIA
2                Alexandria Division

3    N.O. a MINOR, ET AL.,                    )
                                              )
4                        Plaintiff,           )
                                              )
5    v.                                       ) CIVIL ACTION
                                              )
6    MARC ALEMBIK, M.D., ET AL                ) 1:15-cv-868
                                              )
7                        Defendant.           )
     _____)
8
                    REPORTER'S TRANSCRIPT
9
                   JURY TRIAL AM SESSION
10
                Tuesday, April 13, 2016
11
                         ---
12
13   BEFORE:      THE HONORABLE T.S. ELLIS, III
                  Presiding
14
     APPEARANCES:  SCOTT MICHAEL PERRY, ESQ.
15                 Klores Perry Mitchell PC
                   1735 20th Street NW
                   Washington, DC 20009
16
                   LAURIE ANN AMELL, ESQ.
17                 CATHERINE D. BERTRAM, ESQ.
                   Bertram & Amell PLLC
18                 1100 Vermont Ave NW, Suite 500
                   Washington, DC 20005
19

20                      For the Plaintiff
21                           ---

22              MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                     Official Court Reporter
23             USDC, Eastern District of Virginia
                      Alexandria Division
24

25

                 MICHAEL A. RODRIQUEZ, RPR/CM/RMR

2

1                    (APPEARANCES CONTINUED)

2

3              J. JONATHAN SCHRAUB, ESQ.
               PAIGE LEVY SMITH, ESQ.
4              Sands Anderson Marks & Miller
               1497 Chain Bridge Rd
5              Suite 202
               McLean, VA 22101
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

3

```
 1                            INDEX

 2

 3   PRELIMINARY MATTERS:

 4   WITNESSES:              DIRECT CROSS REDIRECT RECROSS

 5   Dr. Khushbaskakhat Mittal   25   71      85
     Dr. Marcus Hermanson        93

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1    witness to go home and return on Monday, and we are

2    going to proceed with other witnesses at this time.

3              All right -- yes?

4              THE JUROR:  May I have a pencil?

5              THE COURT:  Yes, of course.  Everyone have a

6    pencil or a pen?  If you prefer a pen, we will make that

7    available to you.

8              Everybody is set.

9              All right.  You may call your next witness.

10             ATTORNEY AMELL:  Thank you, your Honor.

11             The plaintiffs call Dr. Khush Mittal.

12             (Witness sworn.)

13             THE COURT:  All right.  You may proceed.

14             THEREUPON, KHUSHBAKHAT MITTAL, having been

15   duly sworn, was examined and testified as follows:

16                   DIRECT EXAMINATION

17   BY ATTORNEY AMELL:

18   Q.    Good morning, Doctor.

19   A.    Good morning.

20   Q.    What is your name, sir?

21   A.    Khushbakhat Mittal.

22   Q.    And could you spell your first and last name?

23   THE COURT:  Dr. Mittal, would you speak up, please.

24             THE WITNESS:  Yes.

25             THE COURT:  And you can remove the

**K. MITTAL - DIRECT**

26

1  microphone, if you wish.  You may do as you wish and

2  talk -- and hold it.  It's entirely up to you.  Pull out

3  and it will come off.

4        THE WITNESS:  So my name is spelled a

5  K-h-u-s-h-b-a-k-h-a-t, last name M-i-t-t-a-l.

6  BY ATTORNEY AMELL:

7  Q.    Thank you, Dr. Mittal.

8        What is your profession, sir?

9  A.    I'm a physician and a pathologist.

10  Q.    Where are you employed?

11  A.    I work for New York University School of Medicine

12  hospital.

13  Q.    And what is your position?

14  A.    I'm associate professor attending in pathology and

15  director of OB/GYN pathology.

16  Q.    Is that a full-time position?

17  A.    Yes.

18  Q.    What's your business address?

19  A.    Will you repeat that.

20  Q.    What's your business address in New York?

21  A.    By business address is 560 First Avenue, New York,

22  New York, 10016.

23  Q.    Do you have an area of focus in your practice of

24  pathology?

25  A.    My area of focus is OB/GYN pathology, which

**K. MITTAL - DIRECT**

1    involves for OB part examination of placentas.  Many of

2    them come from high-risk pregnancies.  And for the GYN

3    part, examination of *for again could logic cancers.

4    For the placenta part, this includes examination of

5    placenta cord, including cases of chorioamnionitis.

6    Q.    Is your practice devoted exclusively to OB/GYN

7    pathology?

8    A.    I would say 99 percent.

9    Q.    For how long has that been true?

10    A.    That's been true for, I would say, 25 years.

11    Q.    Would you give the jury a thumbnail sketch of your

12    medical education and training, please.

13    A.    Yes.  I graduated from All India School of Medical

14    Sciences in New Delhi in 1977.  I then did two years of

15    training there before moving to New Zealand.  I was in

16    New Zealand and trained there for another year before

17    moving to USA where I did a year of internship in Warren

18    State Hospital in Pennsylvania.

19           Thereafter, I was in Buffalo, New York with

20    State University of New York affiliated hospitals for

21    three years for additional training.  And thereafter, I

22    was at Yale at New Haven, Connecticut as a senior

23    resident or chief resident.  And thereafter, I did

24    additional year of fellowship with Dr. *camera sigh

25    there at Yale University.  So that's the sum of my

**K. MITTAL - DIRECT**

1    training.

2    Q.    Are there times when you as a pathologist review

3    the patient's medical records in order to reach a

4    pathological diagnosis?

5    A.    Yes.  From time to time, there are complicated

6    cases where we have some questions.  And we can go to

7    the medical record, electronic medical record, and

8    review findings.

9              THE COURT:  I think you mean a diagnosis in

10    pathology, not a pathological one --

11              ATTORNEY AMELL:  That's right, your Honor.

12              THE COURT:  -- which may convey that the

13    diagnosis is ill in some way.

14              ATTORNEY AMELL:  That's correct.  You're

15    right.

16              Would you like me to rephrase the question

17    or did your clarification --

18              THE COURT:  Yes, that would be useful.

19    BY ATTORNEY AMELL:

20    Q.    All right.  Dr. Mittal, are there times when you

21    review the patient's medical record in order to reach a

22    diagnosis in your field of pathology?

23    A.    That is correct.

24    Q.    And under what circumstances would you review the

25    medical records to reach such a diagnosis?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1    **A.**    If I have some questions I need answered to look

2    at the findings, clinical findings, I review the

3    records.

4    **Q.**    Would those involve complex cases?

5    **A.**    Yes.

6    **Q.**    And what percentage of cases do you find to be

7    complex that require you as the pathologist to review

8    the medical records in addition to the pathology

9    specimens themselves?

10    **A.**    I would say perhaps 10 percent of cases.

11    **Q.**    Would you describe what percentage of your

12    practice is clinical, meaning looking at pathology

13    slides, versus teaching or administrative?

14    **A.**    I would say at this time it's 95 percent clinical.

15    **Q.**    Do you have teaching and administrative duties as

16    well?

17    **A.**    Yes, I do.

18    **Q.**    And what do those entail?

19    **A.**    My teaching responsibilities include giving

20    lectures to medical students, teaching residents one on

21    one when we are looking at cases and also giving them

22    lectures.  And my administrative duties include the

23    supervision of other attendings and their guidance and

24    their scheduling.  So those are the responsibilities.

25    **Q.**    Thank you.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1              Dr. Mittal, are you board certified?

2    A.    Yes, I am.

3    Q.    In what specialty, sir?

4    A.    In anatomic pathology.

5    Q.    What is anatomic pathology?

6    A.    So anatomic pathology is the study of tissues both

7    grossly and microscopically to arrive at diagnoses.

8    Q.    How does anatomic pathology differ from clinical

9    pathology?

10   A.    So clinical pathology would be examination of

11   fluids, blood, liquids like urine, and not tissue.

12   Q.    You're not board certified in clinical pathology.

13           Why is that?

14   A.    My interest was anatomic pathology.

15   Q.    You're also the program director for the

16   fellowship program in women's pathology.

17           What does that involve?

18   A.    So individuals who want to train at advanced level

19   in women's pathology apply for fellowships, and we train

20   them at an advanced level for a year before they go on

21   to work as attendings in pathology.  So they come to us.

22   We show them unusual cases.  We help them, you know,

23   prepare cases for conferences so they have some

24   experience regarding that, and also help them with some

25   publications and research.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1    Q.    Your CV indicates that you're on the editorial

2    board of several peer-reviewed journals.

3              What does it mean to be on an editorial

4    board?

5    A.    That means when somebody has some research and

6    they want to publish it, they will send it to the

7    journal, and the journal will then send it to people who

8    are on the editorial board.  We then look at those

9    papers to make sure that those papers were properly done

10   and that there were good controls and that the results

11   are valid and scientific and worth publishing.

12   Q.    What are some of the journals in which you sit on

13   the editorial board?

14   A.    So I'm on the editorial board of *International*

15   *Journal of Gynecologic* [sic] *Pathology*, *Human Pathology*,

16   *Histology and Histochemistry* [sic], *Cancer.*  I review

17   cases for cancer.  And --

18              THE COURT:  That's the name of a journal?

19              THE WITNESS:  That's the name of the

20   journal.

21              THE COURT:  Next -- go ahead.

22   BY ATTORNEY AMELL:

23   Q.    Have you published or presented lectures in your

24   field of pathology?

25   A.    Yes, I have.

**K. MITTAL - DIRECT**

1   Q.    I'd like to at this time show you what's been

2   marked for identification as Plaintiff's Exhibit 59,

3   which is your CV.  Thank you.

4             Dr. Mittal, is that your CV?

5   A.    Yes.

6   Q.    An is that CV reasonably accurate and current?

7   A.    Yes.

8             ATTORNEY AMELL:  At this time, I would move

9   Plaintiff's Exhibit 59 into evidence.

10             ATTORNEY SMITH:  No objection.

11             THE COURT:  It's admitted without objection.

12             Next question.

13   BY ATTORNEY AMELL:

14   Q.    Dr. Mittal, if you could tell the jury your

15   experience with chorioamnionitis.

16   A.    So I see a large number of placentas, and we

17   frequently see chorioamnionitis in these placentas.

18   Perhaps we see maybe two or three cases of

19   chorioamnionitis on a daily basis.

20   Q.    How many diagnoses of chorio would you estimate

21   you've made over the course of your career?

22   A.    That would be involving a lot.  I guess each year

23   perhaps -- maybe 400 cases each year.

24   Q.    And when you make such a diagnosis, it's a

25   histopathological diagnosis; is that correct?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    **A.**    That is correct.

2    **Q.**    And what does that mean, to make a

3    histopathological diagnosis?

4    **A.**    That means to look at tissues under the microscope

5    and look for evidence of inflammation, which is

6    chorioamnionitis.

7    **Q.**    When did you first begin doing medical-legal work

8    such as this?

9    **A.**    Approximately 15 years ago.

10   **Q.**    Can you give us an approximation of how many cases

11   you review on a yearly basis.

12   **A.**    About 15 cases each year.

13   **Q.**    How many times would you estimate you've given

14   depositions?

15   **A.**    I've given deposition approximately two or three

16   times each year.

17   **Q.**    And how many times have you testified at trial?

18   **A.**    I've given testimony at trial on average about

19   once a year.

20   **Q.**    Has your testimony been split between plaintiffs

21   and defense cases?

22   **A.**    Yes.

23   **Q.**    What's your split?

24   **A.**    Approximately half and half.

25   **Q.**    Has that remained pretty steady throughout your

**K. MITTAL - DIRECT**

1   career?

2   A.    It range from year to year.  But overall, yes.

3   Q.    Prior to today, have you ever previously testified

4   at trial for myself or my law partner?

5   A.    No, I haven't.

6   Q.    For Mr. Perry?

7   A.    No, I haven't.

8   Q.    What do you charge for reviewing cases and giving

9   testimony?

10  A.    I charge 400 an hour for review of cases and 4,000

11  for a day or part of day for testimony.

12  Q.    And what percentage of your professional time is

13  spent giving -- doing medical-legal activities?

14  A.    That would be approximately 10 to 15 percent.

15  Q.    Have you ever failed to qualify as an expert

16  witness in the field of pathology?

17  A.    No.

18  Q.    And have you previously given testimony regarding

19  the timing of the development of chorioamnionitis?

20  A.    I must have, although I don't recall specifics.

21  Q.    Have you previously reviewed cases where that was

22  an issue in the case?

23  A.    Again, I must have, but I don't recall specific

24  cases.

25  Q.    And do you advertise your willingness to work as

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1    an expert witness with lawyers?

2    A.    You know, about 15 years ago when they first

3    started websites, somebody solicited my name to be put

4    on an expert website, and I gave them my name.  But no,

5    I haven't paid anybody to list my name on any website.

6    Q.    Do you have any relationships with any companies

7    that help to match lawyers with expert witnesses?

8    A.    There are some companies with whom I have signed

9    agreements that I will review cases for them.  These

10   are, you know, American Medical Consultants, EFMS, TASA.

11   So those are the names I remember.

12   Q.    How does that work?

13   A.    You know, they ask me -- they call me sometimes.

14   They say, "Would you like to review this case?"  And I

15   say "Yes" or "No," and that's it.

16            ATTORNEY AMELL:  Your Honor, at this time, I

17   would proffer Dr. Mittal as an expert witness in

18   anatomical pathology with special expertise in

19   obstetrics and gynecological pathology.

20            ATTORNEY SMITH:  Your Honor, we don't have

21   an objection to that qualification, but limited to that

22   only.

23            THE COURT:  Well, I've already made a ruling

24   with respect to others.

25            Does that alter that at all?

**K. MITTAL - DIRECT**

36

1      ATTORNEY SMITH:  I don't know what she's

2  going to ask.  I'm just saying that we don't object to

3  Dr. Mittal qualifying as an expert on anatomic

4  pathology.

5      THE COURT:  All right.  Ladies and

6  gentlemen, as I've told you previously, there are --

7  generally, witnesses cannot offer their opinions as to

8  matters, but expert opinions are an exception to that.

9  Persons who qualify by reason of experience or special

10  education may give their opinions.  But the extent to

11  which you accept those opinions as accurate or the

12  extent to which you accept the witness as an expert in

13  that field are matters left entirely to you.  Because,

14  as you know, you're the sole judges of the facts of this

15  case.  But I'm going to permit counsel to go ahead --

16  proceed now to ask Dr. Mittal questions as an expert

17  witness in his area.

18      ATTORNEY AMELL:  Thank you, your Honor.

19  BY ATTORNEY AMELL:

20  Q.   Dr. Mittal, did you write a report in this case?

21  A.   Yes.

22  Q.   What was the date of the report?

23  A.   Let me check it, actually.

24      That report was written on October 6, 2015.

25  Q.   And what have you reviewed in this case in forming

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1   your opinions?

2   A.    I reviewed the placental pathology slides as well

3   as a pathology report prepared by Dr. O'Connell and also

4   prenatal records of Christine Orwig from About Women's

5   [sic] OB/GYN, labor and delivery records from Sentara

6   Potomac Hospital, postdelivery records of Noelle Orwig

7   from Sentara Potomac Hospital, and deposition of

8   Christine Orwig.

9   Q.    Have you reviewed any other materials in this

10  case?

11  A.    Just the day before yesterday or yesterday, I

12  reviewed very quickly some of the records from Fairfax.

13  Q.    And any depositions in this case?

14  A.    I have reviewed depositions of Dr. Phillip [sic]

15  and Dr. Hermanson.

16  Q.    Do you have an opinion, to a reasonable degree of

17  medical certainty, what the glass slides demonstrate in

18  this case, just generally?

19  A.    Generally, they demonstrate acute chorioamnionitis

20  and acute funisitis.

21  Q.    Do you have an opinion whether there was any

22  findings from the umbilical cord?

23  A.    Yes.  The umbilical cord had acute inflammation,

24  which we call acute funisitis.

25  Q.    And what is the significance of the findings of

**K. MITTAL - DIRECT**

38

1  chorioamnionitis and funisitis?  What's that indicative

2  of?

3  A.     So chorioamnionitis indicates inflammation of the

4  membranes of the placenta.  Funisitis indicates

5  inflammation of the umbilical cord or infection, both of

6  which indicate presence of infection.  In terms

7  funisitis, if indicates that the fetus is not responding

8  to the infection.  The process is known as fetal

9  inflammatory response syndrome.

10           So when you have those neutrophils from the

11  fetus being activated, they release certain toxic things

12  into circulation, such as interleukin 6, which can

13  damage other tissues in the baby, so make the baby have

14  a poor prognosis in terms of possibility of fetal demise

15  or morbidity.  Also, intraventrical [sic] hemorrhages

16  and poor outcome.

17  Q.     Do you have an opinion, to a reasonable degree of

18  medical certainty, how long the chorioamnionitis was

19  present before this baby was delivered?

20  A.     The chorioamnionitis, within a reasonable degree

21  of medical certainty, was present for approximately

22  24 hours, give or take perhaps three or four hours on

23  either side.  That's my estimate.

24  Q.     What's the basis for that decision on timing?

25  A.     Would you repeat that.

**K. MITTAL - DIRECT**

39

1    **Q.**   What's the basis for your decision on timing?

2    **A.**   So chorioamnionitis progresses over time.  And

3  according to the textbooks and according to studies

4  published, people have found that it first appears just

5  as chorioamnionitis at 6 to 12 hours and then progresses

6  from mild to moderate to severe from 12 to 24 hours.

7  And by 36 hours, you get breakdown of neutrophils.  So

8  those inflammatory cells start to break down because

9  that's their lifespan.  So there's no breakdown of

10  neutrophils here.  The inflammation is severe.  So I put

11  the estimated time at 24 hours, give or take a few hours

12  on each side.

13    **Q.**   Dr. Mittal, you indicated to the jury that you

14  read the pathology report of Dr O'Connell; is that

15  correct?

16    **A.**   Yes, I did.

17         ATTORNEY AMELL:  At this time, I would move

18  into evidence Plaintiff's 28-1-41 and 42.  I understand

19  there's no objection.

20         ATTORNEY SMITH:  No objection.

21         THE COURT:  All right.  Without objection,

22  it's admitted.

23         ATTORNEY AMELL:  And I'd like to publish

24  this to the jury.

25         THE COURT:  You may do so.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1          ATTORNEY AMELL:  Thank you, your Honor.

2    BY ATTORNEY AMELL:

3    Q.    Mr. Mittal, if I could direct your attention to

4    what's on the monitor.

5          What is this document?

6    A.    This is a placental pathology report.

7    Q.    All right.  Who wrote this report?  Who made the

8    pathology diagnosis in this case?

9    A.    Dr. O'Connell.

10   Q.    And I think his name appears at the bottom of the

11   second page?

12         THE COURT:  Can you show the whole document

13   on here?  It's...

14         All right.  Thank you.

15   BY ATTORNEY AMELL:

16   Q.    I think if you go to the second page.

17         Who made the pathological diagnosis,

18   Dr. Mittal?

19   A.    Dr. Jerome T. O'Connell.

20   Q.    Sorry to do this, but going back to the first page

21   now, what was the preoperative diagnosis?

22         THE COURT:  Leave the whole -- rather than

23   focus on that, leave the whole document on there.  And

24   if we need the focus, we will ask for it.

25   BY ATTORNEY AMELL:

**K. MITTAL - DIRECT**

1    Q.    What was Dr. O'Connell's preoperative diagnosis?

2    A.    So the preoperative diagnosis is PPROM 30 weeks.

3    Q.    And as a pathologist, what does that mean to you,

4    a diagnosis of PPROM 30 weeks?

5    A.    So that means premature preterm [sic] rupture of

6    membranes, "preterm" meaning it's less than 37 weeks.

7    "Premature" means the labor has not yet started.  And

8    "rupture of membranes" means the membranes that hold the

9    fluid inside the uterus and where the baby floats, that

10    membrane has broken.  So there's a rupture of the

11    membranes.

12    Q.    And is this information given to the reviewing

13    pathologist by other healthcare providers?

14    A.    Yes.

15    Q.    What is the gross description?  What is that?

16    A.    That's just describing the placenta by looking at

17    it with just your eyes.

18    Q.    So that's not looking at it under the microscope,

19    correct?

20    A.    That is correct.

21    Q.    All right.  And you had a chance to look at the

22    glass slides, correct?

23    A.    Correct.

24    Q.    You didn't have an opportunity to look at the

25    gross specimen, correct?

**K. MITTAL - DIRECT**

1    A.    That is correct.

2    Q.    What were the findings -- strike that.

3          What specimens were sent to the pathology

4    lab?

5    A.    The placenta was sent to the pathology lab.

6    Q.    And what was that composed of?

7    A.    That's composed of placental disc with membranes

8    and umbilical cord.

9    Q.    Was the placenta of a normal weight and size from

10   your review of this report?

11   A.    Yes, the placenta was of normal weight.

12   Q.    You told the jury that you've reviewed glass

13   slides.

14         How were they made?

15   A.    So you examine the placenta.  You slice it through

16   every centimeter or so.  And then you take two

17   representative sections from the placenta.  You also

18   take sections from the umbilical cord and membrane.

19   Those sections are then embedded in paraffin wax so that

20   you can cut very thin slices of those tissues.  And

21   those thin slices are then put on glass slides and

22   stained so you can tell one cell from another cell under

23   the microscope.  So that's the procedure.

24   Q.    Looking at the end of the gross description, how

25   many glass slides were made?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - DIRECT

1    **A.**    There were four glass slides made.

2    **Q.**    And how were they labeled?

3    **A.**    They were labeled as A to D.

4    **Q.**    And what tissue was on each slide from your review

5    of these slides?

6    **A.**    So there were umbilical cord, membranes, and

7    placenta.

8    **Q.**    What procedure did you use to review the glass

9    slides?

10   **A.**    So I put them under the microscope and I looked at

11   different areas both low power, high power.  And that's

12   how I reviewed it.

13   **Q.**    Does your microscope have a magnification ability?

14   **A.**    Yes.  It has different magnifications, like four

15   times, ten times, 40 times.  And each of those are

16   multiplied by ten with the eyepiece.  So the 4X actually

17   means 40X, 40 times magnification.

18   **Q.**    And why sometimes do you use a higher versus a

19   lower magnification?

20   **A.**    So some things you can see under low power.  And

21   some things are small, and so you have to magnify it

22   even further to get an idea of what's going on.

23   **Q.**    Dr. Mittal, what are photomicrographs?

24   **A.**    So those images that you're looking at under the

25   microscope, you can take pictures of those images so we

1  can show other people what we are looking at, and those

2  are called photomicrographs.

3  Q.    Did you prepare any photomicrographs in this case?

4  A.    Yes, I did.

5  Q.    How many?

6  A.    I believe a total of 13.

7  Q.    And when did you prepare these?

8  A.    I prepared it when I was looking at the slides.

9  Q.    Why did you prepare the photomicrographs?

10 A.    So that's to prepare a record of, you know, what I

11 saw so I can, you know, share it with the jury to show

12 them what I saw.

13 Q.    Did you use the standard methodology in your field

14 of pathology when you prepared these photomicrographs?

15

16 A.    It's a simple step.  It's like taking a picture,

17 so...

18 Q.    All right.  And are these photomicrographs, are

19 they representative samplings of what you saw on these

20 glass sides?

21 A.    Yes.

22 Q.    Will these pictures aid the jury in understanding

23 your opinions in this case?

24 A.    Will you repeat that?

25 Q.    Will these photomicrographs help the jury in

**K. MITTAL - DIRECT**

1    understanding your testimony?

2    **A.**    Yes.

3            ATTORNEY AMELL:  At this time I will like to

4    move into evidence Plaintiffs' Exhibit 62, which is the

5    13th photomicrograph of Dr. Mittal, which I understand

6    is not objected to.

7            THE COURT:  All right.  Is that correct?  No

8    objection.

9            ATTORNEY SMITH:  No objection.

10            THE COURT:  All right.  They are admitted.

11    You may display them.

12            ATTORNEY AMELL:  Thank you, your Honor.

13    BY ATTORNEY AMELL:

14    **Q.**    I would like to first put up your first

15    photomicrograph, which is Exhibit 62, and it's A4XAF.

16            Dr. Mittal, what does this picture show?

17    **A.**    May I approach the monitor to indicate?

18            THE COURT:  Approach the monitor?

19            THE WITNESS:  The big screen there, so I can

20    point out.

21            THE COURT:  You can make a mark on that, and

22    they can see it.

23            THE WITNESS:  Okay.  All right.

24            ATTORNEY AMELL:  Use your finger, you can

25    touch the screen --

**K. MITTAL - DIRECT**

46

1          THE WITNESS:  I can touch it.  Okay.  All

2     right.

3          THE COURT:  By the way, ladies and

4     gentlemen, you will have with you in the jury room

5     during your deliberations all of the exhibits that I

6     admit.  What you wouldn't have are the marks that

7     Dr. Mittal might make here because those don't get

8     recorded.  Go ahead.  You may indicate on there, and you

9     may describe it for the record in some qualitative way.

10         ATTORNEY AMELL:  Thank you, your Honor.

11    BY ATTORNEY AMELL:

12    Q.    Dr. Mittal, what does this picture show?

13    A.    So this is a picture of the umbilical cord.  The

14    umbilical cord has three blood vessels.  You are looking

15    at two of them here.  And so this is the outline of one

16    blood vessel.

17    Q.    Right.

18    A.    Here is the lumen, and this is the outside of

19    another blood vessel, and that's the lumen.  And as you

20    can see there are all these little blue dots -- yeah,

21    these little dots in this area, anyway, all this area

22    where there it's pink, in the pink area you can see

23    little blue dots.

24         Those blue dots are cells of information.

25    They are called neutrophils, and I'll show to you later

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

47

1    at a higher magnification so you can appreciate them

2    better.  But this is a low-power, just to show you that

3    the cells are there, and they are in the vessel wall and

4    in the surrounding tissue.  The surrounding tissue is

5    called Wharton's jelly.  It's just a name for that

6    tissue.

7    Q.    The Wharton's jelly, what type of substance is

8    that?

9    A.    It's connective tissue.  It's supports the blood

10   vessels.

11   Q.    It supports the blood vessel in the umbilical

12   cord?

13   A.    Yes.

14   Q.    And the neutrophils, which you said are the blue

15   dots that you're seeing --

16   A.    Right.

17   Q.    -- that's indicative of what?

18   A.    That's indicative of acute inflammation of the

19   umbilical cord.  I would recall acute appendicitis.

20   Q.    Is that the same thing as infection --

21   A.    Yes.

22   Q.    When you're saying you treated.

23   A.    Yes.

24   Q.    You said earlier generally what a neutrophil is.

25   Why does the body create neutrophils in response to an

# K. MITTAL - DIRECT

48

1    infection?

2    A.    So neutrophils are there to fight infection.  They

3    have things which are like acid.  They can release those

4    things into the surrounding area so the bacteria can be

5    digested.  And they also pick up the bacteria so they

6    can be digested as will.

7    Q.    Why do neutrophils produce inflammation?

8    A.    Because they are releasing all these chemicals

9    into the surrounding tissue, so that's the inflammation.

10   Q.    You testified earlier about the findings of

11   funisitis in the umbilical cord.  What is the funisitis

12   that we are seeing here?

13   A.    So funisitis is indicated of infection where the

14   fetus is responding to infection.

15   Q.    Do you have an opinion to a reasonable degree of

16   medical certainty regarding the severity of the

17   funisitis in the umbilical cord?

18   A.    I would say it's fairly advanced.  It starts in

19   the blood vessels, and then it goes out into surrounding

20   tissue, so it's all over in the surrounding tissue.

21   Q.    Would you consider this to be a subtle or a severe

22   finding?

23   A.    I would say this is an obvious finding.

24   Q.    What is the significance of the presence of the

25   funisitis in the umbilical cord?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

49

1    A.    So funisitis indicates presence of infection to

2    which the fetus is responding.

3    Q.    If I can next direct you to the next picture,

4    photomicrograph, and this is designated A 10A X.

5         Dr. Mittal, what does this picture show?

6    A.    This is a high magnification of the previous

7    picture I showed.  And now you can make out those little

8    blue dots more clearly in the surrounding issue and in

9    the vessel wall.  Those little dots are neutrophils, and

10   they indicate response of fetus to the infection.

11   Q.    If I can show you the next picture that is marked

12   for identification C 4X F1B THR.  What does this picture

13   show, Dr. Mittal?

14   A.    So this is a section of the placenta.  These

15   little things here are called chorionic villi.  The

16   maternal blood goes around these villi, and the fetal

17   blood is inside the villi, and that's how the fetus gets

18   its nutrition and oxygen because the two blood vessels

19   are next to each other and therefore they can pick up

20   nutrients, oxygen and things like that.

21        In this area here, there is fibrin, which is

22   called fibrin thrombus.  This is a focal finding.  It

23   involves less than 5 percent of the walling of the

24   placenta.  Placenta has about 20 percent reserve, so

25   because it's a small finding it would not interfere with

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - DIRECT

1  the normal functioning of the placenta because the

2  placenta has a certain reserve in it.

3  Q.    What is a fibrin thrombus in layman terms?

4  A.    Fibrin is a protein that one uses in clotting of

5  the blood, and thrombus is just collection of that

6  protein.

7  Q.    What is the significance, if any, of this finding

8  with regard to functioning of the placenta?

9  A.    When there is such a small area, it has no

10  significance.

11  Q.    If I can refer you to the next picture, which is

12  marked B 10X VILLI.  What does this picture show,

13  Dr. Mittal?

14  A.    This shows the general appearance of the placenta

15  in this case.  You can see are the villi are these

16  little round structures.  They look normal in terms of,

17  you know, they have blood vessels in them.  They're of

18  normal size.  There is no inflammation there.  There is

19  no fibrosis.  The surrounding blood spaces are open, so

20  there is good maternal flow, blood flow.  Good fetal

21  blood flow here, so the placenta overall is good in

22  appearance, enough to supply the baby with what it needs

23  to grow and survive.

24  Q.    If I can refer you the next photograph, marked

25  D 10 -- sorry, C 4X FVE.

**K. MITTAL - DIRECT**

1    **A.**    So this is another placenta.  There you can see

2    that some of the villi are somewhat larger, and this

3    indicates presence of villous edema.  Edema is fluid, so

4    there is collection of some fluid in these villi.  This

5    is a common finding in prematures with chorioamnionitis.

6    It is believed that the infection causes release of

7    chemicals which make these blood vessels in these villi

8    leaky, so the fluid kind of out leaks out of those

9    vessels there.

10    **Q.**    If I could show you the next --

11    **A.**    This again is a focal finding.

12    **Q.**    A focal finding?

13    **A.**    Yes.

14    **Q.**    The next photomicrograph is labeled 10 C10X

15    ACCAMN.  First of all, what magnification is this?

16    **A.**    This is 10X magnification of the objective, and

17    combined with the 10X.  The combined magnification a

18    hundred times.

19    **Q.**    What is this photograph showing?

20    **A.**    This is a section of the placenta.  The membranes

21    not only go around the space they also cover the

22    placenta itself.  This part of the membrane shows

23    infestation by the same little blue dots that we saw

24    earlier in the umbilical cord.

25              So this is the membrane here, this part, it

**K. MITTAL - DIRECT**

1    goes around like that.  And within this membrane you see

2    all those blue dots.  Those are neutrophils.  It

3    indicates infection, which is severe in this case, with

4    lots of neutrophils, and it involves both the chorion,

5    which is this part here, and the amnion, which is this

6    part here.

7    Q.    What is the significance of the fact that the

8    infection involves the full thickness of the chorion and

9    the amnion?

10    A.    It indicates it has been present for longer than

11    12 hours.

12    Q.    If I could next refer you to the photograph

13    labeled A 4X AAF.  What does this show?

14    A.    So this is a high magnification of the

15    neutrophils.  It's showing here what you originally saw

16    as little blue dots.  Now you can see that they have

17    this blue material inside and pink material side.  And

18    so the blue is the nucleus, and the pink is the

19    cytoplasm.  You can identify them as neutrophils because

20    the nuclei are kind of segmented.  They are not perfect

21    rounds, but they have kind of lobs to them.  So it just

22    shows a close-up view to identify these cells as

23    neutrophils.

24    Q.    Is this additional evidence of infection?

25    A.    Yes.

**K. MITTAL - DIRECT**

1    Q.    If I could refer you to the next picture labeled

2    C 20X AC CAMN.

3             What does this photomicrograph show?

4    A.    So this is high magnification of the membrane I

5    showed you previously showing somewhat better those

6    little blue dots which are the neutrophils within these

7    membranes, again showing severe, acute chorioamnionitis.

8    Q.    This is the same picture we saw earlier just at a

9    higher magnification?

10   A.    That is correct.

11   Q.    If I can next show you D 40X AC COAM.  What does

12   this picture show?

13   A.    So this is it again even higher magnification of

14   the same picture we saw earlier of the membranes, again

15   showing these little blue dots in here which are the

16   neutrophils within the memorandum showing acute

17   chorioamnionitis and evidence of infection.

18   Q.    And is this picture showing the neutrophils within

19   both within the chorion and the amnion?

20   A.    That is correct.

21   Q.    If you could show for the jury, where is the

22   chorion and where's the amnion?

23   A.    This part here is the chorion, and this part here

24   is the amnion.

25   Q.    If I could next show you what's labeled

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

54

1    B 20X BAC CHAMNIO.  What does this photograph depict?

2    **A.**    Again, a section of the membranes showing the

3    chorionitis and amnionitis, and chorioamnionitis,

4    indicating infection.

5    **Q.**    And then just very briefly I'll show you B 40X

6    BAC CHAM.

7    **A.**    This is high magnification of the fetus image

8    showing acute chorioamnionitis.

9    **Q.**    And then lastly, image D 4X ACCOAM.  What does

10    this picture show?

11    **A.**    This again shows membranes from slide D with acute

12    chorioamnionitis.  These are the membranes here, and

13    there is severe acute chorioamnionitis, indicating

14    infection.

15    **Q.**    At this time if I could direct your attention back

16    to the pathology report that is already in evidence and

17    specifically to the second page of the report, the

18    impression.  Do you agree with Dr. O'Connell's

19    impression?

20    **A.**    I agree, but I have some additions to that.

21                ATTORNEY AMELL:  Could we make that

22    impression just a bit larger, if that is all right, your

23    Honor.

24                THE COURT:  Yes.

25                ATTORNEY AMELL:  Thank you.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

1    BY ATTORNEY AMELL:

2    **Q.**    You said you had some additional findings to make.

3    What additional findings would you make?

4    **A.**    So I found acute inflammation and acute infection

5    indication in the umbilical cord, and I found some small

6    changes in the placenta, which are not significant.  I

7    also characterized this acute chorionitis as severe,

8    rather than just nondescript.

9              THE COURT:  Would you repeat what you just

10   said, please, Dr. Mittal.  Repeat what you just said.

11             THE WITNESS:  So, umbilical cord showed in

12   addition -- is that better -- shows acute inflammation,

13   indicating acute infection.  And in addition the acute

14   chorioamnionitis is severe in degree, and there are

15   other minor changes in the placenta.

16   BY ATTORNEY AMELL:

17   **Q.**    So essentially you agree with Dr. O'Connell's

18   finding of acute chorioamnionitis?

19   **A.**    I do.

20   **Q.**    You just add the qualifier severe?

21   **A.**    Right.

22   **Q.**    What's your basis for saying that this was severe

23   acute chorioamnionitis?

24   **A.**    This is based on the number of neutrophils

25   present.  There are a very large number of neutrophils

1    there.

2    **Q.**   Do you have an opinion to a reasonable degree of

3    medical certainty whether the presence of the funisitis

4    of the umbilical cord infection has any clinical

5    correlation based on your review of the records?

6              ATTORNEY SMITH:  Objection, your Honor.  I

7    believe this is outside of this witness's expertise.  He

8    has been qualified as a pathologist.

9              ATTORNEY AMELL:  I can respond, your Honor,

10   if you would like me to.

11             THE COURT:  Come to the bench.

12             (Sidebar).

13             THE COURT:  Read me the question please,

14   Mr. Rodriquez.

15             (Question read.)

16             ATTORNEY AMELL:  Has any clinical

17   correlation based on his additional review of the

18   records.

19             THE COURT:  All right.  And the objection is

20   that that's beyond his expertise as a pathologist.

21   What's your response?

22             ATTORNEY AMELL:  My response, your Honor, is

23   that I qualified Dr. Mittal as pathologist who regularly

24   and routinely in 10 percent of the cases that he makes

25   diagnoses where there is verification of clinical

**K. MITTAL - DIRECT**

1    records.  He says that in complex cases that is a normal

2    part of his routine, and so that is why I think this is

3    well within his expertise.

4                  THE COURT:  What do you expect him to say in

5    response to your question?

6                  ATTORNEY AMELL:  He will say that this means

7    that there is more likely to be fetal damage when

8    funisitis is present because this -- this is a very

9    serious finding and associated with chorioamnionitis.

10   And he said this in his deposition, so it's not a

11   surprise.  It's not a new opinion.

12                 THE COURT:  All right.  For the defendant.

13                 ATTORNEY SMITH:  I actually thought she was

14   going to elicit something else or she was seeking to

15   elicit something else which I won't object to.

16                 THE COURT:  Just a moment.

17                 ATTORNEY SMITH:  I thought you were talking

18   about clinical correlation.

19                 THE COURT:  Just a moment, please.  Whether

20   you want to disclose what that other matter is or not is

21   entirely up to you.  But I think what you have just said

22   and what counsel just said is what she has indicated her

23   intention to do is not something you were objecting to.

24                 I don't want to have another bench

25   conference in 30 seconds.  On the other hand, I don't

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - DIRECT

1    want you to feel that you have to reveal what you may be

2    concerned about because that may -- so I will have

3    another bench conference if it's needed.

4                ATTORNEY SMITH:  Jurors then I won't make

5    the objection.  It has been asked and answered.

6                THE COURT:  All right.  I'll overrule that.

7    All right.  Let's proceed.

8                (End of sidebar.

9                THE COURT:  All right.  You may proceed.

10               ATTORNEY AMELL:  Would you prefer that I

11   restate the question?

12               THE COURT:  Yes.

13               ATTORNEY AMELL:  Thank you, your Honor.

14   BY ATTORNEY AMELL:

15   Q.    Dr. Mittal, do you have an opinion to a reasonable

16   degree of medical certainty whether the presence of

17   funisitis, which is the infection of the umbilical cord,

18   has any clinical correlation based on your review of the

19   glass slides and the medical records?

20   A.    The patient had a diagnosis of acute

21   chorioamnionitis, and what I find here is acute

22   chorioamnionitis, so there is a correlation.

23   Q.    And what's -- do you have an opinion as to whether

24   or not there are is a clinical correlation with the

25   findings of both funisitis and chorioamnionitis?

**K. MITTAL - DIRECT**

1    **A.**    Yes.  They are associated with poor outcome for

2    the baby in terms of, you know, you can have fetal

3    demise.  You can have fetal tissue damage.  You can

4    have --

5              ATTORNEY SMITH:  Your Honor, this is outside

6    of his area of expertise.  And he is stating it not

7    to -- he said it's not to medical probability.

8              THE COURT:  Well, I'll overrule that second

9    objection.  And I thought the first one we had dealt

10   with.  This isn't the new one, is it?  So I'll overrule

11   that.  He may continue.  Of course you may cross-examine

12   on these other issues.

13             Go ahead.

14             ATTORNEY AMELL:  Thank you.

15             THE COURT:  Did you finish your answer,

16   Dr. Mittal?  Do you want the read rephrased or restated.

17             THE WITNESS:  No, I think I pretty finished.

18   So acute funisitis, acute chorioamnionitis in a

19   premature infant is associated with, you know, fetal

20   morbidity, and that happened in this case.

21   BY ATTORNEY AMELL:

22   **Q.**    What does fetal morbidity mean?

23   **A.**    So it means the fetus -- when the baby is born the

24   baby has low ab scores and doesn't do well, can have

25   brain damage, can have ventricular hemorrhages, can have

**K. MITTAL - DIRECT**

60

1    disfunction of difference organs.

2    Q.    Do you have an opinion to a reasonable degree of

3    medical certainty whether the funisitis and the

4    chorioamnionitis developed at the same time or at

5    different times, or does it matter?

6    A.    I couldn't be sure.  There could be same time or

7    different time.

8    Q.    Is that significant to you either way in your

9    opinions?

10   A.    No.

11   Q.    You've testified earlier that in your opinion the

12   chorio was present about 24 hours before Noelle was

13   born.  Could you explain whether or not in your opinion

14   this chorioamnionitis could have been present for longer

15   than 36 hours?

16           ATTORNEY SMITH:  Objection, your Honor.  She

17   is asking the question of an expert to less than a

18   reasonable degree of medical of probability, and that is

19   aren't permissible.

20           THE COURT:  All right.  Well.  Come to the

21   bench again.

22           I am going to take a recess in a few minutes

23   not having to do with the case but having to do with me.

24   Just as you have the privilege of calling one I'm going

25   to do one in just a moment here.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1            Come to the bench quickly.

2            (Side bar).

3            THE COURT:  Before I ask you to repeat your

4      question, how much more in your direct?

5            ATTORNEY AMELL:  Not much at all.  I think I

6      will be done in maybe 15 minutes.

7            THE COURT:  All right.  I may have to take a

8      recess.  It has nothing to do with you all.

9            ATTORNEY AMELL:  Okay.

10            THE COURT:  Now, tell me the question you

11      asked.

12            ATTORNEY AMELL:  I was asking him whether or

13      not he had an opinion whether the chorioamnionitis could

14      have been present for greater than 36 hours.

15            THE COURT:  And the objection.

16            ATTORNEY SMITH:  She is asking a question

17      inherently in the question is something less than a

18      reasonable degree of medical probability.  He has

19      already testified in his opinion to reasonable degree of

20      medical probability it was there for approximately

21      24 hours.  Now she is trying to push it back farther

22      only to a degree of possibility, which is not

23      permissible under Virginia --

24            ATTORNEY AMELL:  Actually, I'm not.  I'm

25      trying to --

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

-285-

**K. MITTAL - DIRECT**

1      THE COURT:  Read me the question that you

2  intend to ask him.

3      ATTORNEY AMELL:  Okay.  Do have you an

4  opinion to a reasonable degree of medical certainty

5  whether the chorioamnionitis was present -- I will

6  rephrase it -- was present for greater than 36 years.

7  He's already said that generally, but I want the jury to

8  understand why it couldn't have been present that long

9  because the findings of necrotizing cells in the tissue

10  which are not present, therefore he knows it was less

11  than 36 hours.

12      ATTORNEY SMITH:  Isn't -- she just said that

13  it's been asked and answered.

14      ATTORNEY AMELL:  No, he never --

15      THE COURT:  No, I don't think that's the

16  case, but given what the expected answer is, it seems to

17  me consistent with your objection.  He is not going to

18  say that it lasted or that it existed 36 hours.  He's

19  going to say that it didn't.

20      ATTORNEY SMITH:  Correct.  I believe that

21  the phrasing of her question was...

22      THE COURT:  Yes.  You may be right --

23      ATTORNEY AMELL:  You may be right.

24      THE COURT:  -- but she is changing that.

25      ATTORNEY SMITH:  All right.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

63

```
1            THE COURT:  Let's, proceed.

2            (End of sidebar).

3            THE COURT:  All right.  You may proceed.

4            ATTORNEY AMELL:  Thank you, your Honor.

5            THE COURT:  I think I will take recess at

6    the end of your direct testimony, which I expect you to

7    expediter.

8            ATTORNEY AMELL:  I will, your Honor.

9    BY ATTORNEY AMELL:

10   Q.    Dr. Mittal, do you have an opinion to a reasonable

11   degree of medical certainty whether the chorioamnionitis

12   and funisitis was present for greater than 36 hours in

13   this case?

14   A.    No, it wasn't present for longer than 36 hours.

15   Q.    And why not?

16   A.    Because by that time I expect to see breakdown on

17   neutrophils.

18   Q.    And what is the process that involves a breakdown

19   of neutrophils called?

20   A.    It's called necrosis or apoptosis, cell death.

21           THE COURT:  Would you speak up a bit,

22   please.

23           THE WITNESS:  Necrosis, apoptosis or cell

24   death.

25   BY ATTORNEY AMELL:
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - DIRECT**

64

1    **Q.**   And that was not present?

2    **A.**   That was not present.

3    **Q.**   Do you have an opinion to a reasonable degree of

4    medical certainty whether the chorioamnionitis and

5    funisitis was present for less than 12 hours?

6    **A.**   No.  It wasn't less than 12 hours because the

7    degree is severe, and that wouldn't happen, you know,

8    within 12 hours.

9    **Q.**   If the infection had been present for 12 hours or

10   less, what would have been seen on the glass slides?

11   **A.**   You would see chorioamnionitis, acute

12   chorioamnionitis, and perhaps very early amnionitis.

13   **Q.**   But you would not see the diagnosis in this case?

14   **A.**   Correct.

15        THE COURT:  I don't want truncate your

16   examination, so if you don't -- I am prepared to take a

17   recess now, if that would be useful.

18        ATTORNEY AMELL:  I was trying to get rid of

19   questions to shorten it, but...

20        THE COURT:  Well, that still might be useful

21   to you, but I don't want the fact that I need a recess

22   to truncate your examination.  There may be other good

23   reasons to do it, but that -- my needing a recess is not

24   one of them.

25        Dr. Mittal, you may step down, sir.  Now,

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

-288-

**K. MITTAL - DIRECT**

65

1    during this recess you may not discuss your testimony

2    with anyone, with the lawyers or with anyone because

3    technically you are still on the stand.  You may step

4    down, sir.

5            THE WITNESS:  Yes, sir.

6            THE COURT:  I hadn't plan to take one this

7    early but I need to accommodate myself.  Pass your books

8    to the right.  Court security officer, Mr. Williams,

9    will collect them, maintain their security.

10           Have we put soft drinks back them for them

11   yet?

12           THE MARSHAL:  They are back there.

13           THE COURT:  They are back there, good.  So

14   you may have soft drinks.  And remember to refrain from

15   discussing the matter among yourselves or with anyone or

16   undertaking any investigation on your own.  And it is

17   10:25, so we will reconvene at quarter to 11:00, and

18   then I plan to go to about 12:30.  You may follow the

19   court security officer out.

20           (Jury excused at 10:25 a.m.)

21           THE COURT:  Court stands in recess.

22           (Court recessed at 10:25 a.m.)

23           (Court called to order at 10:47 a.m.)

24           THE COURT:  You may bring the jury in.

25           And Mr. Mittal, you may resume the stand,

**K. MITTAL - DIRECT**

1    please.

2              (Witness resumed stand.)

3              THE COURT:  All right.  You may be seated.

4              Does everyone have a pencil?

5              (Jurors indicating.)

6              THE COURT:  All right.

7              You may proceed.

8              ATTORNEY AMELL:  Thank you, your Honor.

9              THE COURT:  And Dr. Mittal, if you need a

10   glass of water or anything, just ask for it and we will

11   provide it.

12             THE WITNESS:  Thank you.

13             THEREUPON, KHUSHBAKHAT MITTAL, previously

14   sworn, was examined and testified further as follows:

15             DIRECT EXAMINATION (Continued)

16   BY MS. AMELL:

17   Q.    Dr. Mittal, are all the pathological findings from

18   the placenta, the membranes and the umbilical cord, are

19   they all tissues taken from Christine Orwig?

20   A.    Yes.

21   Q.    Do you have a copy of your report in front of you?

22   A.    Yes.

23   Q.    You said you wrote the report back in October

24   2015?

25   A.    I wrote this report on October 6th --

**K. MITTAL - DIRECT**

67

```
 1                    THE COURT:  Speak up if you would, please.
 2                    THE WITNESS:  I wrote this report on
 3     October 6, 2015.
 4     BY ATTORNEY AMELL:
 5     Q.    If I could refer you to page two of your report,
 6     to the second-to-the-last paragraph of your report --
 7     A.    Yes.
 8     Q.    -- that begins, "The diagnosis..."
 9     A.    Yes.
10     Q.    I would like to ask you if you have an opinion to
11     a reasonable degree of medical certainty whether your
12     findings of acute chorioamnionitis -- I should say acute
13     severe chorioamnionitis are consistent with the clinical
14     findings in Mrs. Orwig.
15                    ATTORNEY SMITH:  Your Honor, this re-raises
16     the objection that we broached briefly at the bench.  I
17     believe this is outside of this witness's expertise,
18     regardless of whether it's in his report.
19                    ATTORNEY AMELL:  I thought your Honor had
20     already ruled on this.
21                    THE COURT:  Is this something covered in a
22     deposition?
23                    ATTORNEY AMELL:  Yes.  And it's in his
24     report.
25                    ATTORNEY SMITH:  I don't think he is
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - DIRECT

68

1    qualified as a pathologist to render this opinion.

2             THE COURT:  All right.  Come to the bench.

3    I will hear you very quickly on this.

4             (Sidebar conference held as follows:)

5             THE COURT:  Tell me again the question.

6             ATTORNEY AMELL:  Does he have an opinion to

7    a reasonable degree of medical certainty whether his

8    findings of acute severe chorioamnionitis are consistent

9    with the clinical findings from the medical records.

10            THE COURT:  Now, by "clinical findings" you

11   mean findings of -- for her and for the baby.

12            ATTORNEY AMELL:  Clinical findings of

13   chorio, correct.

14            THE COURT:  Now, was this in his report or

15   deposition?

16            ATTORNEY AMELL:  It was in his report and he

17   was deposed after the defendants had received this

18   report, and they questioned him about his report.  So

19   this is not a surprise.

20            And he testified, again, that he reviews

21   records to make diagnoses in ten percent of his complex

22   cases.

23            THE COURT:  All right.  Now, the objection

24   is that as a pathologist, he isn't qualified to give an

25   opinion as to whether what he found was consistent with

1    the clinical findings.

2          ATTORNEY AMELL:  And that's why I qualified

3    him as having special expertise in obstetrics and

4    gynecological pathology.

5          Because he talked about the process he uses

6    in that field to make diagnoses in complex obstetrical

7    cases, where he looks at the medical records, he

8    considers the clinical findings to make diagnosis in

9    pathology.

10         THE COURT:  All right.

11         ATTORNEY SMITH:  Your Honor, I think what

12    the question is designed to do -- my objection to the

13    question -- it isn't a surprise; yes, it's in his

14    report.  I think it is design to elicit, without

15    labeling it as such, a standard of care opinion that

16    Mrs. Orwig had the clinical symptoms that would meet the

17    diagnosis of clinical chorioamnionitis.

18         He is not an expert on diagnosing clinical

19    chorioamnionitis.  He hasn't been qualified as that.  He

20    is qualified as a pathologist, and I think this is a

21    back-door standard of care to get in his opinion.

22         THE COURT:  All right.  I understand your

23    objection.  I don't think it is that.  In any event, on

24    cross-examination you simply can say:  You are not an

25    expert, are you, in the diagnosis of chorioamnionitis?

1          But I am going to overrule the objection,

2     permit you to ask and elicit that answer.  I think he --

3     he was qualified to give the answer to this.

4          And I don't see it as a back-door standard

5     of care.  However, you can close that door by a simple

6     question.

7          ATTORNEY SMITH:  Yes, sir.

8          THE COURT:  Let's proceed.

9          (End of sidebar conference, open court as

10     follows:)

11          THE COURT:  All right.  I overrule the

12     objection.

13          You may restate the question and Dr. Mittal

14     may answer it.

15     BY ATTORNEY AMELL:

16     Q.    Dr. Mittal, do you have an opinion to a reasonable

17     degree of medical certainty whether your diagnosis of

18     acute severe chorioamnionitis and funisitis was

19     consistent with the clinical findings from Mrs. Orwig's

20     medical records?

21     A.    Yes.  My findings of acute chorioamnionitis is

22     consistent with clinical findings in her chart -- in the

23     chart.

24     Q.    What were those clinical findings, as you

25     enumerated at the bottom of page two of your report?

# K. MITTAL - CROSS

1    A.    Well, those were elevated white cell count, with

2    the left shift, fetal tachycardia, and foul-smelling

3    amniotic fluid.

4    Q.    Dr. Mittal, have all of your conclusions and

5    opinions been rendered to a reasonable degree of medical

6    certainty?

7    A.    Yes, they are.

8              ATTORNEY AMELL:  That's all that I have.

9    Thank you.

10              THE COURT:  All right.  Cross-examination.

11                   CROSS-EXAMINATION

12    BY ATTORNEY SMITH:

13    Q.    Good morning, Dr. Mittal.

14    A.    Good morning.

15    Q.    We met when I took your deposition.

16              You were asked were some of the medical

17    legal work you do, for example, testifying as an expert.

18    You have done that somewhere in the range of 100 to 150

19    times, correct?

20    A.    I would think so, although I don't have the exact

21    number.  Approximately, yes.

22    Q.    That's a fair range?

23    A.    Yes.

24    Q.    And in the last five years you have averaged about

25    $30- to $40,000 of annual income from your work as an

## K. MITTAL - CROSS

1   expert witness for lawyers, correct?

2   **A.**   Correct.

3   **Q.**   Dr. Mittal, you are a pathologist, correct?

4   **A.**   Correct.

5   **Q.**   You look at human tissue under -- on slides under

6   a microscope?

7   **A.**   Correct.

8   **Q.**   You are not, what is referred to in medicine, a

9   clinician?

10  **A.**   That is correct.

11  **Q.**   You do not manage patients, correct?

12  **A.**   No, I don't.

13  **Q.**   You have never medically managed a patient with

14  premature rupture of membranes, correct?

15  **A.**   I don't know.  It was a long time when I did

16  internship.  You know, we did go to OB rounds.  But as

17  for the last 25 years I am a pathologist, so I wouldn't

18  be managing patients.

19  **Q.**   Your internship was when, Dr. Mittal?

20  **A.**   Maybe 30 years ago.

21  **Q.**   So 30 years ago you might have been involved with

22  a patient --

23  **A.**   Right.

24  **Q.**   -- with premature of membranes; is that what

25  you're telling us?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - CROSS

1  A.    Right.

2  Q.    You are not qualified to render opinions on the

3  standard of care for an obstetrician; isn't that right?

4          ATTORNEY AMELL:  Objection, your Honor.

5  Beyond the scope.

6          THE COURT:  I'll overrule it.

7          THE WITNESS:  No; neither have I claimed to

8  have that.

9          ATTORNEY SMITH:  I'm sorry?

10          THE WITNESS:  I have no claimed to have

11  that.

12  BY ATTORNEY SMITH:

13  Q.    As part of your practice as a pathologist, you do

14  not, in realtime, review fetal heart tracings, do you?

15  A.    No.

16  Q.    What was the last time you did that, Dr. Mittal,

17  looked at fetal heart tracings?

18  A.    Not ever.

19  Q.    You have never looked at fetal heart tracings?

20  A.    Not that I recall.

21  Q.    You are not qualified to render opinions on fetal

22  heart tracings, correct?

23  A.    Neither have I ever claimed to have that

24  expertise.

25  Q.    Well, a few minutes ago you mentioned that there

**K. MITTAL - CROSS**

1    were clinical signs of fetal tachycardia.  That's based

2    on fetal heart tracings, correct?

3    **A.**    Correct.  But I wasn't look at the tracings.  I

4    was --

5    **Q.**    Okay.

6    **A.**    -- looking at the notation in the chart --

7              THE COURT:  Let him finish the question

8    (sic).

9              THE WITNESS:  There is a notation in the

10   chart of fetal tachycardia.

11   BY ATTORNEY SMITH:

12   **Q.**    But you didn't base your opinion on the actual

13   tracings, correct?

14   **A.**    Correct.

15             THE COURT:  What did you base the opinion

16   on?

17             THE WITNESS:  On the statement in the chart

18   that there is fetal tachycardia.

19             THE COURT:  Next question.

20   BY ATTORNEY SMITH:

21   **Q.**    Do you know what the baby's heart rate was at

22   2:30 p.m. on October 13, 2011?

23   **A.**    No, I don't recall the exact numbers.

24   **Q.**    Did you look at the fetal heart tracings for

25   Noelle at 2:30 p.m. on October 13th, 2011?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - CROSS**

1    **A.**    No.

2    **Q.**    Dr. Mittal, you are not qualified to render

3    opinions on radiology images, things like x-rays, CAT

4    scans, MRIs; is that correct?

5    **A.**    That is correct.

6    **Q.**    You are not an expert in radiology, are you?

7    **A.**    Neither have I ever claimed to be one.

8    **Q.**    You are not an expert in something called

9    neuroradiology, meaning radiology focused on the brain

10   and spine; is that correct?

11   **A.**    That is correct.

12   **Q.**    And, therefore, you are also not an expert in the

13   field of pediatric neuroradiology.

14   **A.**    Correct.

15   **Q.**    You don't treat babies in a nursery or a NICU, do

16   you?

17   **A.**    No.  I am a pathologist.  I look --

18   **Q.**    Right.

19   **A.**    -- at glass slides.

20   **Q.**    You testified on direct examination about neonatal

21   morbidity as a result of chorioamnionitis, correct?

22   **A.**    That is what is published in the literature.

23   **Q.**    Okay.  You didn't bring the literature today, did

24   you?

25   **A.**    No.  But I can make it available to you, if you

**K. MITTAL - CROSS**

1    need it.

2    **Q.**    Okay.  You are not an expert in the field of

3    neonatology, are you?

4                THE COURT:  Asked and answered.  Next

5    question.

6    BY ATTORNEY SMITH:

7    **Q.**    You are not an expert in the field of pediatrics,

8    correct?

9    **A.**    No.

10    **Q.**    You don't treat babies or kids, right?

11    **A.**    Correct.

12    **Q.**    Dr. Mittal, you, as a pathologist who reviews

13    slides under a microscope, do not see or treat or

14    evaluate patients at the bedside; is that correct?

15    **A.**    That is correct.

16    **Q.**    That includes both mothers, pregnant women and

17    their babies, correct?

18    **A.**    That is correct.

19    **Q.**    The last time you did anything like that in terms

20    of treating a patient at the bedside was a long, long

21    time ago, correct?

22    **A.**    Correct.

23    **Q.**    You talked about, just a few minutes ago at the

24    end of Ms. Amell's questioning, the diagnosis of acute

25    chorioamnionitis was consistent with the clinical

# K. MITTAL - CROSS

1  findings in this case.  Do you remember that?

2  A.   Yes.

3  Q.   But, Dr. Mittal, you have not made a clinical

4  diagnosis of chorioamnionitis in at least 30 years,

5  correct?

6  A.   That is correct.

7  Q.   All right.  And just so we are clear, clinical

8  chorioamnionitis is different than histologic or

9  pathologic chorioamnionitis, correct?

10  A.   No.  Because the same entity -- the clinician is

11  looking at the same entity and the pathologist is

12  looking at the same entity, but we are looking from

13  different perspectives.  They are looking at the patient

14  and I am looking at the placenta.  But it's the same

15  entity.

16  Q.   You are looking at the same entity at very

17  different times, correct?

18  A.   At different times, yes.

19  Q.   So when you, as the pathologist, are looking at

20  the placenta on the slide under the microscope, you are

21  doing that after the baby has been born, correct?

22  A.   That's correct.

23  Q.   It can be days after the baby has been born,

24  correct?

25  A.   Correct.

# K. MITTAL - CROSS

1    Q.    Okay.

2            So you say it's the same entity, but you

3    agree, do you not, with the statement that a pathologic

4    diagnosis of chorioamnionitis, which you made in this

5    case -- correct? -- does not always correspond to a

6    clinical diagnosis of chorioamnionitis?

7    A.    That is correct.  But in this case it does.

8    Q.    It does not always correspond.

9    A.    No, it doesn't always.

10   Q.    An obstetrician's clinical diagnosis made at the

11   bedside of the pregnant mother is made before the

12   placental tissue is sent to the pathologist for review,

13   correct?

14   A.    Correct.

15   Q.    The bedside obstetric clinician does not have the

16   realtime benefit of knowing the pathologic diagnosis

17   made after the baby is born, correct?

18   A.    That is correct.

19   Q.    So in other words, Dr. Mittal, in general, as a

20   general statement, a patient may not meet the diagnostic

21   criteria for an obstetrician to make a clinical

22   diagnosis of chorioamnionitis, but she may in the end

23   have a pathologic diagnosis of chorioamnionitis.

24            ATTORNEY AMELL:  Objection, beyond the

25   scope.

# K. MITTAL - CROSS

1          THE COURT:  I'll overrule it.

2          You may answer.

3          THE WITNESS:  In general, yes.

4          (Pause.)

5          THE COURT:  Next question.

6          ATTORNEY SMITH:  Yes, sir.

7    BY ATTORNEY SMITH:

8    Q.    You testified that the -- in your opinion, the

9    infection that was present and visible on the pathology

10   slides had been there for about 24 hours, right?

11   A.    Yes.

12   Q.    You were clear, it had been there pathologically

13   for about 24 hours, correct?

14   A.    I would say 24 hours.  I mean, that's what I am

15   saying, pathologically or otherwise.

16   Q.    Excuse me?

17          THE COURT:  He said --

18          THE WITNESS:  Twenty-four hours --

19          THE COURT:  -- pathologically --

20          THE WITNESS:  -- is twenty-four hours.

21          THE COURT:  -- or otherwise.

22          ATTORNEY SMITH:  Okay.

23   BY ATTORNEY SMITH:

24   Q.    You do not know when Mrs. Orwig first demonstrated

25   any clinical sign or symptom of chorioamnionitis, do

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - CROSS**

1    you?

2    A.    Well, she had, you know, fetal tachycardia and --

3    Q.    When?

4    A.    I believe around 2:30, around that are time.

5    Q.    But you didn't look at the fetal heart tracings.

6    A.    Correct.

7    Q.    You didn't verify that.

8    A.    I just looked at the notes.

9    Q.    Okay.

10           Did you ever see, in the medical record for

11   Mrs. Orwig, any notation that she had a temperature of

12   greater than 100.4?

13   A.    No, I didn't.

14   Q.    Did you even consider, in your analysis in this

15   case, the maternal temperature?

16   A.    Yes.

17   Q.    You considered it, why?

18   A.    That's one of the features of chorioamnionitis.

19   Q.    You didn't mention that.

20           Do you know whether obstetricians consider

21   maternal temperature to be a hallmark sign --

22           THE COURT:  Let me --

23   BY ATTORNEY SMITH:

24   Q.    -- of clinical chorioamnionitis?

25           THE COURT:  Just a moment.

**K. MITTAL - CROSS**

1      Your comment, "You didn't mention that," is

2  stricken --

3      ATTORNEY SMITH:  Yes, sir.

4      THE COURT:  -- your comment on the

5  testimony.  You have to avoid that.

6      ATTORNEY SMITH:  I'm sorry.

7      THE COURT:  Next question.

8  BY ATTORNEY SMITH:

9  Q.    Are you aware that obstetricians consider maternal

10 temperature to be a hallmark clinical sign in making the

11 diagnosis of chorioamnionitis?

12 A.    I am not aware of what criteria they use to

13 diagnose chorioamnionitis.

14 Q.    You don't know what criteria obstetricians use to

15 make a clinical diagnosis of chorioamnionitis?

16     ATTORNEY AMELL:  Objection.

17     THE COURT:  What is the objection?

18     ATTORNEY AMELL:  He has testified he is not

19 an obstetrician.

20     THE COURT:  Well, it's cumulative.  He has

21 already answered that question.  Asked and answered.

22     Next question.

23 BY ATTORNEY SMITH:

24 Q.    You mentioned that you considered the presence of

25 foul-smelling amniotic fluid to be a clinical sign to be

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

**K. MITTAL - CROSS**

1  consistent with the pathologic diagnosis of

2  chorioamnionitis; is that correct?

3  **A.**    Yes.

4  **Q.**    Okay.  When, in Ms. Orwig's medical record, is

5  there any notation of foul-smelling amniotic fluid?

6                Could you please identify the time?

7  **A.**    In her testimony, Christine Orwig mentioned that

8  the morning of the delivery, she had that foul-smelling

9  fluid.

10 **Q.**    Your recollection is that she testified, the

11 morning of the delivery --

12 **A.**    Sometime earlier that day.

13 **Q.**    Sometime earlier --

14 **A.**    Sometime earlier that day.

15 **Q.**    Than when?

16 **A.**    On the 13th, when she delivered.

17 **Q.**    What time on the 13th, Dr. Mittal?

18 **A.**    I don't recall the exact time.

19 **Q.**    My question, though, is:  Where in the medical

20 record is it mentioned for the first time?

21 **A.**    That, I don't know.

22 **Q.**    Did you look in the medical record?

23 **A.**    I tried looking.

24 **Q.**    Did you find any mention of foul-smelling amniotic

25 fluid?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - CROSS

1   A.   No, I didn't.

2   Q.   You did not?

3   A.   I did not.

4   Q.   Then why did you put it in your report and testify

5   to it?

6   A.   Based on what the patient stated in her testimony.

7   Q.   Okay.

8        But you didn't verify it with the record.

9        THE COURT:  Asked and answered.

10  BY ATTORNEY SMITH:

11  Q.   Did you read Dr. Alembik's deposition?

12  A.   Whose deposition?

13  Q.   Did you read the defendant, Dr. Alembik's,

14  deposition?

15  A.   No.

16  Q.   You did not?

17  A.   No.

18  Q.   So you don't know what his testimony, his sworn

19  testimony, is in this case about whether he appreciated

20  or perceived any foul-smelling amniotic fluid, correct?

21  A.   No, I don't.

22  Q.   Have you ever been present in the delivery of a

23  baby?

24  A.   Yes, I have been, but that was a long time ago.

25  Q.   Are there sometimes odd smells when a baby is

# K. MITTAL - CROSS

1    being delivered?

2    A.    That was a long time ago and I don't recall any

3    such instance.  So it's --

4    Q.    Despite --

5    A.    -- beyond my scope of practice.

6    Q.    Okay.

7          You mentioned that Dr. O'Connell, the

8    pathologist at Potomac Hospital who actually in realtime

9    read Ms. Orwig's placental tissue -- he didn't mention

10   anything about funisitis, correct?

11   A.    Correct.

12   Q.    That's something you brought here today, in

13   addition to what's in the medical record?

14   A.    That's correct.

15   Q.    You never looked at any tissue or pathology from

16   the child; is that correct?

17   A.    That is correct.

18          ATTORNEY SMITH:  That's all I have, your

19   Honor.

20          One moment, please.

21          (Pause.)

22          THE COURT:  Did you say something?  I'm

23   sorry.  I didn't hear --

24          ATTORNEY SMITH:  I said, "One moment,

25   please."

# K. MITTAL - REDIRECT

1          THE COURT:  All right.  You are asking for

2     leave for a moment?

3          ATTORNEY SMITH:  Yes.

4          THE COURT:  All right.  Speak up.  You have

5     it.

6          ATTORNEY SMITH:  Thank you, your Honor.  I'm

7     done.

8          THE COURT:  Any redirect?

9          ATTORNEY AMELL:  Very brief, your Honor.

10         If I could put on the overhead Sentara Tab

11    1, page 49, which is in evidence.

12         THE COURT:  Showing age there, asking for it

13    to be shown on the overhead.

14         ATTORNEY AMELL:  Okay.

15         THE COURT:  What exhibit is this?

16         ATTORNEY AMELL:  Exhibit 28, 1-49.

17         THE COURT:  All right.  Exhibit 28, 1-49.

18    All right.  Next question.

19                   REDIRECT EXAMINATION

20    BY ATTORNEY AMELL:

21    Q.    If I could refer you to --

22         THE COURT:  Put the whole thing on there,

23    please.

24         ATTORNEY AMELL:  Yes.

25    BY ATTORNEY AMELL:

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - REDIRECT

1    **Q.**   If I could refer you to the left-hand column, and

2    specifically --

3             ATTORNEY SMITH:  Your Honor, this is just

4    leading the witness, giving the answer.  I object on the

5    grounds of leading.

6             THE COURT:  Overruled.

7             ATTORNEY AMELL:  Thank you, your Honor.

8    BY ATTORNEY AMELL:

9    **Q.**   The information listed --

10             THE COURT:  I don't know whether it's

11    leading.  She hasn't asked the question yet.  She is

12    entitled to show the witness an exhibit and ask a

13    question.

14             When she is done, if you have an objection

15    as to the form of the question, I will hear it.

16             Question.

17             ATTORNEY AMELL:  Thank you.

18    BY ATTORNEY AMELL:

19    **Q.**   Dr. Mittal, if I could direct you to the

20    information on the left-hand side of the page, under

21    "intrapartum event."

22             ATTORNEY AMELL:  And if I could ask

23    Mr. Perry to enlarge that.

24             THE COURT:  It is sort of an overhead, isn't

25    it?  All right.

# K. MITTAL - REDIRECT

1          ATTORNEY AMELL:  Thank you, your Honor.

2    BY ATTORNEY AMELL:

3    Q.    Are there any references to foul-smelling fluid

4    under the "intrapartum event" listed on this page?

5    A.    Yeah, I saw that as checked off, but I missed

6    that.

7    Q.    Is this one of the examples of the references in

8    the medical records that there was foul-smelling fluid?

9    A.    Correct.

10   Q.    And if I could refer you -- oh.  And this document

11   is signed by Dr. Alembik.  Do you see that below, at the

12   bottom of page 1-49?

13   A.    No, I can't make out the name, but --

14   Q.    Okay.

15          And you also mentioned in your testimony

16   today that low Apgar scores --

17   A.    Yes.

18   Q.    -- is a finding when you see cases involving

19   severe chorioamnionitis and funisitis.  Is there

20   evidence of the Apgar scores on this record?

21   A.    Yes.

22   Q.    And is the first one four?

23   A.    Four, yes.

24   Q.    And is that low?

25   A.    Yes.

# K. MITTAL - REDIRECT

1    Q.    If I could next direct you to Plaintiff's 28,

2    1-28, which is already in evidence.

3                ATTORNEY AMELL:  And if I could publish that

4    to the jury.

5                THE COURT:  What exhibit is this?

6                ATTORNEY AMELL:  Exhibit 28, and then 1-28.

7                THE COURT:  All right.

8                ATTORNEY AMELL:  Thank you, your Honor.

9    BY ATTORNEY AMELL:

10    Q.    And if we could -- if I could direct your

11    attention to the top progress note on the page.  The

12    time is 2:30 p.m. on October 13, 2011.  This is

13    Dr. Alembik's note, which is in evidence.  Do you see

14    where he noted fetal heart tracings, 170s?

15    A.    Yes.

16    Q.    Is that one of the references to fetal tachycardia

17    that you observed?

18    A.    Yes.

19    Q.    What is the time on that note?

20    A.    2:30 p.m.

21    Q.    You were also asked about the deposition testimony

22    of Mrs. Christine Orwig and the timing of the onset of

23    the foul-smelling amniotic fluid.

24                If I could hand up to you page 67 of

25    Mrs. Orwig's testimony, page 67, lines 9 through 13, and

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - REDIRECT

1    ask you to read that portion to refresh your

2    recollection of reading that deposition.

3                THE COURT:  Well, he hasn't said that his

4    recollection needs to be refreshed.

5                ATTORNEY AMELL:  Fair enough, your Honor.

6    BY ATTORNEY AMELL:

7    Q.    What was your understanding, Dr. Mittal, as to

8    Christine Orwig's testimony regarding when the

9    foul-smelling amniotic fluid began on October 13, 2011?

10   A.    I am not sure, but probably sometime that morning

11   of the delivery.

12   Q.    Okay.

13               ATTORNEY AMELL:  If I could hand up, then,

14   to refresh his recollection --

15               THE COURT:  All right.

16               ATTORNEY AMELL:  -- page 67, your Honor, and

17   ask him to review that page, particularly lines 9 --

18               THE COURT:  Well, ask the question, "Would

19   it refresh your recollection?"

20   BY ATTORNEY AMELL:

21   Q.    Would reviewing that portion of her deposition

22   refresh your recollection on when the foul-smelling

23   amniotic fluid was noticed by Ms. Orwig?

24   A.    Yes.

25               THE COURT:  All right.  Now show it to

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - REDIRECT

1   opposing counsel.

2            (Document tendered.)

3            THE COURT:  All right.  Show that to the

4   witness.

5            ATTORNEY SMITH:  Well, actually, your Honor,

6   I don't think that's in fairness.

7            THE COURT:  A witness can be shown anything.

8   It either refreshes his recollection or it doesn't.

9            Show him the document.

10           (Document tendered.)

11           THE COURT:  The question is:  Does reviewing

12  what you have been handed refresh your recollection --

13  that is, does it give you a present recollection as you

14  sit here today -- as to the time of the day at which

15  Ms. Orwig testified that there was foul-smelling

16  discharge?

17           Does it give you a present recollection as

18  you sit here today?

19           (Pause.)

20           THE WITNESS:  Yeah.  So, it was right

21  after --

22           THE COURT:  Just a moment.  You may not read

23  the document.  You have to -- first you have to tell me

24  whether you have a present recollection.

25           If your answer is affirmative, then we put

# K. MITTAL - REDIRECT

1    the document down and ask you what that present

2    recollection is.  If you don't have -- if reading that

3    doesn't give you a present recollection, then we go on

4    to another subject.

5            (Pause.)

6            THE WITNESS:  It looks like sometime on

7    October 13th, but I can't figure out exactly when.

8            THE COURT:  So it doesn't refresh your

9    recollection?

10            THE WITNESS:  Somewhat.

11            THE COURT:  All right.

12            Next question.

13            ATTORNEY AMELL:  Thank you.

14    BY ATTORNEY AMELL:

15    Q.    Dr. Mittal, what was going on in her labor process

16    at the time she said that the smell began?

17    A.    They were hooking her up to the Pitocin.

18    Q.    And what is Pitocin?

19    A.    That's to induce contractions in the uterus.

20    Q.    If I could refer you to the physician's order,

21    which is in evidence, Plaintiff's Exhibit 28, 1-34?

22            ATTORNEY AMELL:  And when I zoom in, if we

23    can, on the date and time of Dr. Alembik's physician's

24    orders, which is at the top left.

25    BY ATTORNEY AMELL:

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# K. MITTAL - REDIRECT

1    **Q.**    Can you see the date of October 13th and the time,

2    2:30 p.m.?

3    **A.**    Yes.

4    **Q.**    Okay.

5          And if we look a little further down, was an

6    order given at that time to start Pitocin?

7          (Pause.)

8          Would you like us to blow up part of it, so

9    it's easier to see?

10   **A.**    Yes, I do.

11   **Q.**    So, at 2:30 p.m. Dr. Alembik ordered Oxytocin.  Is

12   Oxytocin the same thing as Pitocin?

13   **A.**    Yes.

14   **Q.**    Yes.

15          And so that was the time that the Pitocin

16   was ordered, and that's consistent with your

17   understanding of the time --

18          THE COURT:  You are leading now.

19   BY ATTORNEY AMELL:

20   **Q.**    Is the order for the Oxytocin consistent with your

21   understanding as to the timing of the foul-smelling

22   urine?

23   **A.**    Correct.

24          ATTORNEY AMELL:  That's all.  Thank you,

25   your Honor.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1                    THE COURT:  All right.

2                    Any reason why this witness should not be

3        excused?

4                    ATTORNEY AMELL:  No, your Honor.

5                    THE COURT:  All right.  Dr. Mittal, you may

6        step down, sir, and you may be excused.

7                    THE WITNESS:  Thank you, your Honor.

8                    (Witness excused.)

9                    THE COURT:  Call your next witness.

10                   ATTORNEY AMELL:  Thank you, your Honor.

11       Plaintiffs call Dr. Marcus Hermanson.

12                   THE COURT:  Come forward and take the oath

13       here, please, sir.

14                   (Witness sworn.)

15                   THE COURT:  All right.  You may proceed.

16                   ATTORNEY AMELL:  Thank you, your Honor.

17                   (THEREUPON, MARCUS HERMANSON, having been

18       duly sworn, was examined and testified as follows:)

19                        DIRECT EXAMINATION

20       BY ATTORNEY AMELL:

21       Q.    Good afternoon, Dr. Hermanson.

22       A.    Good day.

23       Q.    Would you tell the jury your full name, please?

24       A.    Dr. Marcus Hermanson.  It's --

25       Q.    Dr. Hermanson, what is your business address?